**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| ALEJANDRO JURADO JIMENEZ et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 12-C-0209 |
| v. | ) |
| | ) Judge Griesbach |
| GLK FOODS, LLC and RYAN A. DOWNS, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**
**FOR VIOLATIONS OF THE FAIR LABOR STANDARDS ACT**

Pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56, Plaintiffs submit

this memorandum of law in support of their motion for entry of summary judgment on Count I of

their Second Amended Complaint, which alleges Defendants' violations of the Fair Labor

Standards Act. 29 U.S.C. §§ 201-219 ("FLSA").

## INTRODUCTION

Plaintiffs are seventy-seven migrant workers from Mexico who were employed by

defendants Great Lakes Kraut Foods, Inc. (GLK) and Ryan A. Downs in 2010 and 2011.

Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 1. Plaintiffs were recruited and hired by

defendants to process cabbage into sauerkraut at GLK's cannery plant in Bear Creek, Wisconsin,

under the federal government's "H-2B" guestworker visa program. PSUF ¶ 2.

As a necessary prerequisite to working for defendants, every plaintiff incurred hundreds

of dollars, and in some cases more than a thousand dollars, in expenses for inbound travel,

recruitment and immigration. PSUF ¶¶ 40 - 42. For many plaintiffs, these outlays amounted to

more than a month's earnings in Mexico, where their wages average $10 U.S. per day. PSUF ¶

43. Numerous plaintiffs went into debt to raise money to cover these expenses. PSUF ¶ 44. Some of them are still paying off these debts today. *Id*. This hardship was made worse by the fact that after plaintiffs incurred these expenses, the defendants terminated their employment just a few weeks into the season, in both 2010 and 2011. PSUF ¶ 45.

As a matter of law, plaintiffs should have been reimbursed for these expenses by the defendants: under the FLSA, expenses "incident to and necessary" for employment are the employer's responsibility. They are deemed for the "primary" "benefit or convenience" of the employer, and they cannot be passed on to employees, directly or indirectly, either before or during employment, to the extent they reduce actual wages below the minimum wage. 29 C.F.R. § 531.35; 29 C.F.R. § 531.32(c). The travel, recruitment and immigration expenses plaintiffs incurred to come to work for defendants fall into this category. They were an inevitable and inseparable consequence of the defendants' decision to hire foreign nationals and, as a matter of law, the defendants, rather than the plaintiffs, were required to bear them. *Rivera v. Peri & Sons Farms, Inc.* 735 F.3d 892, 899 (9th Cir. 2013); *Arriaga v. Florida Pacific Farms, L.L.C.,* 305 F.3d 1228, 1237 (11th Cir. 2002); *Morante-Navarro v. T & Y Pine Straw, Inc.,* 350 F.3d 1163, 1166 n.2 (11th Cir. 2003).

The defendants, however, reimbursed plaintiffs for none of these expenses. And the result, by simple arithmetic, was to reduce plaintiffs' wages for their first workweek below the federal minimum wage.

The governing legal rule here—that employers must pay or reimburse employees for many job-related expenses that would otherwise cut into the minimum wage—is not reserved for

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 2 of 26   Document 86

H-2A or H-2B employers and employees. It applies to all low-wage workers.[1] Because of this rule, restaurants must reimburse wait staff for the costs of required uniforms. And many other employers must reimburse low-wage employees for the costs of required tools, gear, or travel.[2] In recent years, however, much of the litigation in this area has arisen in the same context as it does in this case—from employers' failures to reimburse H-2A or H-2B visa workers for their inbound travel, recruitment and immigration expenses. As a result, there is a body of precedent for the summary judgment that plaintiffs are seeking here. *See Rivera,* 735 F.3d at 899 (employers of H-2A workers are responsible for visa and travel expenses to the extent minimum wage provisions are violated); *Arriaga,* 305 F.3d at 1237 (FLSA violation where H-2A workers

_____

[1] High wage workers are also protected but, because of their higher wages, their expenses, unless very large, cut into their receipt of the minimum wage much less often.

[2] *See, among others, Marshall v. Root's Restaurant, Inc.*, 667 F.2d 559 (6th Cir. 1982) (finding FLSA violations from employer's failure to reimburse waitresses for required uniforms); *Shultz v. Hinojosa*, 432 F.2d 259, 265 (5th Cir. 1970) (cost of butcher knives, honing steel and specified articles of clothing that employer provided could not be shifted to butchers, when doing so reduced actual wages below the FLSA minimum); *Reich v. Priba Corp.,* 890 F. Supp. 586, 596-597 (N.D. Tex. 1995) ("to comply with the FLSA, [the employer must] reimburse the waitresses and entertainers for the costs incurred in purchasing uniforms and costumes"); *Donovan v. Captain Bill's, Inc.*, No. 82-06-CIV-4, 1982 WL 2103, at *4 (E.D.N.C. June 20, 1982) (employer violated FLSA by requiring wait-staff and other restaurant employees to purchase aprons); *Marshall v. Newport Motel, Inc.*, No. 71-1007-Civ-CA, 1979 WL 15529, at *3 (S.D. Fla. May 17, 1979) (finding violations of FLSA when employer required motel staff to purchase uniforms at their own expense); *Marshall v. DeBord*, 23 WH Cases 1188, 1192 (E.D. Okla. 1178) (lodging furnished to nursing home employees was primarily for benefit of employer); *Bailey v. Pilots' Ass'n for Bay & River Del.*, 406 F. Supp. 1302, 1309 (E.D. Pa. 1976) (sleeping quarters and lodging provided to apprentice sailor/pilot were primarily for the benefit of the employer and, thus, not includable as wages); 29 C.F.R. § 531.3(d)(2)(non-exhaustive list of items determined by DOL to be "primarily for the benefit or convenience of the employer"). *See generally,* DOL Fact Sheet # 2 (*Restaurants and Fast Food Establishments Under the FLSA*, www.dol.gov/whd/ regs/compliance/whdfs2.pdf ("Deductions made from wages for items such as cash shortages, required uniforms, or customer walk-outs are illegal if the deduction reduces the employee's wages below the minimum wage or cuts into overtime pay"); DOL Fact Sheet # 9: *Manufacturing Establishments Under the FLSA*, www.dol.gov/whd/regs/compliance/whdfs9.pdf ("The cost of tools, uniforms or other similar requirements may not be borne by the employee where such cost would reduce wages paid in the workweek bellow the required minimum wage").

were not reimbursed for incoming expenses); *Morante-Navarro,* 350 F.3d at n.2  (inbound travel expenses cannot be credited against an H-2B employee's minimum wage).[3]

## SUMMARY OF MATERIAL FACTS

Defendant GLK is the largest sauerkraut producer in the world, processing more than 170,000 tons of cabbage into sauerkraut annually. PSUF ¶¶ 3-4. Each head of cabbage must be cored and trimmed, individually, before fermenting. PSUF ¶ 5. The coring and trimming ("trim-line" work) is labor-intensive work. It is also low-wage, seasonal work. At GLK it is performed primarily between August and November. PSUF ¶ 6. Every year, GLK hires roughly 50-100 seasonal workers to do the coring and trimming (using machines). PSUF ¶ 7. For a

---

[3] *See also Salazar-Martinez v. Fowler Brothers, Inc. et al.*, 781 F. Supp. 2d 183, 195 (W.D.N.Y. 2011) (as a matter of law, H-2A workers' pre-employment travel and visa costs were primarily for the benefit of the employer); *Gaxiola v. Williams Seafood of Arapahoe*, 776 F. Supp. 2d 117, 124 (E.D.N.C. 2011) (travel and visa expenses are primarily for benefit of H-2B employer); *Teoba v. Trugreen Landcare, LLC*, 769 F. Supp. 2d 175, 183 (W.D.N.Y. 2011) (visa and transportation expenses for H-2B workers are part of an H-2B employer's costs of "doing business" and primarily for the benefit of the employer); *Martinez-Bautista v. D&S Produce*, 447 F. Supp. 2d 954, 963-64 (E.D. Ark. 2006) (requiring reimbursement of individual bus fares and visa fees paid by H-2A workers, to the extent they reduced workers' first workweek's pay below the minimum wage); *Recinos-Recinos v. Express Forestry, Inc.,* No. 05-1355, 2008 WL 4449973, at *1 (E.D. La. Sept. 26, 2008) (employer ordered to pay all H-2B workers for all transportation deductions); *Rosales v. Hispanic Employee Leasing Program, LLC*, No. 1:06-cv-877, 2008 WL 363479, at *1 (W.D. Mich. Feb. 11, 2008) (travel, visa and administrative expenses incurred by H-2B employees are primarily for employers' benefit); *Rivera v. Brickman Group Ltd.,* No. Civ. 05-1518, 2008 WL 81570, at *12 (E. D. Pa. Jan. 7, 2008) (transportation and visa expenses are for benefit of employer); *De Leon-Granados v. Eller & Sons*, 581 F. Supp. 2d 1295, 1309-10 (N.D. Ga. 2008) (employer responsible for visa processing, travel and border crossing fees because they were primarily for the benefit of employer); *See also* U.S. Dep't of Labor Wage and Hour Div., Field Assistance Bulletin 2009-2, 9 (Aug. 21, 2009) (same). *Cf. Castellanos-Contreras v. Decatur Hotels, LLC,* 622 F.3d 393, 402 n.9 (5th Cir. 2010) (declining to require an H-2B employer to reimburse certain employee expenses, for employment before issuance of the DOL 2009 Field Assistance Bulletin, while expressly acknowledging, however, that in the wake of the DOL 2009 bulletin, "the regulatory landscape is now very different." By its terms, the Fifth Circuit's decision in *Castellanos* reserves and does not decide how expense reimbursement should be analyzed in later cases, like this one, to which the guidance provided by the 2009 DOL Bulletin is fully applicable).

number of years, including in 2010 and 2011, GLK hired predominately Mexican nationals rather than U.S. workers to perform this "trim line" labor. PSUF ¶ 8.

At all relevant times, Defendant Ryan Downs was the owner and President of GLK. PSUF ¶ 9. At all relevant times, GLK and Downs were each "employers" for purposes of the FLSA. PSUF ¶¶ 9-16.[4]

### Defendants' Participation in the H-2B Program

Federal law allows employers to "import" foreign workers in limited circumstances, through various "guestworker" visa programs. PSUF ¶ 17. Defendants participated in the "H-2B" guestworker program. PSUF ¶ 18; *see* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). As a prerequisite to their participation, they were required, among other things, to obtain both a "Temporary Employment Certification," and a prevailing wage determination from the U.S. Department of Labor. PSUF ¶ 19; 20 C.F.R. § 655.15 (temporary labor certification) and § 655.10 (prevailing wage determination, which is required in order to protect the wages of U.S. workers).They were also required to attest under oath, to an inability to find qualified and available U.S. workers. PSUF ¶ 20. For several years, Defendant Downs provided the required attestation personally—although

---

[4] The FLSA's definition of "employer" is broad, covering "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), including corporate officers with operational control of a corporation. Liability under the FLSA is joint and several among all such "employers." Because of Defendant Ryan Downs's operational control over GLK, including his personal involvement in the wage and hour decisions at issue on this motion, he was an "employer." *See Donovan v. Agnew,* 712 F.2d 1509, 151 (1st Cir.1983) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA"); *Solis v. Intern. Detective & Protective Service, Ltd.,* 819 F. Supp. 2d 740, 748-49 (N.D. Ill. 2011) (corporate officers with operational control were "employers" under the FLSA as a matter of law)**;** *Solis v. Saraphino's, Inc.,* 2011 WL 1532543, *4 (E.D. Wis. Apr. 22, 2011) (same).

5

the evidence casts doubt on the veracity of representations that GLK could not find able and qualified workers within the U.S. PSUF ¶¶ 21-23.[5]

Many participating employers hire agencies to help them through the H-2B process. In 2010 and 2011, the defendants retained a firm called LaborQuest. (LaborQuest, in turn, subcontracted with another agency, Florida East Coast Travel Services (FLECTS)). PSUF ¶ 24. However, Defendants hired LaborQuest/FLECTS to manage only a portion of the H-2B process—namely, completing and submitting the petition for temporary employment certification, scheduling visa appointments for the workers, and assisting the workers with paperwork. PSUF ¶ 25. Defendants kept control for themselves over the areas that are the subject of the FLSA claim in this case: recruitment, hiring and wage-and-hour compliance. PSUF ¶¶ 10-16, 26, 27-36, 46-48.

**Defendants' Recruitment Process**

Defendants' history with the H-2B program dates to about 2003, when Ryan Downs approached a long-time GLK employee, Rafael Jimenez Arroyo, told Jimenez Arroyo how much he liked the way Jimenez Arroyo worked, and told him he would try to get visas to bring workers like him under contract. PSUF ¶ 27.

Jimenez Arroyo began traveling to Mexico in May of every year, to recruit and hire workers. PSUF ¶¶ 28-29. He principally recruited from in and around his hometown of Santiago Capitiro, in the state of Guanajuato in Mexico. PSUF ¶ 30. In the early years, Downs

_____

[5] For example, because they applied too late for authorization in 2009, Defendants missed the opportunity to hire H-2B workers as trim-line laborers that year. PSUF ¶ 22. They therefore needed—and managed—to locate and hire qualified and available U.S. workers instead. *Id.* Defendants Downs preferred H-2B workers, however, because he deemed local workers "unmotivated, unreliable and expensive." PSUF ¶ 23.

6

accompanied Jimenez Arroyo on several of these trips. Downs made the trip personally six or seven times. PSUF ¶ 31.

Early on in GLK's participation in the H-2B program, Downs authorized Jimenez Arroyo to recruit and hire workers. PSUF ¶ 32. Over the years, Jimenez Arroyo, in turn, sub-delegated his authority to assistants. In 2010 and 2011, Jimenez Arroyo appointed Elias Vera, one of the H-2B workers, to help him with recruitment and hiring. PSUF ¶ 33.

Defendants' recruitment and hiring proceeded in substantially the same manner every year. In the early spring, Jimenez Arroyo would review the list of workers who had traveled to Bear Creek the previous year and performed satisfactorily. PSUF ¶ 34. Following that, Jimenez Arroyo would travel to Santiago Capitiro and recruit or supervise recruitment for the upcoming season, starting with the workers on that list. PSUF ¶ 35. In years when there were still open positions after offers had been made to incumbents, new names were added to the master list, sometimes from a waiting list. *Id*. Every year, many of the workers Jimenez Arroyo hired were his cousins or other relatives. PSUF ¶ 36.

### The Costs of Travel, Immigration and Recruitment

Once GLK hired the workers, visas had to be procured for each worker. PSUF ¶ 37. Because there was no U.S. consulate in or near Santiago Capitiro, the workers recruited by the defendants from that area had to travel a considerable distance for visa interviews—in 2010 to Mexico City and in 2011 to Matamoros. PSUF ¶ 38-39.

The process of securing a visa and traveling to the border took several days. It also entailed significant expense. The items of expense typically included:

(a)     Bus fare from Santiago Capitiro to Mexico City or Matamoros;

(b)     Accommodations and meals in Mexico City or Matamoros for several

7

days (and sometimes for longer ), while visas are processed and the workers waited for GLK to schedule their travel date to Bear Creek;

(c)     Fees paid to a *licenciado,* to assist with visa paperwork;

(d)     Visa application fees;

(e)     Passport fees (for workers who didn't have a valid passport from an earlier season);

(f)     Bus fare from Mexico City or Matamoros to the Mexico-U.S. border, to begin the trip to Bear Creek; and

(g)     A border-crossing fee at the Mexico-U.S. border.

PSUF ¶ 40. In 2010, the cost borne by each plaintiff for these items ranged from $326 - $720, and, for those charged recruitment fees, from $1067 to $1952. PSUF ¶¶ 41, 56. In 2011, each worker incurred between $294 to $910 of inbound travel and visa-related expenses, and those charged recruitment fees paid from $1507 to $2659 to work for GLK. PSUF ¶¶ 42, 56.

### Defendants' Acknowledgment of Their Reimbursement Obligations

In both 2010 and 2011, LaborQuest specifically advised the defendants, in writing, of their legal obligation to reimburse workers for recruitment, visa and travel expenses. PSUF ¶¶ 46, 47. In fact, in 2010, defendant Downs personally initialed a form provided to him by LaborQuest, agreeing to and acknowledging that:

> New H-2B regulations *require* employer[s] to pays [sic] (or reimburse) for *any* of the *recruitment, visa and travel expenses* for worker from their homes abroad to the place of employment.

(Emphasis added). PSUF ¶ 46. Disregarding this requirement, the defendants failed to reimburse plaintiffs for any of these expenses in the first week of work, either in 2010 or 2011. PSUF ¶ 48.

### Recruitment Fees Paid By Certain Plaintiffs

In 2010, in exchange for employment with defendants, six workers were compelled to pay a "recruitment fee" of approximately between $1,000 and $1,200 U.S.[6] PSUF ¶¶ 49, 56-57. In 2011, nineteen more workers were required to pay recruitment fees. PSUF ¶¶ 50, 56, 58. In both years, these workers were told that the recruitment fee was a requirement for employment. PSUF ¶ 51. Frequently, the fees were paid to Jimenez Arroyo or to Vera directly. PSUF ¶ 52. No plaintiff was ever reimbursed for the cost of these fees, which H-2B regulations prohibit. PSUF ¶¶ 53-54.

**Damages Evidence**

In 2010 and 2011, the FLSA minimum wage was $7.25 per hour. PSUF ¶ 55. That was the minimum that all non-exempt employees had to receive, unreduced by illegal deductions or expenses.[7] Yet no plaintiff in this case received $7.25 per hour for his first week of work at GLK in 2010 or 2011.[8] PSUF ¶¶ 59, 63. All of them received far less, due to unreimbursed expenses they had to pay for inbound travel, immigration and recruitment. Uniformly, their pay, minus

---

[6] According to a recent study, more than half of H-2 workers are forced to pay a recruiter fee, and almost half incur debt to pay their inbound travel, recruitment and/or immigration fees. Ex. 65, *Recruitment Revealed: Fundamental Flaws in the H-2 Temporary Worker Program and Recommendations for Change,* Centro de Los Derechos Del Migrante, Inc. (2014).

[7] 29 U.S.C. § 206(a)(1)(C); *see also* www.dol.gov/whd/state/stateMinWageHis.htm. Many state and local laws establish higher minimum wage rates, and the FLSA does not preempt those higher wage rates or excuse compliance with them. But in an action for minimum wage violations under the FLSA, damages are measured by the federal ("FLSA") minimum wage rate.

[8] Pursuant to Fed. R. Evid. 1006, attached as Exhibit 64, is the Affidavit of Monica Garreton Chavez, a paralegal who, after reviewing the relevant records, prepared Exhibits 51 and 63, which are charts displaying and summarizing each plaintiff's first week's pay, his unreimbursed travel, recruitment and immigration expenses, and the resulting reduction in wages to a level below the federal minimum wage. PSUF ¶¶ 57-58. Exhibit 51 thus itemizes the amounts each plaintiff spent for inbound travel, recruitment and immigration and calculates the total of the expenses, PSUF ¶ 57, while Exhibit 63 calculates the resulting wages after the expenses are accounted for and the damages due to each plaintiff. PSUF ¶ 58.

9

their expenses, divided by the number of hours they worked yielded a wage below the FLSA minimum of $7.25 per hour. PSUF ¶¶ 59, 63. Indeed, after unreimbursed expenses are taken into account, every plaintiff (except one) had *negative* earnings for the first work week in 2010. PSUF ¶ 60. The sole plaintiff with positive earnings received an effective wage of 65 cents an hour. PSUF ¶ 61. In 2011, the story was much the same: roughly 90% of the plaintiffs finished the first week with negative earnings. PSUF ¶ 62. No H-2B worker employed by Defendants in 2010 or 2011 received the minimum wage of $7.25 per hour for his first week of work. PSUF ¶ 63.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). Only factual disputes that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48 (1986).

## ARGUMENT

I.     **BY FAILING TO REIMBURSE PLAINTIFFS FOR THE EXPENSES THEY EACH INCURRED FOR INBOUND TRAVEL, RECRUITMENT AND IMMIGRATION, DEFENDANTS VIOLATED THE FLSA.**

The FLSA's core protections are its twin guarantees that all covered employers must: (a) pay wages at a level equal to or exceeding the federal minimum wage, 29 U.S.C. § 206(a); and (b) guarantee employees' receipt of the minimum wage amount "free and clear," which means unreduced by deductions, offsets or unreimbursed expenses that inure "primarily" to "the benefit or convenience of the employer." 29 C.F.R. § 531.3(d)(1); 29 C.F.R. § 531.35; 29 C.F.R. § 531.32(a).

10

These requirements were violated in this case. The inbound travel, recruitment and immigration-related expenses that plaintiffs incurred were all for the primary benefit of defendants; those expenses were not reimbursed; and they uniformly reduced every plaintiff's first week's wages below the FLSA minimum wage.

**A.  The FLSA Requires Payment Of The Minimum Wage "Free and Clear."**

Like most other hourly-wage employees, H-2A and H-2B workers are covered and protected by the FLSA's minimum wage guarantee. 20 C.F.R. §§ 655.1, 655.22(d)-(e) (2009) (H-2B workers); 20 C.F.R. § 655.135(e) (H-2A workers). As a result, job-related expenses generally cannot be passed on to them, either directly or indirectly, either before or during employment, when wages would be reduced, as a result, below the FLSA minimum.

In the enforcement of this rule, substance prevails over form: any "arrangement that 'tend[s] to shift part of the employer's business expense to the employees" is prohibited "to the extent that it reduce[s] an employee's wage below the statutory minimum." *Ramos-Barrientos v. Bland*, 661 F.3d 587, 594 (11th Cir. 2011). Accordingly, "[t]here is no legal difference" between an arrangement where an employer deducts a cost directly from workers' wages and the alternative where the employer shifts costs, which it could not deduct, to employees to bear. *Arriaga¸* 308 F.3d at 1236 ("This rule cannot be avoided by simply requiring employees to make such purchases on their own, either in advance of or during employment") *Gaxiola v. Williams Seafood of Aaraphoe, Inc.,* 776 F. Supp. 2d 117, 125 (E.D.N.C. 2011) ("[F]ailing to reimburse plaintiffs for their expenditures is equivalent to the employer … improperly deducting them from the employees' pay for the first workweek").[9]

---

[9] Reimbursement, when owed, cannot be waived. *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 706-07 (1945) (employees cannot contract away the right to the statutorily mandated minimum wage); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981);

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 11 of 26   Document 86

In violation of the FLSA, no plaintiff in this case received the minimum wage free and clear for his first week of work with defendants. Uniformly, in both 2010 and 2011, their unreimbursed inbound travel, recruitment and immigration-related expenses reduced their earnings for the first week below the FLSA minimum wage.

**B.  Because Wages Must Be Paid Free And Clear, Expenses That Are For The Primary Benefit Or Convenience Of The Employer Cannot Be Passed On To Employees, Directly Or Indirectly, Either In Advance Of Or During Employment, When Net Wages Would Be Reduced, As A Result, Below The FLSA Minimum.**

Many job-related expenses have some value to both employers and employees, benefitting each of them. The DOL's use of the word "primarily" in 29 C.F.R. § 531.3(d)(1) expressly acknowledges that. Consequently, under the FLSA, employer's reimbursement obligations are not dependent on a showing that a given expense inures to the employer's *exclusive* benefit. Under the FLSA, it is not a valid defense to an employee's minimum-wage claim based on unreimbursed expenses that the employee "benefitted too." Rather, under the case law and federal regulations, the operative distinction is between:

(a)    Expenses that are "incident to and necessary" for a particular job, *see* 29 C.F.R. § 531.32 (a) & (c); 29 C.F.R. § 531.3(d)(1), and

(b)    Personal expenses that would have arisen as a normal living expense no matter where one worked. *See Arriaga*, 305 F.3d at 1242-43 ("When evaluating expenses that are directly or indirectly related to employment," the line to be "drawn [is] between those costs arising from the employment itself and those that would arise

---

*Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 306 (7th Cir. 1986); *Wirtz v. Leonard*, 317 F.2d 768, 769 (5th Cir. 1963). In the H-2A and H-2B context, this means that it makes no difference whether an employer promises to reimburse workers' inbound travel, recruitment, and immigration expenses, expressly denies that it has any such obligation, or is silent on the subject. The right to reimbursement of covered expenses is statutory and non-waivable. It is not contractual.

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 12 of 26   Document 86

in the course of life"); *Rivera v. Brickman Group Ltd.*, No. 05-1518, 2008 WL 81570, at *8-9 (E.D. Pa. Jan. 7, 2008) (same).

Expenses in the first category are, as a matter of law, deemed for the "primary" "benefit or convenience" of the employer; and as such, when they are not reimbursed, they constitute impermissible *de facto* deductions from wages to the extent they reduce wages received below the FLSA minimum wage.[10]

In the context of H-2B employment, the application of these principles and the determination of the "primary" beneficiary is vastly simplified— because as both the U.S. Department of Labor and the courts have recognized, when H-2B employees incur inbound travel, recruitment and immigration expenses, their employers accrue "greater-than-normal benefit from these expenses." DOL Field Assistance Bulletin 2009-2*, Travel and Visa Expenses of H-2B Workers Under the FLSA* at 10 (2009) ("DOL Bulletin 2009-2"), available at http://tinyurl.com/FAB2009 (also attached hereto as Exhibit 65). Underscoring this point, the DOL has specifically concluded that

> The employer's choice to utilize [the H-2B program to hire employees], and their attestation that they are unable to find qualified and available U.S. workers, is evidence of their specific need, for, and benefit from, those foreign workers. *Indeed,* the entire [H-2B] application process *is designed to demonstrate* …that the employer would not otherwise be able to fulfill its identified employment needs ….

*Id.* at 8. Further emphasizing the point, the DOL has also concluded that at the same time that H-2B employers receive "greater than normal benefits," H-2B workers, by contrast, "benefit from

---

[10] These rules create no windfall at all for employees because the FLSA's reimbursement requirements are calibrated, requiring only partial reimbursement of expenses, equal only to the difference between wages actually received and the FLSA minimum wage, rather than the full measure of expenses incurred. Workers are not reimbursed for 100% of their outlay, but only that portion of it required to restore their first week's earnings to the level of the minimum wage.

13

these positions *less than* employees typically benefit from new jobs," notwithstanding their ability to earn higher wages in this country than in their home countries, because:

    (a)    H-2B positions "are, by definition, temporary with no possibility of the jobs becoming permanent, no matter how well the employees perform or what skills they acquire":

    (b)    H-2B workers generally "have no option to remain in the United States. They are not permitted to seek work from another U.S. employer, except under the visa program, thereby reducing whatever benefit they may have obtained from their ability to enter the country:

    (c)     H-2B employment requires H-2B workers "to move away from their families, friends and home country, to a place where many of the workers have a limited ability to participate in normal social and community activities because of language barriers. Thus, while the employees benefit economically from these temporary jobs, there are countervailing hardships as well."

*Id.*

All of the expenses at issue on this motion are expenses that Plaintiffs incurred for defendants' primary benefit and convenience. As a matter of law, when H-2A and H-2B workers incur required expenses for their inbound travel, recruitment and immigration, those expenses must be reimbursed by the employer to the extent they push wages for the first week of work below the FLSA minimum wage. *Rivera,* 735 F.3d at 899; *Morante-Navarro,* 350 F.3d at 1166 n.2; *Arriaga¸* 305 F.3d at 1235; *Salazar-Martinez*, 781 F. Supp. at 195; *Gaxiola,* 776 F. Supp.2d at 125; *Teoba*, 769 F. Supp. 2d at 183; *Martinez-Bautista*, 447 F. Supp. 2d at 963-64; *Recinos-Recinos*, 2008 WL 4449973, at \*1; *Rosales, v.* 2008 WL 363479, at \*1; *Rivera*, 2008 WL 81570, at \*12; *De Leon-Granados,* 581 F. Supp. 2d at 1309-10. *See also* DOL Bulletin 2009-2 at 9.

### 1.  The Transportation Costs Plaintiffs Incurred Were For Defendants' Primary Benefit And Convenience.

All 77 plaintiffs paid for transportation from their hometowns in Mexico to Matamoros or Mexico City; for transportation to and from appointments to complete visa-related paperwork

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 14 of 26   Document 86

and for a visa interview once in Matamoros or Mexico City; and then, after acquiring a visa, for transportation to the Mexico-U.S. border to begin the trip to Bear Creek, Wisconsin. PSUF ¶ 40.

These fees were compulsory. They were "incident to and necessary" for the job. 29 C.F.R. § 531.32 (a) & (c); 29 C.F.R. § 531.3(d)(1). But for their work with Defendants, none of the workers would have incurred them. By participating in foreign visa-worker programs, defendants "created the need for these visa costs," *Arriaga*, 305 F.3d at 1244, which were "an inevitable and inseparable consequence of having foreign nationals employed in the United States pursuant to an H-2B" contract. *Gaxiola,* 776 F. Supp. 2d at 126. They arose directly out of Defendants' decision to use foreign rather than domestic workers; they were increased by Defendants' decision to recruit and employ workers from in an around Santiago Capitiro, which is more than 12 hours from the nearest U.S. consulate; and no worker could avoid incurring these expenses. As a result, they were, as a matter of law, primarily for the benefit and convenience of the defendants and, as such, "cannot be the subject of a deduction, either actual or de facto, that reduces a worker's wages below the federal minimum wage." *Gaxiola,* 776 F. Supp.2d at 126.[11]

---

[11] *Accord: Arriaga,* 305 F.3d at 1242 ("Transportation charges are an inevitable and inescapable consequence of having foreign H-2A workers employed in the United States; these are costs which arise out of the employment of H-2A workers"); *Brickman*, 2008 WL 81570, at *12 ("[T]ransportation [for H-2B workers] is primarily for the employer's benefit, both because it is dissimilar to lodging and board, and because the expense arises out of [the employer's] decision actively to recruit workers in foreign countries"); *Brock v. Glassboro Serv. Ass'n Inc.*, No. 78-0377, 1987 WL 25334, at *5-6 (D.N.J. July 23, 1987), *aff'd sub nom. McLaughlin v. Glassboro Serv. Ass'n*, 841 F.2d 1119 (3d Cir. 1988) ( "the cost of transportation from the point of recruitment to the point of hire (Puerto Rico to New Jersey) was part of the employer's recruitment cost and thus could not be considered part of the employee's wage"); *De Leon-Granados*, 581 F. Supp. 2d at 1312–13 ("[T]he Court finds as a matter of law that plaintiff's transportation [costs] are expenses incurred primarily for the benefit of their employers"); *Rosales*, 2008 WL 363479, at *1; *Teoba*, 769 F. Supp. 2d at 183 (H-2B employer responsible for transportation expenses because they are the costs of "doing business" and primarily for the benefit of the employer); *Morante-Navarro,* 350 F.3d at 1166 n.2; *Salazar-Martinez*, 781 F. Supp. 2d at 195 (H-2A workers' pre-employment travel costs were primarily for the benefit of the employer as a matter of law); *Martinez Bautista,* 447 F. Supp. 2d at 963; *Torreblanca v Naas*

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 15 of 26   Document 86

## 2. The Visa-Related and Border Crossing Fees Plaintiff Incurred Were For Defendants' Primary Benefit And Convenience.

All 77 Plaintiffs paid three fees to procure visas and enter the United States: (a) a fee for paperwork, (b) a visa fee, and (c) an "I-94" border-crossing fee. PSUF ¶ 40. These fees were compulsory. They were "incident to and necessary" for the job. 29 C.F.R. § 531.32 (a) & (c); 29 C.F.R. § 531.3(d)(1). But for their work with Defendants, none of the workers would have incurred them. By participating in foreign visa-worker programs, Defendants "created the need for these visa costs, which are not the type of expense they are permitted to pass on to the [workers]." *Arriaga*, 305 F.3d at 1244. "When an employer decides to utilize" the H-2A or H-2B program, "these costs are certain to arise, and it is therefore incumbent upon the employer to pay them," to the extent they depress wages in the first week below the federal minimum wage. *Id.* *See also Gaxiola,* 776 F. Supp. 2d at 126 (all costs related to procuring the visa are reimbursable because the visa has "no value outside of employment [and]…restricts a worker to one employer for one season"); *Brickman*, 2008 WL 81570, at *12 ("H-2B visas only authorize their holders to work for one specified employer. Thus, unlike ordinary living expenses, these visas had no value to the workers other than their authorization to work for Brickman"); *Teoba*, 769 F. Supp. 2d at 185 (visa costs of H-2B employees "are unique costs of doing business, primarily benefiting

---

*Foods, Inc.*, No. F 78-163, 1980 WL 2100 (N.D. Ind. Feb. 25, 1980); *Marshall v. Glassboro Serv. Ass'n, Inc.,* 1979 WL 1989, at *2 -3 (D.N.J. Oct. 19, 1979). *See also* 29 C.F.R. § 778.217 (b)(3)(expenses such as "transportation…, such as taxicab fares, incurred while traveling on the employer's business" are not considered as part of employee's wages because they are for benefit of employer).

employers, which cannot be passed on to employees, either directly or indirectly, if doing so would reduce the employees' wages below minimum wage"). [12]

### 3. The Lodging And Subsistence Costs Plaintiffs Incurred While Waiting For Visas and Then For A Departure Date Were For Defendants' Primary Benefit And Convenience.

In 2011, Plaintiffs traveled from their hometowns, in and around Santiago Capitiro, Mexico, to Matamoros, Mexico to acquire visas. In 2010, they traveled from their hometowns to Mexico City for visas and then on to Matamoros to cross the border. In both years, the trip took them more than 12 hours away from home, necessitating accommodations in hotels for several days while waiting for their consular interviews, for their visas to be processed and, after acquiring their visas, sometimes for up to a week more while waiting for defendants to send a bus to bring them to Wisconsin. PSUF ¶ 40.

Under the FLSA, "the line" between costs employers must bear and those employees can be forced to bear "is drawn based on whether the employment-related cost is a personal expense that would arise as a normal living expense." *Arriaga,* 305 F.3d at 1243; *Morales-Arcadio v. Shannon Produce Farms, Inc.*, No. 605CV062, 2007 WL 2106188, at *14 (S.D. Ga. July 18, 2007). Plaintiffs' subsistence costs in Matamoros and Mexico City fall on the "employer pays" side of that line. These were extraordinary expenses for plaintiffs. They were not "normal living

---

[12] *Accord*: *Rosales*, 2008 WL 363479, at *1 (visa and administrative expenses incurred by H-2B employees are primarily for employers' benefit); *De Luna-Guerrero v. North Carolina Grower's Ass'n, Inc.*, 338 F. Supp. 2d 649, 662 (E.D.N.C. 2004); *Morante-Navarro,* 350 F.3d at 1166 n.2 (visa expenses cannot be deducted from first week's minimum salary for H-2B workers); *Salazar-Martinez*, 781 F. Supp. 2d at 195 (H-2A workers' visa costs were primarily for the benefit of the employer as a matter of law); *De Leon-Granados*, 581 F. Supp. 2d at 1312 (employer responsible for visa processing, travel and border crossing fees because they were primarily for the benefit of employer); *Avila- Gonzalez v. Barajas*, No. 2:04-CV-567, 2006 WL 643297, at **2 and 4 (M.D. Fla. Mar. 2, 2006) (awarding administrative fees on a class basis to H-2A workers).

expenses" that plaintiffs would have incurred for another job. And there is no reasoned

distinction to be made between these costs and transportation and visa costs. Like the visa and

transportation expenses to which they are intimately related, these expenses were incurred

"primarily" for the benefit of the Defendants. *Id.; Avila- Gonzalez v. Barajas*, No. 2:04-CV-567,

2006 WL 643297, at *2 (M.D. Fla. Mar. 2, 2006) (awarding lodging and meals on a class basis

to H-2A workers); *Ojeda-Sanchez v. Bland Family Farms, LLC*, No. 608CV096, 2010 WL

3282984, at *9 n.15 (S.D. Ga. Aug. 18, 2010) ("Lodging expenses incurred while awaiting visa

processing was not specifically addressed in *Arriaga* … [T]he Court finds that such expenses are

not normal living expenses and were incident and necessary to employment with Bland

Farms").[13]

### 4. The Recruitment Fees Plaintiffs Incurred Were For Defendants' Primary Benefit and Convenience.

Twenty-five plaintiffs were told they had to pay, and did pay, "recruiter" fees—of $1,000

U.S., or more—in exchange for getting their names on Jimenez Arroyo's list and as a condition

employment. PSUF ¶¶ 49-52. They were told that all first-time workers had to pay this fee to be

added to the list, as a condition of gaining access to the job. PSUF ¶ 51. For each of four

---

[13] Board and lodging expenses that are "an incident of and necessary to" employment are incurred for the primary benefit of the employer and are reimbursable. *See* 29 C.F.R. § 778.217 (b)(3) ("living expenses away from home, other travel expenses" for the benefit of the employer); 29 C.F.R. § 778.217(b)(4) ("supper money" given to an employee requested to work longer hours and so unable to return home for a meal for the benefit of the employer); 29 C.F.R. § 531.32(c); *Masters*, 493 F.2d at 1333 (building engineer's lodging, on the premises); *Bailey*, 406 F. Supp. at 1309 (where riverboat pilot apprentice was required to be aboard ship for seven days at a time, sleeping facilities aboard the vessel and at a shore side station were primarily for the benefit of the employer and therefore not includable as wages); *Marshall v. Debord*, No. 77-106-C, 1978 WL 1705, at *6 (E.D. Okla. July 27, 1978) (where employees were required to live on the premises and to be available at all times, costs of furnishing lodging were not includable within wages).

different independent reasons, each of them independently dispositive, those fees were, as a matter of law, for defendants' primary benefit and convenience.

First, recruiter fees are illegal and therefore, and as a matter of law, can never be for the primary benefit or convenience of employees. 29 C.F.R. § 531.31 ("Facilities furnished in violation of any Federal State, or local ordinance or prohibition will not be considered facilities 'customarily' furnished" and must be reimbursed to the extent they push wages below the FLSA minimum wage). Recruitment fees have been expressly prohibited since 2008.[14]

Second, recruiter fees are neither a normal living expense "that would arise [anyway] in the course of life," *Arriaga,* 305 F.3d at 1242-43, nor "board," nor "lodging," nor "something like board or lodging." 29 C.F.R. § 531.32(a). They fall under no exception to the FLSA's rule that wages must be paid "free and clear." They must be borne by the employer, not the employee, to the extent they would reduce wages below the FLSA minimum wage.

Third, when an employer structures recruitment for H-2A or H-2B work in a way that makes it impossible for some, or all, employees to access the program without paying a recruitment fee, that arrangement, depriving employees of all other options and forcing them into to incur a substantial expense, is, almost by definition, for the primary benefit of the employer. Indeed, the DOL takes the position that "[t]he fact that a recruiter is essential to the securing of such worker … underscores the classification of that payment as a cost allocable to the

---

[14] *See, e.g.,* 8 C.F.R. § 214.2(i)(B) (2008 DHS regulations) (stating that no job placement fee or other indirect or direct compensation may be collected from the worker by "petitioner, agent, facilitator, recruiter or similar service as a condition of an offer or condition of H-2B employment" and that a petition may be revoked if USCIS determines that the employer charged such a fee or knew or should have known that such a fee was charged); 20 C.F.R. § 655.22 (c) and (j) (2008 DOL regulations) (requiring employer to contractually forbid foreign labor contractors or recruiters from seeking or receiving payments from prospective employees and prohibiting employer or its agents from seeking or receiving payments from employee for any activity related to obtaining labor certification).

19

employer." 73 Fed. Reg. 78020 at 78037 (2008). Here, GLK structured the recruitment process

so that Jimenez Arroyo and his appointed helpers served as "gatekeepers." PSUF ¶¶ 32-36.

There was no way to the job except through them.[15] Such an arrangement, established by the

employer, is for the primary benefit of the employer. Fees that employees have no choice but to

pay cannot reduce wages. *Salazar-Martinez*, 781 F. Supp. 2d at 195 ("recruitment fees are

primarily for the benefit of the employer, where the employee has no choice but to pay the fee in

order to gain access to the opportunity"); *Brickman,* 2008 WL 81570, *13 (fees are for the

primary benefit of the employer where employer "structured the process in such a way that a

prospective employee [could not] but pay a recruiting fee in order to work for" them); *Teoba*,

769 F. Supp. 2d at 186 (employer responsible for recruiting fees charged by recruiters); *Peri &*

*Sons Farms, Inc*., 735 F.3d at 899*; Morante-Navarro,* 350 F.3d at 1166 n.2 (employers cannot

deduct from workers' wages the fee they paid to recruiting agency employer hired to find

workers).

  Fourth, basic principles of agency law and apparent authority likewise make clear the

defendants' responsibility for the illegal recruitment fees that some plaintiffs were forced to

pay.[16] The operative rule is that: "Where an officer [or other authorized agent] having authority

to acts refers a person seeking to enter into a contract to another as the proper person to deal

with, the latter has apparent authority to act." 2 Fletcher Cyc. Corp. 451. That is what happened

---

[15] Employers often try to structure the recruitment process so as to "wash their hands of recruitment abuse, claiming ignorance of recruitment practices." Ex. 66, *Recruitment Revealed*, p. 24. Here, Defendants did the opposite, retaining LaborQuest/FLECTS to handle the H-2B application with the DOL and visa process but keeping tight rein themselves over recruitment, refusing to outsource the recruitment function.

[16] "Apparent [agency or] authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Rest. 3d Agency § 2.03.

Case 1:12-cv-00209-WCG   Filed 07/08/14   Page 20 of 26   Document 86

here: GLK delegated authority to act with respect to recruitment and hiring to Jimenez Arroyo; in 2010 and 2011, Jimenez Arroyo, in turn, referred the majority of the Plaintiffs to Elias Vera as the proper person to deal with; and Jimenez Arroyo and Vera collected illegal recruitment fees from twenty five plaintiffs, an act for which their principal (GLK) remains responsible. Rest 3d Agency 3.15, comment b ("[T]he principal's legal position is affected by action taken by the subagent as if the action had been taken by the appointing agent"); Rest.3d Agency 3.15 comment d ("As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent"). *See also Morales-Arcadio*, 2007 WL 2106188, at *14 ("[A]t least for the Laborers in this case, recruiting fees would not arise as a normal living expense. Therefore an employer must timely reimburse pre-employment recruiting expenses where the recruiters are agents of the employer with actual or apparent authority to charge recruiting fees.")

### 5. The Passport Fees Plaintiffs Incurred Were For Defendants' Primary Benefit and Convenience.

Plaintiffs who did not have passports by virtue of having worked for GLK in earlier seasons had to obtain them, incurring passport fees. This expense, likewise, was for the primary benefit and convenience of the defendants. *De-Leon Granados*, 581 F. Supp. 2d at 1312 (passport expenses primarily benefited the employer because "[p]laintiffs who did not have passports were required to obtain passports as a necessary first step to participating in the H-2B program"); *Avila-Gonzalez*, 2006 WL 643297 at *3 (passport expense primarily benefitted the employer because workers had no other use for passport); *Morales-Arcadio*, 2007 WL 2106188, at *17 ("As a legal matter, the expense to obtain a passport for the work season is for the benefit of the employer").

In this case, for these workers, passports fees "were not costs that [any of them] would

have incurred otherwise in the course of ordinary life." *De Leon- Granados*, 581 F. Supp. 2d at

1311. But for their work with defendants, none of the workers would have incurred this expense.

They were an expense, for these men, that they incurred solely for the sake of this job, as

"incident to and necessary" for the job, 29 C.F.R. § 531.32 (a) & (c); 29 C.F.R. § 531.3(d)(1),

but otherwise superfluous to their lives and jobs. "As a legal matter, the expense to obtain a

passport for the work season is [primarily] for the benefit of the employer." *Morales-Arcadio*,

2007 WL 2106188, *17.

    C. **UNDER *AUER V. ROBBINS*, THE COURT MUST DEFER TO THE DEPARTMENT OF LABOR'S CONCLUSION THAT H-2B EMPLOYERS MUST REIMBURSE H-2B WORKERS FOR INBOUND TRAVEL AND IMMIGRATION-RELATED EXPESNES BEFORE THE END OF THE FIRST WEEK OF WORK.**

    Responsibility for the administration and enforcement of the FLSA is vested in the

Department of Labor. *See* 29 U.S.C. §§ 204(a) and (b); 216(c); 217. So, too, is the authority to

ensure that H-2B workers are employed in compliance with the H-2B labor certification

requirements. *See* 8 U.S.C. § 1184(c)(1) and § 1184(c)(14)(B); 8 C.F.R. § 214.2(h)(6); and 20

C.F.R. § 655. Given Congress' grant of authority to the DOL in these areas, deference to the

DOL's interpretations in these areas is generally warranted. *Auer v. Robbins*, 519 U.S. 452, 461

(1997); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007); *Condo v. Sysco Corp*., 1

F.3d 599, 604-05 (7th Cir. 1993).

    In August of 2009, exercising its authority over both the FLSA and the H-2B program,

the DOL made determinations regarding employers' obligations to reimburse H-2B workers for

inbound travel, recruitment and immigration-related costs. First, the DOL re-iterated the

longstanding rule, applicable in all contexts, that:

If an employee incurs pre-employment expenses that are primarily for the benefit of the employer, they are considered *de facto* deductions from the employee's wages during the first workweek and such deductions must be reimbursed to the extent that the costs incurred effectively reduce the employee's wages below the minimum wage…

Next, applying this rule to the particular context of H-2B employment, DOL determined that:

[T]ravel and immigration-related costs necessary for workers hired under the H-2B program are for the primary benefit of their employers, and the employers therefore must reimburse the employees for those costs in the first workweek if the costs reduce the employees' wages below the minimum wage … [U]nder the H-2B program, we believe that the employer is the primary beneficiary of the temporary employee's travel and immigration related costs.

DOL, Field Assistance Bulletin 2009-2*, Travel and Visa Expenses of H-2B Workers Under the FLSA* at 3, 9, 10 (2009), Ex. 65.

DOL then further stated that:

Under both the visa program regulations and the FLSA, we believe that employers are [also] responsible for paying the fees of any recruiters they retain to recruit foreign workers and provide access to the job opportunity.

*Id.* at 12. The Ninth Circuit recently accorded controlling deference to the DOL's conclusions on these points, reversing a district court decision that had not. *Peri & Sons Farms, Inc.* 735 F.3d at 899 ("[W]e defer to the DOL's interpretation. The district court erred in ruling that Peri & Sons was not required to reimburse its employees during the first week of work for inbound travel and immigration expenses to the extent that such expenses lowered their compensation below the minimum wage").

## II.    DEFENDANT RYAN DOWNS IS INDIVIDUALLY LIABLE.

The FLSA defines "employer" expansively. For purposes of the FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an

employee." 29 U.S.C. § 203(d). [17] Consistent with this broad definition, corporate officers are often liable for unpaid wages under the FLSA, along with the corporations they manage. Indeed, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages[.]" *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983). *See also Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013)*; Solis v. Saraphino's, Inc.,* No. 09-CV-954, 2011 WL 1532543 (E.D. Wis. Apr. 22, 2011).

Defendant Downs served as the owner and President of GLK in 2010 and 2011 and for many years prior. PSUF ¶ 9. During that time, he exercised operational control over the recruitment, hiring and employment of H-2B workers. PSUF ¶¶ 10-16. He was personally involved with the H-2B application process, personally signing temporary labor certification forms in which he agreed to follow federal and state labor and employment laws and initialed forms from GLK's labor contractors acknowledging an employer's legal obligations in the H-2B program . PSUF ¶ 10. On several occasions, in the early years of the program, he traveled with Jimenez Arroyo on recruiting trips. PSUF ¶ 11. He informed Jimenez Arroyo of the terms of employment that were to be communicated to the workers. PSUF ¶ 11. He was personally involved in assuring compliance with wage and hour issues to the point of personally reading, consenting to and initialing a document acknowledging responsibility for and agreeing to

---

[17] In FLSA cases, common-law definitions of "employ," "employer" and "employee" do not apply. *Wallis v. Portland Terminal Co*., 330 U.S. 148, 150-51 (1947); *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir. 1987). In enacting the FLSA, Congress deliberately "stretched" the meaning of these terms beyond traditional agency law principles, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992), and purposefully replaced and supplanted the common law definitions with "the broadest definition ever included in any one Act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945). Indeed, as the Supreme Court has stated, "a broader or more comprehensive coverage … would be difficult to frame." *Id.* at 362.

reimburse H-2B workers for pre-employment expenses. PSUF ¶ 12. In 2011, he protested a wage

increase for H-2B workers, contacting both elected officials and the DOL. PSUF ¶ 13. When the

Wisconsin State Workforce Department investigated the treatment of H-2B workers by GLK,

Downs met with and/or spoke to the investigators. PSUF ¶ 14. Downs monitored overtime hours

worked by H-2B workers. PSUF ¶ 15. Downs made decision to terminate plaintiffs before the

end of the season, both in 2010 and 2011. PSUF ¶ 16. For purposes of the FLSA, he was clearly

a joint employer of Plaintiffs, along with GLK.

## III. DEFENDANTS DID NOT ACT IN GOOD FAITH OR HAVE REASONABLE GROUNDS TO BELIEVE THEIR CONDUCT COMPLIED WITH FLSA.

Section 216(b) of the FLSA provides for recovery of liquidated (double) damages in

wage suits. 29 U.S.C. § 216; *See* 29 U.S.C. § 260. In fact, "[d]ouble damages are the norm,

single damages the exception," and the burden is on the employer to overcome the "strong

presumption in favor doubling." *Walton v. United Consumers Club Inc.*, 786 F.2d 303, 310 (7th

Cir. 1986). As the Seventh Circuit has explained, "[t]he FLSA originally made double damages

mandatory. Doubling is not some disfavored 'penalty.'" *Id.* Indeed, liquidated damages under the

FLSA do not exist to punish employers. They are intended to compensate employees for

consequential losses in addition to back wages.

In this case, Defendants were advised of and acknowledged the existence of DOL

regulations requiring reimbursement of travel and immigration related expenses. PSUF ¶¶ 10, 12,

46 and 47. Under the circumstances, it is "the duty of the court to award liquidated damages." 29

C.F.R. § 790.22(b); *see also, Bankston v. State of Ill.,* 60 F.3d 1249, 1254-55 (7th Cir. 1995);

*McKinney v. Med Grp. Transp. LLC*, 2013 WL 6709007 at **9–10 (E.D. Wis. Dec. 18, 2013).

25

## CONCLUSION

For all the reasons stated above, plaintiffs request entry of the judgment in their favor, in the amount of $81,139.68, plus an equal amount in liquidated damages, on Count I of the Second Amended Complaint, for Defendants' violations of the FLSA.

Dated: July 8, 2014

s/ Joshua Karsh
One of Plaintiffs' Attorneys

| | |
|---|---|
| Matthew J. Piers | Weeun Wang |
| Joshua Karsh | Nicholas Marritz |
| José J. Behar | Attorney for Plaintiffs |
| Claudia Flores | Farmworker Justice |
| Jenna Miara | 1126 16th Street, N.W., Suite 270 |
| Attorneys for Plaintiffs | Washington, D.C. 20036 |
| Hughes Socol Piers Resnick & Dym, Ltd. | (202) 293-5420 ext. 308 |
| 70 W. Madison Street, Suite 4000 | E-mail: wwang@farmworkerjustice.org |
| Chicago, IL 60602 | nmarritz@farmworkerjustice.org |
| Telephone: (312) 580-0100 | |
| Fax: (312) 580-1994 | |
| E-mail: mpiers@hsplegal.com | |
| jkarsh@hsplegal.com | |
| jbehar@hsplegal.com | |
| cflores@hsplegal.com | |