IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| ALEJANDRO JURADO JIMENEZ et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 12-C-0209 ) ) Judge Griesbach |
| GLK FOODS, LLC and RYAN A. DOWNS, | ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT FOR VIOLATION OF THE FAIR LABOR STANDARDS ACT**

Plaintiffs, by their counsel, and pursuant to Local Rule 56, respectfully submit the following Statement of Undisputed Facts ("PSUF") in support of their motion for partial summary judgment of Count I for violation of the Fair Labor Standards Act:

1. Plaintiffs are 77 migrant workers from Mexico who were employed by defendants in 2010 and 2011. Ex. 1, Second Amended Complaint, ¶ 37, 38.

2. Plaintiffs were recruited and employed by defendants to process cabbage into sauerkraut at GLK's cannery plant in Bear Creek, Wisconsin, under the federal government's "H-2B" guestworker visa program. Ex. 2, GLK001373-78, 2283; Ex. 3, ETA-FOIA0004-11.

3. Defendant GLK is the largest sauerkraut producer in the world. Ex.4, ECF No. 78, Defendants' Answer to Second Amended Complaint, ¶ 7.

4. GLK processes more than 170,000 tons of cabbage into sauerkraut annually. http://www.greatlakeskraut.com/SauerkrautSavvy.html (last visited July 1, 2014).

1

5.  To produce sauerkraut, each head of cabbage must be cored and trimmed, individually, before fermenting. Ex. 5, Deposition of Ryan A. Downs at 9:14-10:8; Ex. 6, GLK002378.

6.  At GLK, coring and trimming of cabbage is performed primarily between August and November. Ex. 5, Deposition of Ryan A. Downs at 56:23-57:1.

7.  GLK hires roughly 50-100 seasonal workers to do the coring and trimming (using machines). Ex. 7, GLK001232; Ex. 8, GLK001296; Ex. 9, Deposition of Rafael Jimenez Arroyo at 11:19-12:3.

8.  For a number of years, including in 2010 and 2011, GLK hired predominantly Mexican nationals rather than U.S. workers to perform this "trim line" labor. Ex. 2, GLK001373-78, 2283; Ex. 3, ETA-FOIA0004-11; Ex. 10, GLK001116-17; Ex. 11, OFLC-FOIA0085-86; Ex.12, GLK001220-21; Ex. 7, GLK001232; Ex. 8, GLK001296; Ex. 9, Deposition of Rafael Jimenez Arroyo at 22:24-23:1; Ex. 5, Deposition of Ryan A. Downs at 9:4-9.

9.  Defendant Ryan A. Downs was, at relevant times, an owner and the President of GLK. Ex.4, ECF No. 78, Defendants' Answer to Second Amended Complaint, ¶¶ 8-9.

10. Downs has personally signed temporary labor certification forms, agreeing to follow federal and state labor and employment laws. He has personally initialed forms from GLK's labor contractors acknowledging an employer's legal obligations in the H-2B process. Ex. 10, GLK001116-17; Ex. 11, OFLC-FOIA0085-86; Ex. 13, OFLC-FOIA0117-118; Ex. 14, GLK001943-45; Ex. 15, GLK001331-1332, 1335.

11. On six or seven occasions, in the early years of the program, Downs accompanied Jimenez Arroyo to Santiago Capitiro, on trips when H-2B workers were recruited. Ex. 5,

Deposition of Ryan A. Downs at 17:17-18:12. Downs instructed Jimenez Arroyo about wages to be offered to the workers and other terms and conditions of employment. *Id.;* Ex. 5, Deposition of Ryan A. Downs at 19:6-25; 22:9-19.

12. Downs was personally involved in assuring compliance with wage and hour issues to the point of personally reading, consenting to and initialing a document acknowledging responsibility for and agreeing to reimburse H-2B workers for pre-employment expenses. Ex. 15, GLK001331-32, 1335.

13. In 2011, when the DOL announced a wage increase for H-2B workers, Downs became involved, personally contacting both elected officials and the DOL in 2011 to oppose the wage increase. Ex. 16, GLK006240; Ex. 17, GLK002552-53; Ex. 18, GLK006169-70.

14. On multiple occasions, the Wisconsin State Workforce Department investigated the treatment of H-2B workers by GLK and Downs met with and/or spoke to these investigators on behalf of GLK. Ex. 19,WHD-FOIA0033-41 at 34, 40-41; Ex. 20, WHD-FOIA0045-55, at 53-54; Ex. 21, DWD0047; Ex. 22, WHD-FOIA0007-20; Ex. 23, WHD-FOIA0003-5; Ex. 24, WHD-FOIA0023-25 at 25; Ex. 25, WHD-FOIA0026-32 at 30.

15. Downs was involved in monitoring overtime hours worked by H-2B workers. Ex. 26, GLK006228-30; Ex. 27, GLK006222; Ex. 4, Defendants' Answer to Second Amended Complaint, ECF No. 78 at 9.

16. Downs made the decision to terminate plaintiffs before the end of the season, both in 2010 and 2011. Ex. 5, Deposition of Ryan A. Downs at 88:13-18.

**Defendants' Participation in the H-2B Program**

17. Federal law allows employers to import foreign workers in limited circumstances, through various "guestworker" visa programs. http://www.doleta.gov/business/gw/guestwkr/

3

18. With the exception of 2009, defendants participated in the "H-2B" guestworker program from 2003 to 2011. Ex. 2, GLK001373-78, 2283; Ex. 3, ETA-FOIA0004-11; Ex. 10, GLK001116-17; Ex. 11, OFLC-FOIA0085-86; Ex. 12, GLK001220-21; Ex. 7, GLK001232; Ex. 8, GLK001296; Ex. 9, Deposition of Rafael Jimenez Arroyo at 22:24-23:1; Ex. 28, Deposition of Betty Miller at 46:2-7.

19. As a prerequisite to defendants' participation in the H-2B program, they were required to obtain a "Temporary Labor Certification," and a prevailing wage determination (in order not to depress wages for U.S. workers). 20 C.F.R. § 655.15 (temporary labor certification) and § 655.10 (prevailing wage determination).

20. They were also required to attest, under oath, to an inability to find qualified and available U.S. workers. 20 C.F.R. § 655.22; Ex. 2 GLK001373-78, 2283; Ex. 3, ETA-FOIA0004-11; Ex.29, GLK001371-72; Ex. 30, GLK001460-61.

21. For several years, Defendant Downs provided the required attestation personally. Ex. 2, GLK001373-78, 2283; Ex. 3, ETA-FOIA0004-11; Ex.29, GLK001371-72; Ex. 30, GLK001460-61.

22. In 2009, GLK applied too late for authorization in 2009 and so missed the opportunity to hire H-2B workers as trim-line laborers that year. They therefore needed—and managed—to locate and hire qualified and available U.S. workers instead. Ex. 5, Deposition of Ryan A. Downs at 31:5-24.

23. Defendants Downs preferred H-2B workers because he deemed local workers "unmotivated, unreliable and expensive." Ex. 31, GLK006232.

4

24. In 2010 and 2011, Defendants retained a firm called LaborQuest. (LaborQuest, in turn, subcontracted with another specialist, Florida East Coast Travel Services (FLECTS)). Ex. 32, Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories, Nos. 9, 11.

25. LaborQuest/FLECTS to completed and submitted the labor certification petition, scheduled visa appointments for the workers, and assisted the workers with paperwork. Ex. 33, Deposition of Jorge Garcia at 88:14-19; 89: 6-18; 94:21-95:25, 108:11-20; 114:10-18, 140:17-141:24; Ex. 34, Deposition of Thomas Robinson at 41:13-42:23, 89:13-91:14.

26. Defendants managed the recruitment and hiring of the H-2B workers and wage and hour compliance. Ex. 5, Deposition of Ryan Downs at 15:16–16:8; 22:9–23:15; Ex. 33, Deposition of Jorge Garcia at 45:20-46:7, 54:21-56:3, 88:14-19, 89:6-18; 363:7-364:11; Ex.35, Declaration of Elias Vera Ramirez at P1499-P1505 ¶ 1-9; Ex. 36, LQ0277-LQ0285; Ex. 37, FL0468-FL0471; Ex. 38, GLK001597-1598; Ex. 39, Deposition of Donna Lorge at 36:12-38:10.

**Defendants' Recruitment Process**

27. Defendants began participating in the H-2B program in approximately 2003, when Ryan Downs approached a long-time GLK employee, Rafael Jimenez Arroyo, and told Jimenez Arroyo how much he liked the way he worked. He told Jimenez Arroyo he would try to get visas to bring workers like him under contract. Ex. 9, Deposition of Rafael Jimenez Arroyo at 23:15–24.

28. Jimenez Arroyo served as GLK's head recruiter of H-2B workers during 2010 and 2011 and for many years prior. Ex. 35, Declaration of Elias Vera Ramirez at P1499-P1505 ¶ 1; Ex. 33, Deposition of Jorge Garcia at 40:6-16, 41:18-23, 43:6-15, 88:14-19, 92:22-93:5; Ex. 5, Deposition of Ryan A. Downs at 15:16-19:14, 25:19-25; Ex. 40, Deposition of Jacci Carlson at 49:6-17, 51:7-20.

5

29. Jimenez Arroyo began traveling to Mexico in May of every year starting on or before 2003 to recruit and hire workers. Ex. 5, Deposition of Ryan A. Downs at 17:17-19:15; Ex. 9, Deposition of Rafael Jimenez Arroyo at 154:13-155:3.

30. Jimenez Arroyo principally recruited from in and around his hometown of Santiago Capitiro, in the state of Guanajuato in Mexico. Ex. 35, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 4; Ex. 9, Deposition of Rafael Jimenez Arroyo at 23:23-27:21; Ex. 5, Deposition of Ryan A. Downs at17:20-18:21; Ex. 40, Deposition of Jacci Carlson at 49:6-17, 51:7-20; and Ex. 39, Deposition of Donna Lorge at 30:18-31:3.

31. Downs accompanied Jimenez Arroyo on several of these trips. Downs made the trip personally 6 or 7 times. Ex. 5, Deposition of Ryan A. Downs at 17:17–19:14.

32. Early on in GLK's participation in the H-2B program, Downs authorized Jimenez Arroyo to recruit and hire the workers. Ex. 5, Deposition of Ryan A. Downs at 15:16-19:24, 25:4-25; and Ex. 32, Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories, Nos. 6-7.

33. In 2010 and 2011, Jimenez Arroyo appointed Elias Vera Ramirez, one of the H-2B workers, to help him with recruitment and hiring. Ex. 9, Deposition of Rafael Jimenez Arroyo at 35:11-37:8; 37:5–8; Ex. 35, Declaration of Elias Vera Ramirez, P1499-P1505, ¶ 1-9.

34. Typically, Jimenez Arroyo would review the list of workers who traveled to Bear Creek the previous year and performed satisfactorily. Ex. 9, Deposition of Rafael Jimenez Arroyo at 34:5-13; 54:25-57:8; Ex. 39, Deposition of Donna Lorge at 38:14-39:1; Ex. 41, GLK002287-2289; Ex. 42, LQ0290-292; Ex. 9, Deposition of Rafael Jimenez Arroyo at 152:6-23.

35.     Then, Jimenez Arroyo would travel to Santiago Capitiro to recruit or supervise recruitment for the upcoming season, beginning with the workers on that list. In years when there were still open positions after offers have been made to incumbents, new names were added to the master list, sometimes from a waiting list. Ex. 9, Deposition of Rafael Jimenez Arroyo at 34:11-13; 46:9-22; 54:25-57:8, 125:15-24; 154:13-156:9; Ex. 35, Declaration of Elias Vera Ramirez, P1499-P1505, ¶ 4; Ex. 39, Deposition of Donna Lorge at 41:22-42:8; 42:23-43-9, 44:2-14; Ex. 43, GLK002269-2274.

36.     Many of the workers Jimenez Arroyo hired were his cousins or other relatives. Ex. 9, Deposition of Rafael Jimenez Arroyo at 24:4-20, 28:10–29:1; Ex. 5, Deposition of Ryan A. Downs at 17:8-18:1, 134:13-18.

**The Costs of Travel, Immigration and Recruitment**

37.     Once GLK hired the workers, visas had to be procured for each worker. 8 C.F.R. § 214.2(h);   Ex. 44, USCIS-FOIA0329-340; Ex. 45, USCIS-FOIA0019-33.

38.     The workers hired by defendants from in and around Santiago Capitiro had to travel to a U.S. Consulate or Embassy for their visa interviews. Ex. 34, Deposition of Thomas Robinson at 290:22-291:1; Ex. 5,  Deposition of Ryan A. Downs at 104:5-14; Ex. 40, Deposition of Jacci Carlson at 51:21-52:2, 72:12-18.

39.     The workers traveled to Mexico City in 2010 and Matamoros in 2011 for their visa interviews at the U.S. consulate in those locations. Ex. 9, Deposition of Rafael Jimenez Arroyo at 151:18–25; Ex. 33, Deposition of Jorge Garcia at 103: 18-23, 116:1-4, 144:9-13, 225:24-226:1; Ex. 46, FL00480-481.

40.     The process of securing a visa and traveling to the border took several days. It also entailed significant expense. The items of expense included:

7

(a) Bus fare from Santiago Capitiro to Mexico City or Matamoros for trip of approximately 12 hours; Ex. 9, Deposition of Rafael Jimenez Arroyo at 52:2-3; Ex. 35, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 6;

(b) Accommodations and meals in Mexico City or Matamoros for several days (and, sometimes, for more than a week), while visas were processed and the workers waited for GLK to schedule their departure for Bear Creek; Ex. 9, Deposition of Rafael Jimenez Arroyo at 66:7-67:8, 172:1-21; Ex. 33, Deposition of Jorge Garcia at 353:20-354:5, 355:14-357:1; Ex. 47, Deposition of Jesus Martinez Gallardo at 31:1-8; Ex. 35, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 6;

(c) Transportation between the hotel and the visa interviews and office of a *licenciado*; Ex. 33, Deposition of Jorge Garcia at 163:17-25, 254:20-258:5;

(d) Fees paid to a *licenciado,* to assist with visa paperwork;

(e) Visa application fees; Ex. 48, P0045, P0264, P0307, P0582, P1102; Ex. 9, Deposition of Rafael Jimenez Arroyo at 51:5-16; Ex. 5, Deposition of Ryan A. Downs at 109:13-22; Ex. 33, Deposition of Jorge Garcia at 125:21-126:6;

(f) Passport fees (for workers who don't have a valid passport from an earlier season); Ex. 9, Deposition of Rafael Jimenez Arroyo at 51:5-16;

(g) Transportation from Mexico City to Matamoros a trip of twelve hours or more, in 2010 and Matamoros to the Mexico-U.S. border in 2011, to begin the trip to Bear Creek; Ex. 33, Deposition of Jorge Garcia at 125:21-126:6, 160:2-4; and;

(h) A border-crossing fee at the Mexico-U.S. border. Ex. 49, P0179, P0497, P0608, P0777, P0939, P0969; Ex. 34, Deposition of Thomas Robinson at 179:4-8.

Ex. 9, Deposition of Rafael Jimenez Arroyo at 51:10–54:6; Ex. 50, Plaintiffs' Responses to Defendants' First Set of Interrogatories, No. 6, Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' First Set of Interrogatories, No. 6; Ex. 46, FL0480-481.

41. In 2010, the cost borne by each plaintiff for these items ranged from $326 - $720, and, for those charged recruitment fees, from $1067 to $1952. Ex. 51, Spreadsheet of H-2B Workers' Expenses in 2010 and 2011.

8

42. In 2011, each worker incurred between $294 to $910 of inbound travel and visa-related expenses, and those charged recruitment fees paid from $1507 to $2659 to work for GLK. Ex. 51, Spreadsheet of H-2B Workers' Expenses in 2010 and 2011.

43. For most plaintiffs, these outlays amounted to more than a month's earnings in Mexico, where their wages average $10 U.S. per day. Ex. 47, Deposition of Jesus Martinez Gallardo at 25:22-26:11; Ex. 52, Deposition of Jose Mendez Baca at 58:3-16; Ex. 53, Deposition of Martin Chavez Jimenez at 32:12-34:1; Ex. 54, Deposition of Alejandro Jurado Jimenez at 106:4-21; Ex. 55, Deposition of Jose Jurado Jurado at 47:19-49:24.

44. Many of the plaintiffs went into debt to raise money to cover these expenses. Many remain in debt to this day. Ex. 56, Deposition of J. Saul Jimenez Rosas at 38:5-11; Ex. 47, Deposition of Jesus Martinez Gallardo at 24:8-25:9; Ex. 54, Deposition of Alejandro Jurado Jimenez at 80:19–24; Ex. 57, Deposition of Enrique Rosas Jurado at 49:5–23; Ex. 58, Deposition of J. Jesus Jimenez Rosas at 38:20–39:17; Ex. 55, Deposition of Jose Jurado Jurado at 59:17–60:25; Ex. 53, Deposition of Martin Chavez Jimenez at 43:17–44:20; Ex. 56, Deposition of J. Saul Jimenez Rosas at 37:18-23; Ex. 9, Deposition of Rafael Jimenez Arroyo at 53:24-54:19; Ex. 35, Declaration of Elias Vera Ramirez P1499-1505; Ex. 52, Deposition of Jose Mendez Baca at 31:1-2.

45. Defendants terminated plaintiffs' employment just a few weeks into the season, in both 2010 and 2011. Ex. 59, GLK005981; Ex. 32, Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories, No. 10; Ex. 50, Plaintiffs' Responses to Defendants' First Set of Interrogatories, Nos. 12 and 15.

**Defendants' Acknowledgment of Their Reimbursement Obligations**

46. In 2010, Downs personally initialed a form provided to him by LaborQuest, agreeing to and acknowledging that:

> New H-2B regulations *require* employer[s] to pays [sic] (or reimburse) for *any* of the *recruitment, visa and travel expenses* for worker from their homes abroad to the place of employment.

(Emphasis added). Ex. 5, Deposition of Ryan Downs at 119:12–120:6.

47. In 2011, LaborQuest also provided invoices that specified costs that should be reimbursed directly to the worker by the employer which included provision of a daily per diem, transportation costs, paperwork processing expenses and border crossing fees. Ex. 60, GLK001614; Ex. 61, GLK001471; Ex. 62, LQ0124-125.

48. Nevertheless, Defendants reimbursed plaintiffs for none of these expenses in their first week of work in 2010 or 2011. Ex. 50, Plaintiffs' Responses to Defendants' First Set of Interrogatories, Nos. 5, 10; Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.

**Recruitment Fees Paid By Certain Plaintiffs**

49. Six workers had to pay a recruitment fee of between approximately $1,000 and $1,200 U.S. dollars in exchange for employment with Defendants in 2010. Ex. 50, Plaintiffs Abraham Ruiz Mendoza, Jesus Eduardo Santiago Garcia, Jose Antonio Flores Perez, Jose Ramon Martinez Palmas, Manuel Mendoza Chiquito and Raul Omar Silva Razo Responses to Defendants' First Set of Interrogatories, Nos. 6, 8, 9, 18, and 21; Ex. 35, Declaration of Elias Vera Ramirez, P1499-P1505, ¶ 5.

50. In 2011, nineteen more workers were required to pay recruitment fees. Ex. 50, Plaintiffs Alejandro Ponce Gonzalez, Fernando Rosas Rivera, J. Salud Rodriguez Ramirez, Jose Alberto Garcia Camargo, Jose Francisco Yerena Gonzalez, Julio Cesar Cabrera Guerrero,

10

Nazario Rodriguez Guzman, Pedro Tapia Rodriguez, Roman Rodriguez Ramirez, Luis Andres Muñoz Espinoza, Raul Flores Flores, Dario Flores Flores, Rafael Arroyo Lopez, Jose Manuel Lopez Valencia, Jesus Ricardo Arroyo Martinez, Jose Baca Guevara, Juan Almanza Sanchez, Diego Armando Arroyo Garcia, and Jose Lorenzo Esparza Barron's Responses to Defendants' First Set of Interrogatories, Nos. 6, 8, 9, 18, 21.

51.     In both years, these workers were told that the recruitment fee was a requirement for employment.  Ex. 50, Plaintiffs Abraham Ruiz Mendoza, Jesus Eduardo Santiago Garcia, Jose Antonio Flores Perez, Jose Ramon Martinez Palmas, Manuel Mendoza Chiquito, Raul Omar Silva Razo, Luis Andres Munoz Espinoza, Raul Flores Flores, Dario Flores Flores, Rafael Arroyo Lopez, Jose Manuel Lopez Valencia, Jesus Ricardo Arroyo Martinez, Jose Baca Guevara, Juan Almanza Sanchez, Diego Armando Arroyo Garcia, Alejandro Ponce Gonzalez, Fernando Rosas Rivera, Julio Cesar Cabrera Guerrero, Jose Lorenzo Esparza Barron, J. Salud Rodriguez Ramirez, Roman Rodriguez Ramirez, Nazario Rodriguez Guzman, Jose Francisco Yerena Gonzalez,  Pedro Tapia Rodriguez, and Jose Alberto Garcia Camargo's Responses to Defendants' First Set of Interrogatories, Nos. 8,21 .

52.      Frequently, recruitment fees were paid to Jimenez Arroyo or to Vera directly. Ex. 50, Plaintiffs Abraham Ruiz Mendoza, Jesus Eduardo Santiago Garcia, Jose Antonio Flores Perez, Jose Ramon Martinez Palmas, Manuel Mendoza Chiquito, Raul Omar Silva Razo, Luis Andres Muñoz Espinoza, Raul Flores Flores, Dario Flores Flores, Rafael Arroyo Lopez, Jose Manuel Lopez Valencia, Jesus Ricardo Arroyo Martinez, Jose Baca Guevara, Juan Almanza Sanchez, Diego Armando Arroyo Garcia, and Jose Lorenzo Esparza Barron's Responses to Defendants' First Set of Interrogatories, Nos. 6, 8, 9, 18, and 21; Ex. 35, Declaration of Elias Vera Ramirez, P1499-P1505, ¶5.

11

53. No plaintiff was ever reimbursed for the cost of these fees. Ex. 50, Plaintiffs Abraham Ruiz Mendoza, Jesus Eduardo Santiago Garcia, Jose Antonio Flores Perez, Jose Ramon Martinez Palmas, Manuel Mendoza Chiquito, Raul Omar Silva Razo, Luis Andres Munoz Espinoza, Raul Flores Flores, Dario Flores Flores, Rafael Arroyo Lopez, Jose Manuel Lopez Valencia, Jesus Ricardo Arroyo Martinez, Jose Baca Guevara, Juan Almanza Sanchez, Diego Armando Arroyo Garcia, Alejandro Ponce Gonzalez, Fernando Rosas Rivera, Julio Cesar Cabrera Guerrero, Jose Lorenzo Esparza Barron, J. Salud Rodriguez Ramirez, Roman Rodriguez Ramirez, Nazario Rodriguez Guzman, Jose Francisco Yerena Gonzalez, Pedro Tapia Rodriguez, and Jose Alberto Garcia Camargo's Responses to Defendants' First Set of Interrogatories, Nos. 5,10.

54. H-2B regulations prohibit recruiter fees. 20 C.F.R. § 655.20(o).

**Damages Evidence**

55. In 2010 and 2011, the FLSA minimum wage was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C); *see also* http://www.dol.gov/whd/state/stateMinWageHis.htm.

56. Exhibit 64 contains an Affidavit of Monica Garreton Chavez, a paralegal at Hughes, Socol Piers, Resnick and Dym, who reviewed and analyzed records containing information about plaintiffs' expenses, summarized those records and used that information to calculate plaintiffs' resulting damages. Ex. 64, Affidavit of Monica Garreton Chavez.

57. Exhibit 51 contains a spreadsheet titled, "H-2B Worker's Expenses in 2010 and 2011" that lists each worker's individual expenses and provides the sum of the total expenses he incurred. Ex. 50, Plaintiffs' Responses to Defendants' First Set of Interrogatories, No. 6.

58. Exhibit 63 contains a second spreadsheet, titled "Net Wages and Damages Due in 2010 and 2011", that sets forth the name of each worker; the total travel and visa related

12

expenses each worker incurred in order to get to Bear Creek, as sworn to by them in their interrogatory responses and totaled in Ex. 51; the gross pay earned by each worker in the first workweek; the total first weeks' pay for each worker after expenses are subtracted; the number of hours each worker worked in his first workweek in Bear Creek according to Defendants' payroll records; the resultant hourly wage received by each worker; the amount owed to restore each worker's earnings to the level of the FLSA minimum wage, after taking into account reimbursable expenses; an equal amount in liquidated damages; and the total amount owed. Ex. 64, Affidavit of Monica Garreton Chavez.

59. After subtracting the unreimbursed expenses that the workers incurred to work for Defendants, they all received net wages of less than $7.25/hour for their first week of work for GLK in both years. Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.

60. Every plaintiff (except one) had negative earnings for the first work week in 2010 after unreimbursed expenses are taken into account. Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.

61. The sole plaintiff with positive earnings in 2010 received an effective wage of 65 cents an hour. Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.

62. In 2011, approximately 90% of the plaintiffs finished the first week with negative earnings. Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.

63. No H-2B worker employed by Defendants in 2010 or 2011 received the minimum wage of $7.25/hour for his first week of work. Ex. 63, Spreadsheet of Net Wages and Damages Due in 2010 and 2011.