**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

**ALEJANDRO JURADO JIMENEZ, et al.,**

        **Plaintiffs,**

  **v.**
                                   **Case No. 12-cv-209**

**GLK FOODS, LLC and RYAN A. DOWNS,**

        **Defendants.**

---

## I.     INTRODUCTION

Plaintiffs are guest workers who were issued temporary visas, commonly referred to as "H-2B" visas, as authorized by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §1101(15)(H)(ii)(b), and were thereafter admitted to the United States and employed by GLK. They have brought a number of claims against Defendants arising from their employment with GLK. Defendants move for summary judgment on Counts III, VI and VIII of the Second Amended Complaint. Those claims are based on the faulty concepts that GLK guaranteed them employment for a defined period of time in 2010 and 2011, and also that any pre-employment expenses incurred by the Plaintiffs in securing visas and passports and traveling to the Mexico/U.S. border should have been reimbursed to them by GLK. Because no law imposes such requirements on GLK and because no contract existed between GLK and the Plaintiffs with such terms, Defendants are entitled to summary judgment on those counts.

## II.     FACTUAL BACKGROUND

The following facts are relevant to the this motion.  Defendant GLK Foods, LLC, (hereinafter "GLK"), is a Wisconsin limited liability company, operating a sauerkraut cannery in Bear Creek, Wisconsin with its main offices in Appleton, Wisconsin.  Defendant Ryan A. Downs is a resident of Wisconsin, and was the President of GLK during the relevant time period.

At various times, GLK employed H-2B workers from Mexico to perform cutting and trimming work of cabbage in its Bear Creek facility.  Relevant to this motion, GLK employed H-2B workers from Mexico in 2010 and 2011.  In 2010 and 2011, GLK contracted with LaborQuest, USA, a Florida corporation, to manage the H-2B petition process along with the coordination of visa processing for and transportation of workers to Wisconsin.  (Dkt. 43-1, Affidavit of Thomas Palmer, ¶4).  LaborQuest held itself out as an "H2 employer agent, working as an outsourced HR service for small to mid-sized companies."  Labor Quest purports to "direct and manage guest worker programs for its clients which includes:  the filing of all DOL/USCIS petitions, the placement and tracking of required advertising, and coordinating the visa processing & transportation for all guest workers."  See, http://www.laborquest.com/aboutus.html.   Defendants' Proposed Findings of Fact ("DPFOF"), ¶¶4-8.

LaborQuest subcontracted portions of the GLK work with another service, Florida East Coast Travel Services, Inc. (hereinafter, "FLECTS").  GLK was informed that LaborQuest and FLECTS would, jointly, coordinate the H-2B certification process, assist in obtaining visas for the H-2B workers, and coordinate the travel for the workers in Mexico to the United States.  In exchange, GLK paid Labor Quest and FLECTS fees for their services, as well as fees for visa-

processing and transportation costs from the border of Mexico to Bear Creek, Wisconsin. In 2010-2011, GLK understood from LaborQuest and FLECTS that the monies it paid them would cover H-2B certification fees, visa processing and related fees for the workers, as well as transportation to Wisconsin. DPFOF, ¶¶8-10.

In GLK's 2011 Application for Temporary Employment Certificate, filed with the U.S. Department of Labor, page 1 of the application refers to a "Period of *Intended* Employment." At the bottom of each page of the application, the application refers to a "validity period." The Department of Labor at page 6 of the application states that the certification was "valid from 8/1/11 to 11/15/11." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. DPFOF, ¶¶10-14.

The application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation." (emphasis supplied). *Id.*

Similarly, paragraph #11 states: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). *Id.*

The standard language of GLK's 2010 application was identical to that of 2011. The certified period of employment for 2010 was identified as 8/9/2010 to 11/30/2010. *Id.*

3

During the relevant time period, a full-time GLK worker - Rafael Jimenez Arroyo - traveled to Santiago Capitiro in Mexico in the spring of the relevant years. Jimenez Arroyo was originally from that town. A significant number of the workers who came to GLK to perform trimming and cutting work lived in or near Santiago Capitiro. Jimenez Arroyo talked to workers (many of whom had been coming to Wisconsin to work at GLK for years) to inform them that GLK was interested in bringing in workers later in the year. DPFOF, ¶¶16-17.

Once the petition was approved, the workers in Mexico who had previously indicated an interest in working for GLK were notified of the dates and locations to obtain visas. For the years relevant to this motion, Labor Quest/FLECTS arranged for appointments to obtain visas in consular cities in Mexico. GLK understood that the fees it was paying LaborQuest included the visa fees in Mexico. The workers went to the consulate to obtain visas. DPFOF, ¶¶18-19.

While GLK's petition to employ H-2B workers had already been granted by the DOL, individual workers could not actually enter the U.S. or begin working until their visas had been approved. Neither Labor Quest/FLECTS or Jimenez Arroyo ever required or accepted recruiting fees from the Plaintiffs/Class members, nor were any fees paid directly to or given to Defendants. DPFOF, ¶¶20-21.

The workers then traveled to a border city in Mexico to await final processing before entering the United States. Workers acknowledged that no one, on behalf of GLK, promised that GLK would reimburse them for their in-country expenses. Thereafter, GLK provided transportation, at its expense, from the U.S. side of the border to Bear Creek and provided per diem reimbursement for food costs in the U.S. Similarly, when workers returned to Mexico, GLK provided bus transportation from Bear Creek to the border. DPFOF, ¶¶21-23.

4

### 2010 and 2011 Harvests

In 2010, excess rains and flooding devastated the cabbage crop in Wisconsin. While GLK was anticipating 90,000 tons of cabbage yield that year, its actual harvest yielded about 20% of that number. Because the crop was so low that year, GLK did not need the number of workers for which it had originally petitioned, nor did it need workers in Bear Creek to remain throughout the Fall. Thus, the workers were sent home that year on or about September 28. GLK paid for their return transportation to Mexico. DPFOF, ¶¶24-26.

In 2011, the Department of Labor instituted 2 significant hourly rate increases for the H-2B workers with little notice. In 2010, the prevailing wage rate required by the DOL for the GLK workers was $7.85 per hour. At the time the 2011 petition was certified, the DOL informed GLK that the prevailing wage rate would be increased to $10.36 per hour. At the same time workers began departing for the U.S. in August 2011, the DOL notified GLK of yet *another* wage increase, this time to $14.68 per hour. This constituted a wage increase of 87% from the previous year. Compounding the significant economic impact of the wage increase was a poor harvest that yielded only 70% of plan. GLK appealed the determination but it was initially rejected. GLK then determined that it was no longer economically viable to pay those rates for the work to be performed and decided to send the workers back to Mexico. When the 2011 workers returned to Mexico, in two separate groups, GLK paid for bus transportation and provided meals from Bear Creek, Wisconsin to the U.S./Mexico border. DPFOF, ¶¶31-33.

In 2010 and 2011, the FLSA minimum wage was $7.25 per hour. 29 U.S.C. §206(a)(1)(C). GLK paid the Plaintiffs the hourly rate of $7.85 per hour in their first week of work in 2010. GLK paid the Plaintiffs the hourly rate of $10.36 per hour in their first week of work in 2011. Plaintiffs admit to receiving pay at such rates. DPFOF, ¶¶27-30.

QB\33245291.1

When the 2011 workers returned to Mexico, in two separate groups, GLK paid for bus transportation and provided meals from Bear Creek, Wisconsin to the U.S./Mexico border. DPFOF, ¶33.

## III.   ARGUMENT

### A.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF THE SECOND AMENDED COMPLAINT.

Count III alleges GLK violated the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1871 ("AWPA") with respect to the 2010 and 2011 classes, by intentionally failing to (for purposes of this motion):

a.      pay Plaintiffs and Class Members the prevailing wage for each worker's first week of work in each season by failing to reimburse Plaintiffs and Class Members for expenses they incurred primarily for the benefit of Defendants;

b.      to employ Plaintiffs and Class Members for the entire certified period of employment each season; and

c.      to provide or pay for return transportation from Defendants' job site to Plaintiffs' and Class Members' homes.

### 1.   Neither AWPA Nor The FLSA Requires GLK To Reimburse Plaintiffs For Pre-Employment Expenses.

In 2010 and 2011, the FLSA minimum wage was $7.25 per hour.  29 U.S.C. §206(a)(1)(C).  GLK paid the Plaintiffs the hourly rate of $7.85 per hour in their first week of work in 2010.  GLK was required to increase the pay for its H-2B workers to $10.36 per hour in 2011.  GLK paid the Plaintiffs the hourly rate of $10.36 per hour in their first week of work in 2011.  Plaintiffs admit to that.  (Defendants' Proposed Findings of Fact, ¶¶11-14.).  Plaintiffs claim that they incurred certain pre-employment expenses associated with obtaining passports, visas, and in-Mexico  travel and lodging expenses, and that such expenses were incurred primarily for GLK's benefit and as a result, effectively lowered their first week's wages below

minimum requirements. However, nothing in AWPA (or the FLSA, upon which the Plaintiffs will presumably rely) specifically requires an employer such as GLK to reimburse H-2B employees for such expenses. Accordingly, this Count must dismissed.

The Fair Labor Standards Act guarantees employees a minimum wage. 29 U.S.C. §206(a). The current minimum wage required by FLSA is $7.25 per hour as of July 24, 2009. *Id*. In 2010, the Department of Labor required H-2B employers to pay H-2B workers $7.85 per hour and in 2011, increased the applicable minimum hourly rate to $10.36 per hour. In 2011, GLK paid Plaintiffs and Class Members the hourly rate of $7.85 per hour in 2010 and $10.36 per hour in 2011, both obviously in excess of the minimum wage and in compliance with DOL requirements.

Under the FLSA, employment expenses paid for by workers, but which are incurred primarily for the benefit of the employer, are considered "kick-backs" of wages to the employer and are treated as the equivalent of deductions from the employees' wages. *See* 29 C.F.R. §531.35 (prohibiting employers from requiring employees to pay for their own "tools of the trade" where the cost of such tools purchased by the employee cuts into the minimum or overtime wages). Such deductions must be reimbursed by the employer to the extent that they effectively result in workers' weekly wages being below the minimum wage. *See* 29 C.F.R. §531.36.

The FLSA regulations describe "tools of the trade" to include items like safety caps, explosives, lamps, electric power, company police or security, taxes and insurance on employer buildings, railway fare for maintenance-of-way railway workers, and uniforms as the types of items not subject to deduction from the employees' wages. *See* 29 C.F.R. §531.32. As these

7

QB\33245291.1

examples illustrate, a cost must be directly connected to the principal job activity to be considered to be primarily for the employer's benefit.

Additionally, and significantly, all of the items listed in the regulations are necessary to the performance of the principal activity of the job for which the employee is employed and affect all employees in the employment in the same way, not just those with long commutes or who relocate from a distance to work for the employer. In other words, they are integral and indispensable to the principal activity of the job itself, not peculiar to the particular situation of the individual employee.

By contrast, Plaintiffs alleged expenses were merely incidental to the work they performed for GLK, and were unique to them because of their individual situation. Any benefit GLK derived from the employee-incurred pre-employment expenses is tangential to the performance of the actual productive work for which they were hired. And while the pre-employment expenses may have enabled Plaintiffs to qualify for and report to work, they were not part and parcel of the job itself, like required training, a required uniform or a specific tool of the trade. *See Heder v. City of Two Rivers*, 295 F.3d 777, 782 (7th Cir. 2002) (requiring reimbursement from employees for cost of training programs, which are an employment condition).

The regulations also provide that payments for expenses personal to the employee for which reimbursement is made, are excluded from the calculation of an employees' regular rate when they are "expenses incurred by the employee on the employer's behalf or solely for [the employer's] benefit or convenience." 29 C.F.R. §778.217. The regulations further recognize that an employee normally incurs expenses traveling to and from work and; therefore, such are not

8

expenses incurred by the employee on the employer's behalf or for the employer's benefit or convenience. 29 C.F.R. §778.217(d).

The FLSA's regulations generally address the issue of transportation costs. 29 C.F.R. §531.3 of the regulations provides that transportation charges that are "an incident of and necessary to the employment (as in the case of maintenance of way employees of the railroad)" are for the benefit of the employer. Conversely, 29 C.F.R. §531.32 of the regulations in defining "other facilities" like board and lodging that are primarily for the benefit of the employee, lists "transportation furnished employees between their homes and work where their travel [1] does not constitute hours compensable under the Act and [2] is not an incident of or necessary to the employment." 29 C.F.R. §531.32.

Thus, it is not enough that Plaintiffs had to obtain a visa and travel into the United States in order to perform work for GLK. While it may have been "necessary" for Plaintiffs to travel to the United States in order to secure a job with GLK, the travel and other related costs are in no way "incident of and necessary to" Plaintiffs' employment to perform work for GLK.

The pre-employment expenses are not *primarily* for the benefit of the employer because H-2B workers derive very substantial benefits themselves. Foreign workers seeking employment under the H-2B Program travel outside of their country not only allows them to earn money— here, far more money than they could have in Mexico over a similar period of time—but also allows them to live and engage in non-work activities in the United States. The fact that H-2B workers travel such distances to obtain work in the United States indicates that the travel greatly benefits those employees. *See* Charles C. Mathes, *The Department of Labor's Changing Policies Toward The H-2B Temporary Worker Program: Primarily For The Benefit of Nobody*, 80 Fordham L. Rev. 1801, 1814-16 (March 2012).

Consistent with this analysis, the Fifth Circuit concluded that H-2B employee pre-employment costs were not primarily for the benefit of H-2B employers and that a "visa and physical presence at the job site are not 'tools' particular to this 'trade' within the meaning of the applicable regulations." *See Castellanos-Contreras v. Decatur Hotel, LLC.*, 622 F.3d 393, 400-01 (5th Cir. 2010).

          **a.**       **Plaintiffs are not entitled to reimbursement of expenses for visa fees.**

Here, Plaintiffs' claim that GLK's failure to reimburse their visa fees during the first workweek violates the FLSA because such expenses were allegedly incurred solely for the benefit and convenience of GLK. However, Plaintiffs' visas provided authorization for them to legally enter and work in the United States. They were not incurred on GLK's behalf and were wholly unconnected with the principal activity of their work at GLK. It is well-established that aliens must bear the expense of their visa and other fees. 22 C.F.R. §41107(c). Visa fees are set based on the principle of reciprocity:

> The fees for the issuance of visas, including official visas, to nonimmigrant nationals or stateless residents of each foreign country shall be collected in the amounts prescribed by the Secretary of State unless, on the basis of reciprocity, no fee is charged. If practicable, fees will correspond to the total amount of all visa, entry, residence, or other similar fees, taxes or charges assessed or levied against nationals of the United States by the foreign countries of which such immigrants are nationals or stateless residents.
> 22 C.F.R. §41107(a).

Plaintiffs' attempt to recover their visa expenses directly conflicts with this principle, since a U.S. citizen would be required to bear the cost of the employees' visas while employers in other countries would not have to bear the costs associated with U.S. nationals working abroad. Nothing in the FLSA or the H-2B program requires transferring the burden of visa fees from a foreign national to a U.S. employer in violation of this policy.

QB\33245291.1

Those requirements do not impose the visa application fee nor the visa issuance fee of the prospective worker on the U.S. employer. There is no shortage of workers willing to come to the United States pursuant to the H-2B visa program. Workers benefit from their visa expenses by gaining legal entry to the United States and becoming qualified to work here at wages far higher than those available in their home countries where unemployment is rampant and wages are poor. The visas unquestionably benefitted Plaintiffs who, without them, could not legally enter and work in the United States.

Visa expenses are not like tools of the trade or uniforms which will be "used in or are specifically required for the performance of the employer's particular work." *See* 29 C.F.R. §531.35. The cost of obtaining a visa is peculiar to the individual employee. Visa costs are more akin to qualifications for employment, such as certain skills, training, degrees in education, and commercial licenses. Employees routinely pay for training, education and licenses without the requirement of reimbursement from their employers under the FLSA. Visa costs are not incidental to carrying on the employer's business or integrally connected with the nature of the business. The Plaintiffs' personal visas enabled them to legally enter the U.S. and to live and work here.

The Plaintiffs' personal visa costs were not incurred on GLK's behalf or solely for its benefit so as to be reimbursable. They were incurred prior to their hire in order for them to become legally qualified to present themselves for employment in the U.S.

      **b.**     **Plaintiffs are not entitled to reimbursement for Passport, Hotel and Meal Expenses.**

Similarly, Plaintiffs' attempts to shift their pre-employment hotel and meal expenses, along with their passport fees, should be rejected. In *De Luna-Guerrero v. North Carolina Growers' Ass'n., Inc.*, 338 F.Supp.2d 649 (E.D. N.C. 2004), the district court found "subsistence

expenses" such as food consumed while traveling to North Carolina from Mexico to be an "ordinary living expense," and the employer's failure to reimburse such expenses did not violate the FLSA. *Id.,* at 662. *See also, Morales-Arcadio v. Shannon Produce Farms, Inc.*, 2007 WL 2106188 at *16-17 (S.D. Ga. 2007)(same).

Regarding claims for the costs of hotel stays while obtaining visas, the district court in *Martinez-Bautista v. D&S Produce*, 447 F.Supp.2d 954, 964 (E.D. Ark. 2006), concluded that such costs were not reimbursable. And in *Ojeda-Sanchez v. Bland Farms, LLC.*, 2010 WL 3282984, at *9 (S.D. Ga. 2010), the district court concluded that the cost of a hotel stay while obtaining a visa was not reimbursable.

> **c.      Plaintiffs are not entitled to reimbursement of expenses for Recruiting Fees.**

Certain of the Plaintiffs' claim that individuals in Mexico required the payment of recruiting fees in order to work for GLK. First, neither GLK, nor its contractors, Florida East Coast Travel or LaborQuest, authorized any individual to require such payment, and it is undisputed that GLK did not receive any alleged recruiting fees. *See*, Defendants' Proposed Finding of Fact, ¶14. In any event, no law or regulation requires an H-2B employer to pay for recruiting expenses, which are in fact, illegal. In fact, even the Plaintiffs' case-in-chief, *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1244-46 (11th Cir. 2002) (discussed below), did not require reimbursement of recruitment expenses. The statutory and regulatory silence as to reimbursement of pre-employment expenses demonstrates a legislative intent not to require reimbursement of such expenses for H-2B workers.

#### d.     The H-2B Program Does Not Require The Reimbursement Of Pre-Employment Travel Expenses.

Nothing in the statutory or regulatory regime for the H-2B program expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker.  *See Castellanos-Contreras*, *supra*, 622 F.3d at 400 (noting the H-2B Program requires *outbound* travel expenses to be paid for H-2B workers under certain circumstances, but not inbound travel); *see also* 8 U.S.C. §1184(c)(5)(A) (requiring payment of outbound transportation costs in certain circumstances for H-2B workers).  By contrast, inbound transportation costs are expressly required to be paid under certain circumstances for H-2A workers.  *See* 20 C.F.R. §655.122(h) (requiring payment of inbound transportation costs in certain circumstances for H-2A workers).

These differences are significant, because the H-2 Program was specifically redesigned by Congress in 1986 to "separat[e] agricultural from non-agricultural workers in the administrative scheme."  *See Sweet Life v. Dole,* 876 F.2d 402, 406 (5th Cir.1989).  Accordingly, the regulations governing the H-2A visa have historically contained a number of requirements designed to prevent the exploitation of H-2A workers that were not present in the H-2B regulations.  For instance, the H-2A regulations specify that the agricultural job offer must include free housing, meals or cooking facilities, guaranteed employment for at least 3/4 of a contract period, and reimbursement for the employee's transportation costs.  *See* 20 C.F.R. §655.122.

Historically, the regulations governing H-2B workers contains no such requirements. As noted above, no law or regulation specifically provides that fees for the employee side of the visa application process must be paid by the employer.  *See* 22 C.F.R. §40.1(l)(1) (requiring non-immigrant visa applicants, such as Plaintiffs, to submit processing fees when they apply for

QB\33245291.1

visas).  On the other hand, an H-2B employer is required to pay its own fees for the application to hire H-2B workers.  *See* 8 C.F.R. §§103.7(a) and (b) (requiring that a U.S. employer submit certain forms and filing fees to become an H-2B visa sponsor).  These regulations thus provide that each party will bear his or its respective costs associated with the H-2B Program.

The issue of whether FLSA requires an employer to reimburse H-2B workers their cost of transportation to the United States, visa expenses, and recruitment costs incurred by them in their home countries has been addressed by the United States Court of Appeals for the Fifth Circuit.  *Castellenos-Contreras v. Decatur Hotels, LLC*, 559 F.3d 332 (5th Cir. 2009).  In that case, virtually identical claims were brought by a group of H-2B hotel service workers, seeking reimbursement of costs incurred in traveling to the United States, obtaining visas, and for fees paid to recruitment companies in their home countries.  The Fifth Circuit reversed the district court's denial of summary judgment, and held that the employer was not required to reimburse such costs to foreign guest workers.

In *Castellanos-Contreras*, *supra*, the Fifth Circuit analyzed the workers' claim for transportation expenses.  Reviewing 29 C.F.R. §531.32(c), the court there concluded that the workers' cost of transportation from their home countries to the United States cannot be a "kickback" for which they must be reimbursed.  That section of the regulations lists examples of items or "facilities" which are primarily for the benefit or convenience of the employer and which therefore cannot be included in computing wages.  Included in the examples are: transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad).  Plaintiffs' expenses of traveling from their home country to the United States were not "an incident of and necessary to" their employment, any more than any domestic employees' costs of getting to work is a

reimbursable expense. Their status as H-2B guest workers does not increase their rights to reimbursement.

With respect to visa expenses, the Fifth Circuit noted that nothing in the FLSA or its regulations requires employers to reimburse visa expenses. In addition, other regulations "clarify that employee-paid expenses to obtain H-2B visas are worker expenses not primarily to the employer's benefit." 559 F.3d at 339; see 22 C.F.R. §§40.1(l)(1); 8 C.F.R. §§103.7(a), 103.7(b)(1), 214.2(h)(2)(i)(A). These regulations, which assign H-2B visa processing fees to visa applicants and H-2B sponsorship-application fees to employees, show that the visa expenses at issue there were not primarily for the employer's benefit. 559 F.3d at 339.

Finally, the Fifth Circuit addressed whether the FLSA obligates an employer to reimburse its H-2B guest workers for the expenses that they incurred with foreign recruitment companies. The court first noted that neither FLSA's provisions nor its implementing regulations require reimbursement of such expenses unless they constitute "kickbacks" to the employer. *Id*. The court concluded that such expenses are not kickbacks and were not part of Decatur's business expenses. As the court noted:

> Our examination and assessment of this question lead us to conclude that recruitment expenses were not part of Decatur's business expense. During the time period relevant to this case, no statute or regulation required H-2B employers to reimburse such expenses. The expenses differed in all fundamental characteristics from the expenses that our court has labeled "kick-backs." *See Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1199 (5th Cir. 1972) (deduction from cashiers' wages to pay for every shortage in employer cash-register accounts, regardless of the reason for the shortage); *Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1370 (5th Cir. 1973) (employee's wage deduction in favor of employer to recover the cost of a wrecked company truck). Furthermore, the expenses were not business expenses of Decatur's by custom or practice of Decatur's industry. In sum, there is no basis in custom, practice, or law to include the recruitment expenses as part of Decatur's business expenses, and Decatur has no FLSA obligation to reimburse the guest workers for them.

QB\33245291.1

559 F.3d at 339-340.

Plaintiffs' theory turns the statutory analysis of the interaction between the IRCA and FLSA analysis upside down by assuming, without statutory or regulatory support, that the FLSA requires payment of guest workers' transportation costs. Plaintiffs ignore the fact that in drafting IRCA, Congress specifically addressed transportation of H-2B guest workers and prescribed a single circumstance in which the employer would be responsible for transportation costs - when an employer returns an H-2B worker to his/her home country before the end of the certified period of employment. In statutory construction, specific controls the general and statutory language is to be given effect over non-binding interpretations. *See Radzanower v. Touche-Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989 (1976); *Morton v. Mancari*, 417 U.S. 535, 550-51, 94 S.Ct. 2474 (1974); *Varity Corp. v. Howe*, 516 U.S. 489, 511, 116 S.Ct. 1065 (1996) (no conflict is required, specific provisions control general).

The Fifth Circuit's holding in *Castellanos-Contreras* is a correct interpretation of the FLSA and its regulations. That statute and those regulations do not require reimbursement of travel, visa, and recruitment expenses of H-2B workers.

      **e.**    **The Eleventh Circuit's Decision In *Arriaga* Was Wrongly Decided; This Court Should Follow The Fifth Circuit's Decision in *Castellanos-Contreras*.**

It is expected that the Plaintiffs will rely heavily on the Eleventh Circuit's decision in *Arriaga v. Florida Pacific Farms, LLC. (supra)* and its progeny in support of their arguments regarding whether these expenses must be reimbursed. The *Arriaga* case, disagreed with by the Fifth Circuit in *Castellanos-Contreras,* is patently wrong. As recognized in *Castellanos-Contreras* and in *Villanueva-Bazaldua v. Trugreen Ltd. Partners, et al.*, 479 F.Supp.2d 411 (D.

QB\33245291.1

Del. 2007), based on the differences between H-2A and H-2B, there is no legal basis to extend *Arriaga* to H-2B workers.

*Arriaga* involved the H-2A program, which stems from a different set of regulations and obligations for the employer. See 8 U.S.C. §1188(c)(3)(B)(i). In *Arriaga*, the court's conclusion that the employer's failure to account for certain expenses incurred by agricultural workers in their wages operated as unlawful, de facto deductions, was logical because the employer had obligations to H-2A workers.

As the Fifth Circuit in *Castellanos-Contreras* concluded, *Arriaga's* holding should not be extended to the H-2B program. In the absence of an H-2B regulation that provides the legal obligation for the violations' alleged or authoritative case extending the *Arriaga* holding to H-2B workers, this Court should decline to follow its reasoning. *Arriaga's* construction of the FLSA as imposing this expense on the employer is incorrect, overbroad and unnecessarily overreaches.

*Arriaga* disregarded applicable regulations promulgated under Section H-2A and misinterpreted and misapplied regulations interpreting FLSA. The *Arriaga* court's novel interpretation of FLSA regulations creates wholly unexpected liabilities superseding long established customs practices between employers and employees, and causes conflict between FLSA and IRCA and many other statutes, regulations and policies in direct contravention of Congress' express intent.

> **f.     Recent DOL Interpretations Which Attempt to Shift Pre-Employment Expenses To Employers Are Not Worthy Of Deference.**
>
> > **i.     Congress' intent in drafting H-2B is clear that it did not intend to shift pre-employment expenses to H-2B employers.**

8 U.S.C. §1184(C)(5)(A) regulating H-2B visas addresses the issue of transportation costs specifically, and provides:

17

In the case of an alien who is provided non-immigrant status under §1101(a)(15)(H)(i)(b) or 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable cost of return transportation of the alien abroad.

The regulations also expressly address § H-2B worker transportation costs:

Liability for transportation costs.  The employer will be liable for the reasonable cost of return transportation of the alien abroad if the alien is dismissed from employment for any reason by the employer before the end of the authorized admission pursuant to §214(c)(5) of the Act.  If the beneficiary voluntarily terminates his or her employment prior to the expiration of the validity of the petition, the alien has not been dismissed.

8 C.F.R. §214.2(h)(6)(vi)(E); see also 20 C.F.R. §655.1 and §655.22  Notably, the H-2B regulations refer to workers to who come to this country on H-2B visas as "beneficiaries" of the H-2B visa program.

In contrast, regulations regarding H-2A workers provide as follows with respect to the issue of transportation to and from the place of employment:

Transportation; daily subsistence - (a) Transportation to the place of employment. The employer shall advance transportation and subsistence costs (or otherwise provide them) to workers when it is the prevailing practice of non-H-2A agricultural employers in the occupation in the area to do so, or when such benefits are extended to H-2A workers.  The amount of the transportation payment shall be no less (and shall not be required to be more) than the most economical and reasonable similar common carrier transportation charges for the distances involved.  If the employer has not previously advanced such transportation and subsistence costs to the workers or otherwise provided such transportation or subsistence directly to the worker by other means and if the worker completes fifty percent of the work contract period, the employer shall pay the worker for costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer to the place of employment. . . . (b) Transportation from the place of employment.  If the worker completes the work contract period, the employer shall provide or pay for the workers' transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, came to work for the employer.

20 C.F.R. §655.102(b)(5).

18

Section H-2A regulations explicitly require employers to advance or provide inbound transportation and subsistence costs when customarily provided to U.S. agricultural workers or when such "benefits" are extended to H-2A workers, to pay H-2A agricultural workers such costs upon completion of fifty percent of the contract period, and to pay the outbound transportation costs of agricultural workers who complete the contract period. Section H-2A regulations also require the employer to provide housing, workers' compensation, and other benefits not provided non-H-2A workers. *See, e.g.,* 20 C.F.R. §655.102(a)(1) & (2). The regulations governing H-2A reference FLSA regulations demonstrate DOL was well aware of FLSA and its regulations when it drafted IRCA regulations. *See e.g.*, 20 C.F.R. §655.102(b)(13).

Prior to the enactment of the IRCA in 1986, Congress did not differentiate between temporary workers performing agricultural and non-agricultural services. All were referred to as H-2 workers. The distinction between agricultural and non-agricultural workers was made clear in 8 U.S.C. §1101(a)(15)(H)(ii)(a)&(b). Congress then provided detailed guidelines for certifying foreign agricultural workers. 8 U.S.C. §1188. Congress chose not to adopt more comprehensive regulations for non-agricultural workers. And visas, as Plaintiffs are well aware, are not fungible or interchangeable. The requirements for one visa are not imported into another, and neither the DOL nor courts should extend benefits afforded H-2A workers to H-2B non-agricultural workers.

Comparing the language of H-2B and its interpretative regulations with those of H-2A, it is clear that Congress intended that H-2B employers would not be responsible for payment of inbound transportation and subsistence costs of H-2B workers, and would only be liable for the cost of outbound transportation in the event the H-2B worker is involuntarily terminated by the

employer before the end of the period of authorized admission.  The fact that Congress specifically addressed this circumstance under H-2B demonstrates its intent not to impose such expenses except as specifically required by the statute.

It is a well-established canon of statutory construction that to include one thing is evidence of an intent to exclude others:  "*Inclusion unius est exclusio alterius.*"  *Russello v. U.S.,* 464 U.S. 16, 23 (1983).  If Congress intended H-2B employers to advance or pay the transportation and inbound expenses of H-2B workers, it knew how to do so.  Instead, Congress chose to limit an H-2B employer's liability to certain, narrow circumstances.  Congress' intent is clearly that H-2B workers who temporarily relocate for employment are not owed reimbursement for their transportation, visa and recruiting expenses.  GLK and other similarly-situated H-2B employers did not impose these expenses on workers.  Congress did and its words should not be disregarded.

ii.     **In light of this clear Congressional intent, the DOL's attempts to override Congress should be disregarded and are owed no deference.**

Plaintiffs will likely rely heavily on a 2009 DOL-issued Field Assistance Bulletin.  That Bulletin asserts that pre-employment expenses are primarily for the benefit of the H-2B employer.  *See Travel and Visa Expenses of H-2B Workers Under the FLSA*, U.S. DOL Wage and Hour Division, Field Assistance Bulletin No. 2009-2 (Aug. 21, 2009).  The bulletin, however, was published less than a year after the DOL had issued a Final Rule concluding that pre-employment expenses were *not* primarily for the benefit of the H-2B employer.  *See Labor Certification Process and Enforcement for H-2B Workers and other Technical Changes*, 73 Fed. Reg. 78,020 (Dec. 19, 2008) (withdrawn by 74 Fed. Reg. 13,261 (Mar. 26, 2009).

QB\33245291.1

An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (internal quotation omitted); *see also Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 599 (7th Cir. 2012) *aff'd.*, *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870 (2014) (7th Circuit noting that courts which have reached varied conclusions on whether employers must compensate employees for time spent putting on and taking off their work clothes have nonetheless come together in spurning the "gyrating agency letters on the subject.") (internal quotation omitted). In fact, in the Supreme Court's decision in *Sandifer, supra,* the Court noted: "Although the Labor Department has construed §203(o) on a number of occasions, the Government has expressly declined to ask us to defer to those interpretations, which have vacillated considerably over the years." *Sandifer v. U.S. Steel Corp.*, 134 S.Ct. 870, 877, fn.5.

Subsequently, the DOL issued a final rule on the H-2B Program attempting to amend its regulations and, among other things, extending the inbound transportation reimbursement requirements to the H-2B Program. *See Temporary Non-agricultural Employment of H-2B Aliens in the United States*, 77 Fed. Reg. 10038 (Feb. 21, 2012) (codified at 20 C.F.R. §655.18) ("2012 Final Rule"). The proposed new H-2B rules would have required H-2B employers (like H-2A employers) to reimburse pre-employment travel and visa expenses after 50% of the certified period of employment had been completed. *Id*. The DOL estimated that these additional expenses would cost employers more than $75 million per year, every year. *Id.* at 10039. However, DOL's 2012 H-2B program rule was enjoined in federal court, with the Eleventh Circuit Court of Appeals upholding a district court's injunction and holding that the rule was beyond DOL's legal authority, on the basis that Congress had not extended rule making

QB\33245291.1

authority to the DOL for H-2B regulations. *Bayou Lawn and Landscape Services, et al. v. Solis et al.*, 713 F.3d at 1080, 1084-85.

In *Bayou*, the DOL attempted to defend its efforts at rule-making on several bases, all rejected by the Eleventh Circuit. Notably, DOL argued that the section of the Immigration and Nationality Act from which the program draws its name – 8 U.S.C. §§1101(a)(15)(H)(ii)(b) – granted it indirect authority to promulgate the rules. The Eleventh Circuit, however, distinguished this provision from the immediately preceding statutory section – (H)(2)(A) – which expressly grants DOL rulemaking authority over the agricultural worker H-2A program. "The absence of a delegation of rulemaking authority to DOL over the non-agricultural H-2B program in the presence of a specific delegation to it of rulemaking authority over the agricultural worker H-2A program persuades us that Congress knew what it was doing when it crafted these sections." *Id.*

Similarly, the court rejected the DOL's argument that the "text, structure and object" of the INA evidence a congressional intent that DOL exercise rulemaking authority over the H-2B program. The court noted that agency authority flows from express delegations from Congress. *Id.* Since that injunction was issued, these rules have never been implemented.

Despite the DOL's efforts in the last few years to impose new liabilities on H-2B employers, it is clear that it does not have the authority to promulgate such regulations and its interpretations under the FLSA should be accorded no deference.

**2.**     <u>The AWPA Does Not Require GLK To Employ Plaintiffs and Class Members For The Entire Certified Period of Employment.</u>

Plaintiffs allege that GLK violated AWPA when it failed to employ them for the entire certified period of employment indicated in the approved H-2B petitions for the years 2010 and 2011. In 2010, GLK sent workers back to Mexico after the crop was ruined due to record

QB\33245291.1

rainfalls. In 2011, the DOL initially increased the minimum wage for H-2B workers that year to $14.86, an increase of 87% from the previous year. As a result, it was not economically feasible for GLK to continue to employ the workers at such rates, and they were sent back to Mexico.

Defendants are entitled to summary judgment on this count. First, the H-2B petitions do not create a contract between the workers, guaranteeing them employment for the entire certified period of employment, both as a factual matter and as a matter of law.

As to the H-2B applications themselves, the language contained therein regarding the certified period of employment only indicates that the certified period of employment is that period of time during which the workers may be employed. There is no requirement stated within the H-2B application itself that the workers be guaranteed a period of employment.

That is evident by the wording contained in the application. For example, page 1 of the 2011 application refers to a "Period of *Intended* Employment." (emphasis supplied). At the bottom of each page of the application, the application refers to a "validity period." The Department of Labor at page 6 of the application states that the certification was "valid from 8/1/11 to 11/15/11." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. To the contrary, the application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation." (emphasis supplied).

Similarly, paragraph #11 states: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to*

QB\33245291.1

*the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). The language in the petition for 2010 was identical.

Moreover, nothing in AWPA warrants such a conclusion. The 2008 H-2B regulations do not speak directly to whether an H-2B job order can form the basis of an actionable breach of contract claim between a worker and his or her employer. Any arguments that H-2B petitions or job orders constitute contracts also heavily rely upon cases decided before the DOL's issuance of the H-2A and H-2B rules referenced above; however, the holdings of these cases were never incorporated into the most recent H-2B regulations. *See, e.g., Western Colorado Fruit Grower v. Marshall*, 473 F. Supp. 693, 696 (D. Colo. 1979)(a "clearance order is essentially an offer for a contract of employment"); *see also* S*alazar v. Presidio Valley Farmers Assn.*, 765 F.2d 1334, 1341-1342 (5th Cir. 1985).

The few cases which have substantively passed upon the issue of whether H-2B applications or job orders create contracts have held that they do not. In *Garcia v. Frog Island Seafood, Inc.*, 64 F.Supp.2d 696 (E.D.N.C. 2009), the district court there rejected breach of contract claims based on H-2B job order, reasoning that "Plaintiff's claims are not for earned benefits but rather for work that was never performed nor was it ever, as this court concludes, contractually promised . . .to apply a unilateral contract analysis to the situation before us would, in effect, require us to abandon the 'at will' doctrine which is the law in this State"(internal quotations and citations omitted). The *Garcia* holding is consistent with dicta in a 2007 case, in which another federal district court observed that "[a]n H-2B worker . . . has no employment contract or work guarantee." *Olivera-Morales v. Intern. Labor Mgmt. Corp.*, 246 F.R.D. 250 (M.D.N.C. 2007).

QB\33245291.1

Although there is little case law squarely addressing this issue, the DOL acknowledged

the impact of the *Garcia* case in its Notice of Proposed Rulemaking for the revised H-2B rules,

when it observed:

> Few legal options exist for H-2B workers who feel their work contracts have been
> violated. An initial barrier to legal recourse is purely practical: H-2B workers are
> not eligible for services from federally-funded legal aid programs. As a result,
> most H-2B workers have no access to lawyers or information about their legal
> rights. Furthermore, the H-2B job order, which specifies the terms and conditions
> of employment, including work hours, may not be enforceable through private
> litigation. *See Garcia v. Frog Island Seafood, Inc*., 644 F.Supp.2d 696, 716-18
> (E.D.N.C. 2009) (holding H-2B job orders would not be treated as enforceable
> contracts). A guaranteed number of hours, enforceable by WHD, may well be the
> only protection H-2B workers have if employers misrepresent the amount of work
> the worker will actually be provided. 76 Fed. Reg. 15130-01 (March 18, 2011).

Accordingly, Plaintiffs' claims for reimbursement of pre-employment expenses and for

pay for a guaranteed or for the entire certified period of employment fail as a matter of law and

Count III must be dismissed as to those claims.

**B.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT VI -
         BREACH OF CONTRACT.**

Count VI alleges a breach of contract claim against GLK on behalf of the 2010 and 2011

classes. Plaintiffs allege that GLK's 2010 and 2011 H-2B applications and certifications created

employment contracts between Defendants and Plaintiffs and Class Members and that GLK

breached those contracts when it sent Plaintiffs and Class Members back to Mexico before the

end of the certified period of employment due to crop failure in 2010 and higher than expected

labor costs in 2011. Plaintiffs also alleged GLK breached its contract with them by failing to pay

them the applicable prevailing wage rate for their respective first weeks of work in each season.

This claim is not supported by either the facts or the law.

Under Wisconsin law, a valid contract requires an offer, acceptance and consideration.

*Briggs v. Miller,* 176 Wis. 321, 325, 186 N.W.2d 163 (1922). Offer and acceptance exist when

the parties mutually express assent, and consideration exists if the parties manifest an intent to be bound to the contract. *Gustafson v. Physicians Ins. Co.,* 223 Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998). Plaintiffs contend that GLK's H-2B application are the basis for a contract between the workers and GLK.

The H-2B applications were submitted by GLK to the Department of Labor, not to the Plaintiffs. As acknowledged by the Plaintiffs in their depositions, no discussions occurred between FLECTS, LaborQuest or any other individual acting on behalf of GLK which specifically guaranteed dates of employment. Instead, they were informed that they would be told when to report to the appropriate consulate for visa processing and that at most, the work would be for the season, but no specific dates were provided to the plaintiffs.

No contract of a specific duration was formed and GLK's decision to terminate the workers was within its rights under the AWPA and under state law. Wisconsin has long adopted the doctrine of employment at will, allowing employers or employees to terminate without cause at the will of either party. *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 3d 561, 572, 335 N.W.2d 834 (1983). To the extent the Plaintiffs rely on the H-2B application as the basis for the contract terms, it is clear from the wording of those forms that the certified period of employment was just that - the period in which the worker was authorized or certified to work. As demonstrated above in Section A (2), GLK's 2010 and 2011 Applications for Temporary Employment Certification did not, by its own terms, create a contract for a defined period of time.

The applications refer to a "Period of *Intended* Employment" or "validity period." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. To the contrary, the application

QB\33245291.1

specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation. " (emphasis supplied).

The declaration in paragraph #11 similarly contemplates work for less than the entire certified period: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). Nowhere in either Application does GLK guarantee a specific period of employment. Thus, the 2010 and 2011 applications cannot form the basis of a contract claim for a defined period of employment, as they lack the fundamental term upon which such a contract could be formed.

Moreover, as demonstrated above in Section II(A)(2)(and incorporated herein by reference), AWPA does not guarantee H-2B workers of a certain term of employment and thus there is no statutory right which could somehow be construed to create a contract for a defined period of employment. *Garcia v. Frog Island Seafood, Inc.*, 64 F.Supp.2d 696 (E.D.N.C. 2009).

Similarly, Plaintiffs have no evidence that Defendants or anyone acting on their behalf promised them reimbursement for pre-employment expenses; to the contrary, they testified no one made such promises to them. Nothing in the H-2B applications refers to, let alone requires or promises reimbursement of pre-employment expenses by the employer. And as demonstrated above in Section A, no law requires reimbursement of such expenses. Accordingly, Defendants are entitled to summary judgment on Count VI.

QB\33245291.1

**C.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT VIII:
(2010 and 2011 Classes)**

Count VIII alleges GLK violated  Wis. Stat. §§ 104.02, 104.03, 109.03(1) as a result of

GLK's alleged failure to reimburse the 2010 and 2011 Plaintiffs and Class Members for

recruitment, immigration, travel and other expenses that Plaintiffs and Class Members incurred

primarily for the benefit of Defendants.  This claim is based on the same facts as Plaintiff's

claims in Counts III and VI - that Plaintiffs incurred recruitment, travel and immigration

expenses primarily for the benefit of the Defendants.

Wis. Stat. §104.02 (**Living wage prescribed**), provides:  "Every wage paid or agreed to

be paid by any employer to any employee, except as otherwise provided in s. 104.07, shall be not

less than a living wage."  A "living wage" under Wis. Stat. §104.01(5) "means compensation for

labor paid, whether by time, piecework, or otherwise, sufficient to enable the employee receiving

the compensation to maintain himself or herself under conditions consistent with his or her

welfare."  Wis. Stat. §104.03 (**Unlawful wages**), provides no substantive rights and simply

states:  "Any employer paying, offering to pay, or agreeing to pay any employee a wage lower or

less in value than a living wage is guilty of a violation of this chapter."  Section 104.02 contains

no reference to reimbursement of pre-employment expenses.

Section 104.02 has been interpreted to require that an employer pay its employees at least

the minimum wage (defined in Wis. Admin. § DWD 272.03(1) as $7.25 per hour currently and

in 2010 and 2011) for all hours worked.  *Bitner v. Wyndham Vacation Resorts, Inc.*, 2013 WL

5878724 at *4 (W.D. Wis. 2013).  As noted above, Plaintiffs admit that they were paid the

required hourly rates for work performed in 2010 and 2011.

Plaintiffs also claim Defendants violated Wis. Stat. §109.03 (Required frequency of

payments) which provides:  "Every employer shall as often as monthly pay to every employee

engaged in the employer's business, except those employees engaged in logging operations and farm labor, all wages earned by the employee to a day not more than 31 days prior to the date of payment."

Neither of these statutory provisions contain reference to reimbursement of pre-employment expenses as potentially reducing wages below minimum requirements. In the absence of specific state-law statutory or regulatory authority, Wisconsin courts look generally to the interpretation of the FLSA in applying Wisconsin's wage law statutes. *See, Madely v. RadioShack Corp*., 2007 WI App 244, 306 Wis. 2d 312, 742 N.W.2d 559. Under the FLSA, such expenses are not incurred primarily for the benefit of GLK and do not diminish the wages of the Plaintiffs and Class Members, as demonstrated above in Section A and incorporated herein by reference. Accordingly, and for the same reasons stated above in Section A and herein, Defendants are entitled to summary judgment on this Count VIII.

## CONCLUSION

For all of the above stated reasons, Defendants' motion for summary judgment on Counts III, VI and VIII should be granted and those counts dismissed as discussed above.

QB\33245291.1

Dated:  February 20, 2015.

Michael Aldana
State Bar No. 1020233
Sean M. Scullen
State Bar No. 1034221


s/Michael Aldana
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Suite 2400
Milwaukee, WI  53202-4426
(414) 277-5000
Attorneys for Defendants

Direct inquires to:

Michael Aldana
(414) 277-5151
michael.aldana@quarles.com