# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

ALEJANDRO JURADO JIMENEZ et al.,    )
    )
        Plaintiffs,    )
    )  Civil Action No. 12-C-0209
    v.    )
    )  Judge Griesbach
GLK FOODS, LLC and RYAN A. DOWNS,    )
    )
        Defendants.    )

AND

JOSE ENRIQUEZ RAMIREZ et al.,    )
    )
        Plaintiffs,    )
    )
    v.    )  Civil Action No. 12-C-210
    )
GLK FOODS, LLC and RYAN A. DOWNS,    )  Judge Griesbach
    )
        Defendants.    )
    )
    )

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF CLASSES'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT FOR VIOLATIONS UNDER THE
AWPA AND THE WMLA OF REQUIREMENTS TO (1) PROVIDE DISCLOSURES OF
TERMS OF EMPLOYMENT, (2) PROVIDE WORK AGREEMENTS, (3) NOT TAKE
UNAUTHORIZED DEDUCTIONS FROM WAGES, AND (4) MAKE AND KEEP
RECORDS OF PERMANENT ADDRESSES OF THE NAMED PLAINTIFFS**

Pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56, the Plaintiffs and the Class certified for purposes of liability and damages under Counts IV and VII in *Jimenez v. GLK*, 12-C-0209 ("*Jimenez*") and the Plaintiff Class in *Ramirez v. GLK*, 12-C-0210 ("*Ramirez*") submit this joint memorandum of law[1] in support of their motion for entry of summary judgment as to liability and an award of statutory damages on their claims that Defendants violated federal and Wisconsin law by:

(a)     Failing to provide workers at the time of recruitment with detailed written disclosures of the terms of employment in Spanish (*Jimenez* Counts IV and VII; *Ramirez* Count I[2]), in violation of 29 U.S.C. § 1821(a), Wis. Stat. § 103.915;

(b)     Failing to provide workers with written work agreements fully and accurately describing the material terms and conditions of employment (*Jimenez* Count VII), in violation of 29 U.S.C. § 1822(c), 29 C.F.R. § 500.72, and Wis. Stat. § 103.915(1)(b);

(c)     Taking  deductions from wages without written authorizations (*Jimenez* Count VII), in violation of Wis. Stat. § 103.93(3); and

(d)     Failing to "make and keep" records of their permanent addresses (*Jimenez* Count V), in violation of 29 C.F.R. § 500.80(a).

---

[1] In the interest of judicial economy and because of the substantial overlap between the AWPA disclosure claims in *Jimenez* and *Ramirez*, the Plaintiffs and Class Members in each case present this combined memorandum of law. Unless otherwise specified, "Class Members" refers to those parties in both *Jimenez* and *Ramirez.*

[2] On February 13, 2015, the *Ramirez* Class filed a motion to modify the scope of class certification of the AWPA disclosure claims in Count I. *Ramirez* Dkt. No. 56. The motion seeks to certify the *Ramirez* AWPA disclosure claims for class-wide adjudication with respect both to liability *and damages*, in conformity with the scope of the class certification of the substantively and functionally identical AWPA disclosure claims in *Jimenez. Id.* The motion is currently pending.

## <u>INTRODUCTION</u>

Between 2006 and 2011, defendants Great Lakes Kraut Foods, Inc. ("GLK") and Ryan A. Downs employed approximately 210 Mexican migrant workers as "trim-line laborers" to process raw cabbage into sauerkraut at the GLK cannery in Bear Creek, Wisconsin. Each year, Class Members were recruited and hired by Defendants under the federal government's "H-2B" guest-worker visa program. The *Jimenez* Class Members each worked at the cannery 2006, 2007, 2008, 2010, and/or 2011. In 2011, in addition to the H-2B workers brought to Bear Creek, approximately 35 other H-2B workers were recruited and hired by Defendants, but then stranded by Defendants at the Mexico-U.S. border. These workers were not brought to the cannery in Bear Creek or paid any wages by Defendants in 2011. The workers stranded at the border are the Class Members in *Ramirez.*

The recruitment and employment of migrant workers is highly regulated by both the federal and Wisconsin state governments. The federal Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") requires, among other things, written and forthright disclosures of the terms of employment in the migrant workers' language at the time of recruitment. 29 U.S.C. § 1821(a). Count IV of *Jimenez* alleges a class-wide claim that Defendants violated the AWPA disclosure requirements in 2006, 2007, 2008, 2010, and 2011. Similarly, Count I of *Ramirez* contains a class-wide claim that Defendants violated the AWPA disclosure requirements in 2011.

Wisconsin's Migrant Labor Act ("WMLA") also requires employers to make written disclosures of employment terms at the time of recruitment, and, in addition, requires employers to provide a written work agreement that includes, among other things, the start and end dates of employment. Wis. Stat. § 103.915. Count VII of *Jimenez* alleges that Defendants violated the

3

WMLA in 2006, 2007, 2008, 2010, and 2011 by failing to provide both the required recruitment disclosures and the mandatory written work agreement.

Plaintiffs also submit this memorandum in support of their motion for summary judgment on Count VII of *Jimenez*, which alleges that Defendants further violated the WMLA in 2011 by deducting sums from migrant workers' pay without the required written consent. Wis. Stat. § 103.93(3).

In addition, the 82 named *Jimenez* Plaintiffs ("Individual *Jimenez* Plaintiffs") submit this memorandum of law in support of their motion for summary judgment on their individual claims in Count V that in 2006, 2007, 2008, 2010, and 2011 Defendants violated the AWPA recordkeeping requirements by failing to record and keep their permanent addresses. 29 U.S.C. § 1821(d)(1); 29 C.F.R. 500.80(a).

As discussed in more detail below, the record evidence in this case clearly establishes Defendants' liability on the disclosure claims, deduction and record-keeping claims, and that the award of the full statutory damages for each violation of state and federal law is warranted.

## SUMMARY OF MATERIAL FACTS

Defendant GLK is the largest sauerkraut producer in the world, processing more than 120,000 tons of cabbage into sauerkraut annually. Plaintiff Classes' Consolidated Statement of Undisputed Facts ("PSUF") ¶ 1. GLK has revenues of between $50 million and $100 million annually. PSUF ¶ 1. At all relevant times, Defendant Ryan Downs was the owner and President of GLK. PSUF ¶ 2. As part of the process of producing sauerkraut, each head of raw cabbage must be cored and trimmed, individually, before fermenting. PSUF ¶ 3. The coring and trimming ("trim-line" work) is labor-intensive work-- each head of cabbage must be cleaned, cored, trimmed, and salted before fermenting. PSUF ¶ 3. It is also low-wage, seasonal work. At GLK it

4

is performed primarily between August and November. PSUF ¶ 4. Every year, GLK hires roughly 50-100 seasonal workers to do the coring and trimming. PSUF ¶ 5. For a number of years, including all the years in the class period, GLK hired predominately Mexican nationals rather than U.S. workers to perform this "trim line" labor. PSUF ¶ 6. The Class Members were recruited and employed by Defendants to do "trim line" work, processing raw cabbage into sauerkraut at GLK's cannery plant in Bear Creek, Wisconsin under the federal government's H-2B program, authorized by 8 U.S.C. § 1101(a)(15)(H)(ii)(b). PSUF ¶¶ 4, 9.

All of the Class Members are migrant workers. PSUF ¶ 69. They are Mexican nationals whose permanent place of residence is Mexico. PSUF ¶ 69. Because they were employed so far from their homes, the *Jimenez* Class Members lived in temporary housing on GLK's property in Bear Creek while they were employed there. PSUF ¶ 70. Spanish is the primary language of all Class Members, and the vast majority speak and read little-to-no English. PSUF ¶ 7.

**Defendants' Recruitment and Hiring of H-2B Workers.**

Federal law allows employers to "import" foreign workers in limited circumstances, through various "guest-worker" visa programs. *See* 8 U.S.C. § 1101(a)(15)(H)(ii). Defendants participated in the "H-2B" guest worker program. PSUF ¶ 8; *see* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). Defendants sought and received temporary labor certifications from the federal government in 2006, 2007, 2008, 2010, and 2011 to employ H-2B workers to perform trim line work at GLK's Wisconsin cannery plant. PSUF ¶ 9.

Many participating employers hire agencies to help them through the H-2B process. While Defendants retained the firm The Associates in 2006 and 2008, and LaborQuest in 2010 and 2011, each season GLK itself conducted recruitment. PSUF ¶¶ 27-29.

Early on in Defendants' participation in the H-2B program, Downs authorized a GLK employee and native of Mexico, Rafael Jimenez Arroyo, to recruit and hire workers. PSUF ¶¶ 33-34. Jimenez Arroyo principally recruited from in and around his hometown of Santiago Capitiro, in the state of Guanajuato in Mexico. PSUF ¶ 36. In the early years, Downs accompanied Jimenez Arroyo on several of these trips. PSUF ¶ 37. Downs made the trip personally six or seven times. PSUF ¶ 37. Once GLK hired the workers, visas had to be procured for each worker. PSUF ¶ 72. Because there was no U.S. consulate in or near Santiago Capitiro, the workers recruited by the defendants from that area had to travel a considerable distance for visa interviews—in 2010 to Mexico City and in 2011 to Matamoros. PSUF ¶¶ 73-74.

In 2011, the H-2B workers' visas were processed in three groups, staggered over a period of approximately a month. PSUF ¶¶ 54-55. The *Ramirez* Class Members are the approximately 35 workers who were in the third group. PSUF ¶ 56. Like the other H-2B workers, having received and accepted offers of employment from Defendants in their home towns, contingent only on their being issued visas, these workers traveled, at their own expense, from their home towns to the U.S. consulate in the Mexican border city of Matamoros, for many of them a journey of more than 12 hours and 600 miles. PSUF ¶¶ 36, 61, 75-76. After the *Ramirez* Class Members received their visas, and only hours before they were scheduled to depart Mexico for travel to Wisconsin, Defendants informed this group of workers that it no longer needed their services and cancelled their visas. PSUF ¶¶ 66-67. The workers thus had to return to their home towns, at their own expense, after having spent significant sums on travel and visa expenses, and without receiving a single day's wages or any reimbursement from Defendants. PSUF ¶¶ 68, 87-88.

**Downs Was Personally Involved in the Recruitment, Hiring, and Employment of the H-2B Workers.**

Defendant Downs exercised operational control over the recruitment, hiring and employment of H-2B workers. PSUF ¶¶ 2, 31-32, 34, 38, 90-91, 120. He was personally involved with the H-2B application process, in some years personally signing temporary labor certification forms in which he agreed to follow federal and state labor and employment laws, and initialed forms from GLK's labor contractors acknowledging an employer's legal obligations in the H-2B program. PSUF ¶ 11. He informed Jimenez Arroyo of the terms of employment that were to be communicated to the workers. PSUF ¶ 37. He was personally involved in assuring compliance with wage and hour issues. PSUF ¶¶ 136, 139-40, 156-57. When the Wisconsin Department of Workforce Development ("DWD") and the U.S. Department of Labor ("DOL") each repeatedly investigated the treatment of migrant workers by GLK several times between 2002 and 2011, Downs met with and/or spoke to the investigators. PSUF ¶¶ 133, 136, 139-40. Downs made the decision to terminate Class Members' employment before the end of the season, both in 2010 and 2011. PSUF ¶ 90.

**Required Disclosures and Work Agreements Were Not Provided.**

The AWPA and the WMLA each require that migrant workers be provided with detailed written disclosures stating the terms and conditions of employment at the time of recruitment. 29 U.S.C. § 1821(a); Wis. Stat. § 103.915(1)(a). In addition, the WMLA also separately requires that migrant workers must be provided a written work agreement. Wis. Stat. § 103.915(1)(b). Both the state and federal statutes require that this written information be provided in the language spoken by the workers, 29 U.S.C. § 1821(g) and Wis. Stat. § 103.915(8), which in this case was Spanish. To facilitate compliance with these detailed disclosure requirements, the DWD publishes a standard form work agreement, both in English and Spanish. PSUF ¶ 168.

7

Similarly, the DOL publishes Form WH-518, which is a "Worker Information" sheet containing the specific disclosures separately required by the AWPA. PSUF ¶ 169. These mandated written disclosures provide essential protections for migrant workers. *See Villalobos v. Vasquez-Campbell*, 1991 WL 311902 * 4 (W.D. Texas Nov. 15, 1991) ("Without the disclosure statements, farm workers … are left without any written form of proof when employers misrepresent the terms and conditions of employment. Many courts, in construing the AWPA and its predecessor, the FLCRA, have recognized the critical role the disclosure statements serve ….").

Defendants did not make use of the either the DOL's or the DWD's form—or any alternative—in any of the seasons at issue in the case. Defendants have stipulated that from 2006 through 2011, neither they, nor any agent working on their behalf, nor, to their knowledge any other person, provided workers with full written disclosures containing all the information required by AWPA or the WMLA, in English or Spanish, to *any* H-2B worker employed by them. PSUF ¶¶ 163-67. Defendants also have stipulated that from 2006 through 2011, neither they nor any agent working on their behalf, nor to their knowledge, any other person, made disclosures in writing to *any* H-2B worker recruited or employed by them regarding transportation or workers' compensation insurance (as required by the AWPA), PSUF 167, or regarding transportation arrangements or the minimum work guarantees (as required by the WMLA). PSUF ¶¶ 165, 167.

### 2011 Deductions From Wages for Meals and Housing.

In each season during the class period, GLK deducted amounts from H-2B workers' wages each week for meals and housing. PSUF ¶ 178. GLK made efforts to obtain proper authorizations for wage deductions in 2006, 2007, 2008, and 2010, generally obtaining written

consent from the workers. PSUF ¶ 179. In those years, workers signed a form provided to them by GLK, which expressly authorized wage deductions, and was titled "Authorized Deductions." PSUF ¶ 180. That form stated, in English and Spanish, "I authorize Great Lakes Kraut Co. to deduct from my weekly payroll, room and board at a rate of [the applicable rate] per week." PSUF ¶ 180.

In 2011, by contrast, Defendants repeatedly deducted $75 per week from the workers' weekly wages for meals and housing without obtaining written authorization. PSUF ¶¶ 181, 188. The workers received between 4 and 7 paychecks in 2011, and $75 was deducted from each one. PSUF ¶ 189.[3] Despite these deductions, in 2011, no worker was presented with or signed any document mentioning wage deductions or linking housing costs with wage deductions.[4] PSUF ¶ 181.

**No Record of Permanent Addresses.**

The AWPA requires covered employers to make and keep detailed payroll records. 29 U.S.C. § 1821(d)(1). As part of their record-keeping responsibilities, employers must record each worker's permanent address. 29 C.F.R. § 500.80. Defendants have admitted, and the records make clear, that they failed to make and keep records of Class Members' addresses. PSUF ¶ 191.

---

[3] Three of the plaintiffs, who worked for Defendants as cooks, had $75 withheld from their wages only for the first three weeks of the 2011 season. PSUF ¶ 188.

[4] In 2011, Defendants had some H-2B workers, sign a "personal data sheet," written in English, which contained various fields of worker information. PSUF ¶ 182-183. Directly above the signature line, the form said, "by signing this form I attest that I physically resided in the state of WI for ten (10) months or more." PSUF ¶ 185. The form also said "Housing: Yes ___ No ___." PSUF ¶ 184. On some of the workers' sheets, there was a check mark next to "yes," and in some cases, "75.00" was handwritten. PSUF ¶ 186. Nowhere on the sheet does it mention a wage deduction or authorization for such a deduction. PSUF ¶ 187.

**Defendants Had Notice of AWPA and WMLA Requirements.**

Defendants were repeatedly put on notice of the AWPA and the WMLA. PSUF ¶ 133-141, 156-61. Defendant Downs received and reviewed informational brochures from the DWD and the DOL regarding applicable rules and regulations, and repeatedly discussed them with representatives of the agencies. PSUF ¶ 156. Betty Miller, a human resources assistant at GLK who was involved in the H-2B program, attended bi-annual DWD-sponsored programs regarding migrant workers, beginning in approximately 1999. PSUF 158. Those programs discussed the AWPA and the WMLA, including the disclosure and working agreement requirements. PSUF ¶ 159. Jacci Carlson, who became GLK's director of human resources in June 2011, read information on the DOL's website regarding laws related to H-2B workers. PSUF ¶ 160. Carlson also met with a representative from the DWD to receive information about the WMLA, and reviewed the statute itself. PSUF ¶ 161.

In addition to being informed of the applicable requirements by these activities, Defendants were further aware of them because on multiple occasions, both the DWD and the DOL investigated the treatment of H-2B and other migrant and seasonal workers by GLK. PSUF ¶ 133. Downs met with these investigators on behalf of GLK. PSUF ¶ 136, 139-40. In 2007 and 2008, GLK was cited by the DWD for violations of the WMLA, including for firing migrant workers before the end of their employment contract. PSUF ¶¶ 150-54. In both instances, GLK was ordered to pay the workers their wages owed for the remainder of the contract period, and given information and counseling about the WMLA, including a copy of the statute itself. PSUF ¶¶ 150-154. In 2002, GLK was cited and fined by the DOL for violations of the AWPA disclosure requirements from 2000 through 2002, and assessed a civil monetary penalty of $4,503.68. PSUF ¶ 134. In 2008, DOL again investigated GLK for, among other things, failure

to provide the required recruitment disclosures to migrant and seasonable workers from 2006 through 2008. PSUF ¶ 137. Defendant Downs and Miller participated in a conference with the investigator and "indicated that they were not aware of some of the MSPA [AWPA] requirements and, now that they were, would comply." PSUF ¶ 140. The DOL also found that GLK had violated the H-2B regulations in 2010 and 2011, and assessed a total of $21,000 in civil penalties against GLK, which GLK paid in early 2013. PSUF ¶ 145-46. Downs and Carlson participated in a conference with the investigator regarding those violations on September 6, 2012. PSUF ¶ 147.

In spite of GLK's lengthy history of being subject to investigations by the DOL and the DWD, and the fact that the company had paid $21,000 in civil penalties to the DOL for their violations of the H-2B regulations less than six months earlier, Defendants provided false sworn discovery responses in this case, dishonestly denying and concealing that they had ever been investigated by any of these agencies for violations of the AWPA, the WMLA, or the H-2B regulations. PSUF ¶ 162.[5]

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). Only factual disputes that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

---

[5] Plaintiffs' counsel discovered Defendants' history of violations only through its own investigation, including through Freedom of Information Act requests to the agencies.

## ARGUMENT

**I.      DEFENDANTS VIOLATED THE AWPA BY INTENTIONALLY NOT PROVIDING THE REQUIRED DISCLOSURES AT THE TIME OF RECRUITMENT (*Jimenez* Count IV and *Ramirez* Count I) AND BY FAILING TO RECORD AND KEEP THE NAMED PLAINTIFFS' PERMANENT ADDRESSES. (*Jimenez* Count V).**

The AWPA was passed in 1982, in substantial part to strengthen and expand protections for migrant and seasonal agricultural workers, who have "long been among the most exploited groups in the American labor force." S.Rep. No. 93-1295, 93rd Cong. 2d Sess. 1-3 (1974), reprinted in 1974 U.S.C.C.A.N. 6441, 6441-42; 29 U.S.C. § 1801. This strengthening and expansion of protections through passage of the AWPA reflected Congress' awareness that existing protections—under the Farm Labor Contractor Act, 7 U.S.C. § 2041 et seq. (repealed 1983),—had "failed to reverse the pattern of abuse and exploitation of migrant and seasonal farmworkers." 1982 U.S.C.C.A.N. 4549*; see also,* H.R.Rep. No. 97–885, 97th Cong. 2d Sess. 16, reprinted in 1982 U.S.C.C.A.N. 4547, 4550  (noting the failures of the FLCRA and emphasizing the "desperate[ ] need" for redoubled efforts to enforce the protections originally embodied in the FLCRA); *id*. at 4548 ("[e]vidence ... confirms that migrant and seasonal agricultural workers remain today, as in the past, the most abused of all workers in the United States"); *Morante-Navarro v. T&Y Pine Straw, Inc.,* 350 F.3d 1163, 1168-69 (11th Cir. 2003); *Barajas v. Bermudez,* 43 F.3d 1251, 1254 (9th Cir. 1994); *Castillo v. Case Farms of Ohio, Inc*., 96 F. Supp. 2d 578, 587 (W.D. Tex. 1999).

The AWPA is a remedial statute, generally to be construed broadly to effectuate its humanitarian purposes. *Charles v. Burton*, 169 F.3d 1322, 1334 (11th Cir. 1999) (*citing Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993)).[6]

---

[6] The AWPA expressly supplements, rather than displaces, state law. 29 U.S.C. § 1871.

## A. Defendants Violated the AWPA's Disclosure Requirements.

Among other protections, the AWPA requires every agricultural employer that "recruits any migrant agricultural worker" to provide each worker detailed informational disclosures at the time of recruitment. 29 U.S.C. § 1821(a).[7] These disclosures must be provided in writing and, for workers not fluent or literate in English, in Spanish or, as reasonable, in another language common to the workers. 29 U.S.C. § 1821(g). Plaintiffs and Class Members in these cases, speak Spanish and little or no English. PSUF ¶ 7. Accordingly, disclosures to them had to be provided in Spanish to ensure that they understood the terms of employment they were being offered and were accepting.

Defendants have stipulated that in each of the five seasons at issue in (2006, 2007, 2008, 2010 and 2011) neither they, nor any agent working on their behalf, nor, to their knowledge any other person, made *any* disclosures in Spanish in writing to *any* H-2B worker recruited or employed by them. PSUF ¶ 163. As discussed in more detail below, there is also no question that Defendants and the H-2B workers they employed are covered by the AWPA's disclosure requirements, or that Defendants' failure to provide the disclosures was intentional. The

---

[7] The disclosures must include: the place of employment; the wage rates to be paid; the crops and kinds of activities on which the worker may be employed; the period of employment; the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them; the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting from any sales by such establishment to the workers; and whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period within which such notice must be given. 29 U.S.C. § 1821(a)(1-8).

undisputed facts thus establish Defendants' liability under *Jimenez* Count IV and the disclosure claim in *Ramirez* Count I.

**B.     Defendants Violated the AWPA's Record-Keeping Requirements.**

In order to further protect migrant agricultural workers, the AWPA also requires covered employers to make and keep detailed payroll records. 29 U.S.C. § 1821(d)(1). As part of their record-keeping responsibilities, employers must record each worker's permanent address. 29 C.F.R. § 500.80. This is more than a technical requirement. Making and keeping address information serves  important purposes: an employer cannot complete or mail employees' IRS wage and tax statements without a record of a migrant worker's permanent address; the United States Department of Labor's ability to conduct enforcement investigations and, in the wake of those investigations, to deliver back wages to migrant workers, is impeded when workers' addresses are not available; and the feasibility of notice of private collective or class actions is similarly impeded. In addition, under the AWPA, "migrant" workers are distinguished from "seasonal" workers largely on the basis of their permanent address. *Compare, e.g.,* 29 C.F.R. § 500.20(p) (definition of "*migrant* agricultural worker") with 29 C.F.R. § 500.20(r) (definition of "*seasonal* agricultural worker") (emphasis added). Defendants did not make or keep records of workers' permanent addresses. PSUF ¶ 191. Accordingly, each Individual *Jimenez* Plaintiff is entitled to summary judgment on his claim in Count V that Defendants failed to keep or record his address.

**C.     Class Members Were AWPA-Covered Employees; Defendants Were AWPA-Covered Employers.**

**1.     All class members were AWPA-covered employees.**

Class Members' status as "agricultural" employees for purposes of the AWPA is beyond legitimate dispute. The AWPA defines "agricultural employment" broadly. And as relevant here,

14

the definition expressly includes "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state," 29 U.S.C. § 1802, by "any individual" who is "required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). The Class Members in *Jimenez* and *Ramirez* satisfy all prongs of this definition. They were recruited and hired to core, clean, trim, and salt raw cabbage—to "handle" and "process" cabbage in its "unmanufactured state." PSUF ¶ 3-4, 9. And they were recruited and hired to perform this trim line labor in Wisconsin, more than a thousand miles away from their permanent place of residence, necessitating their absent overnight. They were, therefore, entitled to the AWPA's protections, which take hold "at the time of the worker's recruitment," before work begins, 29 U.S.C. § 1821(a), including receipt of proper, required written disclosures, which they never received. PSUF ¶¶ 163-67.

### 2. Both GLK and Ryan Downs were AWPA-covered employers, involved in the recruitment of migrant agricultural workers.

Both GLK and Defendant Downs were, at all times relevant, "agricultural employers" "which recruit" migrant agricultural workers, within the meaning of the AWPA.

### a. GLK was a covered "employer," which "recruited" class members, as those terms are defined by the AWPA.

Although many AWPA employers outsource the recruiting function, GLK performed recruitment itself, keeping the job in-house. *See* Defendants' Answer to Second Amended [*Ramirez*] Class Action Complaint, Case No. 12-cv-210, (Dkt. No. 41) ¶ 16 (admitting GLK recruited in *Ramirez*, but disputing whether Defendant Downs "directly" engaged in it); Defendants Answer to Second Amended [*Jimenez*] Complaint, Case No. 12-cv-209, (Dkt. No. 78) ¶ 17 (admitting the same, in *Jimenez*). *See also* PSUF ¶¶ 29-30, 33-34.

As a result, all times relevant, GLK has been an AWPA-covered employer "which recruits." 29 U.S.C. § 1821(a). *See also* 29 U.S.C. § 1802(2) (defining "agricultural employer" as "any person who owns or operates a … processing establishment, cannery… and who either recruits, solicits, hires, employs, furnishes, or transports any migrant…agricultural worker").

As a matter of law, GLK was required, therefore, to ensure that proper written disclosures were made to recruited workers, at the time of their recruitment and to engage in the statutorily mandated record-keeping requirements.

>    **b.     Defendant Downs was likewise a covered "employer," who "recruited" class members, as those terms are defined by the AWPA.**

In addition to GLK, Defendant Downs is also liable for violations of the AWPA's disclosure and record-keeping requirements. His status as a statutory employer under the AWPA, and his personal liability, result from three factors.

First, at all times relevant, Downs has retained and exercised the power to make hiring, firing, and wage-setting decisions for H-2B workers. PSUF ¶¶ 2, 31-32, 34, 38, 90-91, 120. Under the AWPA, he has therefore been, as a matter of law, a statutory "employer." *See Leon Granados v. Eller & Sons Trees, Inc.*, 581 F. Supp. 2d 1295, 1306-07 (N.D. Ga. 2008) (corporate officer personally liable under FLSA and AWPA where officer was involved in hiring, firing, promotion, recruiting, wage and hour matters, and he was involved in day-to-day operation of his business).

Second, as a statutory employer, Downs is, as a matter of law, responsible for the recruitment violations of the agents to whom he has delegated recruitment responsibilities. Here, he delegated some of them to Rafael Jimenez Arroyo. PSUF ¶ 34. He is as a matter of law liable under the AWPA for his recruiting agents' ensuing violations of 29 U.S.C. § 1821(a), whether or not he otherwise personally or "directly" engaged in "recruitment." *See Montalvo v Larchmont*

*Farms, Inc.*, 2009 WL 4573279, at \*4-5 (D.N.J. Dec. 3, 2009)[8] (president and owner of farm corporation involved in the overall management of the farm and the decision to hire workers was liable to the same extent as the farm corporation for AWPA recruitment/disclosure violations); *Escobar v. Baker*, 814 F. Supp. 1491, 1504 (W.D. Wash. 1993) (farm owner who authorized recruitment, without personally participating in it, and without knowledge of the identity of all the recruiters, still held to have "recruited" workers, and, therefore, to be liable for violations of AWPA's disclosure requirements).[9]

Third, and again as a matter of law, the undisputed facts regarding Downs' "direct" personal involvement in recruitment independently establish his liability. Downs retained, and exercised, control over the most important decisions regarding recruiting: every year, even after he delegated recruitment to Jimenez Arroyo, it was Downs who personally determined whether, when and how many H-2B workers to recruit and hire. PSUF ¶ 32. He also monitored and supervised Jimenez Arroyo's recruitment efforts. PSUF ¶ 38. And in both 2010 and 2011, he was personally responsible for the decision to terminate workers' employment before the end of the certified period of employment, including the decision to cancel the visas of the *Ramirez* Class Members, resulting in their being stranded in Matamoros, Mexico. PSUF ¶¶ 90-91. No person who qualifies as a statutory employer and has that level of personal involvement in recruiting can insulate himself. *See Leach*, 812 F. Supp. at 1210 ("Alexander recruited only incident to

---

[8] Pursuant to Civil Local Rule 7(j)(2), copies of all unpublished opinions, decisions, and orders cited herein are attached as Exhibit A.

[9] *See also Antunez v. G & C Farms*, No. Civ-92-0308, 1993 WL 451344, at \*6 (D.N.M. Aug. 9, 1993) (owner of chili pepper farm who was involved of day-to-day operation of harvest was joint employer with farm labor contractor); *Leach*, 812 F. Supp. at 1207-1208 (owner of farm who maintained significant degree of control over crew and had ability to modify employment conditions, although he could not directly hire or fire member of migrant crew, was joint employer with labor contractor for purposes of AWPA).

Johnston's direction. It would be inequitable to conclude that Johnson could escape the Act's requirement while benefiting from Alexander's recruiting.") When Congress replaced the Farm Labor Contractor Registration Act ("FLCRA"), the predecessor of the AWAPA with the AWPA, one of its avowed purposes was to extending coverage of the Act and expanding liability for recruiting violations beyond middlemen.

For all of the above reasons, Defendant Downs is also liable for violations of the AWPA's disclosure and record-keeping requirements.

### D.     Defendants' Violations of the AWPA Were Intentional.

The AWPA's statutory damages remedy applies to "intentional" violations of the AWPA. 29 U.S.C. § 1854(c)(1). But that requirement is not demanding, as it means merely intent to engage in the conduct at issue, and not intent to violate the law. "No specific intention to violate the law is required." *Avila v. A. Sam & Sons*, 856 F. Supp. 763, 774 (W.D.N.Y. 1994). And "lack of knowledge of the Act [or its specific requirements] is not a defense to a finding of intentionality." *Id.* "[T]he defendant need only deliberately and consciously engage in the action which lead[s] to the violation of the Act." *Id.* And "a lack of subjective intent does not absolve" a defendant. *Smith v. Bonds*, 1993 WL 556781, at *11 (E.D.N.C. Sept. 28, 1993). *See also Fannette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1262 (N.D. Fla. 2014); *Herrera v. Singh*, 103 F. Supp. 2d 1244, 1248 (E.D. Wash. 2000).

Further, "in cases where violations occur as a part of a defendant's normal business practices," conscious or deliberate action is established and "no further showing of intent is required." *Fannette*, 28 F. Supp. 3d at 1262-63.

Applying these standards, Defendants' violations of the AWPA were clearly intentional. Their failure to provide workers with proper, required disclosures, in writing, at the time of

recruitment was not an "isolated" "mistake." It was a part of their normal business practice: they have stipulated to their failure to provide these disclosures for a period spanning at least 2006, 2007, 2008, 2010 and 2011. PSUF ¶¶ 163-67. The same is true of their regular failure to make, keep and preserve records of workers' permanent residence addresses. PSUF ¶ 191. These were not random oversights. They resulted from Defendants' standard operating procedure over many successive seasons. As such, they were "intentional." *See Fanette*, 28 F. Supp. 3d at 1262-63 (violations that resulted from standard operating procedures over four consecutive seasons are "intentional" for AWPA purposes).

Further, and although intentionality under the AWPA dispenses with any requirement of knowledge by a defendant that its or his conduct violates the law, the record here leaves no legitimate doubt that the Defendants were aware of the AWPA's requirements, including, specifically, the requirement that migrant workers must be provided written work agreements and disclosures. On repeated occasions, Defendants were affirmatively advised of the requirements of the AWPA; they were, in fact, specifically advised that migrant workers must be given written work agreements; and they repeatedly and expressly guaranteed and certified their compliance with Federal, State and local employment-related laws and regulations. PSUF ¶¶ 136, 139-41, 151.

Defendants' violations of the AWPA were intentional both in the statutory meaning applicable here, but also in the sense that they were well aware that they were breaking the law. As set forth above, Defendants are covered by AWPA. They have stipulated to their failure to provide the required disclosures. The undisputed facts show they failed to record the workers' permanent addresses. And their conduct was a deliberate and conscious part of their operating procedures, thus constituting "intent" under the AWPA. Accordingly, (1) the *Jimenez* Class

Members are entitled to summary judgment on their claims in *Jimenez* Count IV that Defendants violated the AWPA's mandatory disclosure requirements in each of the five seasons during the class period; (2) the *Ramirez* Class Members are entitled to summary judgment on their claims in *Ramirez* Count I that Defendants violated the AWPA's mandatory disclosure requirements in 2011; and (3) the Individual *Jimenez* Plaintiffs are entitled to summary judgment on their claims in *Jimenez* Count V that Defendants did not record their permanent addresses.

## II.    DEFENDANTS VIOLATED THE WMLA BY FAILING TO PROVIDE THE REQUIRED DISCLOSURES AT THE TIME OF RECRUITMENT AND BY FAILING TO PROVIDE A WORK AGREEMENT AT THE TIME OF HIRE. (*Jimenez* Count VII).

Similarly to the AWPA, Wisconsin's Migrant Labor Act mandates that "no person" may "hire a migrant worker for employment in this state unless that person…provides the migrant worker" a written disclosure of work terms and conditions "at the time of the worker's recruitment." Wis. Stat. § 103.915(1)(a). In addition to these recruiting disclosures, the WMLA also requires employers to provide migrant workers with a "written work agreement," signed by the employer and the worker, "at the time of hiring." Wis. Stat. § 103.915(1)(b). At both stages in the hiring process, the disclosures and work agreements must be written in "the customary language of the migrant worker." Wis. Stat. § 103.915(1), (4) and (8).

The WMLA defines "migrant worker" as:

[A]ny person who temporarily leaves a principal place of residence outside of this state and comes to this state for not more than 10 months in a year to accept seasonal employment in the planting, cultivating, raising, harvesting, handling, drying, packing, packaging, processing, freezing, grading or storing of any agricultural or horticultural commodity in its unmanufactured state.

Wis. Stat. § 103.90(5)(a). The Wisconsin definition of "migrant worker" offers broader protection than AWPA, because it extends to the raising, harvesting, and storing of unmanufactured agricultural commodities. *See* Wis. Stat. § 103.90(a); *see generally* 71 Op. Atty

Gen. Wis. 92 (1982) (counseling in favor of broad interpretation of the WMLA due to the comprehensive remedial intent of the Act). Accordingly, for the same reasons discussed above in connection with the AWPA, it is equally clear *Jimenez* Class Members are migrant agricultural entitled to the protections of the WMLA. Wis. Stat. § 103.90.

It is also equally clear that Defendants are employers subject to the WMLA. Under the WMLA, an "employer" includes any "person engaged in planting, cultivating, raising, harvesting, handling, drying, packing, packaging, processing, freezing, grading or storing any agricultural or horticultural commodity in its unmanufactured state who employs a migrant worker." Wis. Stat. § 103.90(2)[10]. The DWD interprets the term "employment" to mean "the act of having direction and control of any worker, being responsible for the wages of the worker, or allowing a worker to perform work for the employer." Wis. Adm. Code DWD 301.06(2). As with the AWPA, discussed *supra*, it is clear that Downs and GLK both meet this statutory definition of an "employer." Downs, for example, was involved in setting Class Members' wages and determining when Class Members would be terminated from employment. PSUF ¶ 31, 90.

The WMLA requires that the recruiting disclosure and the work agreement set forth all of the following detailed information about the key terms of employment:

> A statement of the place of employment, kind of work available, applicable wage rates, pay period, approximate hours of employment including overtime applicable, term of employment including approximate beginning and ending dates, kind of housing and any charges in connection therewith, cost of meals if provided by the employer, transportation arrangements, the names of all persons in the family employed if a family is employed and any other charges or deductions from wages beyond those required by law.

---

[10] Limited Liability Corporations such as GLK are considered to be "persons" under Wisconsin corporate law, *see* Wis. Stat. § 183.0102(18).

Wis. Stat. § 103.915(4)(a).[11] To facilitate compliance with these detailed disclosure requirements, the Wisconsin Department of Workforce Development publishes a standard form work agreement, both in English and Spanish. PSUF ¶ 168. Defendants did not make use of the Department's form—or any alternative. Indeed, as with the AWPA, Defendants have stipulated that in each of the five seasons at issue in this case neither they, nor any agent working on their behalf, nor, to their knowledge, any other person, made *any* written recruiting disclosure or work agreement in Spanish to *any* H-2B worker employed by them. PSUF ¶ 163.

There are no material facts in dispute regarding the WMLA's coverage, and Defendants have stipulated that they did not provide the required disclosures in any year. Accordingly, the *Jimenez* Class Members are entitled to summary judgment on their claims in Count VII that Defendants violated the WMLA's mandatory disclosure and work agreement requirements in each of the seasons during the class period.

## III.    DEFENDANTS VIOLATED THE WMLA IN 2011 BY TAKING DEDUCTIONS FROM WORKERS' WAGES WITHOUT CONSENT. (*Jimenez* Count VII).

Defendants also violated the WMLA's requirement that employers must obtain prior written consent from migrant workers before deducting "any amount on account of debts accrued or anticipated." Wis. Stat. § 103.93(3). During each season in the class period, GLK deducted amounts from the H-2B workers' wages each week for meals and housing. PSUF ¶ 178. In prior years, GLK generally obtained the necessary written consent from workers, using a detailed form that expressly authorized GLK to make "deductions" from workers' weekly payroll. PSUF 179-

---

[11] Both the recruitment disclosures and the work agreement must also contain a minimum work guarantee of at least twenty hours of work in a one-week period or 64 hours of work in every two-week period, Wis. Stat. §103.915(4)(b), as well as a guarantee that the wage and other terms and conditions of employment are not less favorable than those provided by the employer for local workers for similar work. Wis. Stat. §103.915(c).

80. In 2011, by contrast, GLK deducted $75 from the H-2B workers' weekly wages for meals and housing without obtaining any such written authorization. PSUF ¶ 181.[12]

There are no material facts in dispute regarding Defendants' failure to obtain the mandatory written authorization before deducting $75.00 per week from the wages of Class Members in 2011. Accordingly, the *Jimenez* Class Members are entitled to summary judgment on their claims in Count VII that in 2011 Defendants violated the WMLA's requirement that written authorization must be received prior to taking deductions from wages.

## IV. STATUTORY DAMAGES.

The undisputed record evidence establishes that the *Jimenez* and *Ramirez* Plaintiffs and Class Members are each entitled to the full damages authorized by statute, for each violation of the WMLA and the AWPA discussed above.

### A. The Facts In This Case Call For A Maximum Statutory Damages Under The AWPA Of $500 Per Violation Per Worker Per Season.

The AWPA provides a statutory damages remedy for aggrieved workers of up to $500 per plaintiff per violation, 29 U.S.C. § 1854(c)(1). These damages are assessed separately for each worker, for each violation, for each season. *Rivera v. Adams Packing Ass'n, Inc.,* 707 F.2d 1278, 1283 (11th Cir. 1983); *Fanette v. Steven Davis Farms, LLC,* 28 F. Supp. 3d 1243, 1263; *Elizondo v. Podgorniak,* 100 F. Supp. 2d 459, 461 (E.D. Mich. 2000).

Both the legislative history of the Act and the case law make clear that the purpose of this statutory damages remedy is not restricted to compensating individual workers. *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1332 (5th Cir. 1985). Indeed, no showing of actual injury or damages is required to recover statutory damages. *Alvarez v. Joan of Arc, Inc.,* 658 F.2d

---

[12] The "personal data sheet" that some workers signed in 2011 does not provide any reference to a wage deduction, or an authorization for such a deduction. PSUF ¶ 187. On its face, and as a matter of law, it does not constitute a written authorization for *deductions* from wages.

1217, 1224 (7th Cir. 1981); *Martinez v. Shinn*, 992 F.2d 997, 999 (9th Cir. 1993). Congress created the remedy, at least as importantly, both for its deterrent effect and to encourage enforcement and compliance of the Act—conscious of the fact that, particularly in this area, most violations go unreported violations and unredressed.[13]

As the courts have recognized, statutory damage awards under the AWPA should be calibrated both to affirmatively "encourage farmworkers to assert their statutory rights" and to affirmatively discourage future violations. *Beliz*, 765 F.2d at 1332-33 (5th Cir. 1985); *Fannette*, 28 F. Supp.3d at 1263; *Lainez v. Baltazar,* No. 5:11-CV-00167-BR, 2013 WL 3288369, at *1 (E.D.N.C. June 28, 2013); *Betrand v. Jorden*, 672 F. Supp. 1417, 1425 (M.D. Fla. 1987).

Under the circumstances of this case, an award of full, statutorily-authorized damages $500 for each class member for each violation for each season is well warranted.

First, Defendants have already been the subject of repeated enforcement efforts by the DOL and DWD. PSUF ¶¶ 133. They have already on a number of occasions signed documents stating that they recognized their obligation to and would or intended to comply with the law. PSUF ¶¶ 10-11, 141. It is apparent that these measures have had little impact. Scarcely a season has gone by in which Defendants have not been investigated and cited for violations of statutes or regulations governing the governing employment of migrant workers. PSUF ¶ 133. Defendants' violations have been persistent and continuous. They have stipulated that they failed to provide workers with proper, required written disclosures of the material terms and conditions

---

[13] *See generally* Jane Younglove Lapp, The Migrant and Seasonal Agricultural Worker Protection Act: "Rumors of My Death Have Been Greatly Exaggerated," 3 San Joaquin Agric. L. Rev. 173, 178 (1993) ("the number of investigations of alleged AWPA violations that can be done, has remained virtually unchanged since FLCRA was replaced by AWPA in 1983"); Jeanne E. Varner, Picking Produce and Employees: Recent Developments in Farmworker Injustice, 38 Ariz. L. Rev. 433, 468 (1996) (the DOL rarely brings any enforcement actions due to its own lack of resources"). These observations, made by commentators in the 1990's, remain accurate today.

of their employment, and in a language they could understand, in 2006, 2007, 2008, 2010 and 2011. PSUF ¶¶ 163-67. This was standard operating procedure for Defendants. This is a factor expressly considered by other courts as a basis for awarding full statutory damages under the AWPA. *Fannette*, 28 F. Supp.3d at 1263; *Castillo,* 96 F. Supp. 2d at 631; *Bertrand,* 672 F. Supp. at 1425; *Leach v. Johnston,* 812 F. Supp. 1198, 1211 (M.D. Fla. 1992).

Second, the need here for a penalty with bite is further underscored by Defendants' sworn discovery responses in this case, in which they quite remarkably—and falsely—denied even the existence of past enforcement actions or investigations. (They also failed to produce documents from those investigations, which counsel obtained only through FOIA and open-records requests. PSUF ¶ 162). These facts, as well, suggest that only a significant monetary judgment can induce future respect for the law. *Bertrand*, 672 F. Supp. at 1425. It also relevant that GLK is the largest sauerkraut produced in the world, with revenues of between $50 million and $100 million annually. PSUF ¶ 1. An award in this case should consciously be designed, as it has been in other AWPA cases, to "send a message about future compliance with the law." *Hardy v. Ross*, No. 9:89-2379-3, 1990 WL 54615 *3 (D. S. C. Feb. 23, 1990); *Lainez v. Baltazar*, No. 5:11-CV-00167-BR, 2013 WL 3288369, at *2 (E.D.N.C. June 28, 2013); *Cox v. Bissette*, No. 87-570-CIV-5, 1988 WL 122053, at *4 (E.D.N.C. Feb. 25, 1988). Given Defendants' resources, a small award will not send that message. *See also Beliz*, 765 F.2d at 1332 ("Plainly, it ought not to be cheaper to violate the Act and be sued than to comply with the statutory requirements"); *Hardy*, 1990 WL 54615, at *3 (same); *Cox*, 1988 WL 122053, at *4 (same).

Third, the violations here were not slight omissions. The failure to provide workers with written documentation of the required materials terms of their employment strikes at the heart of a worker's rights under the AWPA. "[I]t is recognized that one of the [most important] harms

that the AWPA is designed to combat is the plight of migrant workers who, by the nature of their work, travel long distances and stand at the mercy of employers who may attempt to renege on the offer of employment or vary the terms or conditions of that offer." *Herrera v. Singh*, 103 F. Supp. 2d 1244, 1249 (E.D. Wash. 2000). Written disclosures are required precisely in order to guarantee workers written proof of the job offers extended to them, and the offer's terms, before they decide to travel long distances, often relinquishing other jobs, leaving their homes and families, and, too often, incurring debt to make the trip. When the AWPA's mandatory written disclosures are not properly provided, at the time of recruitment as the AWPA requires, the outcome is the exactly the result that Congress sought to avoid: "farm workers lack the data necessary to make a fully-informed decision about accepting the work, and are left without any written form of proof when employers [renege on or] misrepresent the terms and conditions of employment." *Villalobos v. Vasquez-Campbell*, No. EP-89-CA-27, 1991 WL 311902 * 4 (W.D. Tex. Nov. 15, 1991).

Fourth, the AWPA's statutory damages range was established in 1983. Its deterrent effect has eroded since then. In the intervening decades, the value of the dollar has depreciated significantly. In today's dollars, it would require a fine of almost $1,200 to carry the same force as the $500 damage amount that Congress provided for back in 1983. *See* Consumer Price Index Inflation Calculator, at http://data.bls.gov/cgi-bin/cpicalc.pl?cost1=500&year1=1983&year2=2014. This factor has been expressly considered by courts in assessing statutory damages under the AWPA. *Castillo v. Case Farms of Ohio Inc.*, 96 F. Supp. 2d 578, 631 n.64 ("[T]o achieve Congress' intent to both compensate wronged plaintiffs, and to deter agricultural employers from mistreating workers, court may need to consider the changed consumer price index"); *Herrera,* 103 F. Supp. 2d at 1249 (E.D. Wash. 2000).

Past awards in other cases also support awards at the full authorized level of $500 per violation per season in this case. *See Fannette*, 28 F. Supp. 3d at 1266 (awarding $500 per violation per season, for each of five violations, for a total of $2,500 for each season worked with plaintiffs who worked four seasons receiving $10,000); *Lainez,* 2013 WL 3288369, at *2 (awarding each plaintiff $4,000 in statutory damages, reflecting $500 for each of eight AWPA violations); *Herrera,* 103 F. Supp. 2d at 1245 (awarding each plaintiff $3,400 in statutory damages for violations of the AWPA); *Avila v. A. Sam & Sons*, 856 F. Supp. 763, 774 (W.D.N.Y. 1994) ($500 for each of five violations, resulting in $2,500 for each plaintiff); *Villalobos*, 1991 WL 311902, at * 4 ($500 for each of two disclosure violations to each of five named plaintiffs and 97 class members); *Hardy v. Ross*, No. 9:89-2379-3, 1990 WL 54615 * 3 (D.S.C. Feb. 23, 1990) (maximum amount for each of three violations to three named plaintiffs and each of 76 class members); *Alzalde v. Ocanas,* 580 F. Supp. 1394, 1396 (D. Colo. 1984)  ($227,500 in statutory damages awarded in default judgment against farm labor contractor in action brought by 65 farmworkers under the corresponding provisions of the AWPA's predecessor statute); *Montelongo v. Meese*, 803 F.2d 1341, 1350 (5th Cir. 1986) ($500 per violation, for each of three violations of the FLCRA, for each class member).

Taking these factors into account, the AWPA damages should be awarded as follows:

● **The AWPA Statutory Damages For Defendants' Violations of 29 U.S.C. § 1821(a), Caused By Their Failure To Provide Required Written, Recruitment Disclosures To Class Members in *Jimenez* and *Ramirez*.** For violations of disclosures owed but not received pursuant to 29 U.S.C. § 1821(a), including Defendants' failure (to which they have stipulated) to provide proper written disclosures to workers in Spanish at the time of recruitment, each *Jimenez* Class Member should be awarded $500 for each season he worked for Defendants. Calculated at

$500 per class member per season worked, the resulting award would total approximately as follows:[14]

2006 - $37,500 ($500 x 75 H-2B workers (PSUF ¶ 39)).

2007 - $37,000 ($500 x 74 H-2B workers (PSUF ¶ 41)).

2008 - $45,000 ($500 x 90 H-2B workers (PSUF ¶ 43)).

2010 - $43,000 ($500 x 86 H-2B workers (PSUF ¶ 46)).

2011 - $67,500 ($500 x 135 H-2B workers (PSUF ¶ 48)).

**TOTAL:**                     **$230,000**

● **The AWPA Statutory Damages For Defendants' Violations of 29 U.S.C. § 1821(d)(1) and 29 C.F.R. §500.80(a), Caused By Their Failure to Make, Preserve and Keep Records of Individual *Jimenez* Plaintiffs' Permanent Residence Addresses.** Calculated at $500 per plaintiff per season worked, the resulting award would total approximately as follows:

2006 - $12,500 ($500 x 25 Individual Plaintiffs (PSUF ¶ 40)).

2007 - $12,500 ($500 x 25 Individual Plaintiffs (PSUF ¶ 42)).

2008 - $15,500 ($500 x 31 Individual Plaintiffs (PSUF ¶ 44)).

2010 - $19,500 ($500 x 39 Individual Plaintiffs (PSUF ¶ 47)).

2011 - $35,000 ($500 x 70 Individual Plaintiffs (PSUF ¶ 49)).

**TOTAL:**                     **$95,000**

---

[14] Because GLK's records are not complete or entirely reliable, the number of H-2B workers hired in each season set forth in the damages estimates herein is a best estimate. Further, the amount of damages ultimately paid out on each of the class claims will depend on the number of class members who submit claim forms.

**B.    The Facts In This Case Call For A Maximum Statutory Damages Award Under The WMLA Of $100 Per Violation Per Worker Per Diem.**

The Wisconsin Legislature passed the WMLA in 1971, with the avowed intent, made clear by the notes to the bill, of "improving the status of migrant workers in this state." Wis. Migrant Labor Act, Ch. 17 (Wis. 1977) (attached hereto as Exhibit B).

The Act provides a statutory damages remedy for aggrieved workers of "not less than $10 nor more than $100" for "each violation." Wis. Stat. §103.97(1)(a). The Act also provides that, "Each day of continued violation shall constitute a separate offense." *Id.* Accordingly, every day a violation continues increases statutory damages. *Id.*

For the same reasons discussed above, justifying damages at the maximum authorized level under the AWPA, the maximum authorized award of statutory damages is also appropriate, in this case, under the WMLA. The failure of past enforcement efforts by the DWD to deter violations, the nature of the violations at issue, Defendants' false denial of past enforcement efforts and violations, and the erosion in the value of the statutory damage amounts in the decades since they were first passed (in 1971) all support a maximum award here.

Taking these factors into account, WMLA damages should be awarded as follows:

● **The WMLA Statutory Damages For Disclosure and Work Agreement Violations.** Calculated at $100 per Class Member, per day worked without a written work agreement, and $100 per Class Member, per day worked without the required written disclosures, the resulting award would result in damages of $200 per day for approximately 75 H-2B workers in 2006, 74 H-2B workers in 2007, 90 H-2B workers in 2008, 86 H-2B workers in 2010, and 92 H-2B workers in 2011. [15] [16] PSUF ¶¶ 39, 41, 43, 46, and 48.

_____

[15] The *Ramirez* Class Members do not assert a disclosure claim under the WMLA.

●  **The WMLA Statutory Damages For Unlawful Deductions.** Calculated at $100 per Plaintiff per paycheck subjected to unlawful deductions, the resulting award would total approximately **$49,600** ($100 x 496 paychecks of Class Members, ¶ 190 from which $75 was withheld).

## CONCLUSION

For all the reasons stated above, the Plaintiff Class certified for purposes of liability and damages under Counts IV and VII in *Jimenez* requests entry of judgment in its favor on Count IV in its entirety and on the disclosure, work agreement and deductions claims of Count VII. The Class also requests entry statutory damages in the amount per Class Member of $500 in each season worked from 2006-2011 for Defendants' violations of the AWPA's disclosure requirements (Count IV); $100 for each day worked in each season from 2006-2011 for Defendants' violation of the WMLA's recruitment disclosure requirement (Count VII); $100 for each day worked in each season worked for Defendants' violation of the WMLA's work agreement requirement (Count VII); and $100 for each 2011 paycheck from which a deduction was made for meals and housing for Defendants' violation of the WMLA's requirement that written authorization must be obtained in advance of any deductions from wages. In addition, the Individual *Jimenez* Plaintiffs request entry of judgment in their favor on the record-keeping claims of Count V of the *Jimenez* Second Amended Complaint, and for statutory damages in the amount of $500 in each season in which their permanent address was not recorded.

---

[16] Because GLK's records are not complete or entirely reliable, the number of H-2B workers hired in each season can only be estimated. The same is true for the number of days each H-2B worker worked in each season. However, based on GLK's records, most workers worked 43 to 47 days in 2006, 50 to 51 days in 2007, 77 to 84 days in 2008, 22 to 24 days in 2010, and 20 to 37 days in 2011. PSUF ¶ 50. Further, the amount of damages ultimately paid out will depend on the number of Class Members who submit claim forms.

For all the reasons stated above, the class certified in *Ramirez* requests entry of judgment in their favor on the AWPA disclosure claim of *Ramirez* Count I, and statutory damages in the amount per class member of $500.

Defendant GLK and Defendant Downs should be held jointly and severally liable for the statutory damages imposed by the Court.

Dated: February 20, 2015

s/ Joshua Karsh
One of Plaintiffs' Attorneys

Matthew J. Piers                          Ali Beydoun
Joshua Karsh                              Attorney for Plaintiffs
José J. Behar                             Farmworker Justice
Claudia Flores                            1126 16th Street, N.W., Suite 270
Jenna Miara                               Washington, D.C. 20036
Attorneys for Plaintiffs                  (202) 293-5420
Hughes Socol Piers Resnick & Dym, Ltd.    E-mail: abeydoun@farmworkerjustice.org
70 W. Madison Street, Suite 4000
Chicago, IL 60602
Telephone: (312) 580-0100
Fax: (312) 580-1994
E-mail:  mpiers@hsplegal.com
         jkarsh@hsplegal.com
         jbehar@hsplegal.com
         cflores@hsplegal.com
         jmiara@hsplegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document will be served on counsel listed below by CM/ECF on February 20, 2015.

Michael Aldana, Esq.
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Michael.Aldana@quarles.com


<u>s/ Joshua Karsh</u>
One of Plaintiffs' Attorneys