## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

ALEJANDRO JURADO JIMENEZ et al., )
)
          Plaintiffs, )
)   Civil Action No. 12-C-0209
      v. )
)   Judge Griesbach
GLK FOODS, LLC and RYAN A. DOWNS, )
)
          Defendants. )

## CLASS MEMBERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS III, VI, VII, AND VIII

Pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56, the 2010 and

2011 Plaintiff Classes certified for liability under Counts III, VI, VII, and VIII of the Second

Amended Complaint submit this memorandum of law in support of their motion for the entry of

summary judgment as to liability on those counts, alleging violations of federal law (the Migrant

and Seasonal Agricultural Worker Protection Act or "AWPA," Count III), common law (breach

of contract, Count VI), and state statutory law (the Wisconsin Migrant Labor Act or "WMLA,"

Count VII, and Wisconsin's wage payments and living wage laws, Count VIII). [1]

---

[1] The present motion and this memorandum do not address certain allegations in Counts III and VII. Specifically, paragraph 68e of Count III concerns illegal collection of recruitment fees, which give rise to individual rather than class-wide claims, and, accordingly, fall outside the scope of this motion. In addition, while the allegations of paragraph 93 of Count VII, concerning Defendants' failure to pay class members' wages for the full period of their contracted-for employment is addressed here, additional allegations in Count VII are covered by a separate motion and memorandum, filed concurrently with this one: Plaintiffs' Memorandum Of Law In Support Of Partial Summary Judgment For Violations Under The AWPA And The WMLA Of Requirements To (1) Provide Disclosures Of Terms Of Employment, (2) Provide Work Agreements, (3) Not Take Unauthorized Deductions From Wages, And (4) Make And Keep Records Of Permanent Addresses Of The Named Plaintiffs.

Specifically, the Classes seek a judgment for Defendants': (a) unlawful early termination of Class Members' employment, without legal justification, prior to the end of the contracted period of employment; (b) failure to pay wages at the mandated prevailing wage rate or at the Wisconsin living wage rate for Class Members' first week of work, and (c) failure to provide Class Members with return transportation to their homes in Mexico, as required by the AWPA.

## INTRODUCTION

The Class Members in this case are migrant workers from Mexico who were employed by defendants Great Lakes Kraut Foods, Inc. (GLK) and Ryan A. Downs (as joint, statutory employers), in 2010 and/or 2011, to process cabbage into sauerkraut at GLK's cannery in Bear Creek, Wisconsin. Plaintiff Classes' Consolidated Statement of Undisputed Facts ("PSUF") ¶¶ 4, 9, 69. They were recruited and hired by Defendants under the federal government's "H-2B" guestworker visa program. PSUF ¶ 8.

On June 4, 2014, the Court certified the liability issues in Counts III, VI, VII, and VIII for class-wide adjudication. Dkt. No. 84.[2] Two classes were certified. The "2010 Class" includes:

> All H-2B workers employed by GLK in Bear Creek, Wisconsin in 2010. However, with respect to claims for post-termination wages or damages, this class excludes workers who have waived such claims.

Dkt. No. 84, p. 22. The "2011 Class" includes:

> All H-2B workers employed by GLK in Bear Creek, Wisconsin in 2011. However, with respect to claims for post-termination wages or damages, this class excludes workers who have waived such claims.

The recruitment and employment of migrant workers is highly regulated, by both federal and state statutes and regulations, which both: (a) displace any presumption of at-will employment

---

[2] A portion of Count VII was certified as to both liability and damages. As explained in footnote 1, *supra*, this motion and memorandum does not address that portion of Count VII.

Case 1:12-cv-00209-WCG   Filed 02/20/15   Page 2 of 39   Document 116

for migrant agricultural workers working in this country under visas, and (b) mandate minimum wages and hours.

The rationale for eliminating at-will employment for statutorily-protected migrant agricultural workers under both state and federal law is clear: migrant agricultural workers often leave families and other jobs, travel many hundreds of miles, and incur substantial out-of-pocket visa and travel expenses to accept employment, making them vulnerable when employers misrepresent or renege on agreed-upon terms and conditions of employment, on which the workers relied. Both Congress and the State of Wisconsin have endeavored to protect these workers against exactly the risk that materialized in this case. Class Members in this case were victimized by a bait-and-switch. Defendants belatedly told them, only after that they had accepted employment with GLK, left jobs behind and incurred substantial expenses, travelled to Wisconsin and begun working, that the job would only last roughly half as long as had been promised. The statutory guarantees provided by the AWPA and the WMLA, protecting against terminations at-will and requiring written disclosure of the period of employment in writing before workers agree to accept employment, are essential because migrant workers cannot otherwise effectively insure against or mitigate this risk. *See Villalobos v. Vasquez-Campbell*, 1991 WL 311902 * 4 (W.D. Texas Nov. 15, 1991) ("Without the disclosure statements, farm workers … are left without any written form of proof when employers misrepresent the terms and conditions of employment. Many courts, in construing the AWPA and its predecessor, the FLCRA, have recognized the critical role the disclosure statements serve ….").

Case 1:12-cv-00209-WCG   Filed 02/20/15   Page 3 of 39   Document 116

As demonstrated in this brief, under the AWPA, the WMLA, Wisconsin's wage payments and living wage laws, and common law, the Classes are entitled to summary judgment on Counts III, VI, VII and VIII because the material undisputed facts here establish that:

(1)    Defendants' employment of Class Members was regulated by the AWPA and the WMLA.

(2)    One of the required elements of every employment relationship under the AWPA or the WMLA is that employment of covered migrant workers must be employment for a term, rather than terminable at will.

(3)    By terminating Class Members' employment before the end of their contracted-for term, without legal justification, Defendants violated the AWPA and the WMLA.

(4)    By failing to pay wages at the mandated prevailing wage rate and the Wisconsin living wage for Class Members' first week of work, Defendants violated the AWPA, the WMLA, and Wisconsin's wage payments and living wage laws.

(5)    By failing to provide return transportation to the workers' points of origin, Defendants violated the AWPA.

(6)    Defendants' violations of the AWPA were intentional.

(7)    Defendants' actions likewise constituted breaches of contract at common law. And,

(8)    The Classes are therefore entitled to a liability judgment in their favor on Counts III, VII, and VIII of its Second Amended Complaint, for violations of the AWPA, the WMLA, and Wisconsin's wage payments and living wage laws, and on Count VI, for breach of contract.

## SUMMARY OF MATERIAL FACTS

Defendant GLK is the largest sauerkraut producer in the world, processing more than 120,000 tons of cabbage into sauerkraut annually. PSUF ¶ 1. GLK has revenues of between $50 million and $100 million annually. *Id*. At all relevant times, Defendant Ryan Downs was the owner and President of GLK. PSUF ¶ 2. As part of the process of producing sauerkraut, each head of raw cabbage must be cored and trimmed, individually, before fermenting. PSUF ¶ 3. The

4

coring and trimming ("trim-line" work) is labor-intensive work. *Id.* It is also low-wage, seasonal

work. At GLK it is performed primarily between August and November. PSUF ¶ 4. Every year,

GLK hires roughly 50-100 seasonal workers to do the coring and trimming. PSUF ¶ 5. For a

number of years, including all the years in the class period, GLK hired predominately Mexican

nationals rather than U.S. workers to perform this "trim line" labor. PSUF ¶ 6.   All Class

Members were recruited and employed by Defendants to do "trim line" work at GLK's cannery

plant in Bear Creek, Wisconsin through  the federal government's H-2B visa program,

authorized by 8 U.S.C. § 1101(a)(15)(H)(ii)(b). PSUF ¶¶ 4, 9.

All of the Class Members are migrant workers. PSUF ¶ 69. They are Mexican nationals

whose permanent place of residence is Mexico. *Id.* Because they were employed so far from

their homes, Class Members lived in temporary housing on GLK's property in Bear Creek while

they were employed there. PSUF ¶ 70. Spanish is the primary language of all Class Members,

and the vast majority speak and read little-to-no English. PSUF ¶ 7.

**Defendants' Participation in the H-2B Visa Program.**

The recruitment and employment of foreign nationals through "guest worker" visa

programs is highly regulated and requires advanced authorization from the federal government.

Broadly speaking, the process for obtaining authorization to recruit and hire foreign H-2B

workers proceeds in two-steps. At the first step, an employer must obtain a temporary labor

certification from the U.S. Department of Labor ("DOL"), by filing an Application for

Temporary Employment Certification (ETA 9142 Form). *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b);

20 C.F.R. § 655.22 (2009) [3]; 8 C.F.R. § 214.2(h)(6)(iii)(A). At the second step, if the DOL has a

---

[3] Citations to the H-2B regulations are to the regulations implemented by the 2008 Final Rule,
which was in effect from January 18, 2009 until 2012. *Labor Certification Process and
Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered*

granted temporary labor certification, the employer petitions the Department of Homeland Security to issue H-2B visas, authorizing foreign workers to enter the United States. *See* 8 C.F.R. § 214.2(h)(6)(iii)(C), (E).

In both 2010 and 2011, as it had in several prior years, GLK completed this administrative certification process and received the requisite authorization to recruit and hire foreign workers. PSUF ¶¶ 9, 12. In completing these ETA 9142 Forms, GLK was required to certify, and did certify, under penalty of perjury, that foreign workers would be guaranteed certain mandatory terms and conditions of employment. PSUF ¶ 10.

In completing the ETA 9142 Form, every H-2B employer must identify the "Period of Intended Employment" for all H-2B workers that will be employed. PSUF ¶ 13. In the ETA 9142 Form GLK submitted for the 2010 season, GLK represented to the DOL that the "Begin Date" for employment for H-2B workers would be August 9, 2010 and the "End Date" November 30, 2010—for a total certified period of employment of 16 weeks and 1 day. PSUF ¶ 14. GLK further represented that "Our seasonal need starts in August and runs *through November*." PSUF ¶ 15. For the 2011 season, GLK represented that the "Begin Date" for employment for H-2B workers would be August 1, 2011 and the "End Date" November 15, 2011, for a total certified period of employment of 15 weeks and 2 days. PSUF ¶ 16. GLK

---

*Nursing in the United States (H-2B Workers), and Other Technical Changes; Final Rule*, 73 Fed. Reg. 78020 (Dec. 19, 2008) (codified at 20 C.F.R. § 655 Subpart A). Defendants noted in their Corrected Brief Opposing Plaintiffs' Motion for Rule 23 Class Certification (*Jimenez* Dkt. No. 81, p. 7) that, after the events that precipitated this case, the DOL issued further regulations on the H-2B program which were later enjoined and ultimately vacated. *See* Temporary Non-agricultural Employment of H-2B Aliens in the United States, 77 Fed. Reg. 10038 (Feb. 21, 2012) (codified at 20 C.F.R. § 655.18) ("2012 Final Rule"); *Bayou Lawn and Landscape Servs. v. Perez*, 2014 U.S. Dist. Lexis 180137 (N.D. Fla. 2014). The litigation surrounding the 2012 regulations has no impact on this case, as those regulations postdate Class Members' claims. Copies of the 2009 regulations cited herein are attached as Exhibit C.

further represented that "Our seasonal demand starts in August, when we require the labor to provide the products to our customers, through November." PSUF ¶ 17.

Every H-2B employer must also set forth the weekly hours of employment. In both 2010 and 2011, GLK certified that the employment being offered was "full time" and that it involved "40 hours" a week of work. PSUF ¶ 18.

Satisfying a further prerequisite to employment of visa workers, GLK averred, in both 2010 and 2011, that its employment of H-2B workers would comply with all Federal, State, and local employment-related laws and regulations. PSUF ¶ 10. GLK also acknowledged that, if any H-2B worker's employment were terminated by GLK prior to the end of the certified period of employment, GLK would be liable for return transportation. PSUF ¶ 25.

### Defendants Terminated Class Members Early In 2010 and 2011 and Failed To Provide Or Pay For Return Transportation.

Notwithstanding GLK's representations in the ETA 9142 Forms and in job postings that the season for employment for trim-line workers was from August through November, Defendants in fact employed Class Members for a substantially shorter period in both 2010 and 2011. PSUF ¶ 89.

In 2010, although the certified period of employment was 16 weeks and 1 day, about half the Class Members were fired after approximately 4 weeks of work; the others were fired after about 8 weeks of work. PSUF ¶¶ 93, 94. In 2011, although the certified period of employment was 15 weeks and 1 day, approximately half the Class Members who were transported to Bear Creek were fired after just approximately 3 to 6 weeks of work; the remaining Class Members were terminated after 5 to 7 weeks of work. PSUF ¶¶ 96, 97.

In both years, after firing Class Members after only a few weeks of work, Defendants provided a bus for the terminated workers from Bear Creek, WI to Laredo, Texas on the U.S.-

7

Mexico border. PSUF ¶ 98. But from Laredo, the workers were left to find their own transportation back to their hometowns, a trip for many of them of over 11 hours and 600 miles. PSUF ¶ 99. In neither 2010 nor 2011 did Defendants provide or pay for Class Members' return transportation, which came to $50-$150 U.S per worker. PSUF ¶ 100.

**<u>Defendants' Early Terminations of Class Members Were Not Justified.</u>**

Defendants claim that, in 2010, they were justified in terminating all Class Members before the end of the certified period of employment due to crop failure. PSUF¶ 102. In June and July of 2010, Wisconsin experienced major rains, resulting in flooding and damage to the cabbage crop, including an outbreak of black rot in Outagamie County. PSUF ¶ 103. The significant damage to the crop was evident as early as July, before any Class Members had begun their trip to Wisconsin. PSUF ¶ 104.

In 2010, GLK had applied for and received authorization to "import" 110 H-2B workers. PSUF ¶105. In light of the flooding and damage to the crop, Defendants decided to call up only half that many workers, just 55 H-2B workers. *Id.* But then Defendants reversed their decision, ultimately bringing in a approximately 86 H-2B workers. PSUF ¶ 106. At the time Defendants imported H-2B workers in 2010, they knew there was not enough work to occupy them for a full season. PSUF ¶ 107.

If Class Members had been told before they left Mexico in 2010 that there was only enough work for a few weeks, they would not have accepted the job. PSUF ¶ 109. But Defendants did not notify any of the Class Members about the flood or the near-certainty of reduced work in Wisconsin before the workers accepted the employment or before they left Mexico. PSUF ¶ 108.

8

Defendants had crop insurance in 2010 that covered the cabbage crop failure, and they submitted a claim to the insurance company, which was paid. PSUF ¶ 110.

Defendants claim that, in 2011, they were justified in again terminating all Class Members before the end of the certified period of employment, this time due to the DOL's announcement of a new methodology for determining the mandatory minimum hourly wage payable to H-2B workers, under which wages due to H-2B workers employed by GLK would have increased. PSUF ¶ 111.

Downs projected that the announced wage increase, which would have raised wages for trim-line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's the company's costs of labor for trim line workers by $200,000. PSUF ¶ 121. GLK's total labor costs on an annual basis exceed $6.5 million. PSUF ¶ 122.

For several years leading up to 2011, it was well known that the DOL was planning changes to its methodology for setting wage rates for H-2B workers and that the result of those changes would be to raise wage rates. These developments were so well known and so pervasive that, as early as November 2009, GLK's consultant on matters of H-2B employment, LaborQuest, specifically advised GLK to "Please keep in mind that if [the prevailing wage] is changed *at any time* during the process (or [even] when the workers are [already] in your employ) that you are *required* to adjust their wages accordingly." PSUF ¶ 117.  In response, GLK wrote back to LaborQuest expressly confirming that:

> *We do understand* that any changes [to the prevailing wage rate governing wages for H-2B workers] are *our responsibility*.

PSUF ¶ 118. In addition, in January 2011, the DOL published a notice to the world in the Federal Register, explaining the wage increase, including that its revised method would result in average

hourly pay increases of $4.83 per hour for H-2B workers. PSUF ¶ 113. DOL also explained that

a wage increase was necessary because existing wage rates for H-2B workers were "below what

the average similarly employed worker is paid." PSUF ¶ 114. Indeed, DOL made a finding that

that the existing wage rate methodology led to underpayment of wages in nearly 96% of cases.

PSUF ¶ 112. Ultimately, however, the DOL's proposed wage increase never went into effect.

PSUF ¶ 119; *see also* Wage Methodology for the Temporary Non-Agricultural Employment H-

2B Program; Delay of Effective Date, 78 Fed. Reg. 53643 (August 30, 2013) (indefinitely

delaying implementation of wage determination rule at 20 C.F.R. § 655).

In 2011, after discharging Class Members, Defendants replaced them with domestic

workers whom they hired at a lower wage rate. PSUF ¶¶ 125, 126.

## **Downs Was Personally Involved In the Recruitment, Hiring, Employment, and Early Termination of Class Members.**

Defendant Downs exercised operational control over the recruitment, hiring and

employment of H-2B workers. PSUF ¶¶ 31, 32, 34. He was personally involved with the H-2B

application process, in some years personally signing temporary labor certification forms in

which he agreed to follow federal and state labor and employment laws, and he initialed forms

from GLK's labor contractors acknowledging an employer's legal obligations in the H-2B

program. PSUF ¶ 11. Downs personally determined when, whether, and how many H-2B

workers would be hired each season, PSUF ¶¶ 31, 32; informed Jimenez Arroyo of the terms of

employment that were to be communicated to the workers, PSUF ¶¶ 34, 38; and monitored and

supervised Jimenez Arroyo's recruitment efforts. PSUF ¶ 38. Downs was personally involved in

assuring compliance with wage and hour issues. PSUF ¶¶ 136, 139-40, 156-57. When the DWD

and the DOL each repeatedly investigated the treatment of migrant workers by GLK, Downs met

with and/or spoke to the investigators. PSUF ¶¶ 139, 140, 147, 149.

It is also Downs who made the decision to terminate Class Members' employment before the end of the season, both in 2010 and 2011. PSUF ¶ 90.

**The Costs of Travel, Immigration and Recruitment.**

Once GLK had recruited and hired Class Members in Mexico, visas had to be procured for each worker. PSUF ¶ 72. Because there is no U.S. consulate in or near Santiago Capitiro, where most Class Members reside, the workers recruited by Defendants from that area had to travel a considerable distance for visa interviews—in 2010 to Mexico City and in 2011 to Matamoros. PSUF ¶¶ 74-76.

The process of securing a visa and traveling to the border took several days. It also entailed significant expense. The items of expense typically included:

(a)     Bus fare from Santiago Capitiro to Mexico City or Matamoros;

(b)     Accommodations and meals in Mexico City or Matamoros for several days (and sometimes for longer ), while visas are processed and the workers waited for GLK to schedule their travel date to Bear Creek;

(c)     Fees paid to a *licenciado,* to assist with visa paperwork;

(d)     Transportation between the hotel, the visa interview, and the office of the *licenciado*;

(e)     Visa application fees;

(f)     Passport fees (for workers who didn't have a valid passport from an earlier season);

(g)     Bus fare from Mexico City or Matamoros to the Mexico-U.S. border, to begin the trip to Bear Creek; and

(h)     A border-crossing fee at the Mexico-U.S. border.

PSUF ¶ 40. In both 2010 and 2011, the cost borne by each Class Member for these items ranged from approximately $300 to $900. PSUF ¶ 78. Some workers were also charged a recruitment

11

fee of $1,000 U.S. or more, and were made to understand that they would not be hired by Defendants without paying this fee. PSUF ¶ 71.

**Defendants' Acknowledgment of Their Reimbursement Obligations.**

In both 2010 and 2011, LaborQuest specifically advised Defendants, in writing, of their legal obligation to reimburse workers for recruitment, visa and travel expenses. PSUF ¶¶ 84-85. In fact, in 2010, Defendant Downs personally initialed a form provided to him by LaborQuest, agreeing to and acknowledging that:

> New H-2B regulations *require* employer[s] to pays [sic] (or reimburse) for *any* of the *recruitment, visa and travel expenses* for worker from their homes abroad to the place of employment.

(Emphasis added). PSUF ¶ 84. Disregarding this requirement, Defendants failed to reimburse Class Members for any of these expenses in the first week of work, either in 2010 or 2011. PSUF ¶ 86. Defendants' failure to reimburse these expenses depressed Class Members' wages in their first weeks of work in 2010 and 2011 below the offered wage ($7.85/hour in 2010; $10.36/hour in 2011), as well as below the Wisconsin living wage ($7.25/hour in 2010 and 2011). PSUF ¶ 79.

**Required Disclosure and Work Agreements Were Not Provided.**

The AWPA and the WMLA each require that migrant workers must be provided detailed written disclosures, in a language the workers understand, specifying the material terms and conditions of employment. 29 U.S.C. §§ 1821(a) and (g); Wisc. Stat. §§ 103.915(1)(a) and (b), 103.915(8). To facilitate compliance with these detailed disclosure requirements, the DWD publishes a standard form work agreement, both in English and Spanish. PSUF ¶ 168. Similarly, the DOL publishes Form WH-518, which is a "Worker Information" sheet containing the disclosures required by the AWPA. PSUF ¶ 169.

Defendants did not make use of either the DOL's or the DWD's form—or any alternative—in 2010 or 2011.

Defendants have stipulated that, but for disclosures on their ETA 9142 Forms, there were no other writings. PSUF¶¶ 163-167. According to their stipulation, neither they, nor any agent working on their behalf, nor, to their knowledge any other person, ever provided any Class Member with written disclosures required by the AWPA and the WMLA. *Id.*

### **Defendants Had Notice of AWPA and WMLA Requirements.**

In addition to Defendants' affirmative certifications in the ETA 9142 Forms that they would comply with all Federal, State, and local employment-related laws and regulations, PSUF ¶ 10, Defendants were repeatedly put on notice of the AWPA and the WMLA. PSUF 133-61. Defendant Downs received and reviewed informational brochures from the DWD and the DOL regarding applicable rules and regulations, and repeatedly discussed them with representatives of the agencies. PSUF ¶ ¶ 136, 156-57. Betty Miller, a human resources assistant at GLK who was involved in the H-2B program, attended bi-annual DWD-sponsored programs regarding migrant workers, beginning in approximately 1999. PSUF ¶ 158. Those programs discussed the AWPA and the WMLA, including the disclosure and working agreement requirements. PSUF ¶ 159. Jacci Carlson, who became GLK's director of human resources in June 2011, read information on the DOL's website regarding laws related to H-2B workers. PSUF ¶ 160. Carlson also met with a representative from the DWD to receive information about the WMLA and reviewed the statute itself. PSUF ¶ 161.

On multiple occasions, both the DWD and the DOL investigated the treatment of H-2B and other migrant and seasonal workers by GLK. PSUF ¶¶ 133-161. Downs met with these investigators on behalf of GLK. PSUF ¶¶ 136, 139, 147, 157. In 2007 and 2008, GLK was cited

by the DWD for violations of the WMLA, including for firing migrant workers before the end of their employment contract. PSUF ¶¶ 150-157. In both instances, GLK was ordered to pay the workers their wages owed for the remainder of the contract period, and given information and counseling about the WMLA, including a copy of the statute itself. PSUF ¶¶ 152, 154-157. In 2002, GLK was cited and fined by the DOL for violations of the AWPA disclosure requirements from 2000 through 2002, and assessed a civil monetary penalty of $4,503.68. PSUF ¶ 134. In 2008, DOL again investigated GLK for, among other things, failure to provide the required recruitment disclosures to migrant and seasonable workers from 2006 through 2008. PSUF ¶ 137. Defendant Downs and Miller participated in a conference with the investigator and claimed "that they were not aware of some of the MSPA [AWPA] requirements and, now that they were, would comply." PSUF ¶ 140. The DOL also found that GLK had violated the H-2B regulations in 2010 and 2011, and assessed a total of $21,000 in civil penalties against GLK, which GLK paid in early 2013. PSUF ¶¶ 144-48. Downs and Carlson participated in a conference with the investigator on September 6, 2012. PSUF ¶ 147.

In spite of GLK's lengthy history of being subject to investigations by the DOL and the DWD, and the fact that the company had paid $21,000 in civil penalties to the DOL for violations of the H-2B regulations less than six months before they signed discovery responses in this case, Defendants provided false sworn discovery responses in this case, dishonestly denying and concealing that they had ever been investigated by any of these agencies for violations of the AWPA, the WMLA, or the H-2B regulations. PSUF ¶ 162.[4]

---

[4] Plaintiffs' counsel discovered Defendants' history of violations only through their own investigation, including through Freedom of Information Act and open-records requests to the agencies.

14

<u>**SUMMARY JUDGMENT STANDARD**</u>

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). Only factual disputes that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48 (1986).

<u>**ARGUMENT**</u>

As demonstrated below, each of three distinct sources of law— federal statutory law, Wisconsin statutes, and basic contract law (which incorporates statutory and regulatory requirements existing at the time and place of contracting)—required Defendants to employ Class Members on statutorily-mandated terms. Those statutorily-mandated terms did not allow termination at-will. As discussed below, Defendants breached and violated those terms, without legal justification, entitling the Classes to summary judgment.

**I.    CLASS MEMBERS' EMPLOYMENT WITH GLK WAS GOVERNED AND PROTECTED BY BOTH THE AWPA AND THE WMLA.**

The AWPA was passed in 1982, in substantial part to strengthen and expand protections for migrant and seasonal agricultural workers, who have "long been among the most exploited groups in the American labor force." S. Rep. No. 93-1295; 29 U.S.C. § 1801. The decision to strengthen and expand protections reflected Congress' awareness that existing protections— under the Farm Labor Contractor Registration Act ("FLCRA"), 7 U.S.C. § 2041 *et seq.* (repealed 1983)—had "failed to reverse the pattern of abuse and exploitation of migrant and seasonal farmworkers." H.R. Rep. No. 97–885 (noting the failures of the FLCRA and emphasizing the "desperate[ ] need" for redoubled efforts to enforce the protections originally embodied in the FLCRA); *id.* ("[e]vidence ... confirms that many migrant and seasonal agricultural workers

remain today, as in the past, the most abused of all workers in the United States."); *Morante-Navarro v. T&Y Pine Straw, Inc.,* 350 F.3d 1163, 1169 (11th Cir. 2003); *Barajas v. Bermudez,* 43 F.3d 1251, 1254 (9th Cir. 1994).

The AWPA is a remedial statute, generally to be construed broadly to effectuate its humanitarian purposes. *Charles v. Burton*, 169 F.3d 1322, 1334 (11th Cir. 1999) (*citing Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993).

The Wisconsin Migrant Labor Act was similarly enacted to improve protections for migrant workers. The Wisconsin Legislature passed the WMLA in 1971 with the avowed intent, made clear by the notes to the bill, of "improving the status of migrant workers in this state." Wis. Migrant Labor Act, Ch. 17 (Wis. 1977) (attached as Exhibit B).

### A.     Class Members' Employment With Defendants Was Covered By The AWPA.

Class Members were employed by the Defendants as "migrant agricultural workers" within the meaning of the AWPA, which defines a "migrant agricultural worker" as "an[y] individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). "Agricultural employment" is, in turn, also broadly defined, and specifically includes:

> … the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

29 C.F.R. § 500.20(e). *See also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 236 (7th Cir. 1983) (cannery workers are engaged in "agricultural" employment; construing FLCRA).

Class Members in this case qualify on all prongs of the AWPA's definition of a "migrant agricultural worker." They were migrant workers—from Mexico. PSUF ¶ 69. And they were

hired for "agricultural" employment—to handle and process cabbage in its unmanufactured state. They were therefore entitled to the protections provided by the AWPA. PSUF ¶ 3.

GLK and Defendant Downs were each "employers" under the AWPA. 29 C.F.R. § 500.20(d). GLK's status as an employer is admitted. Dkt. No. 78, ¶¶ 18, 19, 23, 26 (*not denying* offer, acceptance or performance, and admitting action to terminate employment). Defendant Downs' status as a statutory employer for purposes of the AWPA is established by his retention of the powers to make hiring, firing and wage-setting decisions, Dkt. No. 78, ¶ 9, as well as by his exercise of those powers. PSUF ¶¶ 31-32, 34, 38, 90-91, 120. Downs, for example, was personally responsible for the decision to terminate workers' employment before the end of their contractual period of employment, in both 2010 and 2011. PSUF ¶ 90.

**B.      Class Members' Employment With Defendants Was Also Covered By The WMLA.**

Similar to the AWPA, the WMLA also provides protections to "migrant workers," defining a "migrant" worker as "any person who temporarily leaves a principal place of residence outside of this state and comes to this state for not more than 10 months in a year to accept seasonal employment in the planting, cultivating, harvesting, *handling, drying, packing, packaging, processing*, freezing, grading or storing of any agricultural or horticultural commodity in its unmanufactured state." Wis. Stat. § 103.90(5)(a) (emphasis added). Class Members fit within this definition.

In tandem with its broad definition of a "migrant worker" the WMLA contains a correspondingly broad definition of "employer," covering any person "engaged in planting, cultivating, raising, harvesting, handling, drying, packing, packaging, processing freezing, grading or storing any agricultural or horticultural commodity in its unmanufactured state who

employs a migrant worker." Wis. Stat. § 103.90(2). Defendants are covered employers under the WMLA.

**II.    AS REQUIRED BY THE AWPA AND THE WMLA, THE EMPLOYMENT RELATIONSHIP BETWEEN DEFENDANTS AND THE CLASSES WAS FOR A DEFINITE TERM, RATHER THAN TERMINABLE AT WILL.**

**A.    Under The AWPA, The Employment Relationship Between Migrant Workers And Their Employers Is Governed By A Statutorily-Required Written "Working Arrangement."**

The terms and conditions of employment between AWPA-covered employers and AWPA-protected workers are governed by what the AWPA refers to as the "working arrangement" between an employer and its migrant agricultural workers. 29 U.S.C. §§ 1822 and 1832; 29 C.F.R. §500.72.

The starting point for every "working arrangement" are the terms and conditions stated in statutorily-required, written disclosures that employers must make to workers at the time of recruitment, 29 U.S.C. § 1821(a); *De Leon-Granados v. Eller & Sons Trees, Inc.,* 581 F. Supp. 2d 1295, 1317 (N.D. Ga. 2008), including specification of the "wage rates to be paid," "the period of employment," and "the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them." 29 U.S.C. § 1821(a). These mandatory terms, which must be stated in those required disclosures, are thereafter incorporated into and become required elements of every AWPA "working arrangement," which becomes a "'statutory contract' for agricultural workers." *De Leon-Granados*, 581 F. Supp. 2d at 1317.[5] An "employer's failure to comply with the terms and conditions of employment given in the

---

[5] The AWPA and the WMLA disclosure requirements in 29 U.S.C. § 1821(a) and Wis. Stat. § 103.915(4)(a) may create an enforceable AWPA "working arrangement" or WMLA "work agreement" even where common-law requirements for contract formation might not otherwise be satisfied.

18

required disclosure gives rise to a breach of the AWPA." *Id.* (*quoting Villalobos v. Vasquez-Campbell*, No. EP–89–CA–27, 1991 WL 311902, at *7 (W.D. Tex. Nov. 15, 1991)).[6]

At the same time, and as a matter of law, every AWPA working arrangement also implicitly incorporates federal and state employment laws and regulations in effect at the time of contracting. *See De Leon-Granados*, 581 F. Supp. 2d at 1316-17 (noting that the AWPA itself is not the only "source" for obligations imposed by an AWPA, because it also incorporates both obligations specified in an employer's application for H-2B certification and those "required under another statute or regulation," and that "failure to pay wages required under another statute or regulation is a violation of the AWPA, even if the other statute provides no private right of action."); *Medrano v. D'Arrigo Bros. Co. of Cal.*, 125 F. Supp. 2d 1163, 1166-67 (N.D. Cal. 2000) (employer's obligation may arise from express provisions of the AWPA itself or from state law incorporated by the AWPA); *see also Donaldson v. U.S. Dept. of Labor*, 930 F.2d 339, 350 (4th Cir. 1991); *Fulford v. Alligator River Farms, LLC*, 858 F. Supp. 2d 550, 556-57 (E.D.N.C. 2012). *See generally, Home Bldg. & Loan Assn. v. Blaisdell,* 290 U.S. 398, 429-30 (1934) ("the laws which subsist at the time and place of the making of [the] contract, and where it is performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.").

Under the AWPA, an employer may not violate any of the terms of the working arrangement without justification, and any such breach is a violation of the Act. 29 U.S.C. § 1822(c) ("[N]o farm labor contractor, agricultural employer, or agricultural association, shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker.")

---

[6] Pursuant to Civil Local Rule 7(j)(2), copies of all unpublished opinions, decisions, and orders cited herein are attached as Exhibit A.

**B.     Under The WMLA, The Employment Relationship Between Migrant Workers And Their Employers Is Governed By A Statutorily Required Written "Work Agreement."**

Whereas employment under the AWPA is pursuant to what that statute refers to as a "working arrangement," 29 U.S.C. § 1822(c), the WMLA requires employment pursuant to what that Act refers to as a mandatory "written work agreement." Wis. Stat. § 103.915(1)(b).

**III.    IN EVERY AWPA "WORKING ARRANGEMENT" AND IN EVERY WMLA "WORK AGREEMENT," EMPLOYMENT FOR A DEFINED PERIOD OR TERM IS A REQUIRED ELEMENT.**

One of the required elements in every AWPA working arrangement is a defined "period of employment," 29 U.S.C. § 1821(a)(4), specifying beginning and ending dates of work. *See Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 406, n. 1 (7th Cir. 2007) (the AWPA "obliges" employers "to disclose 'the period of employment,'" meaning "the beginning and ending dates of work"); *Colon v. Casco, Inc.*, 716 F. Supp. 688, 694 (D. Mass. 1989) ("The 'period of employment' is a required term in every working arrangement.").

The same is also true under the WMLA. Under the WMLA, every written work agreement must include or incorporate, among other terms both: (a) an explicitly specified "term of employment, including approximate beginning and ending dates," Wis. Stat. § 103.915(4)(a); and (b) a "minimum work guarantee," under which the term of employment "shall" be no shorter than:

> … 10 days from the approximate beginning date specified in the work agreement, or the date the worker reports for work, whichever is later, and … the date of the final termination of employment, which date shall be no sooner than 7 days before the approximately ending date specified in the work agreement, or earlier if the worker is terminated for cause or due to seriously adverse circumstances beyond the employer's control.

Wis. Admin. Code § DWD 301.06(8).[7] *See also*, Wis. Stat. § 103.915(4)(b) (requiring "a minimum of 45 hours in each 2-week period" throughout the term of employment). As these requirements make clear, the WMLA eliminates employment at-will for covered workers. In its place, migrant workers receive employment terminable only: (a) "for cause," (b) at the end of the disclosed, explicit "term of employment," or (c) in some cases, for a slightly shorter period defined by Wis. Admin. Code § DWD 301.06(8). Under the WMLA, this guarantee of employment for a term, is subject to only two exceptions: termination "for cause" or for "seriously adverse circumstances beyond the employer's control." Wis. Admin. Code § DWD 301.06(8). As demonstrated later in this brief, neither exception applies here.

In sum, both the AWPA and the WMLA displace at-will employment, substituting in its place a guarantee of employment for a defined period, which constitutes a required element of every employment relationship under the AWPA or the WMLA.

### A. The Working Arrangement And Work Agreement Between Class Members And Defendants Was For Employment For A Term: From August 9 To November 30 For The 2010 Season And From August 1 To November 15 For The 2011 Season.

Having established that the AWPA and the WMLA require employment of migrant workers for a term, displacing employment at will, the next question, in this case, is how long the required term of employment was. That question is answered by the applications (ETA 9142 Forms) that Defendants submitted to the DOL, in 2010 and 2011, as a condition and prerequisite to obtaining authorization to import foreign workers. In applying for this authorization, GLK

---

[7] In both 2010 and 2011, again in the ETA 9142 Form, Defendants certified to the DOL that they would provide H-2B workers with at least 40 hours of work per week over the certified period of employment. PSUF ¶ 18. The H-2B regulations in place at the time conditioned an employer's participation in the H-2B program on the employer offering a "full-time, temporary position." 20 CFR § 655.22(h) (2009). Defendants understood their obligation to be that "the workers must receive on average a minimum of 40 hours per week." PSUF ¶¶ 24, 26. Full-time employment for the period of employment was clearly a term of Class Members' employment.

certified that the positions it was seeking to fill were "full-time" positions; that wages would be paid at or above the federally-mandated prevailing wage rate; that, for the 2010 season, the "Begin Date" for intended employment was August 9, 2010 and the "End Date" November 30, 2010; and that, for the 2011 season, the "Begin" Date was August 1, 2011 and the "End Date" was November 15, 2011. PSUF ¶¶ 14-19. These were required disclosures on the ETA 9142 Form. Defendants could not have obtained authorization to import foreign workers without them. 20 C.F.R. § 655.20 (2009).[8]

Defendants have stipulated that, but for the above disclosures on their ETA 9142 Forms, there were no other written disclosures. PSUF ¶¶ 163-167. According to their stipulation, neither they, nor any agent working on their behalf, nor, to their knowledge any other person, ever provided any Class Member with written disclosures required by the AWPA or the WMLA. *Id.*

The AWPA and the WMLA each *require* written disclosures of the term or period of employment, which, as a matter of law, then becomes a required element and enforceable term of the employment relationship. Because written disclosure of the period of employment is required, and by their own admission the only written disclosure Defendants ever made of the period of employment was in the ETA 9142 Forms they submitted to the United States Department of Labor, the "Begin Date" and "End Date" stated in those forms became terms of the AWPA working arrangement and the WMLA work agreement as a matter of law. *See Donaldson v. U.S. Dep't of Labor*, 930 F.2d 339, 349-50 (4th Cir. 1991) (terms of employment submitted to Department of Labor by employer of AWPA-covered workers are incorporated into

---

[8] GLK's ETA 9142 Forms also certified that if GLK terminated any workers' employment prior to the end of the certified period, GLK would be liable for the worker's return transportation to Mexico. PSUF ¶ 25. Agreement to this requirement was mandatory. *See* 8 U.S.C. § 1184(c)(5)(A); 20 C.F.R. § 655.22(m) (2009).

the AWPA "working arrangement"); *De Leon-Granados v. Eller & Sons Trees, Inc.,* 581 F.

Supp. 2d 1295, 1325 (N.D. Ga. 2008) (holding that terms of employment submitted to

Department of Labor by employer of AWPA-covered workers were incorporated into the

workers' working arrangements); *Frederick Cnty. Fruit Growers Ass'n, Inc. v. McLaughlin*, 703

F. Supp. 1021, 1030-31 (D.D.C. 1989) *aff'd sub nom, Frederick Cnty. Fruit Growers Ass'n, Inc.*

*v. Martin*, 968 F.2d 1265 (D.C. Cir. 1992) (same). *See also, Fulford v. Alligator River Farms,*

*LLC,* 858 F. Supp. 2d 550, 556-57 (E.D.N.C. 2012) (AWPA working arrangement also

incorporates protections guaranteed by H-2A regulations).

**IV.    DEFENDANTS VIOLATED BOTH THE AWPA AND THE WMLA BY
TERMINATING CLASS MEMBERS PRIOR TO THE END OF THE
CONTRACTED-FOR EMPLOYMENT PERIOD, BY FAILING TO REIMBURSE
CLASS MEMBERS FOR TRAVEL AND IMMIGRATION EXPENSES, WHICH
REDUCED THEIR FIRST WEEK'S WAGES BELOW THE PREVAILING
WAGE, AND BY REFUSING TO PAY FOR THEIR RETURN
TRANSPORTATION.**

Defendants violated the AWPA working arrangement and the WMLA work agreement in

a number of ways.

First, they failed to employ Class Members for the entire contractual period, instead

terminating them without legal justification less than half way into their contracts in both 2010

and 2011. PSUF ¶¶ 89, 93-94, 96-97.

Second, Defendants failed to pay Class Members the prevailing wage for at least 40

hours of work a week as promised. They did this by refusing to reimburse workers for travel and

visa expenses, thereby reducing Class Members' wages in their first week below the prevailing

wage. PSUF ¶¶ 7-9. As discussed in Plaintiff's pending motion for summary judgment on their

Fair Labor Standard Act ("FLSA") claims, *see* Dkt. Nos. 86 and 101, these deductions violated

the FLSA. Because they violated the FLSA, they were also *ipso facto* violations of the AWPA.

*Smith v. Bonds*, No. 91-818-CIV-5-D, 1993 WL 556781, *8 (E.D.N.C. Sept. 28, 1993) ("The

23

court's finding of liability on plaintiffs' FLSA claims *ipso facto* leads to the conclusion that defendants . . . also violated Section 1822(a)."); *see also De Leon-Granados*, 581 F. Supp. 2d at 1319 ("Defendants violated § 1822 of the AWPA by … making deductions for its own benefit that reduce employee pay below the mandated prevailing wage."). Violations of the FLSA are, as a matter of law, also violations of the AWPA because: (a) the AWPA, like the FLSA, requires payment of wages when due, 29 U.S.C. § 1822(a); and (b) the obligations under every AWPA working arrangement include compliance with other applicable employment statutes and regulations, including the FLSA. *See De Leon-Granados*, 581 F. Supp. 2d at 1316-17; *Medrano v. D'Arrigo Bros. Co. of Cal.*, 125 F. Supp. 2d at 1166-67 (N.D. Cal. 2000). *See generally* Section II.A *supra*.

Third, Defendants also violated the AWPA working arrangement by failing to pay return transportation to Class Members' homes, PSUF ¶¶ 99-101, as also required by the H-2B regulations, 20 C.F.R. 655.22(m) (2009), which are incorporated into the AWPA working arrangement. *Id.*

## V.  DEFENDANTS' FAILURE TO REIMBURSE CLASS MEMBERS' TRAVEL AND IMMIGRATION EXPENSES ALSO VIOLATED WISCONSIN'S WAGE PAYMENT AND LIVING WAGE LAWS.

Similar to the AWPA and the FLSA, Wisconsin's wage payment and living wage laws require the payment of the Wisconsin living wage for all hours worked. Wisc. Stat. §§ 104.02, 104.03, 109.03(1); Wis. Admin. Code § DWD 272.03. Like courts analyzing costs incurred primarily for the benefit of employers under the FLSA, the Wisconsin Supreme Court has recognized under state law that employees should not be made to "unfairly bear the employer's costs of operating a business." *Erdman v. Jovoco, Inc.*, 181 Wis. 2d 736, 752, 512 N.W.2d 487, 492 (Wis. 1994). *See also Boelk v. AT&T Teleholdings Inc.*, No. 12-CV-40-BBC, 2013 WL 239066, at *10 (W.D. Wis. Jan. 10, 2013) (recognizing that requiring employees to undertake

24

tasks during meal breaks that "predominantly benefitted" employer without compensation, would violate Wisconsin law).

The Wisconsin living wage in 2010 and 2011 was $7.25 an hour, *see* Dkt. No. 78, ¶ 98, which was identical to the federal minimum wage during the same period. Just as Class Members' unreimbursed immigration and travel expenses reduced their wages in the first week below the federal minimum wage, they also reduced their first-week wages below the Wisconsin living wage and thus also violated Wisconsin law. PSUF ¶ 79. Accordingly, Class Members are entitled to summary judgment as to liability on Count VIII.

## VI. DEFENDANTS' VIOLATIONS OF THE AWPA WERE INTENTIONAL.

Under 29 U.S.C. § 1854(c)(1), "intentional" violations of the AWPA entitle a migrant agricultural worker to recover statutory damages. There is no requirement of scienter or specific intent. Under the AWPA, "intentionally" means that a defendant was consciously or deliberately engaged in the action that led to the violation, even if the defendant was unaware that it was violating the law. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 238 (7th Cir. 1983) (applying the Farm Labor Contractor Registration Act ("FLCRA"), the predecessor to the AWPA); *see also Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1262 (N.D. Fla. 2014) (AWPA "employs the common civil standard which holds one liable for the natural and foreseeable consequences of one's acts"); *Montalvo v. Larchmont Farms, Inc.*, No. CIV.06-2704(RBK/AMD), 2009 WL 4573279, at *14 (D.N.J. Dec. 3, 2009). "This means that the focus is not on the defendant's knowledge of the statute, but the deliberateness of his actions." *Montalvo,* 2009 WL 4573279, at *14. That is, neither an employer's ignorance of the law nor its mistaken belief that it was not subject to or violating the AWPA can excuse its violations. *See De La Fuente*, 713 F.2d at 238 (defendants' erroneous belief that it was except from the FLCRA's requirements did not make its violation unintentional); *Salazar-Calderon v. Presidio Valley*

25

*Farmers Ass'n*, 765 F.2d 1334, 1345 (5th Cir. 1985) (rejecting argument that defendant could not have committed an intentional violation of FLCRA absent knowledge of the statute's existence and requirements); *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 632 (W.D. Tex. 1999); *Bueno v. Mattner*, 633 F. Supp. 1446, 1466 (W.D. Mich. 1986) (rejecting same argument regarding AWPA).

Further, in cases where violations occur as part of a defendant's normal business practices, no further showing of intent is required. *Fanette*, 28 F. Supp. 3d at 1262-63; *Osias v. Marc*, 700 F. Supp. 842, 844 (D. Md. 1988).

In this case, as part of their normal business practices: Defendants made decisions (1) not to reimburse the H-2B works for their travel, immigration, and other expenses, (2) to bring approximately 83 H-2B workers to Wisconsin in 2010 despite knowing of the crop failure and the resultant reduction in the amount of work, (3) to terminate all H-2B workers early in 2010 and 2011, and (4) not to provide or pay for their return transportation. These were conscious, deliberate decisions. That alone is sufficient to impose liability. *Id.*

Further, and although not necessary for a finding of liability, it is notable that Defendants were indisputably aware of the AWPA, as demonstrated both by: (a) the testimony of Downs and other GLK employees that they received and reviewed information about the AWPA, and (b) the multiple governmental investigations to which GLK was subject. PSUF ¶¶ 133-161. Finally, although also unnecessary as a predicate for liability, Defendants certified their agreement to abide by all applicable laws and regulations each time they applied for permission to hire H-2B workers. PSUF ¶ 10.

## VII. NO COGNIZABLE JUSTIFICATION OR DEFENSE EXISTS FOR DEFENDANTS' VIOLATIONS OF THE AWPA AND THE WMLA.

Both the AWPA and the WMLA allow for the possibility of an affirmative defense to breaches of a working arrangement or work agreement, in the rare event that performance would have been impossible or seriously impracticable. The AWPA defines this defense in terms of "justification," by providing that:

> The [AWPA] prohibits farm labor contractors, agricultural employers and agricultural associations from violating, *without justification*, the terms of any working arrangements they have made with migrant or seasonal agricultural workers. Normally, "without justification" would not include situations in which failure to comply with the terms of any working arrangements was directly attributable to acts of God, due to conditions beyond the control of the person or to conditions which he could not reasonably foresee.

29 C.F.R. § 500.72(a) (emphasis added). Similarly, the WMLA permits an employer, in limited circumstances, to terminate an employee prior to the end of the period specified in the work agreement "for cause or due to seriously adverse circumstances beyond the employer's control." Wisc. Stat. § 103.915(4)(b) (emphasis added); Wis. Admin. Code § DWD 301.06(8).[9]

No defense of "justification" under the AWPA or "seriously adverse consequences" under the WMLA should be allowed here because GLK has not raised the alleged presence of justification or seriously adverse circumstances beyond its control as an affirmative defense. Dkt. No. 78 (Answer to Second Amended Complaint). "If a defendant does not raise [affirmative] defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chic. Housing Authority,* 360 F.3d 721, 735 (7th Cir. 2004); *Operating Engineers Local 139 Health*

---

[9] The WMLA, incorporated in the AWPA working arrangement as discussed *supra*, sets an arguably even higher bar to justify the termination of a migrant worker prior to the end of the period of employment. The statute provides that an employer may terminate an employee prior to the end of the period specified in the work agreement "for cause or due to *seriously adverse circumstances beyond the employer's control*." Wisc. Stat. § 103.915(b); Wis. Admin. Code § DWD 301.06(8). Because the Wisconsin standard is nearly identical to or perhaps higher than the "justification" required under AWPA, any justification that falls short under the AWPA would also fall short under the WMLA.

*Benefit Fund v. Lake States Indus. Servs., Inc.,* No. 05-C-0020, 2005 WL 1563332, at *2 (E.D. Wis. June 30, 2005).

However, on the merits, and the undisputed facts, the defenses also fail and fail as a matter of law. The circumstances that led to Class Members' early terminations, both in 2010 and 2011, were not entirely "beyond" Defendants' "control." Nor were Defendants without fault or negligence. Indeed, as explained below, in both years Defendants affirmatively exacerbated rather than mitigated the harm and injuries visited on class members. Under these circumstances, there is no legal justification for shifting the entire risk and cost of the announced and then aborted wage increase in 2011, or the crop failure in 2010, onto the backs of low-wage workers or for allowing Defendants to escape their contract. Further, any such defense would go, at best, only to Class Members' claims under the AWPA and the WMLA for wrongful early termination of their employment. There can be no such affirmative defense either to Defendants' failure to reimburse the workers' expenses during the first week of work or for their failure to provide or pay for return transportation from the Bear Creek cannery to the workers' homes in Mexico. Defendants had the ability to reimburse expenses and to pay for return transportation. Neither failure was due to circumstances beyond their control.

A. **There Is No Legal Justification For Shifting The Entire Risk And Cost Of The Announced And Then Retracted Wage Increase In 2011 To The Low-Wage Workers Rather Than The Employer.**

For 2011, GLK claims that the cause of its termination of class members' employment was what Defendant Downs referred to as the "Socialist Wage Department's" announcement of an increase in the prevailing wage rate applicable to H-2B workers. PSUF ¶¶ 120, 193.

There are at least four reasons why DOL's announcement did *not* provide a cognizable justification under the AWPA and the incorporated WMLA for discharging class members in this case before the end of their guaranteed period of employment in 2011.

28

First, an increase in the cost of performance is rarely allowed as a defense to a breach of contract.[10] Market shifts affecting the price of raw materials or labor are common occurrences. Although their timing often cannot be predicted, the risk of their occurrence is known. As a result, they are rarely the sort of risk that an employer could not protect against either through insurance or appropriate contractual language, nor so insurmountable an obstacle as to excuse performance. Further, "[i]t does not matter [if] it is an act of government" that triggers the increase in costs. *N. Ind. Public Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986). As the Seventh Circuit has emphasized, in this very context, government regulation is "a pervasive factor" in the economy and, consequently, allowing changes in the regulatory environment to excuse contractual performance would make contracts unstable. *Id.*; *see also, W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 768 n.12 (1983) ("Economic necessity is not recognized as a commercial impracticability defense to a breach of contract claim."); *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293-94 (7th Cir. 1974) ("The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused. In our opinion, the present case is one in which performance may have become burdensome but was not excused. Performance . . . was not shown to have been impossible… [In

---

[10] Notably, the increase in the cost of performance would have increased GLK's total labor costs by less than 3%. Downs projected that the announced wage increase, which would have raised wages for trim-line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's the company's costs of labor for trim line workers by $200,000. PSUF ¶ 121. GLK's total labor costs on an annual basis exceed $6.5 million. PSUF ¶ 122. Accordingly, a $200,000 increase as a result of the DOL's new rule, had it been implemented, would have increased the company's total labor costs by less than 3%. The company has of revenues of $50 million to $100 million annually; by that measure, the increase would have been less than four-tenths of a percent of overall revenues. ($200,000/$50,000,000 = .004). If the DOL's proposed rule had been implemented, the increase for GLK, at $4.32 an hour, would have been 11% less than the $4.83 average per hour bump that DOL had projected for H-2B employers overall. *See* PSUF ¶¶ 123-124.

addition,] [t]he red flag of possible governmental controls [was] discernible."); *Ashraf v. Swire Pac. Holdings, Inc.,* 752 F. Supp. 2d 1266, 1270 (S.D. Fla. 2009) (change is market conditions is ordinarily not sufficient to excuse contract performance); *Seaboard Lumber Co. v. United States,* 41 Fed. Cl. 401, 416 (1998) (government policies which do not prevent performance but merely make performance unprofitable are not sufficient grounds to prevent a party from being held liable for non-performance; otherwise, "a financially unstable party would be able to enter into risky contracts with impunity, knowing that if luck went against it, it would be excused from performance. This is not the law.").[11]

Second, in this case, Defendants were not blind-sided by the announcement of a wage increase. For several years leading up to 2011 there had been strong indications that the DOL was planning action to reconfigure its method for determining prevailing wage rates for H-2B workers, specifically in order to increasing H-2B wage rates. PSUF ¶¶ 112-116. The risk was so well known, and the rumors so pervasive, that in November 2009, GLK's consultant on matters of H-2B employment, LaborQuest, specifically advised GLK to "[p]lease keep in mind that if [the prevailing wage] is changed *at any time* during the process (or [even] when the workers are

---

[11] Because an increase in costs does not excuse contract performance at common law, it absolutely should not excuse it under the AWPA or the WMLA. Absent contrary evidence, and there is none here, the court must presume that Congress and the Wisconsin state legislature intended the "justification" exception in the AWPA and the "seriously adverse consequences" exception in the WMLA to be consistent with, rather than alter, the scope of established contract defenses in existing law. *See Hall v. United States*, 132 S. Ct. 1882, 1889 (2012) ("We assume that Congress is aware of existing law when it passes legislation"); *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990)); *State v. Olson*, 175 Wis. 2d 628, 641, 498 N.W.2d 661, 666 (1993) ("When determining legislative intent, this court must assume that the legislature knew the law in effect at the time of its actions."); *Kindy v. Hayes*, 44 Wis. 2d 301, 314, 171 N.W.2d 324, 330 (1969) (finding that it is presumed that legislature acted with full knowledge of existing law, both statutes and court decisions interpreting it, and that presumption extends to and includes rules of an administrative agency).

[already] in your employ) that you are *required* to adjust their wages accordingly." PSUF ¶ 117.

Acknowledging that, GLK wrote back to LaborQuest expressly assuming that risk, stating that:

> "*We do understand* that any changes [to the prevailing wage rate governing wages for H-2B workers] are *our responsibility*."

PSUF ¶ 118. GLK was specifically advised of the risk of a wage increase and voluntarily chose to bear it. *See E. Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 433 (S.D. Fla. 1975) (impracticability not an available defense where "the handwriting was on the wall").

Third, the *announcement* of a planned wage increase, turned out to be only that—an announcement. In the end, the wage increase did not materialize: on September 28, 2011, the DOL postponed the effective date of the rule until Nov. 30, 2011. As of today, three years later, a new wage rule still has not taken effect. *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 78 Fed. Reg. 53643 (August 30, 2013) (indefinitely delaying implementation of wage determination rule at 20 C.F.R. § 655). But even if the wage increase *had* gone through, that would *not*, without more, have created a cognizable defense to contract performance. Rather, the question then would have become whether the employer or employees should bear the risk and incur the resulting loss.

As things currently stand, Defendants have shifted the *entire* risk and cost to the H-2B workers. That is inconsistent with contract law. In the *rare* situations where contract law allows a party to avoid performance due to changed circumstances, that defense is upheld, as the Seventh Circuit has explained, in order to further the goal of "shifting risk to the party better able to bear it, either because he is in a better position to prevent the risk from materializing or because he can better reduce the disutility of the risk (as by insuring) if the risk does occur." *N. Ind. Public Serv. Com.*, 799 F.2d at 278. Here, no such purpose is furthered by allowing Defendants to unilaterally abrogate their contract with workers and avoid their end of the bargain by cutting the

31

contract short and sending the workers back to Mexico, placing the entire risk of increased costs onto the workers. Defendants were far better positioned than the workers to take out insurance against the risk of changes in the cost of materials or labor. There is no market for such insurance available to rural Mexican workers. Defendants also had superior information about this risk—indeed, had been specifically warned by LaborQuest about it and, in the face of that warning, voluntarily assumed the risk.

Fourth, after discharging class members, Defendants replaced them with domestic workers whom they hired at a lower wage rate. PSUF ¶¶ 125-126. That means of "covering" in the market was blatantly illegal. Once an employer has filed and received approval to import H-2B workers, under no conditions can it pay domestic workers less favorable wages for the same work. *See* 20 C.F.R. § 655.10(b) (2009) ("The employer must offer [the prevailing wage] or higher to both its H-2B workers and any similarly employed U.S. worker hired in response to the recruitment required as part of the application."). The purpose of H-2B wage requirements is to protect the wage levels of domestic workers—to assure that employers bring H-2B workers into the country *only* when the wages and working conditions of similarly U.S. workers will not be adversely affected. *See United Ass'n of Journeymen and Apprentices of Plumbing & Pipe Fitting Indus., AFL-CIO v. Reno,* 73 F.3d 1134, 1136 (D.C. Cir. 1996); *De Leon-Granados*, 581 F. Supp. 2d at 1317.

Here, Defendants perversely turned the program purpose upside down. They replaced foreign visa workers with domestic workers *in order to* pay the domestic workers *less* for the same work. That was blatantly illegal. The wage rate mandated by the Department of Labor for H-2B workers is a floor not a ceiling on the wages that must be paid to foreign workers *and* similarly employed U.S. workers. It would be a manifest miscarriage of justice, unjustly

32

enriching Defendants, to allow them to *profit* from their decision to replace visa workers with domestic workers, whom they *illegally* paid *less* after having represented to the government that they were unable to even find domestic workers to perform the work needed. PSUF ¶¶ 10, 125-126. Equities are important when a defendant seeks to escape and refuse to perform a contract.

### B. There Is No Legal Justification For Shifting The Entire Risk And Cost Of Crop Failure In 2010 Onto The Low-Wage Workers.

Just as they discharged all the H-2B workers early in 2011, Defendants also discharged the workers early in 2010. PSUF ¶ 89.  And as with their 2011 terminations, Defendants' 2010 terminations were without legal justification and thus in clear violation of the AWPA and the WMLA.

Before the start of the cutting season in 2010, there was flooding in Wisconsin, which was apparent as early as June, and led to an outbreak of black rot in Outagamie County, harming the cabbage crop. PSUF ¶ 103. The damage to the crop was evident as early as July, before Defendants brought any class members to Wisconsin. PSUF ¶¶ 103-104. Indeed, cognizant of the damage to the cabbage crop, and of what would inevitably be a shortened season, Defendants decided to call up only half the 110 workers for whom they had obtained visas, just 55 Mexican workers. PSUF ¶ 105. But then Defendants reversed their decision, and brought in approximately 86 H-2B workers, PSUF ¶ 106, knowing full well there was not enough work to occupy them for a full season. If Defendants had disclosed what they knew to the workers—namely, the dearth of work, certainty of a short season, and no intention to pay them for a full seasons—the workers would not have accepted the job. PSUF ¶ 109. Under these circumstances, the crop failure does not excuse Defendants' early termination of class members' employment. *See Cruz v. Vel-A-Da, Inc.,* No. 3:90CV7087, 1993 WL 658968, at *4 (N.D. Ohio June 9, 1993)

("The severe drought . . . was an act of God over which the defendants had no control. *However,* this is not a situation in which the defendants were caught off guard by the

33

drought conditions. *The defendants were aware* of the financial problems caused by the drought at the time they entered into the employment agreement. *They could reasonably foresee* that they would be unable to pay the workers their wages when due when they hired them. *Thus, defendants' failure to pay was not excused by the drought and their conduct violated [AWPA] section 1822(c)*.") (emphasis added).

The fact is that crop failure is an inherent risk in Defendants' operation. That risk was well known to them and, indeed, because of that knowledge, one that they had insured against. PSUF ¶ 110. They knew about and accepted that risk. And given those facts, there is no legal justification for shifting the entire risk and cost of crop failure in 2010 onto the low-wage workers. Contractual impracticability and impossibility "are doctrines for shifting risk to the party better able to bear it …" *N. Ind. Public Serv. Com.*, 799 F.2d at 278. In this case, as between Defendants and Class Members, the party better able to bear the risk was and is Defendants.

Second, and relatedly, one significant reason why Defendants were in better position to bear the risk of crop failure than the workers was the informational advantage that Defendants had over Class Members, information which they exploited. When Class Members made the decision to travel from Mexico to Wisconsin, they were not aware that the season would be curtailed due to the flooding and crop failure. Defendants had an informational advantage—and they opportunistically exploited it, by withholding from Class Members that there would only be work for a few weeks. The law does not condone such practices; in fact, it condemns them. *See generally* 29 U.S.C. 1821(f) (prohibiting knowingly providing false or misleading information to migrant workers concerning the terms, conditions or existence of employment); *Villalobos v. Vasquez-Campbell,* 1991 WL 311902, at *4 (W.D. Tex. Nov. 15, 1991) (emphasizing "the critical role" that truthful disclosures of working terms and conditions serve for migrant workers, who need the information before they decide to travel hundreds or thousands of miles from their

homes); *Vega v. Nourse Farms, Inc.,* 62 F. Supp. 2d 334, 346 (D. Mass. 1999) (recognizing that silence about employment can be "even more misleading that direct misrepresentations").

The evidence here shows avowedly opportunistic behavior: Defendants started to cancel their order for at least half the workers they anticipated needing. Then they changed their minds, for their own benefit, to the detriment of the workers who traveled to Wisconsin counting on 16 weeks of work, only to be sent home after four to eight weeks—as Defendants knew they would be. Neither the WMLA nor the law of contracts countenances such opportunistic behavior, which vitiates any otherwise possible defense Defendants might have had to performance. It is fundamental to guest worker programs, and enshrined in law, that guest workers must be provided with disclosures about what the terms and conditions of work will be before they begin their journey from the home countries. *Id.*; H.R. Rep. No. 885, 97th Cong., 2d Sess., 14, reprinted in 1982 U.S.C.C.A.N. 4547, 4560. This information, and its validity, is imperative for workers to decide whether they wish to accept the offered employment or not.

"One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other. '[T]he fundamental function of contract law (and recognized as such at least since Hobbes's day) is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and to make costly self-protective measures unnecessary.'" *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987). Defendants took opportunistic advantage of Class Members, violating these fundamental principles of contract law. Under these circumstances, the crop failure does not justify Defendants' early termination of the H-2B workers' employment in 2010 and thus Defendants are liable for a violation of the AWPA working arrangement.

35

As set forth above, there are no disputed, material facts regarding AWPA coverage, Defendants' intent, or Defendants' failure to abide by the terms of the AWPA working arrangement. Accordingly, the 2010 and 2011 Class Members are entitled to summary judgment as to liability on their claim on Count III.

## VIII. THE CLASSES ALSO ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON COUNT VI FOR BREACH OF CONTRACT.

By hiring and employing Class Members, Defendants indisputably entered into employment contracts with them. *See Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 57 (1st Cir. 2013) ("[A]n employer-employee relationship is, at heart, a contractual one. … The defendants, by hiring and employing the plaintiffs, entered into [ ] employment contract[s] with them. There is no requirement of greater formality to establish an employment contract. Indeed, 'an informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace.'") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 74 (1984).

Further, under both the AWPA and the WMLA, an element of any contractual relationship between a migrant worker and a covered employer (i.e., the work arrangement or the work agreement) is a defined and disclosed period of employment, rather than employment terminable at-will. *See* Sections II and III, *supra*. Additional elements of that contractual relationship are wage payments at the prevailing wage, including in the first week, and reimbursement for the costs of workers' return transportation home, if terminated before the end of the contracted-for period of employment. There is no factual dispute that Defendants breached these terms of Class Members' employment contracts.

Indeed, under basic contract principles, AWPA and WMLA requirements became implied terms of the contractual relationship between Defendants and every Class Member as a

matter of law. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.") (internal quotation omitted); *Dairyland Greyhound Park, Inc. v. Doyle*, 295 Wis. 2d 1, 48-49 (Wis. 2006) (stating that laws in effect at the time of a contract are deemed part of an offer and any resulting contract).

In sum, the employment relationship between Defendants and Class Members was contractual, and an implied term of that contract was employment for a fixed term, rather than employment at-will. And Defendants breached the contract they had with each Class Member by terminating Class Members' employment before the end of the contracted-for term.

## CONCLUSION

For all the reasons stated above, the 2010 and 2011 Classes certified for purposes of liability under Counts III, VI, VII, and VIII of the Second Amended Complaint request entry of judgment for liability only in their favor, on those counts, for Defendants' failure to employ Class Members for the full-term of promised employment without justification, for Defendants' failure to pay Class Members the prevailing wage and the Wisconsin living wage for 40 hours or more of work per week, and for Defendants' failure to cover the cost of return transportation for Class Members, all in violation of the AWPA's working arrangement (Count III), the common law of contract (Count VI), the WMLA's work agreement requirement (Count VII), and Wisconsin's wage payment and living wage laws (Count VIII).

Dated: February 20, 2015

s/ Joshua Karsh
One of Class Members' Attorneys

37

Matthew J. Piers
Joshua Karsh
José J. Behar
Claudia Flores
Jenna Miara
Attorneys for Class Members
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
Telephone: (312) 580-0100
Fax: (312) 580-1994
E-mail:  mpiers@hsplegal.com
        jkarsh@hsplegal.com
        jbehar@hsplegal.com
        cflores@hsplegal.com
        jmiara@hsplegal.com

Ali Beydoun
Attorney for Class Members
Farmworker Justice
1126 16th Street, N.W., Suite 270
Washington, D.C. 20036
(202) 293-5420 ext. 308
E-mail: abeydoun@farmworkerjustice.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on counsel listed below by CM/ECF on February 20, 2015.

Michael Aldana, Esq.
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Michael.Aldana@quarles.com


s/ Joshua Karsh
One of Plaintiffs' Attorneys