UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALEJANDRO JURADO JIMENEZ et al.,

               Plaintiffs,

      v.                                 Case Nos. 12-CV-209

GLK FOODS LLC and RYAN A. DOWNS,

               Defendants.

## DECISION AND ORDER

This is a class and collective class action brought by Mexican migrant workers against GLK Foods LLC (GLK), a Wisconsin company, and GLK's president Ryan A. Downs. The court granted Plaintiffs' motion for class certification on June 4, 2014 and the operative complaint is the second amended complaint (ECF No. 67). Presently before the court are the parties' cross-motions for summary judgment on Count I of the second amended complaint, which alleges Defendants violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, by failing to reimburse Plaintiffs for certain pre-employment expenses. For the reasons below, each of the motions will be granted in part and denied in part.

### I. Background

Plaintiffs are 77 Mexican nationals who were temporarily employed by Defendant GLK, a sauerkraut producer, in 2010 and 2011. Plaintiffs were employed to perform "trim-line" work at GLK's sauerkraut cannery in Bear Creek, Wisconsin. This is seasonal and labor-intensive work that involves operating machines to core and trim heads of cabbage. The season generally runs between August and November. Defendant Ryan A. Downs was President of GLK.

Plaintiffs were employed at GLK through the federal government's H-2B visa program, under which employers can hire foreign workers to perform nonagricultural labor or services in the United States on a temporary or seasonal basis. (The H-2A program applies to temporary agricultural workers.) To participate in the H-2B program, an employer must certify that it is unable to find qualified and available workers in the United States. The employer must first offer the position to United States citizens at a wage that meets the Department of Labor's determination of the prevailing wage for the kind of work involved. An employer must also attest that it will pay the temporary workers the prevailing wage for the type of work involved as determined by the Department of Labor (DOL).

GLK participated in the H-2B program for several years before 2010 and 2011. In 2010 and 2011, GLK hired a Florida agency called LaborQuest USA to facilitate the process. LaborQuest in turn subcontracted portions of the GLK work to another agency called Florida East Coast Travel Services, Inc. According to GLK, LaborQuest and the subcontractor were jointly responsible for coordinating the H-2B certification process, assisting in obtaining visas for the H-2B workers, and coordinating the travel for the workers from Mexico to the United States. GLK asserts that the fees it paid these agencies covered these services as well as H-2B certification fees, visa processing and related fees for the workers, and transportation for the workers from the border of Mexico to Bear Creek, Wisconsin. At the end of their employment, GLK also paid for their transportation back to the border.

GLK recruited H-2B workers principally from around the city of Santiago Capitiro in the Mexican state of Guanajuato. This was the hometown of Jimenez Arroyo, a full-time GLK employee. To recruit workers, Arroyo would travel to Santiago Capitiro in the spring to notify

2

recruits, most of whom had worked at GLK in Wisconsin in the past, of the year's upcoming employment opportunities. Workers were provided a copy of GLK's petition to participate in the H-2B program, which by this time had been approved by the U.S. government, and they were notified of their visa application appointments. These appointments took place in the cities of Mexico City and Matamoros. Workers who received visas then traveled to the U.S.-Mexico border where they were be picked up and transported to Wisconsin by bus. In 2010 and 2011, Arroyo also enlisted Elias Vera Ramirez (Vera), one of the H-2B workers, to assist with recruiting and hiring.

Plaintiffs incurred the following expenses before crossing the border in this pre-employment process in 2010 and 2011: bus fares from Santiago Capitiro to Mexico City in 2010 and Matamoros in 2011; accommodations and meals in these cities for several days while visas were processed and the workers waited for their travel to Wisconsin to be arranged; fees paid to a "licenciado" to assist with visa paperwork; visa application fees; passport fees for those workers who did not already have passports from earlier seasons; bus fare from Mexico City or Matamoros to the U.S.-Mexico border; and a border-crossing fee. Plaintiffs submit that they incurred between $326–$720 each for these expenses in 2010 and $294–$910 in 2011. Six of the plaintiffs also paid a "recruitment fee" in 2010, and nineteen paid such a fee in 2011. These fees were between $1,000 to $1,200 and were paid to Arroyo or Vera directly. Plaintiffs maintain that these fees, which the parties agree were illegal, were necessary in order to have one's name placed on Arroyo's list of prospective workers, and therefore payment of the fee was a condition of employment for those who had not worked for GLK in the past. Defendants state they neither received any such fees nor authorized them.

According to Plaintiffs, LaborQuest specifically advised GLK in writing that it was obligated to reimburse workers for most of these expenses. (ECF No. 86 at 8.) In 2010, Defendant Downs

3

personally initialed a form acknowledging: "New H-2B regulations require employer[] to pay[] (or reimburse) for any of the recruitment, visa and travel expenses for worker from their homes abroad to the place of employment." (ECF No. 95, ¶ 46.) It is undisputed that Defendants did not reimburse Plaintiffs for these pre-border crossing expenses. After Plaintiffs crossed the border, GLK did provide transportation to Wisconsin and per diem reimbursement for food costs to workers, and at the end of their employment, GLK paid for their transportation back to the border.

In 2010, the prevailing wage determined by the DOL was $7.85. However, excess rain and flooding devastated the cabbage crop in Wisconsin, leaving GLK with only 20% of its anticipated harvest. As a result, GLK did not need the number of workers for which it had originally petitioned, nor did it need workers for the length of time it had anticipated. The workers that year were sent home early on or about September 28, 2010. In 2011, the DOL initially increased the prevailing wage rate to $10.36 per hour. At about the time the workers were departing Mexico for the U.S., however, the DOL notified GLK that it was increasing the wage rate to $14.68 per hour. With the 87% increase in wages over the previous year and a poor harvest that yielded only 70% of plan, GLK determined that it was no longer economically viable to continue and decided to send the workers back to Mexico shortly after they arrived.

On February 29, 2012, Plaintiffs filed this action against Defendants GLK and Downs, alleging violations of Plaintiffs' rights under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–1871, the FLSA, various Wisconsin laws, as well as breach of contract. Both parties have moved for summary judgment as to count I in the second amended complaint, which alleges Defendants' failure to reimburse Plaintiffs for their in-country expenses described above during their first week of work in 2010 and 2011 constitutes a violation of the

4

FLSA's minimum wage requirement, and resulting in a violation of the FLSA.

## II. Analysis

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). There is no dispute in this case that the FLSA's minimum wage guarantee applies to Plaintiffs. The dispute is over whether the pre-employment expenses Plaintiffs incurred constitute "de facto deductions" from their first-week wages pushing their effective wage below the minimum. The answer to that question, in turn, depends on whether the employer is legally responsible for the employees' pre-employment expenses. To answer that question, it will be helpful to first consider the history and structure of the H-2B program.

### A.  History and Structure of the H-2B Program

The United States has long relied on temporary guestworkers from foreign countries to supplement the domestic labor market. The H-2 temporary work visa was established as part of the Immigration and Nationality Act in 1952 to accommodate this need. Though early guestworker programs focused on agricultural employment, Congress also recognized a need for temporary workers in other industries. At the same time, Congress did not want to harm domestic workers. Thus, an employer's participation in the H-2 program required certification by the Secretary of Labor that no qualified U.S. workers were available and that the foreign workers' employment would not adversely affect the wages and working conditions of domestic employees.

In 1986, Congress made significant changes to the H-2 program in the Immigration Reform and Control Act (IRCA) in response to calls for increased protection of temporary agricultural workers. Mathes, Charles C., *The Department of Labor's Changing Policies Toward the H-2B*

5

*Temporary Worker Program: Primarily for the Benefit of Nobody*, 80 FORDHAM L. REV. 1801 (2012) (hereinafter Mathes). The IRCA created two separate categories of the H-2 visa: the H-2A visa for temporary agricultural workers and the H-2B visa for temporary non-agricultural workers. One of the primary purposes of dividing the H-2 program in this way was to improve labor conditions for temporary agricultural workers. The same concern did not extend to non-agricultural workers, however:

> Congress had determined that the regulations governing agricultural workers "[d]id not fully meet the need for an efficient, workable and coherent program that protects the interests of agricultural employers and workers alike." Regarding non-agricultural workers, however, a House Report accompanying the bill specifically noted that no changes were being made to the statutory language governing non-agricultural H-2s since the program had worked "reasonably well" with respect to non-agricultural occupations.

Mathes at 1807–08 (footnotes omitted).

In furtherance of the goal of improving the working conditions and preventing exploitation of agricultural workers, the regulations governing the H-2A program added a number of requirements for employers who participated in the program. "For instance, the H-2A regulations specify that the agricultural job offer must include free housing, meals or cooking facilities, guaranteed employment for at least three-fourths of the contract period, and reimbursement for the employee's transportation costs." *Id.* at 1811 (footnotes omitted). But these regulations do not apply to the H-2B program. Historically, the regulations governing the H-2B program contained no such requirements, despite several efforts in Congress to extend the same protections to H-2B workers that H-2A workers enjoyed, including as recently as 2009. *Id.* at 1808. H-2B employers were not required to pay workers' pre- or post-employment expenses with one exception: if an H-2B worker was dismissed before the end of the period of authorized admission, the employer was responsible for the costs of

6

return transportation.  8 U.S.C. § 1184(c)(5)(A).

These are the regulations that were in effect at the time that GLK recruited the plaintiffs in 2010 and 2011.  On March 18, 2011, the DOL issued a Notice of Proposed Rulemaking that sought to amend the regulations governing the H-2B program by, inter alia, making employers responsible for the workers' visa fees and transportation and subsistence expenses "from the place from which the worker has come to work for the employer, whether in the U.S. or abroad, to the place of employment if the worker completes 50 percent of the period of employment covered by the job order (not counting any extensions)."  20 C.F.R. § 655.20(j)(1)(i).  Because the amended rule was not to go into effect until April 23, 2012, it would not apply here in any event.  It should also be noted, however, that the rule was preliminarily enjoined before its effective date and has since been vacated on the ground that DOL lacked the authority to promulgate it.  *Bayou Lawn & Landscape Services v. Perez*, --- F.Supp.3d ----, 2014 WL 7496045 (N.D. Fla. Dec. 18, 2014).

It is thus clear that at the time GLK recruited the Plaintiffs to come to Wisconsin to work in its facility, neither the statutes nor the regulations governing the H-2B program required the employer to pay the pre-employment expenses of the workers.  Plaintiffs do not disagree.  Instead, they argue that the H-2B statute and regulations are irrelevant to their claims and that their claims arise under the FLSA and the regulations promulgated thereunder.  It is to that Act that I now turn.

**B.  Fair Labor Standards Act**

The FLSA guarantees covered employees payment of wages at a level equal to or in excess of the federal minimum wage, which at all times relevant here was $7.25.  29 U.S.C. § 206(a)(1)(C).  There is no dispute that Plaintiffs were covered by the FLSA while employed by GLK.  There is also no dispute that the wage GLK agreed to pay plaintiffs was in excess of the minimum wage.  Under

7

the H-2B program, employees must be paid the prevailing wage as determined by the DOL for the kind of work they are hired to perform. In 2010, this was determined to be $7.85 per hour, and in 2011, it was $10.36. Plaintiffs do not dispute that the paychecks they received while employed at GLK were calculated based on the approved wage rate. Their claim is that in calculating their pay for their first week of employment, GLK failed to reimburse them for some of their pre-employment expenses for which GLK was responsible and that GLK therefore violated the FLSA's "free and clear" rule.

The "free and clear" rule prohibits employers from reducing an employees wages below the required minimum amount by requiring the employee to "kick back" a portion of the employee's wages:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35. Plaintiffs argue that GLK's failure to reimburse them for their pre-employment expenses during their first week of work constitutes a "kick back" to GLK of the amount of those expenses and resulted in an actual wage less than the federal minimum wage.

An essential premise to Plaintiffs' argument is that GLK was responsible for their pre-employment expenses, including inbound travel from their homes in Mexico, visa fees and recruitment fees. If GLK is not responsible for these expenses, then its failure to reimburse Plaintiffs for the

8

amounts claimed did not amount to a "kick-back" or a reduction in the amount of the wages they were paid. As even Plaintiffs concede, the law governing the H-2B program in 2010 and 2011 did not impose these costs on employers. Thus, the authority for imposing these costs on employers must lie elsewhere. Plaintiffs contend it can be found in the DOL's definition of the term "other facilities" as that term is used in the regulation explaining how an employee's wage is computed.

The FLSA defines "wage" to include not only money but also the reasonable cost of certain goods or services provided by the employer:

> "Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees.

29 U.S.C. § 203(m). In other words, in determining the amount the employee is paid, the DOL considers not just the amount of the payroll check but also the reasonable cost of "board, lodging, or *other facilities*, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." The regulations provide the following definition of "other facilities":

> "Other facilities," as used in this section, must be something like board or lodging. The following items have been deemed to be within the meaning of the term: Meals furnished at company restaurants or cafeterias or by hospitals, hotels, or restaurants to their employees; meals, dormitory rooms, and tuition furnished by a college to its student employees; housing furnished for dwelling purposes; general merchandise furnished at company stores and commissaries (including articles of food, clothing, and household effects); fuel (including coal, kerosene, firewood, and lumber slabs), electricity, water, and gas furnished for the noncommercial personal use of the employee; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.

29 C.F.R. § 531.32(a). The cost of facilities that fall within the definition are not by that reason alone considered wages, however. The regulation goes on to say that "the cost of furnishing 'facilities'

which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be computed in computing wages." 29 C.F.R. § 531.32(c).

On its face, 29 C.F.R. § 531.32 would seem to have no application here since GLK does not argue that the cost it incurred in transporting Plaintiffs from the Mexican border to Wisconsin and back again constitutes a portion of their wages. GLK simply contends that it had no obligation to reimburse Plaintiffs for the expenses they incurred before they crossed the border. Several courts, however, have read these regulations as requiring more than that the employer may not treat the cost of furnishing such facilities as part of the employee's wage when it primarily benefits the employer. These courts have read 29 C.F.R. §§ 531.32 and 531.35 together to mean that the employer is responsible for pre-employment expenses of their employees that primarily benefit the employer to the extent necessary to prevent their first weeks wages from falling below the federal minimum wage. *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) ("The district court correctly stated that there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear. An employer may not deduct from employee wages the cost of facilities which primarily benefit the employer if such deductions drive wages below the minimum wage.") (citing 29 C.F.R. § 531.36(b)); *see also Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013).

### 1. *Arriaga* and *Rivera*

*Arriaga* and *Rivera* involved the H-2A program instead of the H-2B program, but this makes no difference as far as the analysis under the FLSA is concerned. *Rivera*, 735 F.3d at 898–99 ("Because of the similar statutory requirements and similar structure of the H–2A and H–2B programs, the same FLSA analysis applies to the H–2A program as was set forth in the Field

10

Assistance Bulletin [2009–2 (Aug. 21, 2009) ].") (quoting 75 Fed.Reg. at 6915). In *Arriaga,* the Eleventh Circuit held that the pre-employment transportation expenses and visa fees incurred by Mexican farm workers hired under the H-2A program were primarily for the benefit of the employers and thus were required to be reimbursed by the employer in the first week to the extent necessary to prevent wages from falling below the minimum wage. *Id.* at 1237. In reaching this decision, the court considered the FLSA regulations governing transportation expenses and the H-2A application process itself. The court acknowledged that transportation expenses between an employee's home and work are generally considered for the benefit or convenience of the employee. 29 C.F.R. § 531.32(a). Other transportation costs, however, "may not be considered 'other facilities,' depending on whether the travel is 'an incident of and necessary to the employment.'" *Id.* at 1241 (quoting 29 C.F.R. § 531.32(c) ("transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad)" are "primarily for the benefit or convenience of the employer")). If the transportation cost of the H-2A workers falls into this category, the court held, "it does not constitute 'other facilities' and may not be counted as wages; the employer therefore would be required to reimburse the expense up to the point the FLSA minimum wage provisions have been met." *Id.* at 1241–42.

Based upon the plain meaning of the words "incident" and "necessary," and the employers' application for the H-2A visa program, the court concluded that the employees' travel expenses from their homes in Mexico to the place of employment in the United States were incident and necessary to the employment and primarily benefitted the employer:

> Transportation charges are an inevitable and inescapable consequence of having foreign H–2A workers employed in the United States; these are costs which arise out of the employment of H–2A workers. When a grower seeks employees and hires from

11

its locale, transportation costs that go beyond basic commuting are not necessarily going to arise from the employment relationship. Employers resort to the H–2A program because they are unable to employ local workers who would not require such transportation costs; transportation will be needed, and not of the daily commuting type, whenever employing H–2A workers.

*Id.* at 1242. On the other hand, the H-2A employees, the *Arriaga* court noted, are coming to the United States for only seasonal work and will return to their homes when the work is completed. Unlike ordinary living expenses that the employees would incur in any event, the travel costs are incurred solely for the purpose of completing work in the United States that the employers could find no United States citizens to perform. Under these circumstances, the court concluded that the transportation costs were incident and necessary to the employment and primarily benefitted the employer.

The *Arriaga* court reached the same conclusion with respect to visa cost:

The visa costs here were necessitated by the Growers' employment of the Farmworkers under the H–2A program. Unlike food, boarding, or commuter expenses, these fees are not costs that would arise as an ordinary living expense. When an employer decides to utilize the H–2A program these costs are certain to arise, and it is therefore incumbent upon the employer to pay them.

*Id.* at 1244. As to the employees, the visas allowed them to perform only the work described in the order and at the conclusion of the work period specified in the clearance order or upon termination of the worker's employment (which ever occurred first), the H–2A visas required the workers to return to Mexico. *Id.* The court therefore concluded that the visa costs primarily benefitted the employer and thus the employer was required to reimburse the employees for these costs as well to prevent payment of less than the minimum wage.

More recently, the Ninth Circuit reached the same conclusion in *Rivera*. The *Rivera* court found the status of inbound travel and immigration expenses ambiguous under the FLSA regulatory

12

standard, but relied heavily on the DOL's interpretation of its regulations and in particular the Field Assistance Bulletin the DOL issued in 2009. *See Travel and Visa Expenses of H-2B Workers Under the FLSA*, U.S. DOL Wage and Hour Division, Field Assistance Bulletin 2009-2 (Aug. 21, 2009). The DOL essentially adopted the analysis of the *Arriaga* court in its Field Assistance Bulletin. (ECF No. 101-2 at 4.) The Rivera court concluded that "the DOL's determination that inbound travel and immigration expenses primarily benefit H-2A employees was reasonable," and was therefore deserving of deference by the court. *Id.* at 899.

### 2. *Castellanos-Contreras* and the Counter Argument

GLK argues in response that *Arriaga* was wrongly decided. There is some merit to its argument. At the outset, it should be noted that the *Arriaga* court's analysis appears logically flawed. As noted above, the *Arriaga* court read sections 531.32 and 531.35 as not only prohibiting the employer from treating the cost of facilities found to primarily benefit the employer as a portion of the employee's wages, but as also requiring the employer to reimburse the employee for the cost of the facilities when the employee pays for them himself to the extent necessary to prevent his wages from falling below the federally guaranteed minimum. But it does not follow that just because an employer may not treat the cost of a particular employee benefit as a portion of the employee's wages that the employer is required to reimburse the employee for same benefit when the employee pays for it himself. Employers are normally free to decide how to run their own businesses. To read sections 531.32 and 531.35 as the *Arriaga* court did could allow an employee, at least theoretically in some situations, to dictate to his employer what expenses it must incur.

It is also true that by its terms, Section 531.35 does not treat as a kick-back the failure to pay for facilities such as transportation and housing. It speaks of the employer's failure to provide tools

13

of the trade: "For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act." 29 C.F.R. § 531.35. Tools and items, such as uniforms, are required by the nature of the employment and cost the same for each employee. 29 C.F.R. § 531.3(d)(2). Transportation expenses to and from the job site, on the other hand, are specific to the employee, vary with each, and are generally unknown by the employer until after they are incurred.

In *Castellanos-Contreras v. Decatur Hotels, LLC*, a majority of the Fifth Circuit rejected the notion that transportation and visa expenses of H-2B workers constitute "tools of the trade" such that the workers' payment of these expenses amounted de facto deductions from their wages. 622 F.3d 393, 400 (5th Cir. 2010) (en banc). The workers' "free and clear" argument, the court said, "begs the question of whether these are expenses that the employer is legally required to bear—a question we answer in the negative." *Id.* The court held that the argument also "stretch[ed] the concept of 'tools of the trade' too far." *Id.* In reaching this conclusion, the court noted that its precedents "look to the nature of disputed expenses rather than simply declaring every cost that is helpful to a given job an employer expense." *Id.* at 400–01. The court also looked to the regulation itself and the various examples provided therein of expenses that could not be deducted from the employees' wages, including "safety caps, explosives, lamps, electric power, company police or security, taxes and insurance on employer buildings, railway fare for maintenance-of-way railway workers, and uniforms . . . ." *Id.* at 401 (citing 29 C.F.R. § 531.32 (2010)). In light of this authority, the court concluded that "[a] visa and physical presence at the job site are not 'tools' particular to this 'trade'

14

within the meaning of the applicable regulations." *Id.*

The Fifth Circuit's decision in *Castellanos-Contreras* is not unreasonable. Visa fees and transportation costs are not "tools of the trade" in the ordinary sense of the phrase, and the FLSA regulations appear to exclude the very kinds of expenses at issue here. Section 531.32(c) states, for example, the transportation charges are primarily for the benefit or convenience of the employer "where such transportation is an incident of and necessary to the employment (as in the case of maintenance of employees of a railroad)." 29 C.F.R. § 531.32(c). Transportation to and from the job site is always "necessary to one's employment," but it is not "an incident of" one's employment unless it is in some sense a part of the employment as in the example set forth in the regulation itself. An employee who has to perform work at sites in the course of a normal day, such as a railroad employee charged with repairing sections of the track, must, as an incident of his employment, travel to the different sections in need of repair as part of his job. But the travel that H-2 workers undertake to get to their employment site would appear no more an incident of their employment than the travel that millions of commuters undertake every day to go to and from work, though it is far less frequent and usually for far shorter distances.

The point is made even more clear by the reference in § 531.31(c) to 29 C.F.R. § 778.217 for a discussion of travel expenses. *Id.* Travel expenses under section 778.217(b)(3) and (b)(5) include only travel expenses incurred "over the road" while working for the employer, as well as the expenses incurred when an employer reassigns a worker to a new town after work has begun in another town. The travel expenses incurred for a worker to move to a different part of the country to seek employment, whether temporary or not, are not covered expenses in any other context.

Construing the FLSA regulations to require reimbursement of H-2 workers for transportation

15

costs and visa fees also seems inconsistent with more specific statutes and regulations governing the H-2A and H-2B programs. As noted above, regulations governing the H-2A program explicitly require the employer to pay inbound transportation costs, as well as other expenses, of H-2A workers, but do not require payment of such expenses for H-2B workers. In *Castellanos-Contreras*, the Fifth Circuit found the "[s]ilence on this issue, in the face of these specific laws governing transportation, [ ] deafening." 622 F.3d at 400.

Even for H-2A workers, the regulations do not require the employer to reimburse the employee for inbound travel expenses until the employee has completed at least 50% of the work contract period. 20 C.F.R. § 655.122(h)(1). But if inbound transportation costs are viewed as facilities that primarily benefit the employer under the FLSA regulations, the employer must reimburse both H-2A and H-2B workers for the transportation expenses with their first weeks pay to avoid falling below the minimum wage. The logical inconsistency in interpreting the FSLA regulations to require immediate reimbursement in the face of the more specific H-2A travel reimbursement regulations was described by the district court in *Rivera*:

> Section 655.122(h)(1) specifically gives employers of H–2A workers half of the contract period to make the inbound travel and subsistence reimbursements it requires. Only kick-backs as defined under section 531.35 that are incurred before or during the first week of work are counted against the first week's pay for the purposes of a minimum wage claim. The failure to reimburse inbound travel and subsistence during the first week is simply not a "kick-back" under section 531.35, because under section 655.122(h)(1) no reimbursement is due at that stage for H–2A workers, and section 531.35 does not itself include such requirements under its definition of kick-backs. It makes little sense to treat as a kick-back the failure to pay a reimbursement that is not yet due.

805 F. Supp.2d 1047–48, *reversed* 735 F.3d 892 (9th Cir. 2013).

16

Reading the FLSA regulations to require employers to reimburse H-2 workers for their visa expenses is similarly problematic in light of the specific regulations governing those programs. The H-2 provision setting forth the obligations of the employers in both the H-2A and H-2B programs explicitly state that they "do[ ] not prohibit employers or their agents from receiving reimbursement for costs that are the responsibility of the worker, such as government required passport or visa fees." 20 C.F.R. § 655.1305(o) (2009); § 655.22(g)(2) (2009). It is true that, at least as to the H-2B program, the provisions also state "an employer subject to the FLSA may not make deductions that would violate the FLSA." 20 C.F.R. § 655.22(g)(1) (2009). Still, it seems quite a stretch to say that the FLSA requires H-2B employers to reimburse workers for a fee that H-2B regulations say is "the responsibility of the worker."

It is also far from clear that these expenses primarily benefit the employer. Travel and proper immigration costs are, of course, essential for the Plaintiffs to enter into an employment relationship with GLK, and GLK had to demonstrate it was unable to satisfy its labor needs with United States citizens before it was allowed to participate in the H-2B program. Without such workers, GLK would have to either find other ways to produce its sauerkraut or find other uses of its cabbage crop, as it apparently did in 2011 when it sent the workers home after the DOL ordered the wage increased to $14.68 per hour. But the H-2B program also provides a substantial benefit to the Mexican workers:

> In their native countries, many H-2B workers earn barely enough money to feed themselves. Conversely, while working in the United States, H-2B visa holders are guaranteed at least the prevailing minimum wage for their occupation. In fact, continued participation in the H-2B program has afforded some employees the opportunity to advance to supervisory positions with even higher salaries. Additionally, spouses and unmarried minor children of H-2B visa holders are eligible for H-4 visas, allowing them to join the H-2B holder in the United States for the

17

> duration of her employment, and may attend school in the United States while they maintain their H-4 status.

Mathes at 1815 (footnotes omitted). This is not to say that some H-2B workers have not been exploited by unscrupulous employers who do not comply with the law. *See* Mathes at 1816–17. But to say that the primary beneficiary of the employment relationship is the employer arguably ignores the economic reality in the countries from which the vast majority of H-2B workers come. *See* Mathes at 1815 (noting that "in Mexico, the number one country of origin for H-2B employees, 44.2 percent of the population lives in poverty").

### 3. DOL Interpretation

In December 2008, six years after *Arriaga* was decided, the DOL expressly rejected that case's interpretation of the FLSA regulations. *See* 73 Fed. Reg. 78020 (December 19, 2008). In the preamble to the final rule implementing the H-2B program the DOL announced that it "does not believe that an H-2B worker's payment of his or her own relocation expenses constitutes a 'kick-back' to the H-2B employer within the meaning of 29 C.F.R. 531.35." 73 Fed. Reg. at 78040. The DOL reasoned that "[b]oth as a general matter and in the specific context of guest worker programs, employee relocation costs are not typically considered to be 'primarily for the benefit' of the employer. Rather, in the Department's view, an H-2B worker's inbound transportation costs either primarily benefit the employee, or equally benefit the employee and the employer. In either case, the FLSA and its implementing regulations do not require H-2B employers to pay the relocation costs of H-2B employees." *Id.* The discussion concluded by advising that "[t]he Department states this is a definitive interpretation of its own regulations and expects that courts will defer to that interpretation." *Id.* at 78041. Three months later, however, the DOL withdrew its interpretation

18

pending further consideration of the issue. *See* 74 Fed. Reg. 13261 (March 26, 2009).

On August 21, 2009, the DOL published Field Assistance Bulletin No. 2009–2, which as noted above, adopted the *Arriaga* court's view. The DOL also noted *Arriaga* was consistent with the agency's "longstanding" position. Noting that courts had "uniformly" reached the same conclusion before the December 2008 interpretation was announced, the Bulletin states:

> The [2008 interpretation] inaccurately characterized these expenses as "relocation" costs when in fact the expenses are costs incurred as a result of travel away from the employee's foreign home for temporary employment, not a change in the employee's domicile for permanent employment. Moreover, this situation involves the employer's assertion, and the Department of Labor's certification, that there are not sufficient U.S. workers available to perform the work. After weighing all the factors relevant to transportation and other costs incident to temporary employment under the H-2B program, we believe that the employer is the primary beneficiary of the temporary employee's travel and immigration-related costs.

(ECF No. 101-2 at 8.) Thus, the DOL unambiguously concluded in the Bulletin that "travel and immigration-related costs necessary for workers hired under the H-2B program are for the primary benefit of their employers, and the employers therefore must reimburse the employees for those costs in the first workweek if the costs reduce the employees' wages below the minimum wage." (ECF No. 101-2 at 9.)

## C. Deference Owed to DOL

In *Castellanos-Contreras* and *Rivera*, the DOL filed amici briefs in support of the workers and urged the courts to follow the interpretation outlined in the Bulletin. In *Castallanos-Contreras*, the Fifth Circuit noted that the Bulletin was issued long after the events in question. The court concluded that "[w]hatever deference may be due to the Department's informally promulgated Bulletin in the future, it does not in any way purport to apply retroactively." 622 F.3d at 401. The court also noted, considering many years of DOL opinion letters, that the interpretation stated in the

19

Bulletin did not appear to be as "longstanding" as the DOL claimed. *See id.* at 402 & n.10.

In *Rivera*, on the other hand, there could be no claim that the Bulletin applied retroactively and the court faced the question of what deference was owed to the DOL head-on. Citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997), the Ninth Circuit noted that "[w]hen regulations are ambiguous, [courts] are required to defer to an agency's reasonable interpretations of those regulations." 735 F.3d at 898. The court found the DOL's interpretation, as outlined in the Bulletin, was reasonable. The court also noted that none of the reasons the Supreme Court has given for withholding "*Auer* deference" existed, such as where the agency's change in position causes unfair surprise or the interpretation is not a product of the DOL's "considered judgment." The court therefore deferred to the DOL's interpretation and held the employer violated the FLSA.

Like the Ninth Circuit, I conclude that the DOL's current interpretation as stated in the Bulletin must be given effect. Defendants argue deference is not warranted given the DOL's shifting views on this issue. Defendants also note that the DOL's 2012 attempt to change the specific H-2B regulations to directly and expressly hold employers liable for these reimbursements has been called into question on the ground that the DOL lacked rule-making authority to make those changes.

Unlike in *Castallanos-Contreras*, however, Plaintiffs were employed well after the Bulletin was issued. As the Ninth Circuit noted, "[a] change in an agency's interpretation does not present a 'separate ground for disregarding the [agency's] present interpretation' unless the change leads to 'unfair surprise.'" *Rivera*, 735 F.3d at 898 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170–71 (2007)). In this case, Defendants cannot show such unfair surprise. Indeed, GLK's president personally initialed a form presented to him by LaborQuest in 2010 agreeing to and acknowledging that "[n]ew H-2B regulations require employer[s] to pays [sic] (or reimburse) for any

20

of the recruitment, visa and travel expenses for worker from their homes abroad to the place of employment." (ECF No. 95 ¶ 46.)

Frankly, this case does demonstrate the expansive authority administrative agencies in the modern age possess not only to implement and enforce the law, but also to interpret and seemingly create it. Even the author of *Auer* has expressed concern about its unforseen implications. *See Talk America, Inc. v. Michigan Bell Telephone Co.*, --- U.S. --- , 131 S. Ct. 2254, 2265–66 (2011) (Scalia, J., concurring). Nevertheless, for the time being, the Supreme Court has instructed that an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461. It might seem a stretch to characterize the expenses at issue here as "kick backs" or to find the employer primarily benefits from H-2 workers' procuring visas and traveling to the United States to work, and the legislative history and specific H-2B regulations might suggest a different interpretation than the DOL's. But I cannot conclude that the DOL's interpretation of its own regulations is plainly erroneous, particularly given the detailed explanation in the Bulletin, which itself relies heavily on a number of other courts' reasoning.

Accordingly, based the DOL's Bulletin, I conclude that GLK is responsible for the Plaintiffs' transportation expenses to and from their homes in Mexico, as well as their visa and border-crossing expenses, to the extent necessary to avoid reducing their first-week wages below the federal minimum wage. The same is not true, however, of some of the remaining expenses Plaintiffs seek to recover. Pre-border crossing expenses for meals and hotels fall into the category of ordinary living expenses which would be properly deductible under the FLSA and thus need not be reimbursed. *De Luna-Guerrero v. North Carolina Grower's Ass'n, Inc.*, 338 F.Supp.2d 649, 662-63 (E.D. N.C. 2004); *Morales-Arcadio v. Shannon Produce Farms, Inc.*, 2007 WL 2106188, * 17 (S.D. Ga. July

18, 2007) (refusing to hold that money paid for meals while on the road was "primarily for the benefit of the employer" and noting that "meals are always regarded as primarily for the benefit and convenience of the employee") (citing 29 C.F.R. § 531.32(c)).

As these cases recognize, FLSA regulations are unambiguous that "meals are always regarded as primarily for the benefit and convenience of the employee." 29 C.F.R. § 531.32(c). The same is generally true of lodging, *see id.* § 531.32(a), except in cases where an employer requires an employee to live on a job-site to meet a particular need of the employer. (ECF No. 87-73 at 8.) Plaintiffs argue that the FLSA regulations only permit an employer to make deductions for food and hotel expenses that the employer actually provides in the first place. (ECF No. 101 at 13.) However, I am not convinced that this is the correct inquiry. The question is simply who, under the regulations, is the primary beneficiary. In the case of meals and lodging, the regulations clearly point to the employee. Therefore, Defendants have no obligation to reimburse Plaintiffs' for these expenses either. Likewise, the Bulletin makes clear that passport expenses are primarily for the benefit of the employee since the employee may use the passport for purposes other than employment. (ECF No. 87-73 at 13.)

## D. Recruitment Fees

That leaves recruitment fees. Recruiters help H-2B employers locate workers in foreign countries. Employers are not allowed to pass on the cost of recruiters to employees. In fact, the H-2B regulations require the employer to attest that it "has contractually forbidden any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2B workers to seek or receive payments from prospective employees." 20 C.F.R. § 655.22(g)(2) (2009); *see also*

22

8 C.F.R. § 214.2(h)(6)(i)(B) ("As a condition of approval of an H–2B petition, no job placement fee or other compensation (either direct or indirect) may be collected at any time, including before or after the filing or approval of the petition, from a beneficiary of an H–2B petition by a petitioner, agent, facilitator, recruiter, or similar employment service as a condition of an offer or condition of H–2B employment ...."). As noted above, GLK hired LaborQuest to coordinate the H-2B certification process, assist in obtaining visas for the H-2B workers and coordinate the travel for the workers from Mexico to the United States with its subcontractor Florida East Coast Travel. GLK asserts that neither GLK, nor LaborQuest, collected or authorized anyone else to collect a recruitment fee from the worker.

Notwithstanding the prohibition of collecting recruitment fees from workers, Plaintiffs contend that twenty-five of their number paid recruitment fees ranging from $1,000 to $1,200 to either Jimenez Arroyo, the full-time GLK employee who returned to Santiago Capitiro each year to assist with the recruiting, or Elias Vera, who was enlisted by Arroyo to assist him. Plaintiffs contend that GLK must reimburse those Plaintiffs who paid recruitment fees to the extent necessary to prevent their wages from falling below the federal minimum wage.

The DOL's Field Assistance Bulletin clearly states that recruitment fees for H-2B workers are the responsibility of the employer, but it does not state whether the same rule applies for illegal or unauthorized recruitment fees. (ECF No. 101-2 at 13.) The *Arriaga* court held that "[t]o be reimbursable, (1) these fees must not constitute "other facilities" and (2) there must be authority to hold the Growers liable for the unauthorized acts of their agents." 305 F.3d at 1245. The court found it unnecessary to decide whether the unauthorized recruitment fees were "other facilities" because it concluded that the Growers could not be held liable under principles of agency law based

23

on the record in that case. *Id.* The Farmworkers had argued that the Growers were liable because those charging the fees had apparent authority to do so, but the court noted that "[t]he agreed statement of undisputed facts includes no words or conduct of the Growers which, reasonably interpreted, could have caused the Farmworkers to believe the Growers consented to have the recruitment fees demanded on their behalf." *Id.* Because the Farmworkers failed to allege facts to support the creation of apparent authority, the court concluded that the Growers are not liable for the recruitment fees. *Id.* at 1246.

It is difficult to see how recruitment fees the employer neither authorized nor received could be considered "other facilities" within the meaning of the FLSA. These are illegal payments extracted from workers by individuals who keep whatever fees they collect for themselves. Nor can they reasonably be found to primarily benefit the employer. Assuming the employer receives none of the fee, it does not benefit the employer at all. Instead, the unauthorized charging of such a fee, if anything, serves as an obstacle to obtaining the number of qualified workers the employer needs. Plaintiffs have submitted a copy of a report by a migrant workers' rights organization entitled "Recruitment Revealed: Fundamental Flaws in the H-2 Temporary Worker Program and Recommendations for Change" which proposes as a key recommendation that legislation be enacted to hold employers strictly liable for all recruitment fees charged to workers. (ECF No. 87-74 at 4.) Implicit in the very call for such reform, however, is the recognition that strict liability is not part of the law at the present time. Thus, the mere fact that some of the Plaintiffs may have paid such recruitment fees is not a basis upon which to rest employer liability.

But it does not follow from the fact that such fees do not constitute other facilities under the FLSA that GLK cannot be held liable for them. H-2B employers have a duty under the regulations

24

governing that program not only to avoid collecting such fees from workers themselves but to prohibit their contractors and agents from doing so as well. 20 C.F.R. § 655.22(g)(2) (2009); 8 C.F.R. § 214.2(h)(6)(i)(B) (2009). If GLK either expressly or implicitly authorized its agents to collect recruitment fees from the workers, it may be liable for repayment in full wholly aside from the FLSA.

GLK denies that any workers paid recruitment fees to GLK or Arroyo, that GLK received any such fees or that GLK authorized any individual or entity to charge a recruitment fee. (ECF No. 95, Response to ¶ 52.) Assuming GLK's statement to be true, it follows that if in fact either Arroyo or Vera collected recruitment fees from the workers, they were acting without authorization of GLK and outside the scope of any actual agency relationship that might have existed. But a jury might not find GLK's statement credible. Arroyo was a full-time GLK employee who Downs authorized to recruit workers from his former hometown of Santiago Capitiro for GLK. Arroyo traveled to his former hometown for his vacation each year in May, and on several occasions, Downs accompanied him. The record does not reveal whether Arroyo's recruitment efforts on behalf of GLK were part of his regular job duties, were governed by a separate contract, or were performed gratis. If GLK did not pay Arroyo for his recruitment efforts while on vacation and those efforts were substantial, a jury may not believe its claim that it did not know that Arroyo and his assistant were charging workers recruitment fees. Moreover, while GLK denies that it authorized anyone to collect recruitment fees from workers, it does not say that it explicitly prohibited its agents or employees from charging such fees as it was required to do. *See* 20 C.F.R. § 655.22(g)(1). This may also lead to direct liability. Given these uncertainties, the mere fact that GLK denies that it received recruitment fees or authorized anyone to collect such fees is not determinative of the issue.

25

Plaintiffs argue that the undisputed facts establish that they are entitled to recover recruitment fees under the doctrine of apparent authority. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006). Apparent authority is created by a person's manifestation through words or conduct "that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." RESTATEMENT § 3.03. Here, Plaintiffs have offered no evidence of words or conduct that would have justified a belief by them that Arroyo or Vera were authorized by GLK to collect fees for recruiting them to work for GLK. Indeed, Plaintiffs do not even say that they thought the fees they paid were authorized by GLK. Given the fact that it is illegal to charge workers such fees, it is possible that the workers knew that Arroyo and/or Vera were acting without GLK's authority. On the record before the court, it is impossible to say. Accordingly, the question of recruitment fees is not ripe for summary judgment.

## E. Individual Liability of GLK's President

Plaintiffs assert that Defendant Downs is individually liable, jointly and severally with GLK, for the FLSA violations. Downs was president and owner of GLK during the relevant time. Although recruitment was delegated to a full-time GLK employee in the relevant years, Downs personally participated in the recruiting in Mexico in years past. Additionally, the undisputed facts show Downs initialed and signed documents from LaborQuest in 2010 on behalf of GLK acknowledging GLK's legal obligation to reimburse the H-2B workers for incoming expenses and

26

confirming that GLK would do so. (ECF No. 95, ¶¶ 12, 46, 47.) Plaintiffs note that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983).

Defendants argue Plaintiffs have failed to demonstrate Downs is individually liable because the record does not show he was directly supervising the Plaintiffs and it does not show that he exercised the "requisite operational control required by the FLSA to impose individual liability." (ECF No. 103 at 8.) Quoting *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987), Defendants argue Downs "was not 'responsible in whole or part for the alleged violation.'" (ECF No. 103 at 8.)

Plaintiffs reply, correctly, that *Riordan* actually demonstrates how broad the FLSA's definition of employer is. *See* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."). In *Riordan*, the court of appeals held the record did not show sufficient operational control to hold an employee liable under 42 U.S.C. § 1983 for a state department's alleged violation of the Equal Pay Act (which is a much different question than whether Downs was an "employer" for purposes of count I); but the court acknowledged that a mere employee can be an "employer" under the FLSA. 831 F.3d at 694. Here, Downs is not a mere employee, but an owner of GLK and its president. And even if he maintains that his initials in the LaborQuest documents do not constitute an admission as to the correctness of the legal conclusions stated therein (*e.g.*, ECF No. 95 ¶ 12), it is clear that GLK, with Downs as president, did not reimburse Plaintiffs for their pre-employment expenses. As explained above, that is a violation of the FLSA to the extent the de facto deductions pushed wages below the minimum. Given Downs' position and involvement, it is clear that he is properly liable for the

27

violations as an employer.

**F. Double Damages**

The FLSA allows for recovery of double damages. 29 U.S.C. § 16(b) ("Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."). In fact, there is "a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith . . . and reasonable grounds for believing that [the] act or omission was not a violation.'" *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) (quoting 29 U.S.C. § 260). "Double damages are the norm, single damages the exception, and the burden on the employer [to prove good faith]." *Id.*

Defendants argue there is no basis for double damages here because of the circuit split between the Fifth and Eleventh Circuit, the shifting and ambiguous guidance from the DOL on the issue and the lack of any Seventh Circuit cases on point. (ECF Nos. 93 at 23, 103 at 9.) Even if the DOL's guidance has not been entirely consistent through recent decades, however, *Bulletin 2009–2* is not ambiguous. And as noted, the bulletin was not operative at the time the Fifth Circuit case Defendants ostensibly relied upon was decided. In light of these facts, Defendants' bare claim that there was a circuit split is insufficient to rebut the presumption. *See Alice v. GCS, Inc.*, No. 05-CV-50132, 2006 WL 2644958, at *7 (N.D. Ill. Spet. 14, 2006) (rejecting good-faith defense when defendant failed to establish it took affirmative steps to follow the law). Double damages are therefore appropriate.

28

## III. Conclusion

For all of these reasons, the parties cross-motions for partial summary judgment are granted in part and denied in part (ECF No. 85, 92). Upon proof of payment, Plaintiffs' are entitled to payment of their transportation costs, visa fees and border crossing expenses to the extent GLK's failure to reimburse them for these expenses reduced their first week's wages below the federal minimum wage. Plaintiffs are not entitled to reimbursement for their passport and subsistence expenses. Factual issues preclude entry of summary judgment on the issue of recruitment expenses. Plaintiffs' motion for leave to file a sur-reply is granted (ECF No. 104).

Dated this __24th__ day of March, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

29