**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | | |
|---|---|---|
| ALEJANDRO JURADO JIMENEZ et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 12-cv-209 |
| v. | ) | |
| | ) | Judge Griesbach |
| GLK FOODS, LLC and RYAN A. DOWNS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CLASS MEMBERS' RESPONSE TO DEFENDANTS' PROPOSED
MATERIAL FACTS AND STATEMENT OF ADDITIONAL FACTS REQUIRING THE
DENIAL OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON COUNTS III, VI and VIII**

The Plaintiff Class submits the following document as its:

(a)     Response, pursuant to Local Rule 56(b)(2)(b)(i), to Defendants' Statement of Proposed Material Facts (ECF No. 111); and

(b)     Statement, pursuant to Local Rule 56(b)(2)(b)(ii), of additional facts requiring denial of Defendants' motion for summary judgment on Counts III, VI and VIII.

## I.     RESPONSE TO DEFENDANTS' PROPOSED MATERIAL FACTS

1.     Plaintiffs are workers from Mexico who were employed by defendants in 2010 and 2011.  Dkt. 67-2, Second Amended Complaint, ¶¶37, 38.

**RESPONSE:**  Undisputed.

2.     Plaintiffs were recruited and employed by GLK to process (by coring and trimming) cabbage into sauerkraut at GLK's cannery plant in Bear Creek, Wisconsin, under the federal government's "H-2B" guest worker visa program.  Dkt. 87-3, Plaintiffs' Ex. 2, GLK001373-78, 2283; Dkt. 87-4, Ex. 3, ETA-FOIA0004-11.

**RESPONSE:** Undisputed.

3.     Defendant GLK is the largest sauerkraut producer in the world.  Dkt. 87-5, Ex. 4, ECF No. 78, Defendants' Answer to Second Amended Complaint, ¶7.

**RESPONSE:** Undisputed.

1

4. During the years at issue, GLK hired seasonal workers to do the coring and trimming work. Dkt., 87-8, Plaintiffs' Ex. 7, GLK001232; Dkt., 87-9, Ex. 8, GLK001296.

**RESPONSE:** Undisputed.

5. In 2010 and 2011, GLK hired predominantly Mexican nationals rather than U.S. workers to perform this "trim line" labor. Dkt, 87-3, Ex. 2, GLK001373-78, 2283; Dkt., 87-4, Ex. 3, ETA-FOIA0004-11; Dkt. 87-10, Ex. 9, Deposition of Rafael Jimenez Arroyo at 22:24-23:1; Dkt., 87-6, Ex. 5, Deposition of Ryan A. Downs at 9:4-9.

**RESPONSE:** Undisputed that GLK hired predominantly Mexican nationals to perform

"trim line" labor in 2010. PSAF ¶¶ 6, 69[1]. For the 2011 season, GLK initially hired

predominantly Mexican nationals rather than U.S. workers to perform "trim line" labor.

However, GLK terminated the contracts of those Mexican nationals before the end of the 2011

season and thereafter hired Haitian workers from Florida to replace them. PSAF ¶¶ 67, 125-126.

6. Federal law allows employers to import foreign workers in limited circumstances, through various "guest worker" visa programs. http://www.doleta.gov/business/gw/guestwkr/

**RESPONSE:** Undisputed.

7. GLK participated in the H-2B guest worker program in 2010 and 2011. Dkt. 87-3, Ex. 2, GLK001373-78, 2283; Dkt. 87-4, Ex. 3, ETA-FOIA0004-11.

**RESPONSE:** Undisputed.

8. In 2010 and 2011, Defendants retained a firm called LaborQuest to coordinate its H-2B application and worker processing for each of those years. LaborQuest, in turn, subcontracted with another specialist, Florida East Coast Travel Services (FLECTS). Dkt. 87-33, Ex. 32, Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories, Nos. 9, 11; Affidavit of Thomas A. Palmer, ¶7, attached as Exhibit B to Affidavit of Michael Aldana.

---

[1] "PSAF" refers to the statement of additional facts requiring the denial of defendants' motion for summary judgment, found in Roman Numeral Section II of this document. The facts set out there are substantially the same, in form and content, to the Consolidated Statement of Undisputed Facts filed by the Plaintiff Class in support of its own motion for summary judgment filed on February 20, 2015 (ECF No. 116). Portions of the record cited as support for statements in the PSAF have been filed as exhibits to ECF No. 116 and can be found there. Due to their volume, they have not been re-filed with this document but will be if the Court prefers.

**RESPONSE:** Undisputed that Defendants retained LaborQuest, which, in turn, subcontracted with FLECTS, with regard to visa processing (rather than "worker processing") and temporary labor certification from the U.S. Department of Labor. However, the materiality of Paragraph 8 is disputed because: (a) it is not a defense to Defendants' liability for any claim made in Counts III, VI or VIII of the Second Amended Complaint that LaborQuest or FLECTS assisted in procuring visas or temporary labor certification; and (b) Defendants' use of LaborQuest and FLECTS was limited to procuring visas and temporary labor certification—Defendants conducted recruitment themselves (PSAF ¶¶ 29-38), including managing solicitation, recruitment and hiring of the H-2B workers and wage and hour compliance, and it is these latter activities (recruitment and hiring) that are chiefly at issue in this case.

9.     Labor Quest/FLECTS completed and submitted the labor certification petition, scheduled visa appointments for the workers, and assisted the workers with paperwork. Dkt., 87-34, Ex. 33, Deposition of Jorge Garcia at 88:14-19; 89: 6-18; 94:21-95:25, 108:11-20; 114:10-18, 140:17-141:24; Dkt. 87-35, Ex. 34, Deposition of Thomas Robinson at 41:13-42:23, 89:13-91:14; Affidavit of Thomas A. Palmer, ¶7, attached as Exhibit B to Affidavit of Michael Aldana.

**RESPONSE:** Undisputed that LaborQuest/FLECTS completed and submitted the labor certification petition in 2010 and 2011, and scheduled visa appointments for the H-2B workers, but the materiality of those facts is disputed because: (a) it is not a defense to any claim made in Counts III, VI or VIII of the Second Amended Complaint that LaborQuest or FLECTS assisted in procuring visas or temporary labor certification; and (b) the solicitation, recruitment of workers was managed by Defendants. PSAF ¶¶ 30-34.

10.     In the 2011 Application for Temporary Employment Certificate, filed with the U.S. Department of Labor, page 1 of the application refers to a "Period of *Intended* Employment." At the bottom of each page of the application, the application refers to a "validity period." The Department of Labor at page 6 of the application states that the certification was "valid from 8/1/11 to 11/15/11." Dkt, 87-3, Ex. 2, GLK001373-78, 2283; Dkt., 87-4, Ex. 3, ETA-FOIA0004-11.

**RESPONSE:** The presence of the quoted language on GLK's 2011 application for

temporary employment certification is undisputed. However, the materiality of that language is disputed because (a) the application submitted by Defendants to the DOL affirmatively specifies a "Begin Date" and "End Date" for the period of intended employment (PSAF ¶ 16); (b) Defendants made no other written disclosure of the period of employment (PSAF ¶¶ 163-164 and 166); and (c) the listed Begin Date and End Date therefore became, as a matter of law, enforceable terms of the parties' employment relationship under the AWPA, which both requires written disclosure of the period of employment and, as a matter of law, displaces employment at will. *See* Class Members' Memorandum of Law In Support of Their Motion for Partial Summary Judgment on Counts III, VI, VII and VIII at pp. 18-22 (ECF No. 116).

11. In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. *Id.*

**RESPONSE:** Undisputed that the employer portion of an ETA 9142 contains no explicit reference to a "guaranteed" or "minimum" period of employment. However, the materiality of that fact is disputed because: (a) the application submitted by Defendants to the DOL affirmatively specifies a "Begin Date" and End Date" for the period of intended employment (PSAF ¶ 16); (b) Defendants made no other written disclosure of the period of employment (PSAF ¶¶ 163-164 and 166); and (c) the listed Begin Date and End Date therefore became, as a matter of law, enforceable terms of the parties' employment relationship under the AWPA, which both requires written disclosure of the period of employment and, as a matter of law, displaces employment at will. *See* Class Members' Memorandum of Law In Support of Their Motion for Partial Summary Judgment on Counts III, VI, VII and VIII at pp. 18-22 (ECF No. 116).

12. The application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

"Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation." (emphasis supplied). *Id.*

**RESPONSE:** Undisputed that the ETA 9142 contains the language quoted above.

Otherwise, both the accuracy and the materiality of paragraph 12 are disputed the quoted language does not, as paragraph 12 asserts, "specifically contemplate" (or authorize) termination of H-2B workers employment before the end of the certified period of employment. There exists a binding federal regulation addressing that subject and it negates the inference that Defendants seek to draw from paragraph 12. Specifically, 20 C.F.R. § 655.22(f), titled *Obligations of H-2B employers*, addresses and recognizes two, and only two, circumstances in which an employer is relieved from continuing to provide work for and pay H-2B workers "prior to the end date specified in the application." The first exception applies in the event of an H-2B worker's "abandonment or abscondment" from the job before the end of the certified period of employment. The second exception applies when an H-2B employer terminates an H-2B "for cause." 20 C.F.R. § 655.22(f). Class Members in this case neither abandoned nor absconded, and they were not terminated for justifiable cause. The DOL regulation states as follows:

> Upon the separation from employment of the H-2B worker(s) employed under the labor certification application, if such separation occurs prior to the end date of employment specified in the application, the employer will notify the Department and DHS in writing ... of the separation from employment not later than 2 work days after such separation is discovered by the employer. An abandonment or abscondment shall be deemed to begin after a worker fails to report for work at the regularly scheduled time for 5 consecutive working days without the consent of the employer. Employees may be terminated for cause.

20 C.F.R. § 655.22(f).

13.    Similarly, paragraph #11 states: "Upon the separation from employment of any

foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). The language in the petition for 2010 was identical. *Id.*

**RESPONSE:** Undisputed that the application contains the language quoted above.

Otherwise, both the accuracy and the materiality of paragraph 13 are disputed because the quoted

language does not contemplate (or authorize) termination of H-2B workers employment before

the end of the certified period of employment. There exists a binding federal regulation

addressing that subject and it negates the inference that Defendants seek to draw from paragraph

13. Specifically, 20 C.F.R. § 655.22(f), titled *Obligations of H-2B employers*, addresses and

recognizes two, and only two, circumstances in which an employer is relieved from continuing to

provide work for and pay H-2B workers "prior to the end date of specified in the application."

The first exception applies in the event of an H-2B worker's "abandonment or abscondment"

from the job before the end of the certified period of employment. The second exception applies

when an H-2B employer terminates an H-2B "for cause." 20 C.F.R. § 655.22(f). Class Members

in this case neither abandoned nor absconded, and they were not terminated for justifiable cause.

The DOL regulation states as follows:

> *Upon the separation from employment of the H-2B worker(s) employed under the labor certification application, if such separation occurs prior to the end date of employment specified in the application, the employer will notify the Department and DHS in writing … of the separation from employment not later than 2 work days after such separation is discovered by the employer. An abandonment or abscondment shall be deemed to begin after a worker fails to report for work at the regularly scheduled time for 5 consecutive working days without the consent of the employer. Employees may be terminated for cause.*

20 C.F.R. § 655.22(f).

14. The standard language of GLK's 2010 application was identical to that of 2011. The certified period of employment for 2010 was identified as 8/9/2010 to 11/30/2010. Dkt, 87-3, Ex. 2, GLK001373-78, 2283.

6

**RESPONSE:** Undisputed.

15. GLK understood that the fees it was paying LaborQuest included the visa fees in Mexico. Affidavit of Thomas A. Palmer, ¶7, attached as Exhibit B to Affidavit of Michael Aldana.

**RESPONSE:** Undisputed that ¶ 7 of the affidavit of Thomas A. Palmer states that "GLK understood from LaborQuest and FLECTS that the monies it paid them would cover H-2B certification fees, visa processing and related fees for the workers, as well as transportation to Wisconsin." However, the accuracy and materiality of that statement is disputed because: (a) as a matter of law, ultimate responsibility for reimbursement of expenses, to the extent necessary to avoid reducing first-week wages below required minimum levels, rests with the employer; (b) this statement is insufficient to dispute or answer the evidence that Class Members' were charged and paid unreimbursed amounts for items *besides* visas fees, including for transportation (from Santiago Capitiro to Mexico City and Matamoros and back and between the hotel and the visa interviews and office of a *licenciado*), for fees paid to a *licenciado* (*See* PSAF ¶¶ 76(a), (c), (d) and (g)) and border crossing fees (PSAF ¶ 76(h)); and (c) LaborQuest/FLECTS informed GLK that, at least one group of workers in 2011, had reported paying *derecho a visa* fees (PSAF ¶ 86).

16. During the relevant time period, a full-time GLK worker - Rafael Jimenez Arroyo - traveled to Santiago Capitiro in Mexico in the spring of the relevant years. Jimenez Arroyo was originally from that town. *see*, Deposition of Rafael Jimenez Arroyo, pp. 22-29, attached as Exhibit C to Affidavit of Michael Aldana.

**RESPONSE:** Undisputed.

17. A significant number of the workers who came to GLK to perform trimming and cutting work lived in or near Santiago Capitiro. Jimenez Arroyo talked to workers (many of whom had been coming to Wisconsin to work at GLK for years) to inform them that GLK was interested in bringing in workers later in the year. *Id.*

**RESPONSE:** Undisputed, with the exception of any intended implication that workers notified of dates and locations to obtain visas had, to that point, merely "indicated an interest" in

7

working for GLK. That inference is not supported by any evidence cited in paragraph 17 and is contrary to the facts: by the time workers were notified of dates and locations for visa interviews, they had been recruited and offered and accepted employment, subject to a single condition: the State Department's issuance of H-2B visas. PSAF ¶¶ 61-62.

19.    For the years relevant to this motion, Labor Quest/FLECTS arranged for appointments to obtain visas in consular cities in Mexico.    The workers went to the consulate to obtain visas.  *See*, Deposition of Thomas Robinson, pp. 147-148. 167-168; attached as Exhibit D to Affidavit of Michael Aldana

**RESPONSE:** Undisputed.

20.    Neither Labor Quest/FLECTS or Jimenez Arroyo ever required or accepted recruiting fees from the Plaintiffs/Class members, nor were any fees paid directly to or given to Defendants.  *See*, Deposition of Ryan A. Downs, pp. 139-141, attached as Exhibit A to Affidavit of Michael Aldana; *see* Affidavit of Thomas A. Palmer, ¶7, attached as Exhibit B to Affidavit of Michael Aldana; *see*, Deposition of Rafael Jimenez Arroyo, pp. 187-188, attached as Exhibit C to Affidavit of Michael Aldana; *see*, Deposition of Thomas Robinson, pp. 4, 147-148; attached as Exhibit D to Affidavit of Michael Aldana.

**RESPONSE:** Disputed as to accuracy. Some Class Members paid recruitment fees to Jimenez Arroyo. PSAF ¶ 71. Class Members also paid recruitment fees to agents of GLK. PSAF ¶ 71. Further, GLK had notice of allegations that its agents were charging recruiting fees, and did nothing in response to those allegations. PSAF ¶ 71.

21.    No workers paid any recruitment fees to GLK, GLK received no such fees and GLK did not authorize any individual or entity to charge a recruitment fee to any worker.  *See*, Deposition of Ryan A. Downs, pp. 139-141, attached as Exhibit A to Affidavit of Michael Aldana; *see* Affidavit of Thomas A. Palmer, ¶7, attached as Exhibit B to Affidavit of Michael Aldana; *see*, Deposition of Rafael Jimenez Arroyo, pp. 187-188, attached as Exhibit C to Affidavit of Michael Aldana; *see*, Deposition of Thomas Robinson, pp. 4, 147-148; attached as Exhibit D to Affidavit of Michael Aldana.

**RESPONSE:** Disputed as to accuracy. Class Members paid recruitment fees to agents of GLK. PSAF ¶ 71.  Further, GLK had notice of allegations that its agents were charging recruiting fees, and did nothing in response to those allegations. PSAF ¶ 71.

22. Workers acknowledged that no one, on behalf of GLK, promised that GLK would reimburse them for their in-country expenses. *See*, Depo. of Alejandro Jurado Jimenez, 74:10-75:14 and Depo. of J. Jesus Jimenez Rosas, 25:2-11, attached as Exhibits E and F to Affidavit of Michael Aldana.

**RESPONSE:** Disputed, both as to accuracy and materiality because: (a) the deposition testimony of two workers is not sufficient cannot be generalized to all "workers", and, in addition, (b) the obligation to reimburse workers for "in-country" expenses arises as a matter of law under the FLSA (and under the AWPA as a result of the AWPA's incorporation of the protections of the FLSA) and is not subject to waiver or modification, particularly through alleged oral, undocumented communications.

23. Thereafter, GLK provided transportation, at its expense, from the U.S. side of the border to Bear Creek and provided per diem reimbursement for food costs in the U.S. Similarly, when workers returned to Mexico, GLK provided bus transportation from Bear Creek to the border. Depo. of Jacci Carlson, 145:16-146:16, attached as Exhibit G to Affidavit of Aldana.

**RESPONSE:** Undisputed that GLK provided Class Members incoming and return transportation from the U.S. – Mexico border to Bear Creek, Wisconsin. Disputed that GLK provided a per diem reimbursement for food costs as the cited portion of Ms. Carlson's deposition transcript simply states that they provided the workers with some food for the return trip from Bear Creek to the U.S. border.

24. In 2010, excess rains and flooding devastated the cabbage crop in Wisconsin. While GLK was anticipating 90,000 tons of cabbage yield that year, its actual harvest yielded about 20% of that number. Dkt. 87-33, Ex. 32, Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories, No. 10.

**RESPONSE:** Undisputed as to the figures provided.

25. Because the crop was so low that year, GLK did not need the number of workers for which it had originally petitioned, nor did it need workers in Bear Creek to remain throughout the Fall. *Id.*

**RESPONSE**: Disputed as to materiality. GLK was well aware that crop damage had occurred when it brought Class Members to work in Bear Creek in 2010. The damage to the

cabbage crop was evident as early as July 2010. Defendants had originally applied for and received authorization to "import" 110 Mexican workers. In view of the flooding and damage to the crop, they decided to call up only half that many, just 55 Mexican workers. However, Defendants ultimately reversed their decision, bringing in approximately 86 H-2B workers. At the time they made this decision, they knew there was not enough work to occupy them for a full season. Defendants did not notify any of the H-2B workers about the flood or the near-certainty of reduced work in Wisconsin before the workers accepted the employment or before they left Mexico. If Class Members had been told before they left Mexico that there was only enough work for a few weeks, they would not have accepted the job. Moreover, Defendants had crop insurance in 2010 that covered the cabbage crop failure and submitted a claim to the insurance company which was paid. PSAF ¶¶ 104-110.

26.     Thus, the workers were sent home that year on or about September 28.  GLK paid for their return transportation to Mexico.  *Id.*

**RESPONSE:** Disputed as to accuracy. GLK sent the workers home in 2010 and 2011 in various groups on different dates. *See* PSAF ¶¶ 93-93 and 96-97. Moreover, GLK provided only return transportation to the US.-Mexico border, failing to provide transportation to the workers' points of origin as legally required. PSAF ¶¶ 100, 101.

27.      In 2010 and 2011, the FLSA minimum wage was $7.25 per hour.  29 U.S.C. §206(a)(1)(C).

**RESPONSE:** Undisputed.

28.     GLK paid the Plaintiffs the hourly rate of $7.85 per hour for non-overtime hours worked in 2010.  *See*, Dkt. 87-51-58; Plaintiffs' Exhibit 50, Interrogatory Responses attached thereto.

**RESPONSE:** Undisputed.

29.     GLK paid the Plaintiffs the hourly rate of $10.36 per hour for non-overtime hours worked in 2011.  *See*, Dkt. 87-51-58; Plaintiffs' Exhibit 50, Interrogatory Responses attached

thereto.

**RESPONSE:** Disputed as to accuracy. GLK failed to pay Class Members the hourly rate of $10.36 per hour for their first week of work in 2011. PSAF ¶ 79.

30.     Plaintiffs admit that GLK paid them the hourly rate of $10.36 for work performed during the first week of work. *See*, Dkt. 87-51-58; Plaintiffs' Exhibit 50, Interrogatory Responses attached thereto.

**RESPONSE:** Disputed as to accuracy. Class Members have argued that GLK failed to pay them $10.36 per hour of work during the first week of work by failing to reimburse them for their incoming expenses which brought their first week's wage below this rate. See Class Members Memorandum of Law in Support of their Motion for Partial Summary Judgment of Counts ____; PSAF ¶ 79.

31.     In 2011, the Department of Labor instituted 2 significant hourly rate increases for the H-2B workers with little notice.  In 2010, the prevailing wage rate required by the DOL for the GLK workers was $7.85 per hour. *Id.*

**RESPONSE:** Disputed. Defendants were not blind-sided by the announcement of a wage increase. For several years leading up to 2011, it was well known that the DOL was planning changes to its methodology for setting wage rates for H-2B workers and that the result of those changes would be to raise wages. PSAF ¶¶ 112-116. These developments were so well known and so pervasive that, as early as November 2009, GLK's consultant on matters of H-2B employment, LaborQuest, specifically advised GLK to "Please keep in mind that if [the prevailing wage] is changed *at any time* during the process (or [even] when the workers are [already] in your employ) that you are *required* to adjust their wages accordingly." PSAF ¶ 117. In response, GLK wrote back to LaborQuest expressly confirming that:

> *We do understand* that any changes [to the prevailing wage rate governing wages for H-2B workers] are *our responsibility*.

PSAF ¶ 118. In addition, in January 2011, the DOL published a notice to the world in the Federal Register, explaining the wage increase and that its revised method would result in average hourly pay increases of $4.83 per hour for H-2B workers. PSAF ¶ 113. DOL also explained that a wage increase was necessary because existing wage rates for H-2B workers were "below what the average similarly employed worker is paid." PSAF ¶ 112. Indeed, DOL made a finding that that the existing wage rate methodology led to underpayment of wages in nearly 96% of cases. PSAF ¶ 112. Ultimately, however, the DOL's proposed wage increase never went into effect. PSAF ¶¶ 116, 119.

32.     At the time the 2011 petition was certified, the DOL informed GLK that the prevailing wage rate would be increased to $10.36 per hour.  At the same time workers began departing for the U.S. in August 2011, the DOL notified GLK of yet *another* wage increase, this time to $14.68 per hour. Compounding the significant economic impact of the wage increase was a poor harvest that yielded only 70% of plan.  *Id.*

**RESPONSE:** Undisputed that the DOL notified GLK that the prevailing wage rate for the 2011 season would be $10.36 per hour on March 25, 2011 and  also announced a further wage increase in August 2011 which, however, never took effect. 76 Fed. Reg. 188 (September 28, 2011) (final rule; delay of effective date); PSAF ¶¶ 116, 119.  The "significant economic impact" of the wage increase is disputed. The increase to $14.68 per hour, if it had gone into effect, which it did not¸ would have increased GLK's total labor costs by less than 3%. Defendant Downs projected that the announced wage increase, which would have raised wages for trim line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's costs of labor for trim line workers by $200,000. PSAF ¶ 121. GLK's total labor costs on an annual basis exceed $6.5 million. PSAF ¶ 122. Accordingly, a $200,000 increase as a result of the DOL's new rule, had it been implemented, would have increased the company's total labor costs by less than 3%. The company has revenues of $50 million to $100

million annually; by that measure, the increase would have been less than four-tenths of a percent of overall revenues. ($200,000/$50,000,000 = .004). *See* PSAF ¶ 123. If the DOL's proposed rule had been implemented, the increase for GLK, at $4.32 an hour, also would have been 11% less than the $4.83 average per hour bump that DOL had projected for H-2B employers overall. *See* PSAF ¶ 124.

33.    This constituted an increase of 87%. GLK appealed the determination but it was initially rejected. GLK then determined that it was no longer economically viable to pay those rates for the work to be performed and decided to send the workers back to Mexico. *Id.*

**RESPONSE:** Disputed, both as to accuracy and materiality. The evidence cited in paragraph 27 does not establish that wage increases would have made it "no longer economically viable" for GLK to employ H-2B workers. GLK's total labor costs on an annual basis exceed $6.5 million. PSAF ¶122. Defendant Downs projected that an increase from $10.36 per hour to $14.68 per hour would have increased the company's costs of labor by $200,000—meaning by less than 3% and less than four-tenths of a percent of the company's overall revenues. PSAF ¶¶ 122-123. In addition, increases in costs due to changes in regulations do not excuse contractual performance. *N. Ind. Serv. Co. v. Carbon County Coal Co.,* 799 F.2d 265, 278 *7th Cir. 1986).

34.    When the 2011 workers returned to Mexico, in two separate groups, GLK paid for bus transportation and provided meals from Bear Creek, Wisconsin to the U.S./Mexico border. Depo. of Jacci Carlson, pp. 139, 144-146, attached as Exhibit G to Affidavit of Aldana.

**RESPONSE:** Undisputed.

## II. CLASS MEMBERS' STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS III, VI and VIII ——*AND* ENTRY OF SUMMARY JUDGMENT IN FAVOR OF THE CLASS.

1.    Defendant GLK is the largest sauerkraut producer in the world, processing more than 120,000 tons of raw cabbage into sauerkraut annually. GLK has revenues of between $50

million and $100 million annually. Ex. 1, *Jimenez* Defendants' Answer to Second Amended

Complaint, Dkt. No. 78 ("*Jimenez* Defs.' Answer to SAC"), ¶ 7; Ex. 2, GLK006165-6166.

2.     Defendant Ryan A. Downs was, at all relevant times, an owner and the President

of GLK. Ex. 1, *Jimenez* Defs.' Answer to SAC, ¶ 8.

3.     To process cabbage into sauerkraut, each head of raw cabbage must be cored and

trimmed individually, as well as cleaned and salted before fermenting. Ex. 3, Deposition of Ryan

A. Downs at 9:14-10:8; Ex. 2, GLK006165-6166.

4.     At GLK, coring and trimming of cabbage, known as trim-line work, is performed

primarily between August and November, a period referred to as the "cutting season." Ex. 3,

Deposition of Ryan A. Downs at 56:23-57:1; Ex. 4, Deposition of Betty Miller at 76:14-18.

5.     From 2006-2011, Defendants hired roughly 50-100 seasonal workers in each year

to work as trim line laborers during the cutting season. Ex. 5, GLK001232; Ex. 6, GLK001296;

Ex. 7, Deposition of Rafael Jimenez Arroyo at 11:19-12:3.

6.     Beginning in approximately 2003, and for the better part of the next decade,

Defendants recruited and employed mostly Mexican nationals, for seasonal employment, to

perform trim-line labor during the cutting season. Ex. 8, ETA-FOIA0021-28; Ex. 9, ETA-

FOIA0004-11; Ex. 10, GLK001116-17; Ex. 12, GLK001220-21; Ex. 13, OFLC-FOIA0085-86;

Ex. 5, GLK001232; Ex. 6, GLK001296; Ex. 7, Deposition of Rafael Jimenez Arroyo at 22:24-

23:1; Ex. 3, Deposition of Ryan A. Downs at 9:4-9; Ex. 4, Deposition of Betty Miller at 46:2-7;

Ex. 11, Deposition of Donna Lorge at 13:19-15:2.

7.     The vast majority of the Mexican H-2B workers employed by Defendants spoke

and read little to no English. Ex. 3, Deposition of Ryan A. Downs at 26:14-22.

**Defendants' Participation in the H-2B Program.**

8.      Defendants employed these Mexican nationals under the federal government's "H-2B" guest worker visa program. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 12; Ex. 11, Deposition of Donna Lorge at 13:19-22.

9.      GLK sought and received temporary labor certifications from the U.S. Department of Labor ("DOL") in 2006, 2007, 2008, 2010, and 2011 to employ H-2B workers to perform trim line work. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 12.

10.     Each time GLK applied for permission to hire H-2B workers, GLK certified that it would abide by all applicable laws and regulations and that qualified U.S. workers were not available to perform the work. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0027; Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0010; Ex. 10, GLK001116-17; Ex. 13, OFLC-FOIA0085-86; Ex. 12, GLK001220-21.

11.     In some years, Downs personally signed temporary labor certification forms agreeing to follow all applicable laws and regulations. He also initialed forms acknowledging an employer's legal obligations in the H-2B process. Ex. 10, GLK001116-17; Ex. 13, OFLC-FOIA0085-86; Ex. 14, OFLC-FOIA0117-118; Ex. 15, GLK001943-45; Ex. 16, GLK001331-1332, 1335.

12.     In both 2010 and 2011, GLK completed the H-2B administrative certification process and received the requisite authorization to recruit and hire foreign workers. In making its application, in each year, Defendants filed the required ETA 9142 Forms with the DOL. Ex. 8, ETA-FOIA0021-28; Ex. 9, ETA-FOIA0004-11.

13.     Among the terms every H-2B employer must provide the federal government as a condition of receiving permission to import H-2B workers is identification of the "Period of Intended Employment" for all H-2B workers that will be employed, including start and end

dates, which must be filled in on the required application form (ETA 9142 Form). Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0021; Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0004.

14.     In the ETA 9142 Form GLK submitted for the 2010 season, GLK represented to DOL that the "Begin Date" for employment for H-2B workers would be 08/09/2010 and the "End Date" 11/30/2010, for a total certified period of employment of 16 weeks and 1 day. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0021.

15.     GLK further represented in its certification for the 2010 season that "Our seasonal need starts in August and runs through November." Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0021.

16.     In the ETA 9142 Form GLK submitted for the 2011 season, GLK represented to the DOL that the "Begin Date" for employment for H-2B workers would be 08/01/2011 and the "End Date" 11/15/2011, for a total certified period of employment of 15 weeks and 2 days. Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0004.

17.     GLK further represented in their certification for the 2011 season that "Our seasonal demand starts in August, when we require the labor to provide the products to our customers, through November."  Ex. 9, ETA-FOIA0004-11 at ETA-FOIA00004.

18.      In both 2010 and 2011, GLK also certified in the ETA 9142 Form submitted to the Department of Labor that it would provide H-2B workers with at least "40 hours" of work per week over the certified period of employment and the employment it was offering was "full time.". Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0021 and ETA-FOIA0023; Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0004 and ETA-FOIA0006.

19.     In both 2010 and 2011, GLK ran advertisements in U.S. publications advertising the same trim-line labor positions to domestic workers. At least one advertisement that

defendants placed in 2010 described the jobs as "Full-Time," "40 Hours Per Week Minimum," from "08/09/10 – 11/30/10." Group Ex. 17, LQ0054-55, LQ0159, LQ0313-315.

20.     The advertisement that ran for the 2011 season, similarly and specifically described the period of employment as from "8/1/2011 – 11/15-2011, 40hrs/wk." Group Ex. 17, LQ0054-55, LQ0159, LQ0313-315 at LQ0315.

21.     In 2010 and 2011, the FLSA and Wisconsin state minimum wage was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C); Wis. Stat. §§ 104.02, 104.03; Wis. Admin. Code § DWD 272.03; *see also* http://www.dol.gov/whd/state/stateMinWageHis.htm.

22.     In 2010, GLK certified in the ETA 9142 Form that it would provide an hourly wage of $7.85 to the workers. This amount was above the prevailing wage set by the Department of Labor that year. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0025.

23.     In 2011, GLK certified in the ETA 9142 Form that it would provide an hourly wage of $10.36 to the workers. This was the amount of the prevailing wage set by the Department of Labor that year. Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0008.

24.     In both years, GLK certified in the ETA 9142 Form that it would pay overtime pay at the rate of one and half times the offered wage for hours worked over 40 in each week. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0025; Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0008.

25.     In both years, GLK certified in the ETA 9142 Form that if it terminated any H-2B worker's employment before the end of the certified period, it would cover the costs of return transportation at the end of the workers' employment. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0028; Ex. 9, ETA-FOIA0004-11 at ETA-FOIA0011.

26.     Thomas Robinson, founder and president of LaborQuest USA, put Defendants on notice of their obligation to provide the workers with a minimum of 40 hours of work per week

in an email in August of 2011 that stated "the workers must receive on average a minimum of 40 hours per week". Ex. 101, GLK0005807; Ex. 21, Deposition of Thomas Robinson at 14:3-10.

**Defendants' Recruitment and Hiring Process.**

27.     In 2006-2008, Defendants used Dianne Guerrero (also known as Dianne Boyer) and her company, the Associates, to assist them with some aspects of the H-2B process. Ex. 4, Deposition of Betty Miller at 52:3-54:7; Ex. 11, Deposition of Donna Lorge at 15:3-25:24, 69:2-22; Ex. 3, Deposition of Ryan A. Downs at 28:25-29:1-12; Group Ex. 18, GLK001072A, GLK001260, GLK005605-5610.

28.     In 2010 and 2011, Defendants retained a firm called LaborQuest to assist them with some aspects of the H-2B process. LaborQuest, in turn, subcontracted with another specialist, Florida East Coast Travel Services (FLECTS). Jorge Garcia was the general manager of FLECTS. Ex. 19, *Jimenez* Defendants' Second Revised Answers to Plaintiffs' First Set of Interrogatories ("*Jimenez* Defs.' Interrog. Resp."), Nos. 9, 11; Ex. 20, Deposition of Jorge Garcia at 25:12-17; 88:14-19; 89:6-18, 94:21-95:25, 108:11-20, 114:10-18, 140:17-141:24; Ex. 21, Deposition of Thomas Robinson at 41:13-42:23, 89:13-91:14.

29.     In 2006, 2007, 2008, 2010, and 2011, Defendants conducted recruitment. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶¶ 17, 74; Ex. 22, *Ramirez* Defendants' Answer to Second Amended Class Action Complaint, Dkt. No. 41 ("*Ramirez* Defs.' Answer to SAC") ¶ 16.

30.     In all the years from 2006 through 2011 that they hired H-2B workers, Defendants managed the solicitation, recruitment and hiring of the H-2B workers and wage and hour compliance. Ex. 3, Deposition of Ryan A. Downs at 15:16–16:8, 19:6-24, 22:9–23:15; Ex. 20, Deposition of Jorge Garcia at 41:13-23, 42:25-43:24, 45:20-46:7, 54:21-56:3, 88:14-19, 89:6-18; Ex. 23, Declaration of Elias Vera Ramirez at P1499-P1505 ¶ 1-9; Ex. 11, Deposition of Donna Lorge at 36:12-38:10; Ex. 4, Deposition of Betty Miller at 42:1-16.

18

31.     At all times relevant, Downs has retained, and exercised, powers to make hiring, firing, and wage-setting decisions for H-2B workers. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶¶ 8, 9; Ex. 4, Deposition of Betty Miller at 42:1-16, 65:23-67:7, 128:17-129:1; Ex. 25, Deposition of Jacci Carlson at 73:15-17; Ex. 3, Deposition of Ryan A. Downs at 88:13-18 .

32.     Downs personally determined when, whether, and how many class members would be hired in each season. Ex. 4, Deposition of Betty Miller at 42:1-16, 65:23-67:7, 128:17-129:1; Ex.25, Deposition of Jacci Carlson at 73:15-17.

33.     Rafael Jimenez Arroyo, a full-time GLK employee, coordinated recruitment of H-2B workers throughout the relevant period. Ex. 23, Declaration of Elias Vera Ramirez at P1499-P1505 ¶ 1; Ex. 20, Deposition of Jorge Garcia at 40:6-16, 41:18-23, 43:6-15, 88:14-19, 92:22-93:5; Ex. 3, Deposition of Ryan A. Downs at 15:16-19:14, 25:19-25; Ex. 25, Deposition of Jacci Carlson at 49:6-17, 51:7-20.

34.     Early on in GLK's participation in the H-2B program, Downs authorized Jimenez Arroyo to recruit and hire the workers. Ex. 3, Deposition of Ryan A. Downs at 15:16-19:24, 25:4-25; Ex. 19, *Jimenez* Defs.' Interrog. Resp., Nos. 6, 7.

35.     Jimenez Arroyo began traveling to Mexico in May of every year starting on or before 2003 to recruit and hire workers. Ex. 3, Deposition of Ryan A. Downs at 17:17-19:15; Ex. 7, Deposition of Rafael Jimenez Arroyo at 154:13-155:3.

36.     Jimenez Arroyo principally recruited from in and around his hometown of Santiago Capitiro, in the state of Guanajuato in Mexico. Ex. 23, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 4; Ex. 7, Deposition of Rafael Jimenez Arroyo at 23:23-27:21; Ex. 3, Deposition of Ryan A. Downs at 17:20-18:21; Ex. 25, Deposition of Jacci Carlson at 49:6-17, 51:7-20; and Ex. 11, Deposition of Donna Lorge at 30:18-31:3.

37.     On six or seven occasions, in the early years of the program, Downs accompanied Rafael Jimenez Arroyo to Santiago Capitiro, on trips during which Jimenez Arroyo recruited H-2B workers. Ex. 3, Deposition of Ryan A. Downs at 17:17-19:14. Downs, or other GLK employees or agents, instructed Jimenez Arroyo about wages to be offered to the workers and other terms and conditions of employment. Ex. 3, Deposition of Ryan A. Downs at 17:17-19:14, 19:6-24, 22:9-19.

38.     Downs monitored and supervised Jimenez Arroyo's recruitment efforts. Ex. 3, Deposition of Ryan A. Downs at 19:6-24, 22:9-19, 139:5-140:8.

**H-2B Workers hired in 2006, 2007, 2008, 2010 and 2011.**

39.     In 2006, Defendants recruited and hired approximately 75 migrant H-2B workers from Mexico as trim-line workers. Ex. 28, GLK – 2006-2008 and 2010-2011 H-2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

40.     Of the workers hired in 2006, 25 are the *Jimenez* individual Plaintiffs. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 39; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

41.     In 2007, Defendants recruited and hired approximately 74 migrant H-2B workers from Mexico as trim-line workers. Ex. 28, GLK – 2006-2008 and 2010-2011 H-2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

42.     Of the workers hired in 2007, 25 are the *Jimenez* individual Plaintiffs. Ex. 1, Jimenez Defs.' Answer to SAC ¶ 39; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

43.     In 2008, Defendants recruited and hired approximately 90 migrant H-2B workers from Mexico as trim-line workers. Ex. 28, GLK – 2006-2008 and 2010-2011 H-2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

44.     Of the workers hired in 2008, 31 are the *Jimenez* individual Plaintiffs. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 39; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Response of Plaintiff Francisco Ruiz Figueroa, No. 3, at Ex. 29 p. 60-75.

45.     In 2009, GLK applied too late for authorization and so missed the opportunity to hire H-2B workers as trim-line laborers that year. GLK therefore needed—and managed—to locate and hire qualified and available U.S. workers instead. Ex. 3, Deposition of Ryan A. Downs at 31:5-24; Ex. 11, Deposition of Donna Lorge at 14:16-23.

46.     In 2010, Defendants recruited and hired approximately 86 migrant H-2B workers from Mexico as trim-line workers. Ex. 28, GLK – 2006-2008 and 2010-2011 H2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

47.     Of the workers hired in 2010, 39 are the *Jimenez* individual Plaintiffs. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 38; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

48.     In 2011, Defendants recruited and hired approximately 135 migrant H-2B workers from Mexico as trim-line workers; however, GLK transported only approximately 92 to Wisconsin. Ex. 30, WHD-FOIA0045-55 at 51; Ex. 31, GLK001422; Ex. 32, FL00241-242; Ex. 28, GLK – 2006-2008 and 2010-2011 H2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

49.     Of the workers hired in 2011, 70 are the *Jimenez* individual Plaintiffs. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 37; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3; Ex. 29, Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Response of Plaintiff Francisco Ruiz Figueroa, No. 3, at Ex. 29 p. 60-75.

50. Most H-2B workers worked between 43 to 47 days in 2006, 50 to 51 days in 2007, 77 to 84 days in 2008, 22 to 24 days in 2010, and 20 to 37 days in 2011. Ex. 33, GLK000362-731.

51. Defendants placed the names of all workers who had been given and accepted offers of employment for the 2010 season on a list. These workers were provided instructions regarding visa application procedures. Ex. 7, Deposition of Rafael Jimenez Arroyo at 54:25-57:8, 137:22-138:5; Ex. 34, FL0012-13; Ex. 20, Deposition of Jorge Garcia at 93:18-94:25, 95:15-96:5, 183:18-25; Ex.24, LQ0290-91; Ex. 4, Deposition of Betty Miller at 96:11-97:10.

52. Defendants placed the names of all workers who had been given and accepted offers of employment for the 2011 season on a list. These workers were provided instructions regarding visa application procedures. Ex. 7, Deposition of Rafael Jimenez Arroyo at 54:25-57:8; Ex. 35, FL0072-87; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories Nos. 8, 15.

53. Visa appointments were scheduled for the workers at the U.S. consulate in Mexico City in 2010 and the border city of Matamoros Mexico in 2011. Ex. 7, Deposition of Rafael Jimenez Arroyo at 151:18-25; Ex. 20, Deposition of Jorge Garcia at 103:18-23, 116:1-4, 144:9-13, 225:24-226:1; Ex. 36, FL0480-481. And it was understood, both by Defendants and by these workers in both years that, upon issuance of a visa to any worker, the job was his. Ex. 7, Deposition of Rafael Jimenez Arroyo at 54:25-57:8; Ex. 3, Deposition of Ryan A. Downs at 24:16-25:12; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 12, 13, 17; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 15, 20.

54. In 2011, Defendants divided the workers into three separate groups to have their visa interviews and then, if they were issued visas, board buses to travel to Wisconsin. Ex. 21,

Deposition of Thomas Robinson at 305:11-307:20; Ex. 20, Deposition of Jorge Garcia at 75:8-11, 240:17-244:11.

55.     The first group departed the U.S.-Mexico border on or about August 5, 2011 and arrived in Wisconsin on or about August 7, 2011. Ex. 20, Deposition of Jorge Garcia at 272:17-24; Ex. 37, GLK001547-1550. The second group departed the U.S.-Mexico border on or about August 19, 2011 and arrived in Wisconsin on or about August 22, 2011. Ex. 20, Deposition of Jorge Garcia at 283:10-18; Ex. 38, GLK001979-1982. The third group, although issued visas, never left Mexico. Ex. 22, *Ramirez* Defs.' Answer to SAC ¶¶ 22, 23; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

56.     Approximately 35 workers were in the third group.[2] Ex. 39, FL0220-223; Ex. 20, Deposition of Jorge Garcia at 300:3-13; Ex. 22, *Ramirez* Defs.' Answer to SAC ¶ 28.

57.     The list referenced in Paragraph 52 included workers in the third group. Ex. 7, Deposition of Rafael Jimenez Arroyo at 54:24-57:8; Ex. 35, FL0072-87; Ex. 39, FL0220-223; Ex. 20, Deposition of Jorge Garcia at 300:3-13.

58.     Defendants made job offers to all the workers in the third group. Ex. 22, *Ramirez* Defs.' Answer to SAC ¶ 17.

59.     These job offers were communicated to the workers by Rafael Jimenez Arroyo or Elias Vera Ramirez, one of the H-2B workers Jimenez appointed to help him with recruiting and hiring. Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories Nos. 6, 7, 12; Ex. 3, Deposition of Ryan A. Downs at 25:1-25; Ex. 7, Deposition of Rafael Jimenez Arroyo at 28:21-29:20, 33:14-16, 57:10-20; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories Nos. 7, 8, 15.

---

[2] The workers in the third group are the *Ramirez* Plaintiffs and Class Members. Ex. 22, *Ramirez* Defs.' Answer to SAC ¶ 28; Ex. 39, FL0220-223; Ex. 20, Deposition of Jorge Garcia at 300:3-13.

60.     Jimenez Arroyo oversaw and coordinated recruitment for GLK for the 2011 season. Vera assisted him. Ex. 7, Deposition of Rafael Jimenez Arroyo at 35:11-37:8; 57:10-18; Ex. 23, Declaration of Elias Vera Ramirez, P1499-P1505, ¶¶ 1-9; Ex. 4, Deposition of Betty Miller at 61:3-62:8, Ex. 25, Deposition of Jacci Carlson at 49:6-17, 51:7-20; Ex. 3, Deposition of Ryan A. Downs at 15:16-19:24, 25:4-25; Ex. 20, Deposition of Jorge Garcia at 40:6-16, 41:18-23, 43:17-46:4, 49:25-50:1, 88:14-19, 92:22-93:5, 225:13-23; Ex. 19, *Jimenez* Defs.' Interrog. Resp., Nos. 6, 7; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 3.

61.     When the H-2B workers were recruited in Mexico, they were offered employment subject to a single condition: the State Department's issuance of H-2B visas. Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 13, 17; Ex. 26 *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 15, 20; Ex. 7, Deposition of Rafael Jimenez Arroyo at 54:25-57:8; Ex. 3, Deposition of Ryan A. Downs at 24:16-25:12.

62.     All class members accepted these job offers. Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 8, 20; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 6, 7, 12.

63.     For the 2011 season, the State Department issued H-2B visas to the approximately 135 Mexican workers, who had been recruited and offered employment by Defendants. Ex. 22, *Ramirez* Defs.' Answer to SAC ¶ 22; Ex. 31, GLK001422; Ex. 32, FL00241-242; Ex. 38, GLK001979-1982; Ex. 37, GLK1547-1550; Ex. 39, FL0220-223; Ex. 20, Deposition of Jorge Garcia at 300:3-13.

64.     After receiving their visas, the workers in the third group remained in Matamoros for several days while waiting for Defendants to arrange for transportation from Mexico to

Wisconsin. Ex. 41, Deposition of Jiovanni Mendez Lancon at 34:23-25; Ex. 42, Deposition of Javier Jimenez Vera at 31:1-16; Ex. 40, FL0104-105.

65.     A bus was reserved to take this group to Wisconsin. Ex. 20, Deposition of Jorge Garcia at 301:23-25; Ex. 40, FL0104-105.

66.     On or about Sept. 1, 2011, GLK requested that the U.S. Consulate in Matamoros cancel their already issued visas. Ex. 43, FL0069-71; Ex. 20, Deposition of Jorge Garcia at 303:10-19. The U.S. consulate complied with that request. Group Ex. 44, RAM0002, RAM0015-RAM0017, RAM0021, RAM0022, RAM0026-27, RAM0032.

67.     On approximately September 2, 2011, shortly before they were scheduled to depart Mexico to travel to Wisconsin, Defendants informed the third group of workers that their services were not needed. Ex. 22, *Ramirez* Defs.' Answer to SAC, ¶ 23; Ex. 45, *Ramirez* Defendants' Second Revised Responses to Plaintiffs' First Set of Interrogatories ("*Ramirez* Defs.' Interrog. Resp."), Nos. 3, 7; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 7; Ex. 41, Deposition of Jiovanni Mendez Lancon at 38:4-12; Ex. 42, Deposition of Javier Jimenez Vera at 32:12-33:3.

68.     Defendants did not provide, pay for, or reimburse the cost for the *Ramirez* workers' return transportation to their home towns, the cost of which totaled approximately US$44 to US$74 per worker.[3] Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 5, 13, 15; Ex. 41, Deposition of Jiovanni Mendez Lancon at 38:23-39:7; Ex. 25, Deposition of Jacci Carlson at 192:16-18; Ex. 20, Deposition of Jorge Garcia at 306:24-307:1.

---

[3] Plaintiffs relied on http://www.x-rates.com/average/?from=MXN&to=USD&year=2010 and http://www.x-rates.com/d/MXN/USD/hist2011.html to determine the exchange rate for the 2010 expenses to be 12.766 Mexican pesos to one U.S. dollar and the rate for the 2011 expenses to be 12.2322 Mexican pesos to one U.S. dollar.

69.     All of the H-2B workers recruited and hired by Defendants from 2006 through 2011 were Mexican nationals whose permanent place of residence was Mexico, and whose primary language was Spanish. Ex. 3, Deposition of Ryan A. Downs at 16:19-18:5; Ex. 25, Deposition of Jacci Carlson at 39:8-10; Ex. 20, Deposition of Jorge Garcia at 27:16-20; Ex. 11, Deposition of Donna Lorge at 13:19-25; Ex. 46, Deposition of Gina Maria Pahl at 15:14-16:6; Ex. 1, *Jimenez* Defs.' Answer to SAC ¶¶ 5, 74; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 2; Ex. 21, Deposition of Thomas Robinson at 33:1-4; Ex. 7, Deposition of Rafael Jimenez Arroyo at 87:12-20.

70.     Because they were employed so far from their homes, the H-2B workers lived in temporary housing on GLK's property in Bear Creek while employed by Defendants. Ex. 7, Deposition of Rafael Jimenez Arroyo at 135:8-12, 136:1-14; Ex. 3, Deposition of Ryan A. Downs 22:9-19.

**The Cost of Travel, Immigration and Recruitment in 2010 and 2011.**

71.     In 2010 and 2011, some workers were required to pay a recruitment fees of US$1,000 or more, and were made to understand that they would not be hired by Defendants without paying this fee. *See, e.g.,* Ex. 26, *Jimenez* Plaintiffs Abraham Ruiz Mendoza, Jesus Eduardo Santiago Garcia, Alejandro Ponce Gonzalez, Manuel Mendoza Chiquito, and Fernando Rosas Rivera's Responses to Defendants' Interrogatories Nos. 6, 8, 9, 18, and 21 at Ex. 26 p. 25-47, 69-88, 305-324, 562-584, 1240-1260; Ex. 23, Declaration of Elias Vera Ramirez, P1499-1505 ¶ 5. Defendants were made aware that some workers reported paying recruitment fees and did nothing in response. Ex. 3, Deposition of Ryan A. Downs at 139:5-141:14; Ex. A, Deposition of Jacci Carlson at 64:23-66:4, 67:24-70:24.

72.     Once Defendants hired the workers, visas had to be procured for each worker. 8 C.F.R. § 214.2(h); Ex. 7, Deposition of Rafael Jimenez Arroyo at 56:9-57:8; Ex. 3, Deposition of Ryan A. Downs at 24:16-25:12.

73.     The workers hired by Defendants had to travel to a U.S. Consulate or Embassy to sit for their visa interviews. Ex. 21, Deposition of Thomas Robinson at 290:22-291:1; Ex. 3, Deposition of Ryan A. Downs at 104:5-14; Ex. 25, Deposition of Jacci Carlson at 51:21-52:2, 72:12-18.

74.     The workers traveled to Mexico City in 2010 and Matamoros in 2011 for their visa interviews at the U.S. consulate in those locations. Ex. 7, Deposition of Rafael Jimenez Arroyo at 151:18–25; Ex. 20, Deposition of Jorge Garcia at 103:18-23, 116:1-4, 144:9-13, 225:24-226:1; Ex. 36, FL0480-481.

75.     Mexico City is approximately 193 miles from Santiago Capitiro. Matamoros is approximately 600 miles from Santiago Capitiro. Group Ex. 47, Map Showing Distance from Santiago Capitiro to Mexico City, Map Showing Distance from Santiago Capitiro to Matamoros.

76.     The process of securing a visa and traveling to the border took several days. It also entailed significant expense. Ex. 7, Deposition of Rafael Jimenez Arroyo at 51:10–54:6. The items of expense included:

(a)     Bus fare from Santiago Capitiro to Mexico City or Matamoros (a trip of approximately 12 hours); Ex. 7, Deposition of Rafael Jimenez Arroyo at 52:2-3; Ex. 23, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 6; Ex. 41, Deposition of Jiovanni Mendez Lancon at 24:20-25:2; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676;

(b)     Accommodations and meals in Mexico City or Matamoros for several days (and, sometimes, for more than a week), while visas were processed and the workers waited for Defendants to schedule their departure for Bear Creek; Ex. 7, Deposition of Rafael Jimenez Arroyo at 66:7-67:8, 172:1-21; Ex. 20, Deposition

of Jorge Garcia at 353:20-354:5, 355:14-357:1; Ex. 48, Deposition of Jesus Martinez Gallardo at 31:1-8; Ex. 23, Declaration of Elias Vera Ramirez, P1499-1505, ¶ 6; Ex. 42, Deposition of Javier Jimenez Vera at 31:1-16; Ex. 41, Deposition of Jiovanni Mendez Lancon at 29:22-30:24, 34:23-25; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5; Ex. 26, *Jimenez* Plaintiff's Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p.1667-1676;

(c)     Transportation between the hotel and the visa interviews and office of a *licenciado*; Ex. 20, Deposition of Jorge Garcia at 163:17-25, 254:20-258:5; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676;

(d)     Fees paid to a *licenciado,* to assist with visa paperwork; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p.1667-1676;

(e)     Visa application fees; Group Ex. 52, P0045, P0264, P0307, P0582, P1102; Ex. 7, Deposition of Rafael Jimenez Arroyo at 51:5-16; Ex. 3, Deposition of Ryan A. Downs at 109:13-22; Ex. 20, Deposition of Jorge Garcia at 125:21-126:6; Ex. 26, *Jimenez* Plaintiff's Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676;

(f)     Passport fees (for workers who did not have a valid passport from an earlier season); Ex. 7, Deposition of Rafael Jimenez Arroyo at 51:5-16; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676;

(g)     Transportation from Mexico City to Matamoros, a trip of twelve hours or more, in 2010 and Matamoros to the Mexico-U.S. border in 2011, to begin the trip to Bear Creek; Ex. 20, Deposition of Jorge Garcia at 125:21-126:6, 160:2-4; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676, and;

(h)     A border-crossing fee at the Mexico-U.S. border. Group Ex. 53, P0179, P0497, P0608, P0777, P0939, P0969; Ex. 21, Deposition of Thomas Robinson at 179:4-8; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 6 and

*Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 6 at Ex. 26 p. 1667-1676.

77. In 2010, the cost borne by each worker for these items ranged from US$326 - US$720, and, for those charged recruitment fees, from US$1067 to US$1952. Ex. 54, Spreadsheet of H-2B Workers' Expenses in 2010 and 2011; Ex. 55, Affidavit of Monica Garreton Chavez.

78. In 2011, each worker incurred between US$294 to US$910 of inbound travel and visa-related expenses, and those charged recruitment fees paid from US$1507 to US$2659 to work for GLK. Ex. 54, Spreadsheet of H-2B Workers' Expenses in 2010 and 2011; Ex. 55, Affidavit of Monica Garreton Chavez.

79. Defendants' failure to reimburse these expenses depressed H-2B workers' wages in their first weeks of work in 2010 and 2011 below the offered wage ($7.85/hour in 2010; $10.36/hour in 2011), as well as below the Wisconsin living wage ($7.25/hour in 2010 and 2011. Ex. 62, Spreadsheet of Net Wages and Damages Due in 2010 and 2011; Ex. 55, Affidavit of Monica Garreton Chavez.

80. The *Ramirez* workers who were stranded at the border paid all the fees in Paragraph 77 except for their visa application fee, transportation from Matamoros to the U.S.-Mexico border, and the border-crossing fee. Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 5.

81. For most workers, these outlays amounted to more than a month's earnings in Mexico, where their wages average US$10.00 per day. Ex. 48, Deposition of Jesus Martinez Gallardo at 25:22-26:11; Ex. 50, Deposition of Jose Mendez Baca at 58:3-16; Ex. 56, Deposition of Martin Chavez Jimenez at 32:12-34:1; Ex. 57, Deposition of Alejandro Jurado Jimenez at 106:4-21; Ex. 58, Deposition of Jose Jurado Jurado at 47:19-49:24; Ex. 42, Deposition of Javier

Jimenez Vera 25:24-27:1, 35:25-36:18; Ex. 41, Deposition of Jiovanni Mendez Lancon at 40:23-41:6.

      82.    Many of the workers went into debt to raise money to cover these expenses. Many remain in debt to this day. Ex. 49, Deposition of J. Saul Jimenez Rosas at 38:5-11; Ex. 48, Deposition of Jesus Martinez Gallardo at 24:8-25:9; Ex. 57, Deposition of Alejandro Jurado Jimenez at 80:19–24; Ex. 59, Deposition of Enrique Rosas Jurado at 49:5–23; Ex. 51, Deposition of J. Jesus Jimenez Rosas at 38:20–39:17; Ex. 58, Deposition of Jose Jurado Jurado at 59:17–60:25; Ex. 56, Deposition of Martin Chavez Jimenez at 43:17–44:20; Ex. 49, Deposition of J. Saul Jimenez Rosas at 37:18-23; Ex. 7, Deposition of Rafael Jimenez Arroyo at 53:24-54:19; Ex. 23, Declaration of Elias Vera Ramirez P1499-1505; Ex. 50, Deposition of Jose Mendez Baca at 31:1-2; Ex., 42, Deposition of Javier Jimenez Vera at 32:1-11; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 13, 17; Ex. 41, Deposition of Jiovanni Mendez Lancon at 25:6-10, 25:21-26:10, 40:10-13.

      83.    Many of the H-2B workers left their jobs in Mexico in order to work for GLK, and were unemployed for extended periods of time after returning from Matamoros (in the case of the *Ramirez* workers) or from Bear Creek (in the case of the *Jimenez* workers). Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 13, 17; Ex. 41, Deposition of Jiovanni Mendez Lancon at 40:10-13; Ex. 42, Deposition of Javier Jimenez Vera at 35:25-37:1; Ex. 50, Deposition of Jose Mendez Baca at 57:23-58:6; Ex. 56, Deposition of Martin Chavez Jimenez at 33:14-19; Ex. 59, Deposition of Enrique Rosas Jurado at 40:11-15.

**Defendants' Acknowledgment of Their Reimbursement Obligations.**

      84.    In 2010, Downs personally initialed a form provided to him by LaborQuest, agreeing to and acknowledging that: "New H-2B regulations require employer[s] to pays [sic] (or reimburse) for any of the recruitment, visa and travel expenses for worker from their homes

abroad to the place of employment." Ex. 16, GLK001331-1332, 1335 at GLK001332; Ex. 3, Deposition of Ryan A. Downs at 119:12–120:6.

85.     In 2011, LaborQuest also provided invoices and documents that specified costs that should be reimbursed directly to the worker by the employer which included provision of a daily per diem, transportation costs, paperwork processing expenses and border crossing fees. Ex. 31, GLK001422; Ex. 60, GLK001471; Ex. 61, LQ0124-125.

86.     Defendants did not reimburse H-2B workers for any of these expenses in their first week of work in 2010 or 2011. Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 5, 10 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 10 at Ex. 26 p. 1667-76; Ex. 62, Spreadsheet of Net Wages and Damages Due in 2010 and 2011; Ex. 55, Affidavit of Monica Garreton Chavez. In 2011, LaborQuest informed GLK that, at least one group of workers, had reported paying *derecho a visa* fees. Ex. B, Deposition of Gina Maria Pahl at 36:3-24, 37:5-39:24, 40:18-24, 43:1-45:3; Ex. A, Deposition of Jacci Carlson at 89:24-91:13, 92:7-19; Group Ex. 52, P0045, P0264, P0307, P0582, P1102.

87.     None of the *Ramirez* workers were paid any wages by GLK in 2011. Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

88.     None of the *Ramirez* workers' travel, lodging, subsistence, visa or other expenses have ever been reimbursed by Defendants. Ex. 45, *Ramirez* Defs.' Interrog. Resp., No. 7; Ex. 29, *Ramirez* Plaintiffs' Responses to Defendants' Interrogatories, No. 9.

**Defendants' Terminated All H-2B Workers Early in 2010 and 2011.**

89.     In both 2010 and 2011, Defendants terminated employment for most H-2B workers in September, after 8 or fewer weeks of employment. In neither year did GLK provide

any class member employment into November. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶¶ 26, 27; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 3.

90.     Downs personally made the decision to terminate plaintiffs' employment before the end of the season, both in 2010 and 2011. Ex. 3, Deposition of Ryan A. Downs at 88:13-18.

91.     Downs made the decision that, in 2011, the *Ramirez* plaintiffs would not go to GLK to work, after they had already obtained their H-2B visas. Ex. 45, *Ramirez* Defs.' Interrog. Resp., No. 8; Ex. 25, Deposition of Jacci Carlson at 73:15-17.

92.     All of the approximately 83 H-B workers hired by Defendants in 2010 began work in Bear Creek on or about August 17, 2010. Ex. 26, *Jimenez* Plaintiffs' Response to Defendants' Interrogatories Nos. 3, 18 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, No. 18 at Ex. 26 p. 1667-76; Ex. 28, GLK – 2006-2008 and 2010-2011 H2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1.

93.     Approximately half of the 2010 H-2B workers in 2010 were terminated by Defendants just four weeks later, after completing their work for the day on September 16, 2010. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 26; Ex. 26, *Jimenez* Plaintiffs' Response to Defendants' Interrogatories, No. 3; Ex. 51, Deposition of J. Jesus Jimenez Rosas at 11:7-9, 29:17-20; Ex. 49, Deposition of J. Saul Jimenez Rosas at 14:9-11; Ex. 58, Deposition of Jose Jurado Jurado at 37:6-10; Ex. 59, Deposition of Enrique Rosas Jurado at 9:9-19; Ex. 4, Deposition of Betty Miller at 181:21-182:2.

94.     The remaining approximately half of the H-2B workers were terminated on or about October 26, 2010. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 26; Ex. 26, *Jimenez* Plaintiffs' Response to Defendants' Interrogatories, No. 3.

95.     Of the approximately 135 H-2B workers hired by Defendants and issued visas to work at GLK from August 30, 2011 to November 15, 2011, approximately half of those who began work for Defendants in Bear Creek did so on August 8, 2011 and the other half began work on August 23, 2011. Ex. 37, GLK001547-1550; Ex. 38, GLK001979-1982; Ex. 26, *Jimenez* Plaintiffs' Response to Defendants' Interrogatories Nos. 3.

96.     Of the H-2B workers who began work in Bear Creek in 2011, approximately half of them were terminated just three to six weeks into the season, after completing their work for the day, between September 16 and 20, 2011. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 27; Ex. 26, *Jimenez* Plaintiffs' Response to Defendants' Interrogatories, No. 3.

97.     The remaining H-2B workers were terminated during the following two weeks, on or before September 28, 2011, just five to seven weeks into the season. Ex. 1, *Jimenez* Defs.' Answer to SAC ¶ 27; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories Nos. 3.

98.     In 2010 and 2011, Defendants provided a bus for the terminated workers from Bear Creek, WI to Laredo, Texas on the U.S.-Mexico border. Ex. 63, GLK001552; Ex. 64, FL0018-19; Ex. 65, FL0054; Ex. 4, Deposition of Betty Miller at 180:24-182:2; Ex. 51, Deposition of J. Jesus Jimenez Rosas at 28:22-24, 30:9-11; Ex. 49, Deposition of J. Saul Jimenez Rosas at 29:1-6; Ex. 48, Deposition of Jesus Martinez Gallardo at 35:7-9; Ex. 58, Deposition of Jose Jurado Jurado at 40:15-18, 51:15-17.

99.     From Laredo, the workers had to find their own transportation back to their hometowns, a trip of almost 11 hours and 600 miles. Ex. 63, GLK001552; Ex. 66, FL0059; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 6, 12, 14, 18 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, Nos. 6,

18 at Ex. 26 p. 1667-1676; Ex. 51, Deposition of J. Jesus Jimenez Rosas at 29:14-16; Ex. 49, Deposition of J. Saul Jimenez Rosas at 29:1-8; Ex. 48, Deposition of Jesus Martinez Gallardo at 35:10-17; Ex. 58, Deposition of Jose Jurado Jurado at 51:15-21; Ex. 103, Map Showing Distance from Laredo to Santiago Capitiro.

100.     Defendants did not fully pay for or provide the 2010 workers' return transportation to their hometowns from Laredo, the cost of which totaled approximately US$47 to US$162 per worker. Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 6, 12, 14, 18 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, Nos. 6, 18 at Ex. 26 p. 1667-1676.

101.     Defendants did not fully pay for or provide the 2011 workers' return transportation to their home towns, the cost of which totaled approximately US$60 to US$152 per worker. Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 6, 12, 14, 18 and *Jimenez* Plaintiff Jesus Martinez Gallardo's Amended Response to Defendants' Interrogatories, Nos. 6, 18 at Ex. 26 p. 1667-1676; Ex. 63, GLK001552; Ex. 66, FL0059; Group Ex. 67, P0097, P0266, P0456, P0686, P0850, P1233.

102.     Defendants claim that in 2010, they were justified in terminating all the H-2B workers before the end of the certified period of employment due to crop failure. Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 10.

103.     In June and July of 2010, Wisconsin experienced major rains, resulting in flooding and damage to the cabbage crop, including an outbreak of black rot in Outagamie County. Ex. 68, FL0026; Ex. 3, Deposition of Ryan A. Downs at 39:17-40:15.

104.     The damage to the cabbage crop was evident as early as July 2010. Ex. 68, FL0026; Ex. 3, Deposition of Ryan A. Downs at 50:4-7.

105.    Defendants had applied for and received authorization to "import" 110 Mexican workers. In view of the flooding and damage to the crop, they decided to call up only half that many, just 55 Mexican workers. Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0021; Ex. 68, FL0026; Ex. 3, Deposition of Ryan A. Downs at 59:2-62:15.

106.    Defendants ultimately reversed their decision, bringing in approximately 86 H-2B workers. Ex. 69, GLK001337; Ex. 28, GLK – 2006-2008 and 2010-2011 H2B Employee List; Ex. 27, *Jimenez* Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories, No. 1; Ex. 4, Deposition of Betty Miller at 125:8-126:13.

107.    At the time Defendants brought in the H-2B workers in 2010, they knew there was not enough work to occupy them for a full season. Ex. 68, FL0026; Ex. 4, Deposition of Betty Miller at 125:8-126:13.

108.    Defendants did not notify any of the H-2B workers about the flood or the near-certainty of reduced work in Wisconsin before the workers accepted the employment or before they left Mexico. Ex. 4, Deposition of Betty Miller at 178:24-179:6; Ex. 46, Deposition of Gina Maria Pahl at 24:2-18; Ex. 7, Deposition of Rafael Jimenez Arroyo at 93:21-24; Ex. 49, Deposition of J. Saul Jimenez Rosas at 33:10-24; Ex. 58, Deposition of Jose Jurado Jurado at 37:11-38:5; Ex. 56, Deposition of Martin Chavez Jimenez at 32:1-10.

109.    If the H-2B workers had been told before they left Mexico in 2010 and 2011 that there was only enough work for a few weeks, they would not have accepted the job. Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 15.

110.    Defendants had crop insurance in 2010 that covered the cabbage crop failure, Defendants submitted a claim to the insurance company, which was paid. Ex. 3, Deposition of Ryan A. Downs at 86:10-19.

111.     Defendants claim that in 2011, they were justified in terminating all the H-2B workers before the end of the certified period of employment due to the DOL's announcement of a new methodology for determining the mandatory minimum hourly wage payable to H-2B workers, which would have increased the wages due to GLK's workforce. Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 10; Ex. 3, Deposition of Ryan A. Downs 91:22-92:11.

112.     After an extensive notice and comment period, on January 19, 2011, DOL published a new wage rule. DOL explained that a wage increase was necessary because existing wage rates for H-2B workers were "below what the average similarly employed worker is paid." 76 Fed. Reg. 3452, 3453 (Jan. 19, 2011). DOL made a finding that that the existing wage rate methodology led to underpayment of wages in nearly 96% of cases. 76 Fed. Reg. at 3463.

113.     In January 2011, DOL provided notice, by publication in the Federal Register, that its revised method would result in average hourly pay increases of $4.83 per hour for H-2B workers. 76 Fed. Reg. 3452, 3470-71 (Jan. 19, 2011).

114.     DOL also explained that a wage increase was necessary because existing wage wages for H-2B workers were "below what the average similarly employed worker is paid." 76 Fed. Reg. 3452, 3453 (Jan. 19, 2011).

115.     On April 14, 2011, in anticipation of the implementation of a new wage rule, DOL also published a Notice Modifying the ETA 9142 Form. 76 Fed. Reg. 21,036-01 (April 14, 2011). The Notice Modifying the ETA 9142 Form advised employers that they must attest to statements in their ETA 9142 Forms, including that they will pay the prevailing wage, and emphasizing that the prevailing wage is the wage that "is or will be" issued by DOL during the period of the certification. 76 Fed. Reg. 21,036-01.

116.     Initially the rate change was scheduled to go into effect on January 1, 2012. Subsequently, the DOL moved the effective date forward to September 30, 2011, to comply with a court order. 76 Fed. Reg. 45,667 (Aug. 1, 2011). But on September 28, 2011, DOL postponed implementation until Nov. 30, 2011. 76 Fed. Reg. 59,896 (Sept. 28, 2011). Since then, DOL has postponed implementation several more times. *See Louisiana Forestry Ass'n Inc. v. Sec'y of Labor*, 745 F.3d 653, 665 (3d Cir. 2014).

117.     As early as November 2009, Defendants' consultant on matters of H-2B employment, LaborQuest, specifically advised Defendants to "Please keep in mind that if [the prevailing wage] is changed at any time during the process (or [even] when the workers are [already] in your employ) that you are required to adjust their wages accordingly." Ex. 70, LQ0071; Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 9.

118.     In response, Defendants wrote back to LaborQuest expressly confirming that "We do understand that any changes [to the prevailing wage rate governing wages for H-2B workers] are our responsibility." Ex. 70, LQ0071.

119.     During the last two weeks in September 2011, in contemplation of the implementation of DOL's new wage rates—which never took effect—Defendants terminated the employment of all H-2B workers in Bear Creek. Ex. 71, GLK005981; Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 10; Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, Nos. 12, 15.

120.     Downs says he made the decision to terminate all the H-2B workers in Bear Creek in 2011 to avoid the increased labor costs that the DOL's proposed wage increase would have caused GLK to incur. Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 10; Ex. 3, Deposition of Ryan A. Downs at 88:16-18, 91:22-92:11.

121.     Downs projected that the announced wage increase, which would have raised wages for trim-line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's costs of labor for trim line workers by $200,000. Ex. 2, GLK006165-6166 at GLK006165; Ex. 3, Deposition of Ryan A. Downs at 88:16-18.

122.     GLK's total labor costs on an annual basis exceed $6.5 million. Ex. 2, GLK006165-6166 at GLK006166.

123.     Accordingly, a $200,000 increase as a result of the DOL's new rule, had it been implemented, would have increased the company's total labor costs by less than 3%. With revenues of $50 million to $100 million annually, the increase would have been less than four-tenths of a percent of overall revenues. ($200,000/$50,000,000 = .004). Ex. 2, GLK006165-6166.

124.     If the DOL's proposed rule had been implemented, the increase for GLK, at $4.32 an hour, would have been 11% less than the $4.83 average per hour bump that DOL had projected for H-2B employers overall. Ex. 2, GLK006165-6166 at GLK006166.

125.     Defendants hired replacement workers to do the trim-line work performed by the H-2B workers. Ex. 7, Deposition of Rafael Jimenez Arroyo at 67:20-68:6; 70:23-71:1; Ex. 3, Deposition of Ryan A. Downs at 98:4-7; Ex. 11, Deposition of Donna Lorge at 111:19-21.

126.     The 2011 replacement workers were a group of Haitian workers from Florida managed by a labor contractor named Cabioch Bontemps and his company, Krop Rite. Ex. 11, Deposition of Donna Lorge at 111:19-112:11; Ex. 3, Deposition of Ryan A. Downs at 97:20-23, 98:4-7.

127. It cost GLK $10.25 per hour to employ the Krop Rite workers, of which the workers received only $8.00 per hour. Group Ex. 72, GLK002525, GLK002398-2404; Ex. 73, GLK005929-5934.

128. In 2011, the DWD found that wage records for the Krop Rite workers were not in compliance with the WMLA. The violations included failure to provide wage statements to its workers and payroll records not matching actual time cards. There were also potential violations of federal law found with respect to the workers because proper tax withholdings were not being taken from their pay. Instead they were being paid in cash and treated as independent contractors, receiving a 1099 form. Ex. 76, GLK005771-5772; Group Ex. 74, DWD0084-85, DWD0086-87, DWD0088, DWD0089, DWD0090-92, DWD0093, DWD0097, DWD0116-117; Ex. 75, GLK005754.

129. Defendants have not employed H-2B workers since 2011. Ex. 3, Deposition of Ryan A. Downs at 83:7-14, 84:23-25.

**Defendant's Knowledge of the Laws and Regulations Applicable to Migrant Workers.**

130. Defendant Downs made the decisions to terminate H-2B workers early in both 2010 and 2011 without legal advice. Ex. 3, Deposition of Ryan A. Downs 88:13-18, 90:4-16.

131. Instead, Defendants relied on their own "innocen[ce] and competen[ce]." Ex. 3, Deposition of Ryan A. Downs at 142:23-144:6.

132. Every year, prior to the arrival of the H-2B workers, Defendants sought and obtained a housing certification from the DWD, certifying that the housing occupied by the H-2B workers was in compliance with the WMLA. Group Ex. 78, DWD0001, DWD0002-5, DWD0009-10, DWD0024, DWD0026-30, DWD0033, DWD0036-37, DWD0038-41, DWD0050-54; Ex. 79, GLK001642-1644; Ex. 80, GLK006088.

133. From 2002 through 2011, Defendants were repeatedly investigated, cited and subjected to findings and fines or civil monetary penalties for violations of regulations governing the employment of migrant and seasonal workers, including the Wisconsin Migrant Labor Act, the AWPA, and the regulations governing the H-2B program. Ex. 81, WHD-FOIA0003-22; Ex. 82, WHD-FOIA0023-25; Ex. 83, WHD-FOIA0026-32; Ex. 84, WHD-FOIA0033-41; Ex. 30, WHD-FOIA0045-55; Ex. 86, GLK002530-2536; Ex. 87, DWD0015-19; Ex. 88, DWD0021-22; Ex. 89, DWD0035.

134. In 2002, the DOL found GLK had violated the AWPA (referred to as the "MSPA" in the DOL reports) and the FLSA, and assessed fines of $4,503.68 against the company for its non-compliance. Ex. 83, WHD-FOIA0026-32 at WHD-FOIA0030-32.

135. Among other things, the DOL found GLK in violation of the AWPA for failing to provide migrant and seasonal workers with disclosures at the time of recruitment, and for failing to record its employees' addresses. Ex. 83, WHD-FOIA0026-32 at WHD-FOIA0029.

136. As part of its investigation in 2002, the DOL met with Defendant Downs and provided information and materials regarding the AWPA and its requirements. Ex. 83, WHD-FOIA0026-32 at WHD-FOIA0030.

137. In 2008, the DOL again investigated GLK and again found it in violation of the AWPA for, among other things, failure to provide the required recruitment disclosures to migrant and seasonal workers in 2006-2008. Ex. 81, WHD-FOIA0003-22.

138. Specifically, the 2008 DOL investigation questioned whether all the required disclosures were made at the time of recruitment and found that GLK was not in full compliance with the record-keeping regulation, 29 C.F.R. § 500.80. Ex. 81, WHD-FOIA0003-22 at WHD-FOIA0018-19.

139.     In 2008, the DOL investigator met with Defendant Downs and Betty Miller, a human resources assistant at GLK who was involved in the H-2B program, and again provided information and materials regarding the AWPA and its requirements. Ex. 81, WHD-FOIA0003-22 at WHD-FOIA0019.

140.     In 2008, Defendant Downs and Miller claimed "to the DOL investigator that they were not aware of some of the MSPA [AWPA] requirements and, now that they were, [they] would comply." Ex. 81, WHD-FOIA0003-22 at WHD-FOIA0019.

141.     Defendants were affirmatively advised of the requirements of the AWPA; they were, in fact, specifically advised that migrant workers must be given written work agreements; and they repeatedly and expressly guaranteed and certified their compliance with Federal, State and local employment-related laws and regulations. Ex. 4, Deposition of Betty Miller at 36:18-20; Ex. 9, ETA-FOIA0004-0011 at ETA-FOIA0010; Ex. 8, ETA-FOIA0021-28 at ETA-FOIA0027; Ex. 10, GLK001116-17; Ex. 13, OFLC-FOIA0085-86; Ex. 14, OFLC-FOIA0117-118; Ex. 16, GLK001331-1332, 1335; Ex. 83, WHD-FOIA0026-32 at WHD-FOIA0030.

142.     The DOL also investigated GLK regarding its employment of H-2B workers in the 2010 and 2011 seasons. Ex. 81, WHD-FOIA0033-41; Ex. 30, WHD-FOIA0045-55.

143.     Because of the instant litigation, the DOL's investigations were limited to the H-2B regulations only, and did not include an investigation of possible violations of FLSA and AWPA. Ex. 84, WHD-FOIA0033-41 at WHD-FOIA0035 and WHD-FOIA0048.

144.     The DOL's investigation regarding the 2010 season found that GLK violated the H-2B regulations by not properly notifying the federal government it had terminated workers before the end of the certified period of employment. Ex. 84, WHD-FOIA0033-41.

145.    The DOL's investigation regarding the 2011 season again found that GLK violated the H-2B regulations by not properly notifying the federal government that they had terminated the H-2B workers before the end of the certified period of employment and using H-2B workers to perform work other than the trim-line work for which they were certified. Ex. 30, WHD-FOIA0045-55.

146.    The DOL assessed a total of $21,000 in civil penalties against GLK for its violations of the H-2B regulations in 2010 and 2011. Ex. 86, GLK002530-36.

147.    Downs and Carlson participated in a conference with the investigator regarding those violations on September 6, 2012. Ex. 30, WHD-FOIA0045-55 at WHD-FOIA0053.

148.    GLK paid those penalties no later than February 28, 2013. Ex. 86, GLK002530-36 at GLK002536.

149.    Downs and Miller also promised that they would comply with the AWPA's requirements in the future. Ex. 81, WHD-FOIA0003-22 at WHD-FOIA0019.

150.    In 2007, Gloribel Limpert, a Migrant Labor Inspector for the DWD, reviewed GLK's records related to migrant workers not hired under the H-2B program and found that GLK was not in compliance with the WMLA, specifically regarding lunch breaks and the minimum guarantee of employment for the contract period. Ex. 87, DWD0015-19.

151.    Ms. Limpert's letter explained the WMLA's minimum guarantee requirement in detail, included references to the law, enclosed the statute, and encouraged GLK representatives to call her if they had any questions. Ex. 87, DWD0015-19.

152.    Ms. Limpert also instructed GLK to pay the workers their wages owed for the remainder of their contracts. Ex. 87, DWD0015-19.

153.    In 2008, Ms. Limpert reviewed GLK's payroll records for four migrant workers and again found that three of the four workers were terminated too soon before the end of their contract's ending date. Ex. 89, DWD0035.

154.    The DWD instructed GLK to pay the three workers all of the wages owed for the remainder of their employment contract. Ex. 89, DWD0035.

155.    On October 20, 2011, Ms. Limpert (aka Gloribel Tegen) noted in an email to Evelyn Cruz, a State Monitor Advocate for the Migrant and Seasonal Farmworker Program of the Department of Workforce Development, that GLK "has been working with migrant laws for many years and they have been educated by me and 4 previous inspectors on the requirements." Ex. 90, DWD0112-113.

156.    On several occasions, Defendant Downs received and reviewed informational brochures from the DWD and the Department of Labor regarding applicable rules and regulations. Ex. 3, Deposition of Ryan A. Downs at 20:8-20:22.

157.    Downs also discussed the regulations with the agencies involved in administering the regulations. Ex. 3, Deposition of Ryan A. Downs at 21:11-22:8.

158.    Betty Miller attended bi-annual DWD-sponsored programs regarding migrant workers, beginning in approximately 1999. Ex. 4, Deposition of Betty Miller at 34:4-36:23.

159.    Among other rules and regulations that applied to employers of migrant workers, those programs discussed the AWPA and the WMLA, including the disclosure and working agreement requirements. Ex. 4, Deposition of Betty Miller at 35:11-36:23.

160.    Jacci Carlson, who became GLK's director of human resources in June 2011, read information on the Department of Labor's website regarding laws related to H-2B workers. Ex. 25, Deposition of Jacci Carlson at 86:20-87:13.

161.     Carlson also met with a representative from the DWD to receive information about the WMLA, and testified that she believes she reviewed the statute itself. Ex. 25, Deposition of Jacci Carlson at 105:17-25.

162.     Despite GLK's lengthy history of being subject to investigations by the DOL and the DWD, Defendants denied in their sworn discovery responses that they had been investigated at all.

Plaintiffs' Interrogatory No. 20 stated:

> 20.  For the covered time period, list each instance in which you have been reviewed, examined, investigated, cited, warned, sued, threatened with suit, or subjected to any finding or action for any actual or potential, (2) violations or alleged violations of the Migrant and Seasonal Agricultural Worker Protection Act, (3) failures or alleged failures to comply with the terms and conditions of work offered to H-2B workers, (4) violations or alleged violations of the rules and regulations governing the H-2B visa program, (5) violations or alleged violations of the Wisconsin Migrant Labor Act, or (6) violations or alleged violations of the Wisconsin Wage Payments, Claims and Collections Act. For each such instance, provide the style, cause number, and court or agency in which each action was/is pending; the name of the agency involved, if any; a brief summary of the allegations; and the date and outcome of the review, investigation, warning, or suit.

Defendant Downs's sworn response to this interrogatory, signed on July 31, 2013, and Thomas J. Palmer's, Vice President and Chief Financial Officer of GLK, sworn response to this interrogatory, signed January 15, 2013, state:

> No such instances have occurred other than this suit and the related suit, *Ramirez v. GLK Foods, Inc., et al.*

Ex. 19, *Jimenez* Defs.' Interrog. Resp., No. 20 and Verification; Ex. 102, *Jimenez* Defendants' Revised Responses to Plaintiffs' First Set of Interrogatories, No. 20 and Verification.

**Defendants' Failure to Provide Written Recruitment Disclosures or Work Agreements in 2006, 2007, 2008, 2010 and 2011.**

163.     Neither Defendants, nor any agent working on their behalf, nor, to their knowledge any other person, provided the H-2B workers with any written disclosures or a

written work agreement in Spanish regarding the terms and conditions of their employment in Wisconsin. Ex. 91, *Jimenez* Defs.' Stipulation of November 25, 2013 ¶¶ 2, 4.

164.    In 2006, 2007, 2008, 2010 and 2011, neither GLK nor any agent of GLK (nor any other person, to the best of GLK's knowledge, information and belief) provided any plaintiff or other H-2B worker employed by GLK a written disclosure (or disclosures) in Spanish disclosing any of the following information regarding their employment by GLK: (1) the place of employment; (2) the wage rates to be paid; (3) the crops and kinds of activities on which the worker may be employed; (4) the period of employment; (5) the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them; (6) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; (7) the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting from any sales by such establishment to the workers; and (8) whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period within which such notice must be given. Ex. 91, *Jimenez* Defs.' Stipulation of November 25, 2013, ¶ 2.

165.    In 2006, 2007, 2008, 2010 and 2011, neither GLK nor any agent of GLK (nor any other person, to the best of GLK's knowledge, information and belief) provided any plaintiff or other H-2B worker employed by GLK a written disclosure (or disclosures), in English, disclosing the following information regarding their employment by GLK prior to their

employment with GLK: (1) transportation,; and (2) whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period within which such notice must be given. Ex. 91, *Jimenez* Defs.' Stipulation of November 25, 2013, ¶ 3.

166.    In 2006, 2007, 2008, 2010 and 2011, neither GLK nor any agent of GLK (nor any other person, to the best of GLK's knowledge, information and belief) provided any plaintiff or other H-2B worker employed by GLK a written disclosure (or disclosures) or work agreement in Spanish containing any of the following information regarding their employment by GLK: (a) a statement of the place of employment, kind of work available, applicable wage rates, pay period, approximate hours of employment including overtime applicable, term of employment including approximate beginning and ending dates, transportation arrangements, the names of all persons in the family employed if a family is employed and any other charges or deductions from wages beyond those required by law; (b) a guarantee of a minimum of 20 hours of work in a one-week period or a minimum of 64 hours of work in a 2-week period, clearly stating whether the guarantee is on the basis of a one-week or 2-week period or, in the case of a migrant worker employed exclusively in agricultural labor as defined in W.S.A. 108.02 (2), shall be a minimum of 45 hours in each 2-week period; and (c) a guarantee that the wages together with the other terms and conditions of employment are not less favorable than those provided by the employer for local workers for similar work. Ex. 91, *Jimenez* Defs.' Stipulation of November 25, 2013, ¶ 4.

167.    In 2006, 2007, 2008, 2010 and 2011, neither GLK nor any agent of GLK (nor any other person, to the best of GLK's knowledge, information and belief) provided any plaintiff or

other H-2B worker employed by GLK a written disclosure (or disclosures) or work agreement, in English, containing the following information regarding their employment by GLK: (a) transportation arrangements, the names of all persons in the family employed if a family is employed; (b) a guarantee of a minimum of 20 hours of work in a one-week period or a minimum of 64 hours of work in a 2-week period, clearly stating whether the guarantee is on the basis of a one-week or 2-week period or, in the case of a migrant worker employed exclusively in agricultural labor as defined in W.S.A. 108.02 (2), shall be a minimum of 45 hours in each 2-week period. Ex. 91, *Jimenez* Defs.' Stipulation of November 25, 2013, ¶ 5.

168. The Wisconsin Department of Workforce Development ("DWD") publishes a standard form work agreement, both in English and Spanish. Ex. 92, Exhibit 8 to Deposition of Betty Miller.

169. Similarly, the U.S. Department of Labor ("DOL") publishes Form WH-518, which is a "Worker Information" sheet containing the disclosures required by the AWPA. Ex. 93, Exhibit 9 to Deposition of Betty Miller.

170. Defendants did not make use of the either the DOL's or the DWD's form—or any alternative. Ex. 4, Deposition of Betty Miller at 116:6-14.

171. The workers were not provided with anything in writing related to working at GLK before leaving their hometowns to travel to the consular or embassy city to receive their visa. Ex. 7, Deposition of Rafael Jimenez Arroyo at 132:24-133:35; Ex. 4, Deposition of Betty Miller at 106:5-10; 138:19-139:9; 168:12-15; Ex. 20, Deposition of Jorge Garcia at 156:13-157:2; Ex. 57, Deposition of Alejandro Jurado Jimenez at 76:12-15; Ex. 42, Deposition of Javier Jimenez Vera at 28:14-24, 34:14-35:3; Ex. 48, Deposition of Jesus Martinez Gallardo at 32:2-16; Ex. 49, Deposition of J. Saul Jimenez Rosas at 31:15-32:4; Ex. 50, Deposition of Jose Mendez

Baca at 27:19-28:4;  Ex. 41, Deposition of Jiovanni Mendez Lancon at 18:17-19:14, 33:13-

34:13; Ex. 25, Deposition of Jacci Carlson at 62:5-22; Ex. 26, *Jimenez* Plaintiffs' Responses to

Defendants' Interrogatories, No. 7.

172.    In 2010, Jorge Garcia gave every worker a copy of the GLK job order (ETA 9142

Form). Ex. 20, Deposition of Jorge Garcia at 143:8-149:12.

173.    In 2011, Jorge Garcia gave every worker a copy of the GLK job order (ETA 9142

Form). Ex. 20, Deposition of Jorge Garcia at 146:22-25, 148:18-149:12.

174.    It was Jorge Garcia's understanding that U.S. consulates processing H-2 visas

required that every worker receive a copy of the job order. Ex. 20, Deposition of Jorge Garcia at

144:17-146:2-6.

175.    Jorge Garcia told the workers that the ETA 9142 Form was their "contract." Ex.

20, Deposition of Jorge Garcia at 152:20-153:5.

176.    In 2010, Jorge Garcia communicated to every worker that work was supposed to

end November 30, 2010. Ex. 20, Deposition of Jorge Garcia at 145:19-22.

177.    In 2011, Jorge Garcia communicated the period of employment to every worker.

Ex. 20, Deposition of Jorge Garcia at 148:18-149:12.

**Defendants' Failure in 2011 to Obtain Mandatory Authorization for Deductions from
Wages.**

178.    In each season during the class period, GLK deducted the cost of meals and

housing from each H-2B worker's paycheck. Ex. 4, Deposition of Betty Miller at 71:10-72:6,

117:2-13, 117:23-118:1; Ex. 11, Deposition of Donna Lorge at 76:9-78:6; Ex. 7, Deposition of

Rafael Jimenez Arroyo at 135:4-23; *See, e.g.,* Group Ex. 94, P0871, P0989, P1134, P1197; *See,

e.g.* Group Ex. 95, GLK002977, GLK002984, GLK002991, GLK003005, GLK003010,

GLK003015, GLK003242, GLK004439, GLK004444, GLK004447.

179.    In 2006-2010, GLK generally received prior authorization to make these deductions from wages. Ex. 11, Deposition of Donna Lorge at 77:15-21, 80:2-12; Ex. 4, Deposition of Betty Miller at 71:19-72:6, 117:16-118:6; *See, e.g,* Group Ex. 95, GLK002977, GLK002984, GLK002991, GLK003005, GLK003010, GLK003015, GLK003242, GLK004439, GLK004444, GLK004447.

180.    From 2006 through 2010, workers signed a form specifically authorizing wage deductions, titled "Authorized Deductions", that stated, in English and Spanish, "I authorize Great Lakes Kraut Co. to deduct from my weekly payroll, room and board at a rate of [the applicable rate] per week."   *See, e.g,* Group Ex. 95, GLK002977, GLK002984, GLK002991, GLK003005, GLK003010, GLK003015, GLK003242, GLK004439, GLK004444, GLK004447.

181.    In 2011, no worker was presented with or signed any document mentioning wage deductions or linking housing costs with a wage deduction. Ex. 25, Deposition of Jacci Carlson at 98:1 to 109:8; Ex. 97, Exhibit 13 from Deposition of Jacci Carlson, GLK003645-3650;  Ex. 26, *Jimenez* Plaintiffs' Responses to Defendants' Interrogatories, No. 11.

182.    In 2011, GLK utilized a form called a "Seasonal Personal Data Sheet," with fields of worker information which some of the H-2B workers signed. *See*, *e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791; Ex. 25, Deposition of Jacci Carlson at 101:6-21; Ex. 97, Exhibit 13 from Deposition of Jacci Carlson, GLK003645-3650; at GLK003645.

183.    The Data Sheet is a one-page document written in English. *See, e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791.

184.    Half-way down the Data Sheet there is a line that says "Housing: Yes _____ No _____." *See*, *e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791.

185.    Directly above the signature line, the form said, "By signing this form, I attest that I physically resided in the state of Wisconsin for (10) months or more." *See, e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791.

186.    On some of the workers' sheet, there was a check mark next to "yes" and in some cases, "75.00" was handwritten. *See, e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791; Ex. 25, Deposition of Jacci Carlson at 104:13-105:116; Ex. 97, Exhibit 13 from Deposition of Jacci Carlson, GLK003645-3650; at GLK003645.

187.    Nowhere on the sheet does it contain the word "deduct" or "deduction" or "authorize" or "authorization". *See*, *e.g.,* Group Ex. 96, GLK003633, GLK003639, GLK003651, GLK003657, GLK003771, GLK003775, GLK003779, GLK003783, GLK003787, GLK003791; Ex. 25, Deposition of Jacci Carlson at 101:13-105:9; Ex. 97, Exhibit 13 from Deposition of Jacci Carlson, GLK003645-3650; at GLK003645.

188.    In 2011, Defendants repeatedly deducted $75.00 per week from each H-2B workers' paycheck for meals and housing, except for 3 H-2B workers who were put to work as cooks. The cooks were only charged for meals and housing during the first 3 weeks of work. Ex. 100, GLK001997-2052; *See e.g.* Ex. 26, *Jimenez* Plaintiff Jose Alberto Martinez Gonzalez's Response to Defendants' Interrogatories, Nos. 7, 11, 35 at Ex. 26 p. 732-751 and *Jimenez*

Plaintiff Jose Ramon Martinez Palmas' Response to Defendants' Interrogatories, No. 11 at Ex. 26 p. 1069-1092; *See, e.g.,* Group Ex. 98, P00994, P1010, P1019.

189.    Other than the cooks, each H-2B worker in Bear Creek in 2011 had a $75.00 deduction taken from each of his 4 to 7 paychecks. Ex. 100, GLK001997-2052; *See, e.g.,* Group Ex. 98, P00994, P1010, P1019.

190.    In total, GLK deducted $75.00 from 496 paychecks in 2011. Ex. 100, GLK001997-2052.

**Defendants' Failure to Keep Records of H-2B Workers' Permanent Addresses in 2006, 2007, 2008, 2010 and 2011.**

191.    Defendants did not make or keep records of workers' permanent addresses. Ex. 11, Deposition of Donna Lorge at 76:7-77:9, 80:2-8; Ex. 21, Deposition of Thomas Robinson at 201:10-14; Ex. 99, Affidavit of Cynthia Brito.

192.    Donna Lorge, was an Executive Assistant and Human Resources Assistant at GLK whose responsibilities encompassed work related to GLK H-2B workers and accounts payable. Ex. 11, Deposition of Donna Lorge at 7:2-19:11.

193.    In an email to GLK colleagues on Sept. 8, 2011, Ryan Downs referred to the DOL's planned wage increase to the DOL's planned wage increase for H-2B workers as an action by "the Socialist Wage Department." Ex. 104, GLK006240.

194.    Based on the certifications made in the Application for Temporary Employment Certification (ETA 9142 Form) submitted to the DOL, GLK was granted permission for 143 H-2B workers.

Dated: May 15, 2015

                                    s/ Joshua Karsh
                                    One of Plaintiffs' Attorneys

Matthew J. Piers
Joshua Karsh
José J. Behar
Claudia Flores
Attorneys for Plaintiffs
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
Telephone: (312) 580-0100
Fax: (312) 580-1994
E-mail:   mpiers@hsplegal.com
          jkarsh@hsplegal.com
          jbehar@hsplegal.com
          cflores@hsplegal.com

Ali Beydoun
Attorney for Plaintiffs
Farmworker Justice
1126 16th Street, N.W., Suite 270
Washington, D.C. 20036
(202) 293-5420
E-mail: abeydoun@farmworkerjustice.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on counsel listed below by

CM/ECF on May 15, 2015.


Michael Aldana, Esq.
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI  53202
Michael.Aldana@quarles.com


s/ Joshua Karsh
One of Plaintiffs' Attorneys
