# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ALEJANDRO JURADO JIMENEZ, et al.,

       **Plaintiffs,**

    v.                                                **Case No. 12-cv-209**

GLK FOODS, LLC and RYAN A. DOWNS,

       **Defendants.**

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

---

## I.      INTRODUCTION

Plaintiffs are guest workers who were issued temporary visas, commonly referred to as "H-2B" visas, as authorized by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §1101(15)(H)(ii)(b), and were thereafter admitted to the United States and employed by GLK. They have brought a number of claims against Defendants arising from their employment with GLK. Plaintiffs move for summary judgment on Counts III, VI and VII and VIII of the Second Amended Complaint. Those claims are based on the faulty concepts that GLK guaranteed them employment for a defined period of time in 2010 and 2011, and also that any pre-employment expenses incurred by the Plaintiffs in securing visas and passports and traveling to the Mexico/U.S. border should have been reimbursed to them by GLK. Because no law imposes such requirements on GLK and because no contract existed between GLK and the Plaintiffs with such terms, Defendants are entitled to summary judgment on those counts. For the reasons set forth in further detail herein, Plaintiffs' motion must be denied. Defendants also

incorporate by reference its summary judgment motion papers (Dkt. 92-95) as well as its response to Plaintiffs' Statement of Undisputed Facts in support of their pending motions.

## II.     FACTUAL BACKGROUND

The following facts are relevant to this motion. Defendant GLK Foods, LLC, (hereinafter "GLK"), is a Wisconsin limited liability company, operating a sauerkraut cannery in Bear Creek, Wisconsin with its main offices in Appleton, Wisconsin. Defendant Ryan A. Downs is a resident of Wisconsin, and was the President of GLK during the relevant time period.

At various times, GLK employed H-2B workers from Mexico to perform cutting and trimming work of cabbage in its Bear Creek facility. Relevant to this motion, GLK employed H-2B workers from Mexico in 2010 and 2011. In 2010 and 2011, GLK contracted with LaborQuest, USA, a Florida corporation, to manage the H-2B petition process along with the coordination of visa processing for and transportation of workers to Wisconsin. (Dkt. 43-1, Affidavit of Thomas Palmer, ¶4). LaborQuest held itself out as an "H2 employer agent, working as an outsourced HR service for small to mid-sized companies." Labor Quest purports to "direct and manage guest worker programs for its clients which includes: the filing of all DOL/USCIS petitions, the placement and tracking of required advertising, and coordinating the visa processing & transportation for all guest workers." See, http://www.laborquest.com/aboutus.html. Defendants' Proposed Findings of Fact ("DPFOF"), ¶¶4-8.

LaborQuest subcontracted portions of the GLK work with another service, Florida East Coast Travel Services, Inc. (hereinafter, "FLECTS"). GLK was informed that LaborQuest and FLECTS would, jointly, coordinate the H-2B certification process, assist in obtaining visas for the H-2B workers, and coordinate the travel for the workers in Mexico to the United States. In

2

exchange, GLK paid Labor Quest and FLECTS fees for their services, as well as fees for visa-processing and transportation costs from the border of Mexico to Bear Creek, Wisconsin. In 2010-2011, GLK understood from LaborQuest and FLECTS that the monies it paid them would cover H-2B certification fees, visa processing and related fees for the workers, as well as transportation to Wisconsin. DPFOF, ¶¶8-10.

In GLK's 2011 Application for Temporary Employment Certificate, filed with the U.S. Department of Labor, page 1 of the application refers to a "Period of *Intended* Employment." At the bottom of each page of the application, the application refers to a "validity period." The Department of Labor at page 6 of the application states that the certification was "valid from 8/1/11 to 11/15/11." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. DPFOF, ¶¶10-14.

The application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation." (emphasis supplied). *Id.*

Similarly, paragraph #11 states: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). *Id.*

The standard language of GLK's 2010 application was identical to that of 2011. The certified period of employment for 2010 was identified as 8/9/2010 to 11/30/2010. *Id.*

During the relevant time period, a full-time GLK worker - Rafael Jimenez Arroyo - traveled to Santiago Capitiro in Mexico in the spring of the relevant years. Jimenez Arroyo was originally from that town. A significant number of the workers who came to GLK to perform trimming and cutting work lived in or near Santiago Capitiro. Jimenez Arroyo talked to workers (many of whom had been coming to Wisconsin to work at GLK for years) to inform them that GLK was interested in bringing in workers later in the year. DPFOF, ¶¶16-17.

Once the petition was approved, the workers in Mexico who had previously indicated an interest in working for GLK were notified of the dates and locations to obtain visas. For the years relevant to this motion, Labor Quest/FLECTS arranged for appointments to obtain visas in consular cities in Mexico. GLK understood that the fees it was paying LaborQuest included the visa fees in Mexico. The workers went to the consulate to obtain visas. DPFOF, ¶¶18-19.

While GLK's petition to employ H-2B workers had already been granted by the DOL, individual workers could not actually enter the U.S. or begin working until their visas had been approved. Neither Labor Quest/FLECTS or Jimenez Arroyo ever required or accepted recruiting fees from the Plaintiffs/Class members, nor were any fees paid directly to or given to Defendants. DPFOF, ¶¶20-21.

The workers then traveled to a border city in Mexico to await final processing before entering the United States. Workers acknowledged that no one, on behalf of GLK, promised that GLK would reimburse them for their in-country expenses. Thereafter, GLK provided transportation, at its expense, from the U.S. side of the border to Bear Creek and provided per diem reimbursement for food costs in the U.S. Similarly, when workers returned to Mexico, GLK provided bus transportation from Bear Creek to the border. DPFOF, ¶¶21-23.

4

### 2010 and 2011 Harvests

In 2010, excess rains and flooding devastated the cabbage crop in Wisconsin. While GLK was anticipating 90,000 tons of cabbage yield that year, its actual harvest yielded about 20% of that number. Because the crop was so low that year, GLK did not need the number of workers for which it had originally petitioned, nor did it need workers in Bear Creek to remain throughout the Fall. Thus, the workers were sent home that year on or about September 28. GLK paid for their return transportation to Mexico. DPFOF, ¶¶24-26.

In 2011, the Department of Labor instituted 2 significant hourly rate increases for the H-2B workers with little notice. In 2010, the prevailing wage rate required by the DOL for the GLK workers was $7.85 per hour. At the time the 2011 petition was certified, the DOL informed GLK that the prevailing wage rate would be increased to $10.36 per hour. At the same time workers began departing for the U.S. in August 2011, the DOL notified GLK of yet *another* wage increase, this time to $14.68 per hour. This constituted a wage increase of 87% from the previous year. Compounding the significant economic impact of the wage increase was a poor harvest that yielded only 70% of plan. GLK appealed the determination but it was initially rejected. GLK then determined that it was no longer economically viable to pay those rates for the work to be performed and decided to send the workers back to Mexico. When the 2011 workers returned to Mexico, in two separate groups, GLK paid for bus transportation and provided meals from Bear Creek, Wisconsin to the U.S./Mexico border. DPFOF, ¶¶31-33.

In 2010 and 2011, the FLSA minimum wage was $7.25 per hour. 29 U.S.C. §206(a)(1)(C). GLK paid the Plaintiffs the hourly rate of $7.85 per hour in their first week of work in 2010. GLK paid the Plaintiffs the hourly rate of $10.36 per hour in their first week of work in 2011. Plaintiffs admit to receiving pay at such rates. DPFOF, ¶¶27-30.

QB\35126154.1

When the 2011 workers returned to Mexico, in two separate groups, GLK paid for bus

transportation and provided meals from Bear Creek, Wisconsin to the U.S./Mexico

border. DPFOF, ¶33.

### III.     ARGUMENT

**A.**     **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE SECOND AMENDED COMPLAINT MUST BE DENIED.**

Count III alleges GLK violated the Migrant and Seasonal Agricultural Worker Protection

Act, 29 U.S.C. §§ 1801-1871 ("AWPA") and Count VII, the Wisconsin Migrant Labor Act

("WMLA") by intentionally failing to (for purposes of this motion) employ them for the entire

certified period of employment in 2010 and 2011 and by failing to reimburse Plaintiffs and Class

Members for expenses they incurred allegedly primarily for the benefit of Defendants. Because

Defendants were not required by AWPA or the WMLA to employ them for a defined period of

time or to reimburse them for travel expenses, Defendants are entitled to summary judgment.

**1.**     **Neither AWPA Or the WMLA Requires GLK To Employ Plaintiffs and Class Members For The Entire Certified Period of Employment.**

Plaintiffs allege that GLK violated AWPA and the WMLA when it failed to employ them

for the entire certified period of employment indicated in the approved H-2B petitions for the

years 2010 and 2011. In 2011, the DOL initially increased the minimum wage for H-2B workers

that year to $14.86, an increase of 87% from just two year's earlier (DPFOF). As a result, it was

not economically feasible for GLK to continue to employ the workers at such rates, and they

were sent back to Mexico. Plaintiffs' motion for summary judgment on this count must be

denied.

The H-2B petitions do not create a contract between the workers, guaranteeing them

employment for the entire certified period of employment, both as a factual matter and as a

QB\35126154.1

matter of law.  As to the H-2B applications themselves, the language contained therein regarding the certified period of employment only indicates that the certified period of employment is that period of time during which the workers may be employed.  There is no requirement stated within the H-2B application itself that the workers be guaranteed a period of employment.

That is evident by the wording contained in the application.  For example, page 1 of the 2011 application refers to a "Period of *Intended* Employment."  (emphasis supplied).  At the bottom of each page of the application, the application refers to a "validity period."  The Department of Labor at page 6 of the application states that the certification was "valid from 8/1/11 to 11/15/11."  In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment.  To the contrary, the application specifically contemplates employment for periods shorter than the certified or valid period of employment.  On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation. "  (emphasis supplied).

Similarly, paragraph #11 states:  "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied).

Moreover, nothing in AWPA warrants such a conclusion.  The 2008 H-2B regulations do not speak directly to whether an H-2B job order can form the basis of an actionable breach of contract claim between a worker and his or her employer.  Any arguments that H-2B petitions or job orders constitute contracts also heavily rely upon cases decided before the DOL's issuance of

7

QB\35126154.1

the H-2A and H-2B rules referenced above; however, the holdings of these cases were never incorporated into the most recent H-2B regulations. *See, e.g., Western Colorado Fruit Growers v. Marshall*, 473 F. Supp. 693, 696 (D. Colo. 1979)(a "clearance order is essentially an offer for a contract of employment"); *see also Salazar v. Presidio Valley Farmers Assn.*, 765 F.2d 1334, 1341-1342 (5th Cir. 1985).

      The few cases which have substantively passed upon the issue of whether H-2B applications or job orders create contracts have held that they do not. In *Garcia v. Frog Island Seafood, Inc.*, 64 F.Supp.2d 696 (E.D.N.C. 2009), the district court there rejected breach of contract claims based on H-2B job order, reasoning that "Plaintiff's claims are not for earned benefits but rather for work that was never performed nor was it ever, as this court concludes, contractually promised . . .to apply a unilateral contract analysis to the situation before us would, in effect, require us to abandon the 'at will' doctrine which is the law in this State" (internal quotations and citations omitted). The *Garcia* holding is consistent with dicta in a 2007 case, in which another federal district court observed that "[a]n H-2B worker . . . has no employment contract or work guarantee." *Olivera-Morales v. Intern. Labor Mgmt. Corp.*, 246 F.R.D. 250 (M.D.N.C. 2007).

      Although there is little case law squarely addressing this issue, the DOL acknowledged the impact of the *Garcia* case in its Notice of Proposed Rulemaking for the revised H-2B rules, when it observed:

> Few legal options exist for H-2B workers who feel their work contracts have been violated. An initial barrier to legal recourse is purely practical: H-2B workers are not eligible for services from federally-funded legal aid programs. As a result, most H-2B workers have no access to lawyers or information about their legal rights. Furthermore, the H-2B job order, which specifies the terms and conditions of employment, including work hours, may not be enforceable through private litigation. *See Garcia v. Frog Island Seafood, Inc.*, 644 F.Supp.2d 696, 716-18 (E.D.N.C. 2009) (holding H-2B job orders would not be treated as enforceable

contracts). A guaranteed number of hours, enforceable by WHD, may well be the only protection H-2B workers have if employers misrepresent the amount of work the worker will actually be provided. 76 Fed. Reg. 15130-01 (March 18, 2011).

Plaintiffs cite to two cases for the proposition that AWPA eliminated the concept of at-will employment for H-2B workers - *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 406 n.1 (7th Cir. 2007) and *Colon v. Casco, In*c., 716 F. Supp. 688, 694 (D. Mass. 1989). They grossly overstate the holdings of those cases.

Neither case addressed, let alone held that an H-2B petition, by virtue of the certified period of employment contained in each petition, created a contract for a defined period of time. In fact, in *Reyes,* the Seventh Circuit concluded that "AWPA requires disclosure of the hourly wage, *but not a minimum quantity of work.*" *Id.* at 406. The footnote cited by Plaintiffs reads:

> The AWPA does oblige employers to disclose "the period of employment". 29 U.S.C. § 1821(a)(4). Plaintiffs treat this phrase as equivalent to "the number of hours of work to be paid for every week", but its more natural reading is "the beginning and ending dates of work." That is how the phrase is used elsewhere in the same section.

The issue before the court in *Colon*, *supra*, a case from 1989, was whether an agricultural employer's policy making weekend work option was a "working arrangement" under AWPA. As in *Reyes*, the *Colon* court did not address whether an H-2B petition created a guaranteed period of employment and noted, unremarkably, that the period of employment is a required term in every working arrangement. *Id.* at 693.

The Plaintiffs' motion for summary judgment on a claim under the WMLA similarly fails. Here, there is no evidence that the parties' had agreed to a specific term of employment. At most, there was a range of possible employment, as noted in the H-2B applications which were submitted by GLK to the Department of Labor, not to the Plaintiffs. As acknowledged by the Plaintiffs in their depositions, no discussions occurred between FLECTS, LaborQuest or any

9

other individual acting on behalf of GLK which specifically guaranteed dates of employment. Instead, they were informed that they would be told when to report to the appropriate consulate for visa processing and that at most, the work would be for the season, but no specific dates were provided to the plaintiffs.

To the extent the Plaintiffs rely on the H-2B application as the basis for the specified term of employment, it is clear from the wording of those forms that the certified period of employment was just that - the period in which the worker was authorized or certified to work. GLK's 2010 and 2011 Applications for Temporary Employment Certification did not, by its own terms, set a defined period of time.

The applications refer to a "Period of *Intended* Employment" or "validity period." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. To the contrary, the application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation. " (emphasis supplied).

The declaration in paragraph #11 similarly contemplates work for less than the entire certified period: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). Nowhere in either Application does GLK guarantee a specific period of employment.

QB\35126154.1

Moreover, the WMLA only requires a work agreement with "approximate" beginning and ending work dates. The H-2B petitions and forms given to the Plaintiffs in Mexico contained such an "approximate" beginning and ending work dates: the intended or certified period of employment. Further, GLK had cause to terminate the workers' employment: the devastating rains which ruined its crops in 2010 and the much higher than anticipated wage rates to be imposed by the Federal Government in 2011.

**2.    The AWPA Does Not Require GLK To Reimburse Plaintiffs For Pre-Employment Expenses.**

Plaintiffs claim that the Defendants violated AWPA by failing to reimburse them for certain expenses associated with obtaining passports, visas, and in-Mexico travel and lodging expenses. However, nothing in AWPA specifically requires an employer such as GLK to reimburse H-2B employees for such expenses. Accordingly, Plaintiffs are not entitled to summary judgment on this Count, and instead, summary judgment must be granted to Defendants.[1]

**a.    The H-2B Program Does Not Require The Reimbursement Of Pre-Employment Travel Expenses.**

Nothing in the statutory or regulatory regime for the H-2B program expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker. *See Castellanos-Contreras*, *supra*, 622 F.3d at 400 (noting the H-2B Program requires *outbound* travel expenses to be paid for H-2B workers under certain circumstances, but not inbound travel); *see also* 8 U.S.C. §1184(c)(5)(A) (requiring payment of outbound transportation costs in certain circumstances for H-2B workers). By contrast, inbound transportation costs are

---

[1] In this Court's order and decision of March 24, 2015 (Dkt. 119), it noted with skepticism the theories that AWPA and the H-2B program required reimbursement of the types of expenses sought by Plaintiffs, given the structural differences between the H-2A and H-2B programs. But at that point in time, it was rendering a decision on Plaintiffs' FLSA claims. The Court's skepticism is well-founded as will be described herein and as reinforced by the cases below.

QB\35126154.1

expressly required to be paid under certain circumstances for H-2A workers. *See* 20 C.F.R. §655.122(h) (requiring payment of inbound transportation costs in certain circumstances for H-2A workers).

These differences are significant, because the H-2 Program was specifically redesigned by Congress in 1986 to "separat[e] agricultural from non-agricultural workers in the administrative scheme." *See Sweet Life v. Dole,* 876 F.2d 402, 406 (5th Cir.1989). Accordingly, the regulations governing the H-2A visa have historically contained a number of requirements designed to prevent the exploitation of H-2A workers that were not present in the H-2B regulations. For instance, the H-2A regulations specify that the agricultural job offer must include free housing, meals or cooking facilities, guaranteed employment for at least 3/4 of a contract period, and reimbursement for the employee's transportation costs. *See* 20 C.F.R. §655.122.

Historically, the regulations governing H-2B workers contain no such requirements. As noted above, no law or regulation specifically provides that fees for the employee side of the visa application process must be paid by the employer. *See* 22 C.F.R. §40.1(l)(1) (requiring non-immigrant visa applicants, such as Plaintiffs, to submit processing fees when they apply for visas). On the other hand, an H-2B employer is required to pay its own fees for the application to hire H-2B workers. *See* 8 C.F.R. §§103.7(a) and (b) (requiring that a U.S. employer submit certain forms and filing fees to become an H-2B visa sponsor). These regulations thus provide that each party will bear his or its respective costs associated with the H-2B Program. In drafting IRCA, Congress specifically addressed transportation of H-2B guest workers and prescribed a single circumstance in which the employer would be responsible for transportation costs - when an employer returns an H-2B worker to his/her home country before the end of the

12

certified period of employment. In statutory construction, specific controls the general and

statutory language is to be given effect over non-binding interpretations. *See Radzanower v.*

*Touche-Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989 (1976); *Morton v. Mancari*, 417 U.S. 535,

550-51, 94 S.Ct. 2474 (1974); *Varity Corp. v. Howe*, 516 U.S. 489, 511, 116 S.Ct. 1065 (1996)

(no conflict is required, specific provisions control general).

Thus it is clear from the statutory framework that Defendants were not required to provide

reimbursement of travel, visa, and recruitment expenses of H-2B workers.

> **b.    Recent DOL Regulations and Interpretations Which Attempt to Shift Pre-Employment Expenses To Employers Are Invalid Or Not Worthy Of Deference.**

>> **i.    Congress' intent in drafting H-2B is clear that it did not intend to shift pre-employment expenses to H-2B employers.**

8 U.S.C. §1184(C)(5)(A) regulating H-2B visas addresses the issue of transportation

costs specifically, and provides:

> In the case of an alien who is provided non-immigrant status under §1101(a)(15)(H)(i)(b) or 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable cost of return transportation of the alien abroad.

> The regulations also expressly address § H-2B worker transportation costs:

> Liability for transportation costs.  The employer will be liable for the reasonable cost of return transportation of the alien abroad if the alien is dismissed from employment for any reason by the employer before the end of the authorized admission pursuant to §214(c)(5) of the Act . If the beneficiary voluntarily terminates his or her employment prior to the expiration of the validity of the petition, the alien has not been dismissed.

8 C.F.R. §214.2(h)(6)(vi)(E); see also 20 C.F.R. §655.1 and §655.22  Notably, the H-2B

regulations refer to workers to who come to this country on H-2B visas as "beneficiaries" of the

H-2B visa program.

QB\35126154.1

In contrast, regulations regarding H-2A workers provide as follows with respect to the issue of transportation to and from the place of employment:

> Transportation; daily subsistence - (a) Transportation to the place of employment. The employer shall advance transportation and subsistence costs (or otherwise provide them) to workers when it is the prevailing practice of non-H-2A agricultural employers in the occupation in the area to do so, or when such benefits are extended to H-2A workers. The amount of the transportation payment shall be no less (and shall not be required to be more) than the most economical and reasonable similar common carrier transportation charges for the distances involved. If the employer has not previously advanced such transportation and subsistence costs to the workers or otherwise provided such transportation or subsistence directly to the worker by other means and if the worker completes fifty percent of the work contract period, the employer shall pay the worker for costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer to the place of employment. . . . (b) Transportation from the place of employment. If the worker completes the work contract period, the employer shall provide or pay for the workers' transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, came to work for the employer.

20 C.F.R. §655.102(b)(5).

Section H-2A regulations explicitly require employers to advance or provide inbound transportation and subsistence costs when customarily provided to U.S. agricultural workers or when such "benefits" are extended to H-2A workers, to pay H-2A agricultural workers such costs upon completion of fifty percent of the contract period, and to pay the outbound transportation costs of agricultural workers who complete the contract period. Section H-2A regulations also require the employer to provide housing, workers' compensation, and other benefits not provided non-H-2A workers. *See, e.g.,* 20 C.F.R. §655.102(a)(1) & (2).

The regulations governing H-2A reference FLSA regulations demonstrate DOL was well aware of FLSA and its regulations when it drafted IRCA regulations. *See e.g.*, 20 C.F.R. §655.102(b)(13).

Prior to the enactment of the IRCA in 1986, Congress did not differentiate between temporary workers performing agricultural and non-agricultural services. All were referred to as H-2 workers. The distinction between agricultural and non-agricultural workers was made clear in 8 U.S.C. §1101(a)(15)(H)(ii)(a)&(b). Congress then provided detailed guidelines for certifying foreign agricultural workers. 8 U.S.C. §1188. Congress chose not to adopt more comprehensive regulations for non-agricultural workers. And visas, as Plaintiffs are well aware, are not fungible or interchangeable. The requirements for one visa are not imported into another, and neither the DOL nor courts should extend benefits afforded H-2A workers to H-2B non-agricultural workers.

Comparing the language of H-2B and its interpretative regulations with those of H-2A, it is clear that Congress intended that H-2B employers would not be responsible for payment of inbound transportation and subsistence costs of H-2B workers, and would only be liable for the cost of outbound transportation in the event the H-2B worker is involuntarily terminated by the employer before the end of the period of authorized admission. The fact that Congress specifically addressed this circumstance under H-2B demonstrates its intent not to impose such expenses except as specifically required by the statute.

It is a well-established canon of statutory construction that to include one thing is evidence of an intent to exclude others: "*Inclusion unius est exclusio alterius.*" *Russello v. U.S.,* 464 U.S. 16, 23 (1983). If Congress intended H-2B employers to advance or pay the transportation and inbound expenses of H-2B workers, it knew how to do so. Instead, Congress chose to limit an H-2B employer's liability to certain, narrow circumstances. Congress' intent is clearly that H-2B workers who temporarily relocate for employment are not owed reimbursement for their transportation, visa and recruiting expenses. GLK and other similarly-

situated H-2B employers did not impose these expenses on workers. Congress did and its words should not be disregarded.

### ii.    Recent Decisions Striking Down H-2B regulations.

Subsequently, the DOL issued a final rule on the H-2B Program attempting to amend its regulations and, among other things, extending the inbound transportation reimbursement requirements to the H-2B Program. *See Temporary Non-agricultural Employment of H-2B Aliens in the United States*, 77 Fed. Reg. 10038 (Feb. 21, 2012) (codified at 20 C.F.R. §655.18) ("2012 Final Rule"). Among other things, the 2012 Rule decreased the maximum number of months an employer may employ an H-2B worker from ten to nine; r*equired employers to guarantee that H-2B employees work at least seventy-five percent of the hours certified in any twelve-week period* and, if not, pay the employees the difference for the time not worked; required employers to pay non-H-2B workers wages and benefits at least equal to those paid to H-2B employees if the two perform "substantially the same work;" and required employers to pay the round-trip airfare and subsistence costs of H-2B employees. *Id.* at 10039. However, DOL's 2012 H-2B program rule was enjoined in federal court, with the Eleventh Circuit Court of Appeals upholding a district court's injunction and holding that the rule was beyond DOL's legal authority, on the basis that Congress had not extended rule making authority to the DOL for H-2B regulations. *Bayou Lawn and Landscape Services, et al. v. Solis et al*., 713 F.3d 1080, 1084-85 (11th Cir. 2013).

In *Bayou*, the DOL attempted to defend its efforts at rule-making on several bases, all rejected by the Eleventh Circuit. Notably, DOL argued that the section of the Immigration and Nationality Act from which the program draws its name – 8 U.S.C. §§1101(a)(15)(*H*)(ii)(b) – granted it indirect authority to promulgate the rules. The Eleventh Circuit, however, distinguished this provision from the immediately preceding statutory section – (H)(2)(A) –

which expressly grants DOL rulemaking authority over the agricultural worker H-2A program. "The absence of a delegation of rulemaking authority to DOL over the non-agricultural H-2B program in the presence of a specific delegation to it of rulemaking authority over the agricultural worker H-2A program persuades us that Congress knew what it was doing when it crafted these sections." *Id.*

Similarly, the court rejected the DOL's argument that the "text, structure and object" of the INA evidence a congressional intent that DOL exercise rulemaking authority over the H-2B program. The court noted that agency authority flows from express delegations from Congress. *Id.* Since that injunction was issued, these rules have never been implemented.

On remand, the District Court for the Northern District of Florida, granted summary judgment on behalf of the plaintiffs, vacating and permanently enjoining the DOL H-2B rules, finding that DOL lacked legislatively delegated authority to issue the rules. *Bayou Lawn & Landscape Services v. Perez*, No. 3:12cv183, 2014 WL 7496045 (N.D. FL. 2014). In its Order, the Court found that the INA itself contains no express delegation of authority to DOL. Comparing Congress's express grant of rulemaking authority to DOL with respect to the H-2A program, the Court found that Congress plainly never granted DOL such authority under the H-2B program. *See Bayou Lawn*, 2014 WL 7496045, at *4-*5.

The District Court also found that the Wagner-Peyser Act, 29 U.S.C. § 49, *et seq.*, likewise conferred no rulemaking authority on DOL with respect to the H-2B program because the statute did not apply to the H-2B program. *See id.* at *5. Finally, the Court addressed the Third Circuit Court of Appeals contrary decision in *Louisiana Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653 (3d Cir. 2014), and deemed the case distinguishable, specifically rejecting DOL's argument that its rulemaking authority under the H-2B program derives from its

consultative role under 8 U.S.C. § 1184(c)(1), which DOL had argued in both *Bayou Lawn* and *Louisiana Forestry*. Accordingly, the Court concluded that "DOL lacks authority to engage in legislative rulemaking under the H-2B program," and vacated the DOL's 2012 Rule and permanently enjoined its enforcement. *Id*.

Immediately afterwards, a new suit was filed in the Northern District of Florida, challenging DOL's enforcement of its 2008 H-2B regulations. *Perez v. Perez*, 3:14-cv-00682 (N.D. FL. 2015). The Plaintiff argued that because DOL's 2008 regulations were issued pursuant to the same claim of authority deemed invalid in *Bayou Lawn*, DOL's 2008 regulations are equally invalid. In its decision on March 4, 2015, the Court noted that the DOL's defenses in the new *Perez* case as to its rulemaking authority were the same which were considered and rejected in *Bayou Lawn*. Accordingly and for the reasons set forth in its decision in *Bayou Lawn*, the Court also found that DOL lacked authority to enact the 2008 regulations at issue, such that Perez was entitled to judgment as a matter of law and permanently enjoined the DOL from enforcing its 2008 regulations. It subsequently stayed its order, pending an appeal. As a result of that order, the DOL's prohibition on the collection of recruitment fees, first found in the 2008 regulations, was also found invalid, as well as the requirement that employers notify the Department of Homeland Security if the H-2B worker is terminated prior to the end of the certified period of employment. 20 CFR Part 655.

Despite the DOL's efforts in the last few years to impose new liabilities on H-2B employers, it is clear that it does not have the authority to promulgate such regulations and thus, any interpretation seeking to impose such liabilities on employers is misguided. The 2012 regulations attempted to shift pre-employment and transportation costs and require guaranteed employment for H-2B workers. Those regulations have been found invalid, and the Plaintiffs'

18

attempt here to apply an interpretation of AWPA consistent with those now invalid regulations is baseless.

On April 29, 2015, the U.S. Department of Labor (DOL) and the Department of Homeland Security (DHS) jointly issued an Interim Final Rule ("2015 IFR"). A chart prepared by the DOL showing the proposed changes to the H-2B regulations in the new rules further confirms that there is no current legal basis to impose such costs on employers. http://www.dol.gov/whd/immigration/H2BFinalRule/H2BSideBySide.htm. For example, the chart shows that no guarantee of a period of employment was previously in place; the new rules would require an Employer guarantee to offer employment for a total number of work hours equal to at least three-fourths of the workdays in every 12-week period (or, for job orders lasting less than 120 days, every 6-week period). 20 CFR 655.20(f), 29 CFR 503.16(f). The DOL chart goes on to note that under the new rules, an Employer is liable under for reasonable cost of 1) inbound travel, including related daily subsistence expenses, for workers who complete 50% of the job order, and 2) outbound travel, including related daily subsistence expenses, for workers who work until the end of the job order or are dismissed early.

As to visa expenses, the DOL specifically stated that under previous regulations, visa expenses were *not* an employer obligation under H-2B but would be under the proposed new rules.

Accordingly, Plaintiffs' claims for reimbursement of pre-employment expenses, alleged recruitment fees and for pay for a guaranteed or for the entire certified period of employment fail as a matter of law. Accordingly, their motion for summary judgment on these Counts must be denied.

19

**B.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT VI -
BREACH OF CONTRACT MUST BE DENIED.**

Count VI alleges a breach of contract claim against GLK claiming that GLK's 2010 and
2011 H-2B applications and certifications created employment contracts between Defendants
and Plaintiffs and Class Members and that GLK breached those contracts.  This claim is not
supported by either the facts or the law.  Under Wisconsin law, a valid contract requires an offer,
acceptance and consideration.  *Briggs v. Miller,* 176 Wis. 321, 325, 186 N.W.2d 163 (1922).
Offer and acceptance exist when the parties mutually express assent, and consideration exists if
the parties manifest an intent to be bound to the contract.  *Gustafson v. Physicians Ins. Co.,* 223
Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998). Plaintiffs contend that GLK's H-2B
applications are the basis for a contract between the workers and GLK.

The H-2B applications were submitted by GLK to the Department of Labor, not to the
Plaintiffs.  As acknowledged by the Plaintiffs in their depositions, no discussions occurred
between FLECTS, LaborQuest or any other individual acting on behalf of GLK which
specifically guaranteed dates of employment.  Instead, they were informed that they would be
told when to report to the appropriate consulate for visa processing and that at most, the work
would be for the season, but no specific dates were provided to the plaintiffs.

No contract of a specific duration was formed and GLK's decision to terminate the
workers was within its rights under the AWPA and under state law.  Wisconsin has long adopted
the doctrine of employment at will, allowing employers or employees to terminate without cause
at the will of either party.  *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 3d 561, 572, 335 N.W.2d
834 (1983).  To the extent the Plaintiffs rely on the H-2B application as the basis for the contract
terms, it is clear from the wording of those forms that the certified period of employment was
just that - the period in which the worker was authorized or certified to work.  As demonstrated

above, GLK's 2010 and 2011 Applications for Temporary Employment Certification did not, by its own terms, create a contract for a defined period of time.

The applications refer to a "Period of *Intended* Employment" or "validity period." In the Employer Declaration portion of the application, there is no declaration or representation as to a guaranteed, minimum or defined period of employment. To the contrary, the application specifically contemplates employment for periods shorter than the certified or valid period of employment. On page 7, paragraph #10 states:

> "Unless the H-2B worker is being sponsored by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at *the end of the period certified by the Department or separation from the employer, whichever is earlier*, as required under § 655.35, and *that if dismissed by the employer prior to the end of the period*, the employer is liable for return transportation. " (emphasis supplied).

The declaration in paragraph #11 similarly contemplates work for less than the entire certified period: "Upon the separation from employment of any foreign worker(s) employed under the labor certification application, *if such separation occurs prior to the end of the period specified in the application*, the employer will notify the Department and DHS in writing …." (emphasis supplied). Nowhere in either Application does GLK guarantee a specific period of employment. Thus, the 2010 and 2011 applications cannot form the basis of a contract claim for a defined period of employment, as they lack the fundamental term upon which such a contract could be formed.

Moreover, as demonstrated above (and incorporated herein by reference), the AWPA does not guarantee H-2B workers of a certain term of employment and thus there is no statutory right which could somehow be construed to create a contract for a defined period of employment. *Garcia v. Frog Island Seafood, Inc.*, 64 F.Supp.2d 696 (E.D.N.C. 2009).

QB\35126154.1

Similarly, Plaintiffs have no evidence that Defendants or anyone acting on their behalf promised them reimbursement for pre-employment expenses; to the contrary, they testified no one made such promises to them. (DPFOF) Nothing in the H-2B applications refers to, let alone requires or promises reimbursement of pre-employment expenses by the employer. And as demonstrated above, no law requires reimbursement of such expenses. Accordingly, Plaintiffs' motion for summary judgment as to Count VI must be denied.

## C.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT VIII MUST BE DENIED

Count VIII alleges GLK violated Wis. Stat. §§ 104.02, 104.03, 109.03(1) as a result of GLK's alleged failure to reimburse the 2010 and 2011 Plaintiffs and Class Members for recruitment, immigration, travel and other expenses that Plaintiffs and Class Members incurred primarily for the benefit of Defendants. This claim is based on the same facts as Plaintiff's claims in Counts III and VI - that Plaintiffs incurred recruitment, travel and immigration expenses primarily for the benefit of the Defendants.

Wis. Stat. §104.02 (**Living wage prescribed**), provides: "Every wage paid or agreed to be paid by any employer to any employee, except as otherwise provided in s. 104.07, shall be not less than a living wage." A "living wage" under Wis. Stat. §104.01(5) "means compensation for labor paid, whether by time, piecework, or otherwise, sufficient to enable the employee receiving the compensation to maintain himself or herself under conditions consistent with his or her welfare." Wis. Stat. §104.03 (**Unlawful wages**), provides no substantive rights and simply states: "Any employer paying, offering to pay, or agreeing to pay any employee a wage lower or less in value than a living wage is guilty of a violation of this chapter." Section 104.02 contains no reference to reimbursement of pre-employment expenses.

QB\35126154.1

Section 104.02 has been interpreted to require that an employer pay its employees at least the minimum wage (defined in Wis. Admin. § DWD 272.03(1) as $7.25 per hour currently and in 2010 and 2011) for all hours worked. *Bitner v. Wyndham Vacation Resorts, Inc.*, 2013 WL 5878724 at *4 (W.D. Wis. 2013). As noted above, Plaintiffs admit that they were paid the required hourly rates for work performed in 2010 and 2011.

Plaintiffs also claim Defendants violated Wis. Stat. §109.03 (Required frequency of payments) which provides: "Every employer shall as often as monthly pay to every employee engaged in the employer's business, except those employees engaged in logging operations and farm labor, all wages earned by the employee to a day not more than 31 days prior to the date of payment."

Neither of these statutory provisions contain reference to reimbursement of pre-employment expenses as potentially reducing wages below minimum requirements. In the absence of specific state-law statutory or regulatory authority, Wisconsin courts look generally to the interpretation of the FLSA in applying Wisconsin's wage law statutes. *See, Madely v. RadioShack Corp.*, 2007 WI App 244, 306 Wis. 2d 312, 742 N.W.2d 559. Under the FLSA, such expenses are not incurred primarily for the benefit of GLK and do not diminish the wages of the Plaintiffs and Class Members, as demonstrated above in Section A and incorporated herein by reference. Accordingly, and for the same reasons stated above, Plaintiffs' motion for summary judgment on this Count VIII must be denied.

D.     **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON ALLEGED WORK AGREEMENT, RECORD KEEPING AND WAGE DEDUCTIONS VIOLATIONS SHOULD BE DENIED.**

Plaintiffs also move for summary judgment on alleged violations by GLK to provide work agreements, maintain addresses and for allegedly unlawful wage authorizations and for

associated penalties. Because there are issues of fact as to each of these, and/or as to the appropriateness of a penalty, their motion must be denied.

As to the alleged unlawful wage deductions in 2011, there is no dispute that the Plaintiffs paid $75 per week for housing and meals, as had been the practice with H-2B workers throughout the years at issue in this case. Nor is there any dispute that GLK provided room and board to the Plaintiffs during the time they spent working at GLK. The only issue is whether the Plaintiffs signed an authorization form. As the Plaintiffs' own Proposed Undisputed Facts show, forms were signed by the 2011 Plaintiffs, with the notation of $75 dollars on the form. Their signatures, along with the history between the parties, establishes that authorization was provided. But at most, an issue of fact exists as to whether the workers' provided knowing authorizations. Moreover, the benefit they received from GLK - the room and boarding during their time in Wisconsin - offsets any alleged damages.

Regarding the failure to provide written disclosures in Spanish or work agreements, Plaintiffs have failed to show how they were allegedly damaged. Most of the Plaintiffs had worked for GLK numerous times in the past and had a general understanding of the work to be done, the general timeframe in which it would occur and general pay. They returned year after year. Moreover, in 2010 and 2011, it is undisputed that GLK relied on LaborQuest and FLECTS, and before that Diane Guerrero, to assist in coordinating visa processing, consular visits and other in-Mexico processing. Thus, to the extent that Spanish written disclosures or work agreements were not provided by their contractors, such a technical issue was not, as Plaintiffs allege, intentional nor did GLK benefit from it.

QB\35126154.1

Similarly, any alleged failures to maintain permanent addresses were unintentional and Plaintiffs have failed to show how they were harmed. Moreover, Plaintiffs have failed to show how Ryan Downs was involved in any of these record-keeping requirements.

Finally, Plaintiffs seek statutory penalties in excess of $300,000 (Dkt. 114, pp. 29-32). An award of such damages is premature, as summary judgment should be denied, for the reasons set forth above. Moreover, it is grossly disproportionate to any technical non-compliance. In previous DOL investigations for other record-keeping issues, fines ranged from $50 to $12,000. See Plaintiffs' Undisputed Statement of Facts, ¶¶138-144. Further, an award of penalties for the alleged failure to obtain housing and meal deductions is inappropriate, at most, there is a factual issue regarding whether such authorizations were provided. Moreover, imposing such penalties ignores the benefit GLK provided to the workers with housing and meals.

## CONCLUSION

For all of the above stated reasons, Plaintiffs' motion for summary judgment should be denied.

Dated: May 15, 2015.

<div style="margin-left: 40%">

Michael Aldana
State Bar No. 1020233
Sean M. Scullen
State Bar No. 1034221


s/Michael Aldana
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Suite 2400
Milwaukee, WI 53202-4426
(414) 277-5000
Attorneys for Defendants

</div>

Direct inquires to:

Michael Aldana
(414) 277-5151
michael.aldana@quarles.com

QB\35126154.1